## Exhibit Tag/ Cover Sheet

Party submitting: **PLAINTIFFS**          **Ex. #1**

**Admitted: Yes   or    No  (circle one)**

**Debtor:   MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:   12-10462 (KKS)**

*Adv. No.*:   **13-01007 (KKS)**

**Nature of Hearing/**
**Docket No:   Motion to Compel Re: Privilege**

Dated _____ , 20____.

By:_____,   **Deputy Clerk**

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CASE NO.:  12-10462-KKS
ADV. NO.:  13-01007-KKS

IN RE:

MATTHEW BRUCE HINTZE and LARINA K. HINTZE,

      Debtors.

_____/


JOHN SPENCE, SHEILA SPENCE, INTERMED
BIOMEDICAL SERVICES, INC., a Florida
corporation, DAVID WHITNEY, and FLH
HOLDINGS OF FLORIDA, LLC, a Florida
limited liability company,

      Plaintiffs/Counterclaim-Defendants,

vs.

MATTHEW BRUCE HINTZE and LARINA K. HINTZE,

      Defendants/Counterclaim-Plaintiffs/
      Third-Party Plaintiffs,

vs.

ETHAN FIELDMAN and STEVEN FIELDMAN,

      Third-Party Defendants.

_____/


| | |
|---|---|
| BEFORE: | HONORABLE KAREN K. SPECIE |
| DATE: | Thursday, December 4, 2014 |
| TIME: | 1:30 p.m. - 2:35 p.m. |
| PLACE: | U.S. Federal Courthouse<br>401 Southeast First Avenue<br>Gainesville, Florida |
| REPORTED BY: | Rhonda D. Mashburn<br>Court Reporter/Notary Public |

1   APPEARANCES:

2       WILCOX LAW FIRM
        BY:  ROBERT D. WILCOX, ESQUIRE (via CourtCall)
3       814 A1A North, Suite 202
        Ponte Vedra Beach, Florida  32082
4       Attorney for Plaintiffs/Counterclaim-Defendants

5       CHILDERSLAW
        BY:  SELDON J. CHILDERS, ESQUIRE
6       2135 Northwest 40th Terrace, Suite B
        Gainesville, Florida  32605
7       Attorney for Defendants/Counterclaim Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     THE COURT:  We are here in the adversary case of

2  Spence vs. Hintze, Case No. 13-01007.  Before the

3  court are two motions for protective order, both

4  filed by the defendants, one on which the court has

5  entered an interim order, and then also we are here

6  to conduct a status hearing.

7     We'll take appearances live in the courtroom and

8  then via CourtCall, please.

9     MR. CHILDERS:  Good afternoon, Your Honor.  Jeff

10  Childers for the Defendants.

11     THE COURT:  Mr. Childers.  CourtCall, please, Mr.

12  Wilcox.

13     MR. WILCOX:  Good afternoon, Your Honor.  Robert

14  Wilcox for the plaintiffs.

15     THE COURT:  All right.  Gentlemen, let's try

16  starting with the motion for protective order at

17  Docket No. 249, on which the court entered an interim

18  order dated November 18, 2014.  Mr. Childers.

19     MR. CHILDERS:  Yes.  Your Honor, I don't think

20  the dates are quite run yet, but we have made

21  progress and I can give an interim report to the

22  court.  There were two issues, as the court may

23  recall, an issue about e-mail attachments and an

24  issue related to carbon copy or blind carbon copy

25  recipient names.

1       So we have since the entry of the order reviewed

2   the entire production top to bottom and have

3   determined that all the attachments we believe that

4   are material were provided.  However, they may not

5   have been in as clear a way as possible.  The

6   attachments were saved in a separate place than the

7   e-mails that they were related to.  They did share a

8   file name, but it may not have been immediately

9   obvious which one went with which.

10      So we're reproducing the e-mails that have

11  attachments with the attachments attached directly

12  to those original e-mails.  And I believe I saw an

13  e-mail from Mr. Wilcox just now asking for the

14  documents in their original format as well.  And so

15  we'll copy those into another disc and send that off

16  to him so he'll have it in each of the three ways and

17  it should make it very clear.

18      We'll also be pointing out to Mr. Wilcox there

19  are some e-mails where at the top it says that there

20  are attachments, but if you look into the body of

21  the e-mail, you'll see that there's a file name in

22  brackets under certain people's e-mail signature.

23  In particular, Mr. Spence has a graphic logo.  So

24  every time one of his signatures appears there, it

25  counts as an attachment.

1      It should be clearly obvious that it's just his

2    logo, and we're going to point that out and make sure

3    that satisfies his concerns about that.  So I believe

4    that between those several actions, we'll have

5    resolved the issue to his satisfaction, or at least I

6    hope so, in relation to the e-mail attachments.

7      We also looked into the issue of the

8    identification of names that had been carbon copied

9    or blind carbon copied on e-mails, and what we

10   discovered is that the e-mail system that they use

11   only prints those categories when there is a name in

12   those categories.  So we have found examples of each

13   of those.

14     We found examples where there is neither a carbon

15   copy or blind carbon copy and you'll see that neither

16   one of those appears.  We found examples from Mr.

17   Wilcox where just carbon copy names are included and

18   you'll see it then pops up.  And we found blind

19   carbon copy examples in there as well.  So we'll be

20   providing those to Mr. Wilcox and hopefully that will

21   resolve that issue.

22     The third component of the interim order was for

23   us to confer on a resource that could assist us with

24   reviewing electronically stored information, if

25   necessary.  Mr. Wilcox and I have not done that yet,

1   in the hope or anticipation that we can resolve the

2   issues without needing to go to that final step.  If

3   we need to do so, we still have time in the order,

4   and if we need more time, the order indicates that we

5   can file a joint motion to extend it.

6       THE COURT:  Thank you, Mr. Childers.  Anything

7   further on that, Mr. Wilcox?

8       MR. WILCOX:  No, Your Honor.  I look forward to

9   receiving the attachments in their native format.

10  With regard to what Mr. Childers was saying about the

11  blind carbon copy, we just want to make sure that we

12  can see -- for instance, there were e-mails sent out

13  to friends and family or unidentified parties and to

14  potential investors or friends, and we just want to

15  know who those are.

16      So we think it's crucial that all those names

17  and e-mail addresses are listed.  I couldn't exactly

18  understand from Mr. Childers' answer whether that's

19  going to be the case or not.  If that's the case --

20  and, of course, we haven't received the documents,

21  but the deadline is, I believe, next Tuesday.  So,

22  you know, we will reserve judgment as to whether Mr.

23  Childers has, you know, done what the court asked,

24  and we appreciate the representations that he's made.

25      But I just want to make sure that we're all on

1    the same page regarding what we're asking for with

2    regards to these Bcc parties.

3        THE COURT:  Anything further on that, Mr.

4    Childers?

5        MR. CHILDERS:  No, Your Honor.

6        THE COURT:  All right.  Very well.  Then we

7    will simply continue the hearing on this motion for

8    protective order again as in essence a status hearing

9    to the court's next docket on January the 8th.

10       Moving now to the motion for protective order at

11   Docket No. 266, I have reviewed that motion and the

12   response objection to the motion.  Mr. Childers, it's

13   your motion.

14       MR. CHILDERS:  Thank you, Your Honor.  And to

15   make it clear -- it may not be clear from the

16   pleadings -- we have produced a large volume of

17   relevant e-mails.  The areas of dispute are very

18   narrow.

19       Even within the request numbers -- and we're

20   seeking protection only for request numbers one, two,

21   11, 12, 13 and 16, and even within those, we're only

22   seeking partial protection.  So, for example, Mr.

23   Wilcox defined the investor group with a large number

24   of names, and we're only asserting the joint defense

25   exception as to Bruce Hintze, Chris James, and the

1  debtors.  So as to all the other names in that group

2  we have produced.

3      As the court is aware from reviewing the

4  pleadings, the first of what I believe are two issues

5  is that joint defense privilege issue, and I guess a

6  subset would be, you know, whether the joint defense

7  issue applies in this case; and then second, from

8  what date should we be permitted to claim a joint

9  defense privilege, and we assert a joint defense

10 privilege from May 1st of 2012.

11     The plaintiffs' response has questioned that

12 date, but has not set forth any other date that they

13 believe would be the appropriate date.  So I'm not

14 sure that issue is ripe to be decided today.

15     THE COURT:  The issue of whether there's a joint

16 defense agreement at all or the issue from when it

17 would begin?

18     MR. CHILDERS:  Right.  So the first issue is

19 whether there's a privilege at all.  The second issue,

20 if there is a privilege, from what date would the

21 privilege extend.

22     So I believe that we have pure -- maybe not a

23 pure issue of law, but we have a fairly medium legal

24 issue as to the privilege itself.  I don't know that

25 anybody has questioned the factual basis for the

1    privilege, but certainly it's the plaintiffs' right

2    to do so.  The second issue is the date, and I don't

3    know that we can address that today.

4        The other issue that is involved in the motion

5    for protective order is in relation to confidential

6    commercial information.  In particular, the

7    plaintiffs are seeking communications between the

8    debtors and other potential investors that the

9    plaintiffs are not aware of and that did not invest

10   in TutoringZone.

11       The defendants' objection to producing that

12   information is two-fold.  One, these are resources

13   that it took a lot of networking and investment to

14   build the actual relationships with these potential

15   investing parties; and two, a concern for how the

16   information -- the identity of these folks would be

17   used, that may negatively impact the debtor's

18   ability to utilize those resources in the future.

19       So it's not that the content of the

20   communications is the concern.  It's the identity

21   and nature of the folks and given that this is a very

22   attenuated area of discovery.  These are not folks

23   who invested.  They didn't participate -- they didn't

24   go forward even from a very preliminary stage.  For

25   example, they didn't receive the same financial

1    disclosures that the plaintiff group did.

2        These guys were all out of the picture long

3    before we got to that stage, so it's not clear what

4    the usefulness or relevance of that information would

5    be.  So given the commercially sensitive nature and

6    the low value of that information to this case, we

7    would ask for protection.

8        In the event that the court was inclined to give

9    the plaintiffs, you know, some access to that, then

10   we would ask for the ability to perhaps redact those

11   communications to obscure the identity of the folks

12   while disclosing perhaps the content of the

13   communications so that the plaintiffs can satisfy

14   themselves that it wasn't useful.

15       But, again, because these folks are so attenuated

16   from any of the claims in the case, I think it would

17   be appropriate at this time, unless they discover

18   some other information suggesting otherwise, that we

19   have full protection on those communications.

20       THE COURT:  All right.  Thank you.  Mr. Wilcox.

21       MR. WILCOX:  Thank you, Your Honor.  First of

22   all, we certainly question the factual basis of the

23   assertion of the privilege.  The motion has the

24   interesting language that counsel for the defendants

25   began representing Christopher James and related

1    entities on or around May 1, 2012, and the defendants

2    essentially sometime after.

3        We don't think it's our burden to identify the

4    dates.  You know, we don't know what that date is.

5    It doesn't say in the schedules that the debtors

6    filed what that date was.  Until that occurs, there

7    clearly can be no joint privilege, and it's not our

8    burden to identify dates in the applicable privilege.

9    Let's be clear about what we're talking about here.

10        Christopher James was a creditor of the Hintzes.

11    We're talking about the assertion of a joint defense

12    privilege between a creditor and a debtor when the

13    debtor subsequently transferred assets to the benefit

14    of the creditor, and this defendant is now asserting

15    that -- we are asserting -- excuse me -- we are

16    asserting and the Trustee is asserting that that was

17    a fraudulent transfer.

18        That transfer took valuable assets and put them

19    out of the reach of creditors and allowed these

20    debtor defendants to get a personal credit in

21    connection with the transfer to TutoringZone 2.  They

22    transferred corporate assets through an alterego

23    company for their personal benefit.  The idea that

24    somehow Mr. Childers represented both the creditor

25    and the debtor, both the transferee and the

Page 12

1    transferor, is quite frankly very troubling, and it's

2    always been troubling.

3         But before we even get there, we need to know

4    what the dates of the representation are and the

5    court needs to know what the dates of representation

6    are.  This issue has been out there for a while and

7    it seems to me they just haven't given the court

8    enough to show that there's any privilege in that

9    regard.

10        Secondly, what is the joint -- what were they

11   defending against prior to the filing of this

12   bankruptcy?  There was no litigation that I'm aware

13   of, certainly not from my clients, pending at that

14   time.  So, you know, to my understanding, to assert

15   this privilege, we need to understand the dates, the

16   nature, the scope of the alleged joint defense, and

17   what they were proposing to be defending against.

18   None of that is in the motion and the court should

19   deny the motion on that basis alone.

20        And, Your Honor, also as we asserted in our

21   papers, nothing in this is new except the assertion

22   now that they are asserting the privilege from May 1,

23   2012, which is, according to the motion that's on

24   file, prior to the date that Mr. Childers was

25   actually contacted by the Hintzes.  We'd also reserve

1    the right to assert a fraud defense, but we just

2    don't have enough information to do that at this time.

3        I'm glad to hear Mr. Childers say that he's only

4    seeking partial protection with regard to the

5    individual requests, because the motion as stated

6    seeks complete protection as to various requests.

7    With regard to the confidential information, I'm just

8    not aware of any confidential information privilege

9    here.

10       My clients have three basic causes of action

11   here:  Objection to the dischargeability of these

12   debts, and then also two objections to the discharge.

13   With regard to the dischargeability issue, obviously

14   it related to loans and what we believe was the

15   fraudulent information we received in connection with

16   making those loans.

17       What we're asking for is who else was contacted,

18   what information did they receive, and maybe they

19   received additional information and then decided not

20   to make these loans.  That's very useful information.

21   Secondly, with regard to confidential business

22   information, these are debtors who chose to file a

23   bankruptcy case.  When they did that, they took on an

24   obligation to open up their books.

25       Also, these loans are personal loans.  These were

1   not loans to TutoringZone.  These were loans to the

2   debtors themselves.  And we all agree that Tutoring-

3   Zone 1, as a result of the transfers of which we and

4   the Trustee complain, is no longer an operating

5   entity.  So TutoringZone can have no confidential

6   information either.

7       Again, these are points laid out in our response

8   to it, but, you know, we need to see that information.

9   We're not asking for anything unusual.  What we

10  have are e-mails from Matt Hintze going out to

11  unidentified parties saying this is what's going on,

12  I'm about to get control of this company and every-

13  thing is going to be hunky-dory, and I need money.

14      And what we ask in connection with the e-mails

15  is that all the recipients of those e-mails be

16  identified, and it's taken a long time to do it.  And

17  this request goes right along with that.  It says

18  what were the communications with those people?  What

19  were those people promised?  Why did those people

20  decide to make loans or not make loans?  Did they

21  realize early on that there were no non-competes?

22      Those kind of things are very relevant to this

23  action, Your Honor.  Thank you.

24      THE COURT:  Thank you, Mr. Wilcox.  Mr. Childers.

25      MR. CHILDERS:  Thanks, Your Honor.  I'll go in

1    reverse order.  Mr. Wilcox has yet to explain, while

2    it may be interesting to know why other folks decided

3    not to invest, how that would be relevant in any way

4    to any claims that his clients have made in this case.

5    Suppose the prior parties decided it was a terrible

6    investment.  How would that be relevant to any of the

7    claims that his clients have made that my parties

8    submitted financials to them that were fraudulent?

9        Suppose that my client submitted fraudulent

10   financials to these other parties who are not parties

11   to this litigation.  How would that be relevant to

12   any information that my clients gave to his clients?

13   Suppose that my clients told them and they were fully

14   aware that there were no non-competes with the tutors.

15   How is that relevant to what my clients told the

16   plaintiffs?  That evidence would be inadmissible.

17       So it's not clear from Mr. Wilcox' presentation

18   just how that information would be useful.  So again

19   I would ask that we have complete protection on those

20   until there is a reasonable explanation from the

21   plaintiffs about how any of that highly sensitive

22   information could be useful to them or lead to any

23   admissible evidence in this case.

24       As to the joint defense privilege, you know, this

25   is not a complicated case.  The facts by now are well

1    known to all of us.  In October of 2011, at least

2    two of the advisory board members were threatening

3    litigation against TutoringZone.  David Whitney in

4    particular had e-mailed the group multiple times

5    making noise about an involuntary bankruptcy filing.

6        Kevin Ogilby was not one of the plaintiffs, but

7    was one of the three advisory board members, had

8    circulated an article about the process of invoking

9    involuntary bankruptcy.  And when Mr. James was asked

10   in May of 2012 to invest more money into Tutoring-

11   Zone, he wanted assurance that his investment would

12   be secured, notwithstanding all this noise coming

13   from the advisory board about things that they were

14   threatening to do.  It was at that time that a joint

15   defense arose.

16       THE COURT:  But, Mr. Childers, how can I know

17   that?  I can't accept just representations.  We don't

18   have any evidence.

19       MR. CHILDERS:  Perhaps we need an evidentiary

20   hearing.

21       THE COURT:  I think we probably do.  I'm going

22   to go ahead and cut to the chase on some of this and

23   I will welcome both of your comments when I finish.

24       I have reviewed a significant amount of material

25   since reviewing this motion for the first time and

1    the response, including one of the cases that was

2    cited, I believe, by Mr. and Mrs. Hintze, and that

3    was the Pensacola Firefighters' Relief Pension Fund

4    vs. Merrill Lynch, at 2011 Westlaw 3512180.  That is

5    a district case out of the Northern District of

6    Florida.

7        And in that case the court ultimately determined

8    that there was a joint defense doctrine that would

9    apply, but prior to doing so the court had a complete

10   itemized privilege log from the party asserting the

11   privilege and also had affidavits from at least five,

12   if not more, attorneys attesting to the basis for the

13   communications.  I don't have any of that here, and

14   that's one of the things that the plaintiffs have

15   raised in their objection, is that in order to assert

16   a defense under the common interest doctrine or the

17   joint defense doctrine, you have to have a specific

18   privilege log.

19       Going even farther back, though, it seems to me

20   after reviewing the applicable cases, in particular

21   the U.S. Supreme Court case of Fisher vs. The United

22   States, it appears to me that the attorney-client

23   privilege has to be there before any communications

24   can be protected under any common interest doctrine

25   or common defense doctrine.  I'm not going to go as

1     far as to call it a privilege because it really isn't

2     a privilege.  It's a doctrine that kind of piggybacks

3     on top of the attorney-client privilege.

4         Well, what's the attorney-client privilege?

5     Well, it applies when a party communicates with his

6     or her attorney for the purpose of obtaining legal

7     advice or getting legal assistance with a pending

8     matter.  That has to occur first before anyone can

9     even have a protection against a communication being

10    discovered into under any common defense doctrine.

11        So without a log to see what exactly it is that

12    is being -- that the defendants are requesting should

13    be protected, we can't even tell whether the bottom

14    line exists, and that is whether it was even an

15    attorney-client privilege communication to begin

16    with.

17        If, for example, Mr. Hintze at one point spoke

18    to Mr. James at one point, regardless of whether the

19    two of them were represented at the same time or at

20    different times by Mr. Childers, if Mr. Childers

21    and/or Mr. James's attorney, when he obtained another

22    one, weren't involved in those communications, then

23    I would have to see case law showing me why those

24    communications could possibly be protected, even

25    under a common interest doctrine or a common defense

1    doctrine claim of privilege, because those were not

2    communications between counsel for the parties.  They

3    were communications between the parties.

4        Further, it appears to me from reading this case

5    law that if a communication, even if it was with an

6    attorney, involved something other than legal

7    advice -- I'm going to use a very simple example.

8    If a person were to call his or her attorney and say,

9    "I just found out that X piece of property is for

10   sale for $50,000.  Do you think that's a good deal?"

11   That to me doesn't sound like legal advice.  That

12   sounds like business advice.  That may or may not end

13   up being a privileged communication.

14       On the other hand, if the person called the

15   attorney and said, "I just found out this piece of

16   property is for sale for $50,000, but I've been told

17   there might be a title issue.  What do you think I

18   ought to do?"  That might be a whole different

19   category, because at that point it appears that the

20   lawyer's legal skills are coming into play.  And so,

21   again, without a privilege log, number one, I don't

22   see how we can possibly determine what communications

23   might or might not be covered here.

24       Secondly, with respect to whether or not the

25   parties are entitled to assert even if communications

1    were privileged, if they're claiming that there was

2    some sort of common interest doctrine in play or

3    common defense doctrine, the motion for protective

4    order alleges that Mr. James hired Mr. Childers --

5    let me see what paragraph it is -- May 1 of 2012, and

6    that Mr. Childers had began representing James and --

7    quote, unquote -- "related entities," and those are

8    set forth in a footnote.  And then as Mr. Wilcox

9    points out, it says sometime after that Mr. Childers

10   began representing the defendants.

11       Then in paragraph nine of the motion for

12   protective order, it asks for protection of all

13   correspondence between the defendants, Mr. and Mrs.

14   Hintze and James, after May 1, 2012, and it says

15   that that correspondence was exchanged under the --

16   quote -- "protections of a common interest doctrine."

17   But once again, the common interest doctrine can only

18   come into play if two things occur.

19       Number one, if the communications we're talking

20   about were privileged to begin with under the

21   attorney-client privilege, which if they were

22   strictly communications between Mr. James and Mr.

23   and Mrs. Hintze may not be; and number two, if the

24   parties can show, regardless of whether it was in

25   writing, that there was some sort of common interest

1    at the time.

2        And I agree with Mr. Wilcox from the standpoint

3    that, at least as far as we know, a debtor's interest

4    and a creditor's interest are not necessarily

5    synonymous.  They're usually not synonymous at all.

6    Whether there was some other -- quote, unquote --

7    "common interest" that would be protected remains to

8    be seen.

9        Paragraph 10 of the motion says that Bruce

10   Hintze, parent of the defendants, consulted with

11   counsel for the plaintiff -- that must mean Mr.

12   Childers -- on or around June 3, 2012.  It does not

13   tell us whether that was consulting for business,

14   whether it was consulting for the purpose of

15   protecting Mr. and Mrs. Hintze, or whether it was

16   consulting for the purpose of attempting to retain

17   counsel.  We don't know.

18       And then it just categorically says, "All

19   correspondence shared between the defendants and

20   Bruce Hintze was made confidentially."  Well, maybe

21   between them they agreed that it was confidential,

22   but that doesn't necessarily mean it's binding on

23   anyone else.  And it certainly doesn't connect the

24   dots and show how, in any way, shape or form, that

25   could possibly be attorney-client privilege and

1     therefore part of a common interest doctrine.

2          As a matter of fact, that's not even alleged in

3     paragraph 10 as to communications between Bruce

4     Hintze and Mr. and Mrs. Hintze.  And then it says,

5     "Neither defendants nor Bruce Hintze have waived that

6     privilege."  There's no privilege in that paragraph

7     asserted, and so I can't tell what they supposedly

8     had to either waive or not waive.

9          Paragraph 11 alleges that Christopher James,

10    Bruce Hintze, Cynthia Frenchman and the defendants

11    have a joint defense agreement in regards to claims

12    being brought by the Trustee in related Adversary

13    Case No. 14-01005, and all potential claims by the

14    plaintiffs in regards to TutoringZone.  We have to

15    have proof on that.  We have zero proof at this point.

16         The opinions that I've read on this issue at

17    minimum take testimony or affidavits from the parties

18    attempting to assert the privilege so that the court

19    can determine what facts it's making a determination

20    based on.  Then it goes on to say in paragraph 11

21    that communications were exchanged between the

22    parties for the limited purpose of assisting in their

23    common cause.

24         Well, by then, as pointed out by Mr. Wilcox, what

25    common cause was there between Christopher James and

1    Bruce Hintze?  What common cause was there between

2    Bruce Hintze and the defendants?  What common cause

3    was there between Cynthia Frenchman, whom I recognize

4    later the motion says was an agent of Mr. James's

5    entities?

6        What common cause do we have here and how could

7    conversations that took place in May and June of 2012

8    have been part of a joint defense agreement against

9    an adversary that was filed in 2014?  So all of those

10   questions remain unanswered here.  I could go on and

11   on with the different paragraphs of this motion, but

12   I think the two of you can see where I am.

13       We need a specific itemized log of any

14   communications and/or documents that have been

15   requested, to which the defendants are objecting, and

16   we need evidence that any such communications were,

17   in fact, privileged communications under the attorney-

18   client privilege to begin with.  And then we would

19   need further evidence to determine if any kind of

20   joint defense agreement existed and, if it did, when

21   it occurred, whether there is any common interest

22   doctrine that could possibly come into play here.

23       With respect to the claims of the commercially

24   sensitive information, the defendants allege that the

25   plaintiff owns the only competitor to TutoringZone,

1    which is Study Edge.  The defendants claim that the

2    plaintiffs are fishing for commercial litigation

3    strategy information and that they had confidential

4    relationships with potential investors.

5       Mr. Childers, I see that you cited one Florida

6    case in your pleadings, which is the Inrecon vs.

7    Village Homes at Country Walk, at 644 So.2d 103, but

8    because, number one, this was a loan to the debtors

9    individually and, number two, TutoringZone 1 was

10   defunct at the time this bankruptcy was filed, I'm

11   not sure the facts of the Inrecon case have a bearing

12   on what we're dealing with here.

13      So I need further briefing on what privilege

14   could possibly apply to this so-called commercially

15   sensitive information, number one, if there is one;

16   and number two, why the court cannot order this

17   information to be disclosed under an order requiring

18   the information to be kept confidential by the

19   plaintiffs and to be used for only one purpose and

20   that is in prosecution of this particular case,

21   because I'm simply unaware of any rule of evidence

22   under which this information under these facts could

23   be properly kept away from the plaintiffs.

24      Mr. Childers, I'll give you the first opportunity

25   to respond to the court's comments.

1        MR. CHILDERS:  Well, Your Honor, I would be happy

2   to specifically brief the issue of commercially

3   sensitive information.  I believe that there is a lot

4   of case law on that area.  You see it quite commonly

5   when creditors who have not yet obtained a judgment

6   are asking for post-judgment information that's

7   confidential, bank account statements, tax returns,

8   things like that.

9        THE COURT:  But isn't that current information,

10  not past information?

11       MR. CHILDERS:  Well, three years of previous tax

12  returns would be past information I would say, unless

13  I'm misunderstanding the point.  Two years of bank

14  statements, you know, are all confidential

15  information.  It's no less confidential because it

16  happened two years ago.

17       But in the context of commercial, I think there's

18  similar case law on this issue.  I think it's a

19  pretty common litigation tactic to probe your

20  adversary for things that you know are going to be

21  harmful if they have to disclose.

22       THE COURT:  Well, that may be true and I'm not

23  trying to prejudge this.  But the question here and

24  as set forth in your motion, it says that the

25  complaint alleges among other things that -- just a

Page 26

1     moment.

2          MR. CHILDERS:  While you're looking that up, Your

3     Honor --

4          THE COURT:  No, just give me a moment.  In

5     subparagraph (f) on Page 2 of the motion, you recite

6     that one of the allegations against your clients is

7     that the debtors were never in a position to obtain a

8     refinancing of $935,000 in debt in order to repay the

9     loan from the Spences.

10         MR. CHILDERS:  Right.

11         THE COURT:  So why wouldn't the information

12    about who the Hintzes tried to get financing from be

13    relevant here?

14         MR. CHILDERS:  I think that there's a timeline

15    confusion.  The communications that Mr. Wilcox are

16    seeking happened prior to the breakup with the

17    Fieldmans, not at the time of, you know, a year

18    following the breakup when the refinancing was

19    supposed to occur.  If there were communications

20    after that time, after the breakup, I would agree

21    with the court those would probably be relevant.

22         We're talking about before the breakup even

23    happened.  So it's not just old history, it's ancient

24    history.  It predates the original loans by the

25    Spences to the Hintzes that were supposed to have

1    been -- you know, they had a balloon in a year.  So

2    I guess the idea was that they would be somehow

3    refinanced out or, you know, some debt exchange or

4    something.  So it's those ancient communications with

5    commercially sensitive persons that are at issue.

6        I would be happy to provide the more recent

7    stuff.  I think it would be relevant.  The plaintiffs

8    have objected to probably -- I don't want to over-

9    estimate here -- but 70 or 80 percent of our requests

10   that they have deemed are not relevant, not relevant.

11   Not only are these communications not relevant, but

12   they're also potentially very harmful to our clients.

13       THE COURT:  All right.  Then go ahead and brief

14   it, but I'll need some kind of facts to show

15   relevance, I suppose.

16       MR. CHILDERS:  I think the burden is on the

17   plaintiffs to show that this information would be

18   relevant to the case.

19       THE COURT:  Mr. Wilcox.

20       MR. WILCOX:  Your Honor, I'm looking for the --

21   to see the exact request we're talking about, and I'm

22   trying to understand what Mr. Childers' position is

23   today that somehow -- you know, it seems to me that

24   there are a number of relevant periods here.  I'm

25   going to see if I can lay them out.

Page 28

1         One is that period of the breakup of the

2    ownership of TutoringZone 1 and the loans that my --

3    you know, the period leading up to my clients making

4    the loans in May and June of 2011.  Okay?  We believe

5    we got incorrect financial information.  This

6    information we're requesting is essentially the same

7    as our requesting information that these defendants

8    gave to banks, information to which there has been no

9    objection.

10        Essentially we want to check to see if the

11   financial information that we got is the same as what

12   other people got.  Certainly as to the relevance of

13   that information, it certainly is possible that the

14   defendants made representations -- made accurate

15   representations -- and let's not forget that these

16   defendants were under a specific time when they had

17   to have that money available.

18        It is certainly possible that the defendants gave

19   accurate information to a number of people, could not

20   get the funds anywhere else, and then gave slightly

21   more favorable information to my client.

22        THE COURT:  All right.  Let me stop you right

23   there and we'll just kind of piece this apart.  Mr.

24   Childers earlier suggested what if we give the

25   information, but we redact the names.  That would at

Page 29

1    least get you to where we are now, which is a

2    determination as to whether different information may

3    have been given out to third parties than was given

4    out to your clients; correct?

5        MR. WILCOX:  That would, Your Honor, but that

6    presupposes that somehow the business contacts are

7    something out of the ordinary.  But I understand --

8    you know, again, if there's a basis to think that

9    the investors' identities were somehow confidential,

10   we're talking about a transaction that has now

11   occurred three and a half years ago.

12       Is the identity of the -- or are the identities

13   of the individuals that they contacted somehow

14   incredible value at this point that outweighs the

15   general right that my clients have to ask for these

16   communications?  I just don't think so.

17       THE COURT:  Well, and you may be right, but I'm

18   trying to decide how far we can get today.  And at

19   least on that point it seems to me that if I order

20   the defendants to provide copies of communications to

21   these other people or entities during this point in

22   time which was leading up to the loans by your

23   clients that took place in May and June of 2011 ,

24   without the names of the parties to whom that

25   information was given -- if in fact that information

1    is synonymous with what your clients got, then

2    presumably that should be the end of the inquiry.

3        If it isn't synonymous, then, yes, you may be

4    absolutely correct that the next step would be for

5    them to divulge the identities of the parties that

6    were the recipients of that information.

7    MR. WILCOX:  Your Honor, if I may give an example

8    based on information we learned in the case.  We've

9    determined that there was an individual who made a

10   short-term loan to Mr. Hintze of approximately

11   $150,000, then was repaid within two days of when my

12   clients put in additional information.  I have

13   interviewed that individual.

14       The type of information that person will receive

15   in getting that short-term -- you know, that that

16   individual received seems to me to be very relevant.

17   If the court is not inclined to give us the names of

18   the individuals without our determining -- you know,

19   I leave that to the court's discretion.

20       However, I would bet the vast majority of this

21   information was transmitted by e-mail anyway, that

22   we're supposed to get the e-mails from all the Bcc

23   parties, it seems like that's not much -- you know,

24   that's really kind of a spurious argument to argue

25   that the identities of these people should not be

1    disclosed.

2         THE COURT:  Mr. Childers.

3         MR. CHILDERS:  Just as an example of how far

4    down the rabbit hole we are here, the financial

5    information that Mr. Wilcox keeps saying our clients

6    provided to his clients was provided to his clients

7    by his clients.  It was assembled and sent to the

8    group by David Whitney.

9         MR. WILCOX:  Your Honor, that's just not right.

10        MR. CHILDERS:  And the documentary evidence fully

11   supports that.

12        THE COURT:  I don't think that that's relevant

13   to what I'm trying to do today.  We are here on a

14   request for production of documents and a motion for

15   protective order, and the question is what documents

16   the defendants should have to produce.

17        And in this particular category, at least for

18   today, the plaintiffs want to see whether different

19   financial information was sent to third parties than

20   was sent to them at a specific point in time.  I

21   believe that that is an entirely reasonable request.

22   The defendants are saying, "Well, we don't think that

23   we should have to disclose the people to whom we gave

24   that information."  Am I right, Mr. Childers?

25        MR. CHILDERS:  What I'm saying to you is that in

1    every case where a trading partner of my clients has

2    become publicly known, that person or entity has

3    been the subject of an anonymous campaign of letter

4    writing to destroy the relationship between my

5    clients and those folks and put on notice for that.

6        THE COURT:  Mr. Childers, then file a lawsuit.

7    We're not here to -- Mr. Childers, I have no evidence

8    here.  I have one party asking for information and

9    the other party saying, "We don't want to give it."

10   My role is to try to determine what should be done.

11       So on the issue of the so-called sensitive

12   commercial information, I'm going to grant the

13   request and overrule the motion for protective order

14   and order the defendants to provide that information

15   with the names of the recipients redacted.  That is

16   without prejudice to the plaintiffs' right to request

17   the names of the recipients if it can prove that the

18   information that was produced to these other parties

19   was different than was produced to them at the time,

20   or some other material fact to this case.  You may

21   brief the issue of whether or not the defendant

22   should have to produce the names of the recipients at

23   all, if you would like to.

24       Specifically what request for production are we

25   talking about here, Mr. Childers or Mr. Wilcox?  I

1    know at the very beginning of this hearing Mr.

2    Childers indicated that we're only here on requests

3    one, two, 11, 12 and 16.  I would like the record to

4    be entirely clear as to specifically which of those

5    we are on at this moment.

6        MR. CHILDERS:  Your Honor, I think 13 is included

7    in that list as well.  So the complete list is one,

8    two, 11, 12, 13 and 16.  So I believe that all of the

9    requests except for two are related to the joint

10   defense issue.  Request number two is related to the

11   commercially sensitive relationship issue.

12       THE COURT:  And that is -- request number two

13   reads, "All documents reflecting any communication

14   during the period from January 1, 2011, through the

15   petition date between any of the prospective

16   investors and you or your agents."  Is that correct?

17       MR. CHILDERS:  That's correct, Your Honor.

18       THE COURT:  All right.  That is my ruling at

19   this moment and without prejudice as to the request

20   for production number two.  With respect to the

21   request for production number one, 11, 12, 13 and

22   16, the defendants have 15 days within which to

23   produce an itemized privilege log of all of the

24   communications.

25       How much time do the parties need to brief the

1    issue of -- well, I need to know also, I guess by

2    affidavit at minimum, what facts the defendants claim

3    give rise to their claims of joint defense or joint --

4    I shouldn't say joint -- of common interest doctrine.

5        MR. CHILDERS:  Your Honor, on this one, I'm not

6    sure affidavits are going to be the case.  I think

7    we might need to have a hearing so that we can ask

8    questions and cross examine and redirect as necessary.

9        THE COURT:  Well, we may need a hearing as to

10   some.  We may not need a hearing as to others.  Once

11   again, we need some sort of threshold to establish

12   whether or not each such communication contained or

13   was attorney-client privilege at all.

14       MR. CHILDERS:  Well, presumably the privilege

15   log, included with the information that's supposed to

16   be on it, would indicate at least the threshold basis

17   for the privilege.

18       THE COURT:  Mr. Wilcox.

19       MR. WILCOX:  Your Honor, the claims of privilege,

20   you know, are so broad here that -- you know, the

21   other thing is this process -- and I understand -- I

22   appreciate the court wants to do it very -- be very

23   careful here, but this is really delaying the

24   litigation at this point.  You know, this request was

25   sent out in August.  It's a pretty basic request.

1        But as far as the timing, the sooner the better

2    on that.  But I think we need affidavits to establish

3    that there's anything to even talk about.

4        THE COURT:  That's my problem.  I'm not sure,

5    Mr. Childers, in the affidavits I know that there's

6    anything even out here to have a hearing on.

7        Under Fisher vs. United States, the Supreme Court

8    listed the elements of attorney-client privilege

9    as, number one, "A party is or sought to become a

10   client."  Number two, "The party that they consulted

11   with was a lawyer and was acting as a lawyer at the

12   time of the communication."

13       Number three, "The communication was, in fact,

14   that the client communicated to the lawyer without

15   the presence of strangers to secure a legal opinion,

16   legal services, or assistance in a legal proceeding."

17   And then finally, "That the party asserting the

18   privilege hasn't waived it."

19       The Firefighters case that I referred to earlier

20   in talking about whether a joint defense agreement

21   or common interest doctrine exists says that there's

22   got to be an agreement to cooperate through a common

23   enterprise towards -- and I quote -- "an identical

24   legal strategy."  Number two, that the communications

25   were given in confidence and that the client

1    reasonably understood this and it requires the

2    communication to be shared among counsel.

3        I think that last prong, at minimum, seems to

4    be missing in the allegations in the motion for

5    protective order.

6        MR. CHILDERS:  Your Honor, I think I understand

7    what the court needs.  We'll get to work on that.

8    And this is not -- this is an investment of time for

9    the case, because the plaintiffs have raised the

10   exact same privilege and we'll be right back here

11   switching roles --

12       THE COURT:  Okay.

13       MR. CHILDERS:  (Continuing) -- and making the

14   same arguments going back the other way.  So at least

15   now we have a framework and the plaintiffs can get

16   prepared for their turn when we have the same

17   argument.

18       THE COURT:  All right.  Then 15 days for the

19   defendants to provide a written privilege log and 20

20   days for the parties to brief -- well, I shouldn't

21   say that -- privilege log and affidavits setting

22   forth at least the minimal facts on which they assert

23   the various privileges or doctrines that are being

24   asserted, who was represented by whom, who

25   communicated with whom, so that we can determine

1    whether there's any foundation at all for some of

2    these communications to be claimed under any

3    privilege, not to mention a common interest or common

4    defense doctrine.

5        I'm not going to schedule an evidentiary hearing

6    at this time, but I'm going to continue the hearing

7    on this motion to the court's docket on January the

8    8th.  It may be that we will set this the afternoon

9    before that, January the 7th, because we've already

10   scheduled a two-hour evidentiary hearing for the

11   afternoon of the 8th.

12       So we'll either be back here on the afternoon of

13   January the 7th, at approximately 1:30, or sometime

14   on January the 8th.  I'm going to set aside two hours

15   for this hearing for additional argument and I want

16   us to be prepared and counsel to be prepared to

17   address the claims on the log one item at a time or

18   have dealt with them already by the time the hearing

19   begins.

20       If we cannot resolve the issues on the affidavits

21   and the privilege log, then we will look at the

22   calendar and set as soon as I can a full-blown

23   evidentiary hearing on whether there is any attorney-

24   client privilege and, if so, what it may apply to and

25   to whom.

1       Any questions, Mr. Childers?

2       MR. WILCOX:  Your Honor --

3       THE COURT:  Just a moment, Mr. Wilcox.

4       MR. CHILDERS:  No, Your Honor.

5       THE COURT:  Mr. Wilcox.

6       MR. WILCOX:  Thank you, Your Honor.  If we could,

7  can we take a look at the request we're talking

8  about?  Because my understanding is that number 10

9  is not an issue.  There is no objection to request

10  number 10.  Request 11, "All documents reflecting any

11  communications during the period of June 1 -- June 4,

12  2011, through the petition date with Mr. James."

13       My understanding from Mr. Childers' argument is

14  that there was no privilege until May 1, 2012.  Based

15  on that, they should have to produce documents prior

16  to May 1, 2012 immediately.

17       THE COURT:  Mr. Childers.

18       MR. WILCOX:  They've acknowledged that there's

19  still privilege during that period.

20       MR. CHILDERS:  Your Honor, there's no motion to

21  compel set for hearing today, number one.  Number two,

22  I can represent to the court and to Mr. Wilcox that I

23  don't have any communication with Mr. James preceding

24  my engagement with him.  And number three, I don't

25  have the request and our response in front of me to

1    see if we raised any other objections to that request

2    that aren't subject to the motion for protective

3    order.  So I'm not prepared to argue that point today.

4         MR. WILCOX:  May I, Your Honor?

5         THE COURT:  Just a moment.  I'm reading from the

6    motion for protective order.  At paragraph eight it

7    says, "While defendants have provided the plaintiffs

8    with copies of all responsive documents dated prior

9    to May 1, 2012, they seek protection for all

10   correspondence with Christopher James and his agent,

11   Cynthia Frenchman, after May 1, 2012."  Mr. Wilcox.

12        MR. WILCOX:  That's fine, as long as they're

13   actually produced.  But the order should reflect that

14   the privilege issues only allegedly begin on May 1,

15   2012, with regard to requests 11, 12 and 13.  There

16   may be a different twist to number 16.

17        And I would point out, Your Honor, that we're

18   asking for information that was exchanged during the

19   period from June 4, 2011, and it's during that period

20   of June 4, 2011, to sometime in May or June of 2012,

21   TZ is the operating entity, TZ 1.  TZ 1 is no longer

22   in existence , so I don't understand the confidential

23   business information aspect of it.

24        We are willing in order to get this -- you know,

25   all this information is now at least two years old,

1    so I would ask the court to keep that in mind.  With

2    regard to number 16, I think that is much more akin

3    to number two than it is to 11, 12 and 13.  I haven't

4    heard any allegation that there's a privilege --

5    attorney-client or joint defense privilege with

6    regard to request number 16.

7        Number two requests communication between the

8    prospective investors and the debtors, and number 16

9    requests communication between any of the prospective

10   investors and TZ 1.  So those seem to me to be akin.

11   There may be a confidentiality issue that the court

12   has already addressed, but there's no privilege issue

13   there.

14       MR. CHILDERS:  I think that that's correct, 16

15   should be grouped with number two.  So to that

16   extent, the court's orders relating to two should

17   also extend to number 16.

18       THE COURT:  So ordered.  Mr. Childers, do you --

19   can you agree, based on what I just read from the

20   motion, that the assertion of joint defense doctrine,

21   attorney-client privilege, common interest doctrine

22   relates to communications on and after May 1, 2012?

23       MR. CHILDERS:  I may live to regret this , but I

24   think we're willing to put the flag on May 1st of

25   2012.

1      THE COURT:  Then in paragraph eight, the motion

2      itself sets forth that all documents prior to that

3      date have already been delivered.  Is that correct?

4      MR. CHILDERS:  That's what the motion says.

5      THE COURT:  If you take issue with that, Mr.

6      Wilcox, it sounds like it's time for a motion to

7      compel, because right now of record the defendants

8      claim that they have produced everything that they

9      do not claim as privileged that occurred on or after

10     May 1, 2012.

11     MR. WILCOX:  We've been trying to avoid getting

12     into this kind of situation.  It appears we'll need

13     to have a motion to compel.

14     THE COURT:  All right.  And then once again, Mr.

15     Childers and Mr. Wilcox, just to make sure that we

16     are all on the same page, at this moment my

17     understanding of the defendants' position is that

18     they are claiming that certain communications between

19     certain parties, as set forth in the motion that's on

20     for hearing today, Docket 266, are privileged or are

21     covered under the common interest doctrine as being

22     privileged or work product.

23     And my understanding is that in order for any of

24     those communications to in any way be privileged,

25     there has to have been an attorney-client privilege

1    at the very beginning or at the foundation of the

2    communication.  Otherwise, where I sit now, unless

3    you can convince me otherwise, they're not going to

4    be protected.  Any questions?

5         Thank you very much.  This hearing is concluded.

6    Let's go ahead and prepare an interim order on this

7    so that everything I've ruled today will be as clear

8    as it can be.  We'll be back here on January 7 or 8.

9    I was trying to see whether there's any way to

10   schedule a telephonic hearing before then, but I just

11   don't believe that our calendar will permit that.

12        You have your briefing and scheduled to submit

13   the privilege log and the affidavits, Mr. Childers,

14   and we'll be back here in January.  Thank you very

15   much.  This hearing is concluded.

16        THE BAILIFF:  All rise.

17        (Thereupon, the proceedings were concluded at

18        2:35 p.m.)

19

20

21

22

23

24

25

Page 43

1                    REPORTER'S CERTIFICATE

2

3     STATE OF FLORIDA:

4     COUNTY OF ALACHUA:

5          I, Rhonda D. Mashburn, Court Reporter and Notary

6     Public, certify that I was authorized to and did

7     stenographically report the foregoing proceedings in the

8     case of John and Sheila Spence, et al., vs. Matthew and

9     Larina Hintze, et al., and that the transcript is a true

10    and complete record of my stenographic notes.

11         I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties'

14    attorney or counsel connected with the action, nor am I

15    financially interested in the action.

16              DATED this 8th day of December, 2014.

17

18

19                              _____

20                              Rhonda D. Mashburn

21                              Court Reporter/Notary Public

22

23

24

25

**<u>Exhibit Tag/ Cover Sheet</u>**

**Party submitting: <u>PLAINTIFFS</u>**    **Ex. # <u>2</u>**

**Admitted: Yes   or    No  (circle one)**

**Debtor: <u>MATTHEW BRUCE HINTZE, and LARINA K. HINTZE</u>**

**Case No.: <u>12-10462 (KKS)</u>**

***Adv. No.*: <u>13-01007 (KKS)</u>**

**Nature of Hearing/
Docket No: <u>Motion to Compel Re: Privilege</u>**

**Dated** _____ **, 20___.**

**By:** _____,  **Deputy Clerk**

# EXHIBIT 2

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 5-29-2012 | Larina Hintze<br>Chris James and Matt Hintze | Email concerning Sensitive Business information including tutor payroll and equity incentives. | Sensitive Business information of TZ2 |
| 5-29-2012 | Larina Hintze<br>Chris James and Matt Hintze | Email concerning Sensitive Business information including tutor payroll and equity incentives. | Sensitive Business information of TZ2 |
| 6-5-2012 | Matt Hintze<br>Chris James | Email seeking permission to implement a TZ2 business decision | Sensitive Business information of TZ2 |
| 7-17-2012 | Larina Hintze<br>Chris James | Email concerning Sensitive Business information including tutor payroll and equity incentives. | Sensitive Business information of TZ2 |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 07-13-2012 | Jeffrey Childers Larina Hintze and Matt Hintze; Chris James | Email direction to employees of TZ2 as attorney for TZ2. | Sensitive Business information and attorney client privileged. |
| 07-26-2012 | Matt Hintze Larina Hintze, Chris James, Cynthia Frenchman, Chris James personal assistant, Paul Hintze | Email regarding business plan of TZ | Sensitive Business information of TZ2 |
| 10-19-2012 | Matt Hintze Chris James | Email thread regarding TZ2 financials and use of TZ2 protocols. | Sensitive Business information of TZ2 |
| 10-26-2012 | Matt Hintze Chris James | Email thread regarding weekly financials | Sensitive Business information of TZ2 |
| 8-22-2012 | Matt Hintze Cynthia Frenchman, Paul Hintze Misty Barnett from SunTrust | Email thread with TZ2 Federal ID number for TZ2 | Sensitive Business information of TZ2 |
| 8-3-2012 | Matt Hintze Chris James | Email regarding and attaching the TZ2 Business Plan | Sensitive Business information of TZ2 |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 8-10-2012 | Matt Hintze and Christopher James | Email thread about TZ2 personnel and business plan and meeting regarding business plan, financial projections. | Sensitive Business information of TZ2 |
| 8-22-2012 | Cynthia Frenchman ,Matt Hintze, Christopher James | Email thread discussing operational decisions such as banking, copier and car lease for TZ2 | Sensitive Business information of TZ2 |
| 8-3-2012 | Matt Hintze and Chris James | Email regarding marketing TZ2 | Sensitive Business information of TZ2 |
| 8-2-2012 | Chris James and Matt Hintze | Email thread regarding marketing TZ2, van lease and copier lease | Sensitive Business information of TZ2 |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 7-30-2012 | Larina Hintze and Matt Hintze, Chris James and assistant, and Cnthia Frenchman | Email thread regarding draft employment contracts and TZ2 financials | Sensitive business information of TZ2 |
| 8-28-2012 | Matt Hintze, Christopher James, Cynthia Frenchman | Email regarding capital expenditures by TZ2 | Sensitive business information of TZ2 |
| 9-4-2012 | Matt Hintze, Christopher James, Cynthia Frenchman | Email regarding TZ2 financials | Sensitive business information of TZ2 |
| 9-4-2012 | Matt Hintze and Chris James | Email thread regarding TZ2 financials | Sensitive business information of TZ2 |
| 9-17-2012 | Matt Hintze, Larina Hintze and Chris James | Email regarding marketing TZ2; public announcements; platform/delivery systems | Work product of TZ2, Sensitive business information |
| 9-8-2012 | Christopher James and Matthew Hintze | Email regarding potential legal action by TZ2. | Work Product of TZ2, |
| 7-13-2012 | Matt Hintze, Larina Hintze, Chris James | Email thread discussing TZ2 legal remedies | Work product of TZ2, Sensitive business information |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 7-6-2014 | Norman Beldsoe, Jeff Childers, Scott Walker, Christopher James, Matthew Hintze, Bruce Hintze | Email thread discussing Hintze and TZ2 legal remedies | Work product, common interest, attorney client privilege |
| 7-18-2014 | Norman Beldsoe,  Scott Walker, Christopher James, Matthew Hintze, | Email thread discussing Hintze and TZ2 legal remedies | Work product, common interest, attorney client privilege |
| 7-27-2014 | Norman Beldsoe, Jeff Childers, Scott Walker, Christopher James, Matthew Hintze, Bruce Hintze | Email thread discussing Hintze and TZ2 legal remedies | Work product, common interest, attorney client privilege |
| 8-2-2012 | Larina Hintze, Matt Hintze, Jeffrey Childers, Chris James, James personal assistant, Cynthia Frenchman | Email thread discussing eviction and operations. | Work product, common interest, attorney client privilege |
| 7-5-2012 | Chris James and Matthew Hintze | Email thread discussing litigation | Work product, common interest |

**<u>Exhibit Tag/ Cover Sheet</u>**

**Party submitting: <u>PLAINTIFFS</u>        Ex. # <u>3</u>**

**Admitted: Yes   or    No  (circle one)**

**Debtor: <u> MATTHEW BRUCE HINTZE, and LARINA K. HINTZE</u>**

**Case No.: <u> 12-10462 (KKS)</u>**

***Adv. No.*: <u> 13-01007 (KKS)</u>**

**Nature of Hearing/**
**Docket No: <u> Motion to Compel Re: Privilege </u>**

**Dated** _____ , 20___.

**By:** _____, **Deputy Clerk**

# EXHIBIT 3

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 5-29-2012 | Larina Hintze<br>Chris James and Matt Hintze | Email concerning Sensitive Business information including tutor payroll and equity incentives. | Sensitive Business information of TZ2 |
| 6-5-2012 | Matt Hintze<br>Chris James | Email seeking permission to implement a TZ2 business decision | Sensitive Business information of TZ2 |
| 7-17-2012 | Larina Hintze<br>Chris James | Email concerning Sensitive Business information including tutor payroll and equity incentives. | Sensitive Business information of TZ2 |
| 07-13-2012 | Jeff Childers<br>Larina Hintze and Matt Hintze;<br>Chris James | Email direction to employees of TZ2 as attorney for TZ2. | Sensitive Business information and attorney client privileged. |
| 07-26-2012 | Matt Hintze<br>Larina Hintze, Chris James, Cynthia Frenchman, Chris James personal assistant, Paul Hintze | Email regarding business plan of TZ | Sensitive Business information of TZ2 |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| 10-19-2012 | Matt Hintze Chris James | Email thread regarding TZ2 financials and use of TZ2 protocols. | Sensitive Business information of TZ2 |
| 10-26-2012 | Matt Hintze Chris James | Email thread regarding weekly financials | Sensitive Business information of TZ2 |
| 8-22-2012 | Matt Hintze Cynthia Frenchman, Paul Hintze Misty Barnett from SunTrust | Email thread with TZ2 Federal ID number for TZ2 | Sensitive Business information of TZ2 |
| 8-3-2012 | Matt Hintze Chris James | Email regarding and attaching the TZ2 Business Plan | Sensitive Business information of TZ2 |
| 8-10-2012 | Matt Hintze and Christopher James | Email thread about TZ2 personnel and business plan and meeting regarding business plan, financial projections. | Sensitive Business information of TZ2 |
| 8-22-2012 | Cynthia Frenchman ,Matt Hintze, Christopher James | Email thread discussing operational decisions such as | Sensitive Business information of TZ2 |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| | | banking, copier and car lease for TZ2 | |
| 8-3-2012 | Matt Hintze and Chris James | Email regarding marketing TZ2 | Sensitive Business information of TZ2 |
| 8-2-2012 | Chris James and Matt Hintze | Email thread regarding marketing TZ2, van lease and copier lease | Sensitive Business information of TZ2 |
| 7-30-2012 | Larina Hintze and Matt Hintze, Chris James and assistant, and Cynthia Frenchman | Email thread regarding draft employment contracts and TZ2 financials | Sensitive business information of TZ2 |
| 8-28-2012 | Matt Hintze, Christopher James, Cynthia Frenchman | Email regarding capital expenditures by TZ2 | Sensitive business information of TZ2 |
| 9-4-2012 | Matt Hintze, Christopher James, Cynthia Frenchman | Email regarding TZ2 financials | Sensitive business information of TZ2 |
| 9-4-2012 | Matt Hintze and Chris James | Email thread regarding TZ2 financials | Sensitive business information of TZ2 |
| 9-17-2012 | Matt Hintze, Larina Hintze and Chris James | Email regarding marketing TZ2; public announcements; | Work product of TZ2, Sensitive business information |

| Date of Communication | Parties to correspondence | Nature of document | Privilege Asserted |
|---|---|---|---|
| | | platform/delivery systems | |
| 9-28-2012 | Matt Hintze, Chris James and all Employees of TZ2 | Email discussing TZ2 financials | Sensitive business information |
| 9-8-2012 | Christopher James and Matthew Hintze | Email regarding potential legal action by TZ2. | Work Product of TZ2, |
| 7-13-2012 | Matt Hintze, Larina Hintze, Chris James | Email thread discussing TZ2 legal remedies | Work product of TZ2, Sensitive business information |
| 6-27-2014 | Jeff Childers, Christopher James, Matthew Hintze, | Email thread discussing Hintze and TZ2 legal remedies | Work product, attorney client privilege |
| 8-2-2012 | Larina Hintze, Matt Hintze, Jeffrey Childers, Chris James, James personal assistant, Cynthia Frenchman | Email thread discussing eviction and operations. | Work product, attorney client privilege |
| 7-5-2012 | Chris James and Matthew Hintze | Email thread discussing litigation | Work product |

**Exhibit Tag/ Cover Sheet**

Party submitting: **PLAINTIFFS**          Ex. # **4**

Admitted: Yes   or    No  (circle one)

**Debtor:  MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:  12-10462 (KKS)**

*Adv. No.***:  13-01007 (KKS)**

**Nature of Hearing/
Docket No:  Motion to Compel Re: Privilege**

Dated _____ , 20___.

By:_____,   Deputy Clerk

EXHIBIT 4



# CHILDERSLAW
### L L C

Tel 866.996.6104                          Attorney at Law                          Jeff Childers
Fax 407.209.3870                                                                   jchilders@smartbizlaw.com
www.smartbizlaw.com              2135 NW 40th Terrace, Suite B
                                 Gainesville, Florida 32605

January 5, 2015

Robert Wilcox
814 A1A North, Suite 202
Ponte Vedra Beach, FL 32082

*Via First Class US Mail with enclosures; via email (without enclosures)*

Mr. Wilcox:

    Please find enclosed an amended privilege log, correcting a few typos and reducing the number of documents claimed as privileged. Also enclosed find a CD containing supplemental production. I'm copying you this letter electronically without the CD, so that you can plan accordingly for the upcoming hearing.

    First, we have withdrawn the claim of privilege under the common interest doctrine, without prejudice to asserting that basis later for different documents if needed. We will produce the documents that were previously identified as privileged in this category.

    Second, in regard to the commercially sensitive category, I discussed the issue with Ryan Davis as attorney for TutoringZone II. My conclusion is that Matthew Hintze lacks authority (individually) to turnover documents that are property of TZ2. Therefore, these proprietary documents are properly requested from Mr. Davis, not me (as I do not represent TZ2). He has agreed to speak with you to discuss the turnover of these particular documents.

    In summary, we are currently only asserting privilege in regards to those documents clearly work product or attorney client privileged. I believe this resolves all outstanding issues related to the privilege log that were set for evidentiary hearing this Wednesday.

    Should you have any questions or concerns about the attached, please do not hesitate to contact me.

Regards,

Jeff Childers, Esq.

SJC/jh

Enclosures

Cc: Ryan Davis

**<u>Exhibit Tag/ Cover Sheet</u>**

**Party submitting: <u>PLAINTIFFS</u>        Ex. # <u>5</u>**

**Admitted: Yes   or    No  (circle one)**

**Debtor: <u> MATTHEW BRUCE HINTZE, and LARINA K. HINTZE</u>**

**Case No.: <u> 12-10462 (KKS)</u>**

***Adv. No.*****: <u> 13-01007 (KKS)</u>**

**Nature of Hearing/**
**Docket No: <u> Motion to Compel Re: Privilege</u>**

**Dated       _____ , 20____.**

**By:_____,   Deputy Clerk**

# EXHIBIT 5

# WILCOX LAW FIRM

ELIZABETH R.P. BOWEN
E-MAIL: eb@wlflaw.com

TELEPHONE
(904) 405-1248
(904) 497-0193 (direct)

July 3, 2015

**Via Electronic Mail and**
**US Postal Service First Class Mail**

Matthew Hintze
Larina K. Hintze
708 NE Blvd.
Gainesville, Florida 32601

   Re: Deficiencies and Responses to Plaintiffs' Discovery Responses
    <u>Spence et al v. Hintze, Adversary Proceeding No. 12- 1007 (Bankr., N.D. Fla)</u>

Mr. and Mrs. Hintze:

   As you are aware, this firm represents Plaintiffs John Spence, Sheila Spence, InterMed Biomedical Services, Inc., David Whitney, and FLH Holdings of Florida, LLC (collectively, "Plaintiffs"). The Plaintiffs served four separate Requests for Production on Matthew Hintze and Larina Hintze (the "Defendants") on (i) August 18, 2014, (ii) September 2, 2014, (iii) September 15, 2014, and (iv) September 16, 2014 (the "Plaintiffs' Requests").

   This letter will confirm the issues we discussed in our phone conversation earlier today. As we discussed, these are not new issues, and I had discussed most or all of them with Seldon J. Childers, Esq. Pursuant to Local Rule 7026-1A, this letter is the undersigned's attempt to resolve any disputes regarding what I believe are the deficiencies in your Responses to the Plaintiff's Requests. Accordingly, this letter requests your commitment to resolve production deficiencies addressed below.

   Unless I receive a firm and detailed commitment from you to remedy all of the deficiencies in the Responses no later than 12:00 p.m. on Monday July 6, 2015, the Plaintiffs will seek relief from the Court. The relief the Plaintiffs will request will include, but not be limited to,

an order from the Court compelling you to produce the requested documents (subject to properly asserted, established, and identified privileges) and an award of Plaintiffs' attorney fees associated with the assertion of the discovery insufficiencies.

**To the extent you are withholding documents based on any type of privilege, please provide a detailed and complete privilege log. If there are no additional documents or if you claim the documents are not within your control, please so state. To the extent you contend there are no additional documents, we will request that the Court order you to certify that in writing.**

As I stated above, the issues I am raising are not new ones, and most if not all of them were addressed to Mr. Childers when he represented you.

(1) *Plaintiff John Spence's Request for Production of Documents* was served on August 18, 2014. The Defendants partially responded on September 22, 2014, then later with a corrected batch which included email attachments on or around December 15, 2014.

The documents produced by the Defendants in response to the Plaintiffs' First Request are incomplete. The following request numbers have been answered incompletely or no documents were provided.

> **Request #2.** All documents reflecting any communication during the period from January 1, 2011 through the Petition Date between any of the Prospective Investors and (a) You or (b) Your Agents.

*Defendants' Production in Response:* The folder on the production disk labelled #2 Prospective Investors was empty and contained no documents. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

> **Request #9.** All documents reflecting any communication during the period from January 1, 2011 through June 4, 2011 between Christopher James and You.

> **Request #10.** All documents reflecting any communication during the period from January 1, 2011 through June 4, 2011 between Christopher James and Your Agents.

*Defendants' Combined Production Response to #9-10:* One email produced. The folder on the production disk labelled *#9-10 CJ Emails January 2011 to 2011* contained 1 email. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

> **Request #11.** All documents reflecting any communication between during the period from June 4, 2011 through the Petition Date between Christopher James and You.

**Request #12.** All documents reflecting any communication between during the period from June 4, 2011 through the Petition Date between Christopher James and Your Agents.

*Defendants' Combined Production Response to ##11-12:* 25 emails total, of which there were only 3 in 2 in March and 3 in April, 2012, in the period just prior to the transfer of assets from TZ1 to TZ2.

The folder on the production disk labelled *#11-12 CJ Emails June 2011 to Nov 1, 2012* contained 25 emails total, of which there were only 2 in March and 3 in April, 2012, in the period just prior to the transfer of assets from TZ1 to TZ2. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #14.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Defendants' Counterclaim.

*Defendants' Production in Response:* The folder on the production disk labelled *#14 Defendants' Counterclaims* contains 0 documents. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #16.** All documents reflecting any communication between any of the Prospective Investors and TZ 1 during the period from January 1, 2011 through the Petition Date.

*Defendants' Production in Response:* The folder on the production disk labelled #16 Prospective Investors and TZ1 contains 7 documents. Only Duncan Williams-related documents were produced. No other prospective investor communications or solicitations. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

(2) *Plaintiff Intermed's Request for Production of Documents* was served on September 2, 2014. The Defendants partially responded on October 7, 2014. The documents that were produced by the Defendants in response to the Plaintiffs' second request are incomplete. The following request numbers have been answered incompletely or no documents were provided.

**Request #11.** All documents relating to communications during the period from January 1, 2010 to and including the Petition Date between Matthew Hintze and Paul Hintze.

*Defendants' Production in Response to Request #11:* Only two emails were produced from the time period when Paul Hintze assumed an executive role in TutoringZone. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #12.** All documents relating to communications during the period from January 1, 2010 to and including the Petition Date between Larina Hintze and Paul Hintze.

*Defendants' Production in Response to Request #12:* Only 4 emails were produced. None were produced from the time period when Paul Hintze assumed an executive role in TutoringZone. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #17.** All documents relating to Paul Hintze's role as a member of TZ I since January 1, 2010.

*Defendants' Production in Response to Request #17:* No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #18.** All documents relating to Paul Hintze's role as an owner of TZ I since January 1, 2010.

*Defendants' Production in Response to Request #18:* No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #19.** All documents relating to Paul Hintze's role as an agent of TZ I since January 1, 2010.

*Defendants' Production in Response to Request #19:* No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #20.** All documents under which You assert Paul Hintze became an owner, member, or manager of TZ I.

*Defendants' Production in Response to Request #20:* No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

**Request #21-28.** Each one of these requests contains the date "January 1, 2014", which was a typo, which date should have read January 1, 2011. We previously addressed that issue, but received no doucments.

**Request #21.** All employment agreements, tutor contract agreements, and non-compete agreements, to which TZ I was a party during the period from January 1, 2014 through the Petition Date.

4

*Defendants' Production in Response to Request #21:* No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.

Request # 22. All employment agreements, tutor contract agreements, and non-compete agreements, to which Matthew Hintze was a party during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #22:* No documents were produced.

Request #23. All employment agreements, tutor contract agreements, and non-compete agreements, to which Larina Hintze was a party during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #23:* No documents were produced.

Request # 24. All employment agreements, tutor contract agreements, and non-compete agreements, to which Ethan Fieldman was a party during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #24:* No documents were produced.

Request #25. All employment agreements, tutor contract agreements, and non-compete agreements, to which TZ II was a party during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #25:* No documents were produced.

Request #26. All documents relating to any communications between any attorney representing You and any attorney representing Ethan Fieldman or Study Edge, LLC during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #26:* No documents were produced.

Request #27. All documents relating to any communications between any attorney representing TZ I and any attorney representing Ethan Fieldman or Study Edge, LLC during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #27:* No documents were produced.

Request #28. All documents relating to any communications between any attorney representing TZ II and any attorney representing Ethan Fieldman or Study Edge, LLC during the period from January 1, 2014 through the Petition Date.
*Defendants' Production in Response to Request #28:* No documents were produced.

(3) *Plaintiff Sheila Spence's Request for Production of Documents* was served on September 15, 2014. The documents that were produced by the Defendants in response to the Plaintiffs' third request are incomplete. The following request numbers have been answered incompletely or no documents were produced.

**Request #1.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count I (Spence).

*Defendants' Production in Response to Request #1. No documents were produced.    We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #2.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count II (Spence).

*Defendants' Production in Response to Request #2. No documents were produced.    We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #3.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count III (Intermed).

*Defendants' Production in Response to Request #3. No documents were produced.    We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #4.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count IV (Intermed).

*Defendants' Production in Response to Request #4. No documents were produced.    We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #5.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count V (Whitney).

*Defendants' Production in Response to Request #5. No documents were produced.    We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #6.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count VI (FLH Holdings).

*Defendants' Production in Response to Request #6. No documents were produced.    We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #7.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count VII (FLH Holdings).

*Defendants' Production in Response to Request #7. No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #8.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count VIII.

*Defendants' Production in Response to Request #8. No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request #9.** Any documents that reflect, relate to, reference or otherwise support the allegations contained in Affirmative Defense as to Count IX.

*Defendants' Production in Response to Request #9. No documents were produced. We ask that you either produce the responsive documents or certify that you have no responsive documents and that your production was complete.*

**Request for Tangible Things.**

**Request #10.** Any and all computers, computer hard drives, mirror drives, removable storage devices, portable storage devices, diskettes, tapes, or other storage devices used by Matthew Hintze (whether or not owned in whole or in part by Matthew Hintze) during the period from January 1, 2010 through the Petition Date.

*Plaintiffs are in the process of identifying third parties to review electronically stored information on all computers, computer hard drives, removable storage devices, etc. Please provide a list of available "tangible things" in order to assess the technological support requirements.*

**Request #11.** Any and all computers, computer hard drives, mirror drives, removable storage devices, portable storage devices, diskettes, tapes, or other storage devices used by Larina Hintze (whether or not owned in whole or in part by Larina Hintze) during the period from January 1, 2010 through the Petition Date.

*Plaintiffs are in the process of identifying third parties to review electronically stored information on all computers, computer hard drives, removable storage devices, etc. Please provide a list of available "tangible things" in order to assess the technological support requirements.*

(4) *Plaintiff David Whitney's Request for Production of Documents* was served on September 16, 2014. The Defendants have produced *no* documents at all in response to the twenty-two (22) requests in the Plaintiffs' fourth request for documents.

I have attached copies of the above requests for your convenience.  The Plaintiffs request that you respond to this letter or produce the requested documents by Monday July 6, 2015 at 2:00 pm. We understand that you are travelling, so we would agree to a written response as to what documents you intend to produce, and what documents do not exist/and you can certify complete production to by that date, with the production to occur upon your return.

If you do not respond by Monday July 6, 2015, the Plaintiffs will file Motions to Compel or Certify based upon the inadequacies noted above.

Sincerely,

Elizabeth R.P. Bowen

(Pleadings copied via email only)

8

**Elizabeth R Bowen**

---

**From:** Elizabeth R Bowen
**Sent:** Saturday, August 29, 2015 7:18 PM
**To:** 'Matt Hintze'; 'Larina Hintze'
**Cc:** Robert D Wilcox
**Subject:** Hintze-Confer Communication Prior to Motion to Compel

**Importance:** High

| Tracking: | Recipient | Delivery |
|---|---|---|
| | 'Matt Hintze' | |
| | 'Larina Hintze' | |
| | Robert D Wilcox | Delivered: 8/29/2015 7:18 PM |

Dear Mr. and Mrs. Hintze,

I am still going through the production provided late July, as there was a great deal of duplication and production of documents not specifically requested in our correspondence.  In addition, as discussed with Mr. Hintze on at least two occasions, production of the emails in PDF format prevents the attachments from being viewed, and all emails were to be produced in "native format," and thus the entire production will need to be reproduced in native format so that the attachments can be accessed.  We discussed this on at least 2 occasions, and I also sent you instructions on how to produce the emails in native format, as well as offered technical assistance.  I will be setting forth in detail the issues with the production prior to filing a Motion to Compel.

There is one area of communication not produced that I will move to compel immediately if not produced.  Pursuant to John Spence's Requests 11, 12, and 13, I am requesting again all communications/correspondence between you and Mr. James and Ms. Frenchman, and your Agents, including Jeff Childers and his respective agents.  In the interest of limiting the scope of this inquiry, I am requesting every email from March 1, 2012 to the petition date (and you may provide a privilege log for emails relating to legitimate attorney client privilege advice offered by Mr. Childers with respect to your pending bankruptcy petition), *with the exception of any emails relating to TZ1/ TZ2/ Mr. James/Ms. Frenchman which must all be produced immediately.* As discussed previously, in is our position that Mr. Childers' role in orchestrating the transfer of the assets from TZ1 to TZ2, and his representation of all parties to the transaction defeats any privilege you may have been able to assert relating to those emails.  In addition, you should understand that you hold the privilege, not Mr. Childers.  Please let me know by Tuesday, September 1, 2015, whether you will be providing those emails and by what date.

If you fail to produce the emails, we plan to move to compel and request costs and sanctions for continuing failure to comply.  I urge you to review Judge Specie's order relating to Motions to Compel.

I have also asked on at least two occasions for deposition dates that you and Mrs. Hintze would be available, trying to accommodate what might be a slower summer season.  As I have received no response, I will add that to the list of issues in the Motion to Compel unless I receive a response from you.  Please provide 4 dates in September on which you and Mrs. Hintze would be available.

***As always, understanding that these are technical and difficult issues, especially with respect to privilege, I would suggest you consult an attorney.***

Regards,

**Elizabeth R.P. Bowen, Esq.**

**Wilcox Law Firm**
814 A1A North, Suite 202
Ponte Vedra Beach, FL 32082
(904) 497-0193 (direct)

CONFIDENTIALITY NOTICE: The information and all attachments contained in this electronic communication are legally privileged and confidential information, subject to the attorney-client privilege and intended only for the use of intended recipients. If the reader of this message is not an intended recipient, you are hereby notified that any review, use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately of the error by return email and please permanently remove any copies of this message from your system and do not retain any copies, whether in electronic or physical form or otherwise.
Thank you.

**<u>Exhibit Tag/ Cover Sheet</u>**

**Party submitting: <u>PLAINTIFFS</u>**          **Ex. # <u>6</u>**

**Admitted: Yes   or    No  (circle one)**

**Debtor:  <u>MATTHEW BRUCE HINTZE, and LARINA K. HINTZE</u>**

**Case No.: <u>12-10462 (KKS)</u>**

*Adv. No.*: <u>**13-01007 (KKS)**</u>

**Nature of Hearing/**
**Docket No: <u>Motion to Compel Re: Privilege</u>**

**Dated** <u>            </u> **, 20___.**

**By:<u>                    </u>,   Deputy Clerk**

# EXHIBIT 6

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

In Re:

        MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,

              Debtors.

_____

JOHN SPENCE, SHEILA SPENCE, INTERMED
BIOMEDICAL SERVICES, INC., a Florida
corporation, DAVID WHITNEY, and FLH
HOLDINGS OF FLORIDA, LLC, a Florida limited
liability company,

    Plaintiffs,

v.

MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,

    Defendants.

_____/

Case No. 12-10462-KKS
    Chapter 7

Adv. No. 13-01007-KKS

## <u>DECLARATION OF SELDON J. CHILDERS</u>

    I am Seldon J. Childers.  I am the sole attorney and founder of the law firm of ChildersLaw, LLC ("ChildersLaw"). ChildersLaw maintains offices for the practice of law at 2135 NW 40th Terrace, Suite B, Gainesville, Florida 32605.  I am familiar with the matters set forth herein and make this Declaration ("the ChildersLaw Declaration") to supplement the privilege log provided to the Plaintiffs:

    1.      I began providing legal representation to Christopher James on or around May 1, 2012. My legal representation extended to the entities related to Christopher James, including CMJ Consulting, Inc., and Tutoring Zone II, LLC.

2.      My representation of Christopher James and his related entities CMJ Consulting, Inc. and Tutoring Zone II, LLC concluded on October 31, 2012.

3.      I began providing legal representation to the Defendants, Matthew and Larina Hintze, on or around June 3, 2012 and continue to provide legal representation.

This concludes my Declaration.

### 28 U.S.C. §1746 DECLARATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of January, 2015.

_____
Seldon J. Childers

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been furnished this day, via electronic mail to Robert Wilcox, at rw@wlflaw.com.

CHILDERSLAW

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel 866.996.6104  fax 407.209.3870
net jchilders@smartbizlaw.com

 /s/ Seldon J. Childers, Esq.    .
Florida Bar No. 61112

Declaration of Seldon J. Childers
In re Hintze;
Case No. 13-01007
Page 2 of 2

**Exhibit Tag/ Cover Sheet**

Party submitting: **PLAINTIFFS**         Ex. # **7**

Admitted: Yes   or   No  (circle one)

Debtor:  **MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

Case No.:  **12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

Nature of Hearing/
Docket No:  **Motion to Compel Re: Privilege**

Dated  _____ , 20____.

By:_____,   Deputy Clerk

# EXHIBIT 7

# EXHIBIT 7



Larina Hintze <larinahintze@gmail.com>

---

## RE: Semester Wrap Up

**James,Christopher** <christopher.james@warrington.ufl.edu>          Tue, May 1, 2012 at 4:02 AM
To: Larina Hintze <larinahintze@gmail.com>

Keep the faith. You understand that the repayment of the advance is going right back in once we have the other funding set up. I think its important to let Kevin and the others know what the results are and that I insisted on repayment of the advance (the idea being is if they think there is any $ in TZ they will go after it). With that thought in mind, when structuring the buyout, pay off everyone prorate and then we'll but it back in. Otherwise I worry that the other investors will say why don't we split the payout among ourselves. What do you think?

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Monday, April 30, 2012 6:01 PM
**To:** James,Christopher; Greer,Creed C,III; Bphintze@bellsouth.net
**Subject:** Semester Wrap Up

As expected once we refund the CMJ payroll advance and then meet our own 5/1 payroll we have wiped out final revenues - we will have to defer some of our operating expenses.

We will hold the rent check specifically as we have about a $6k shortfall.  We have some straggling revenue like an invoice out to Bill's Bookstore.

We will have to have everything worked out and funds in our account by 5/13/12 in order to make the next payroll.  So that is our drop dead deadline.

Until then we just defer some bills and we will be fine - relatively speaking :-)

Reports are forthcoming.

L

Exhibit 7.page 1



**Larina Hintze <larinahintze@gmail.com>**

---

## RE: Touching Base

**James,Christopher** <christopher.james@warrington.ufl.edu>                    Wed, May 2, 2012 at 2:57 AM
To: Larina Hintze <larinahintze@gmail.com>

So I reviewed the email trail…. Things will come together although it's going to be a nail biter (no surprises there).  I wrote to Kevin to let him no my positions (read below…note that I am posturing)……

Kevin,

Thanks for working on this..... I understand how frustrating it can be. As you know I have asked them to put together a term sheet for the investors (on both sides of the transaction) to review and react to. Both the Ethan deal and the TZ deal (if there is one) are risky. I am not sure why Ethan can't put more cash up front. My concern is that he will try and wiggle out of the later payments leaving us with close to .10 on the dollar. Again, as you have pointed out, it is difficult to evaluate these proposals without concrete terms.

Here is where I stand. Without the new investors providing the money to buy out the existing investors, I will not provide any additional funding for summer operations. I have told Larina and Matt that I would provide working capital (up to 100K) if they can clean up the balance sheet with new money. In exchange, I would be willing to take either equity or a new note in the restructured company. However, this funding is contingent on (1) having the payroll advance repaid and (2) new investment sufficient to match Ethan's offer for the notes and additional working capital to get through the summer. My logic for continuing is that Matt and Larina are longtime friends and I made a commitment to them. In addition, from my perspective, providing them with some working capital amounts to just leaving some of what I have already invested in TZ.  Finally, I am skeptical that Ethan will deliver on the contingent payments.

Let me know if I can help in anyway

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Tuesday, May 01, 2012 9:39 PM
**To:** Kevin Ogilby
**Subject:** Re: Touching Base

Agreed it's a tough sell across the board.  We have our work cut out for us.  Let's let everyone marinate on this and start at it again tomorrow.

Night.

On Tue, May 1, 2012 at 8:33 PM, Kevin Ogilby <kgogilby@gmail.com> wrote:

Are they talking about your commercial creditors as well or just the noteholders?  My thought is that they should be able to pay off the existing holders more quickly than 18 months.  What happens if they (the new investors) decide not to pay?  We have nothing over them except an expensive lawsuit and a judgment which will be difficult to enforce as it will probably only carry a corporate guarantee.  At least we have the non-compete against Ethan. We could always stipulate that his default forfeits the money and the non-compete.

Exhibit 7 page 2

The other concern is that the payoff is getting to the insignificant point for people that may take their chances with a liquidation of assets and future judgments.  This would certainly inhibit the investor's chances of doing anything with Matt in the near term.  Folks need to know they are getting something or why not just take write off and not get raked over the coals twice.  We are being offered 22 cents on the dollar on an investment we have held for less than 11 months.  It is a tough sell across the board at that level and on those terms.  People feel duped and that is hard to reconcile with the existing offer.  Not to say Study Edge's offer is that much better but we still have a lot of negotiating to do with Ethan on the overall terms, which will most likely shorten the payout and eliminate a lot of the terms.  The issues around bankruptcy preferences are fine.  It is better to have the money and force everyone else to fight it out than vice versa.


On Tue, May 1, 2012 at 8:01 PM, Larina Hintze <larinahintze@gmail.com> wrote:

Kevin,

Thank you for continuing to work so very hard to reach a conclusion.  This is obviously a very complex deal, and with the added urgency it seems that every conversation results in more questions than answers.

Given our continued strong belief in TutoringZone we see your proposal as a win-win.  We have an opportunity to clean up the balance sheet, if just a bit, and you have an opportunity to bring closure to an investment that you wish to liquidate.

Obviously any buyout and commitment of working capital is going to be provided by new investors.  As we have had conversations about if and how potential new investors are willing to invest, a number of obstacles have come up.

First, they are insisting that all debt, not just Spence, Staab, Scott, Ogilby and Whitney, agree to the buyout.  We are attempting to communicate with Chris while he is working in Turkey to see if he is amenable to this and have a call into Creed.

Second, you can imagine that we are getting beaten up on terms.  How would you approach this deal?  They have considered our interpretation of the Study Edge offer and have raised a number of issues.  Obviously these are important considerations in terms of the amount and structure of the payments to existing creditors.

If we do agree to a non-compete at UF then (with certainty) the company will be forced to declare bankruptcy.  Without UF revenues for Summer and Fall, there is no way for us to continue to pay rent, the solar loan, bank lines of credit, nor any staff for that matter.  If this is the case then counsel has advised us that we will be exposed to litigation for preferentially settling certain obligations ahead of others.  Their opinion is that diverting SE's payment directly to noteholders and only noteholders will result in lengthy and expensive litigation for all.  Do you disagree?

Based on this analysis, they presented the $.22 figure that I e-mailed earlier, and suggested a similar structure in terms of payments over the next 18 months.  At face value, the feeling is that their offer would be cleaner and less likely to be held up by the various due-diligence and performance clauses that SE's offer contains.

Once again, please know that we appreciate all of your efforts on behalf of the creditors and the company.  We are working extremely hard to bring everyone together and resolve the numerous complications.


On Tue, May 1, 2012 at 7:16 PM, Kevin Ogilby <kgogilby@gmail.com> wrote:

Larina,

Can you give me an update on what pieces you are waiting for to fall into place?  I need to update everyone and to make a determination on our course forward.  Thank you.


On Tue, May 1, 2012 at 1:54 PM, Larina Hintze <larinahintze@gmail.com> wrote:

Kevin maybe you can help sort this out.  I"m really not sure how to put a deal together whereby everyone is in

agreement.

A sale of TZ to SE would require a pro rata share disbursement to all creditors and it would be in direct violation of agreements in place and would set up - those that agreed to terms as well as those that took terms - for future suits and litigation if we selectively pay creditors and sell TZ assets.

| | |
|---|---|
| $75,000.00 | solar loan |
| $100,000.00 | compass loan |
| $50,000.00 | capital city loan |
| $100,000.00 | attorney's |
| $45,000.00 | Ryan Dix |
| $10,000.00 | Dex |
| $10,000.00 | Gotcha |
| $20,000.00 | Amex |
| $1,210,000.00 | Promissory notes |
| $1,620,000.00 | |
| $350,000.00 | Buy Out |
| $0.22 | |

On the other hand if TZ buys out existing promissory note holders and there is unanimous agreement with releases then you still have a pro rata buy out but since you are not selling TZ it's limited to just note holders.

| | |
|---|---|
| $1,255,000.00 | Promissory includes Dix |
| $350,000.00 | Buy Out |
| $0.28 | |

If TZ can raise working capital fine and if not at least with all the notes purchased no one will come back filing suit and it creates a more workable solution in moving forward without limitations.

It's all very complex and Matt and Larina really have no say at this point. It's contingent upon the agreements within each group. We can't force anyone to settle and we can't force anyone to buy out.

Exhibit 3 page 4

Thoughts?


On Tuesday, May 1, 2012, Kevin Ogilby wrote:

I have spoken to Rick Staab, Randy Scott, John and Sheila Spence, David Whitney, and my family. All would take a buyout from TZ at this point, assuming the payout is in the 40 cent range. So i don't feel that we will get hung up if the bid is strong enough.

On Tue, May 1, 2012 at 10:21 AM, Larina Hintze <larinahintze@gmail.com> wrote:

Kevin:

Everyone is 'marinating' on this. Our family's fate is tied to all this so the stakes have never been higher and we wish more than anyone for an expeditious resolution.

When we introduce someone new to this process they have to catch up to everyone's position and with all that's swirling around it's a lot to digest.

The buy out must be unanimous and all 8 creditors must agree to the same terms. Where does for instance Randy Scott stand. I have not contacted him as you seemed to indicate you have that firmed up.

So my question is if we have a check split among all 8 creditors pro rata waiting at Scott Walker's office with a reciprocal release of liability are you confident everyone will sign?

Thank you,
Larina


On Tue, May 1, 2012 at 9:38 AM, Kevin Ogilby <kgogilby@gmail.com> wrote:

Any word this morning?

Kevin G. Ogilby

352-226-6040

Kevin.Ogilby@duncanwilliams.com


On Apr 30, 2012, at 3:56 PM, Larina Hintze <larinahintze@gmail.com> wrote:

Kevin:


Thank you - agree contingencies are just a lay up to justify non-payment of future installments.


We are familiar with this style and format -


I'll touch base tomorrow

Exhibit 7.page 5

On Monday, April 30, 2012, Kevin Ogilby wrote:

Attached is the term sheet Ethan proposed.  I have discussed with him that several of the provisions are not needed with respect to due diligence of the Company, etc.  The agreement would be a straightforward non-compete at UF.  He has agreed that much of the legalese is not needed.


I have made no formal counter to his offer yet.  I am going to email him today to let him know we are processing the term sheet with our investors, etc.  I do want to have something to move on by close of business tomorrow though.


Look forward to hearing your alternative.


On Mon, Apr 30, 2012 at 2:07 PM, Larina Hintze <larinahintze@gmail.com> wrote:

Hi Kevin as we discussed last week we would touch base today.  We have a conference call set up for late this evening and I should have more information or at the very least an update for you tomorrow.

May we see a copy of the contract that Ethan sent that we are being asked to consider.  What is the update with the offer, counter offer on that front?

I realize timing is critical and we are moving things forward expeditiously around everyone's schedule.

Thank you,
Larina

Exhibit 7.page 6



**Matthew Hintze <matthewhintze@gmail.com>**

## Re: Touching Base

**Matthew Hintze** <matthewhintze@gmail.com>        Wed, May 2, 2012 at 4:02 PM
To: Larina Hintze <larinahintze@gmail.com>, christopher.james@warrington.ufl.edu

Hey Chris,

First off, thank you for allowing us to interrupt your vacation on a daily basis. Interesting times...

The proposal was meant to do a couple of things.

First, I want to consider the 'home run' swing - a clean balance sheet would put us in the best position to attract outside investment. We have to deal with the EBITDA and competitive landscape, but at least without the debt overhang we can narrow the objections. Of course, not to suggest we do anything disingenuous, but I want to present a cap table with a nice equity majority for Larina and I that may or may not represent any 'side deal' you and I have. I worry that a cap table with much less founders equity might turn off professional money. For all intents and purposes we may have a convertible instrument that we present to professional money as a strictly equity stake.

Second, I want to position a $3M valuation. The 15.8% was based on the $475 current investment and a $3M valuation. There is another line at the bottom labeled 'Working Capital and Debt Buyout' that is 13.2% for the $400,000 in working capital and debt buyout, based on roughly $.30 on the dollar to Spence, Staab, Scott, Whitney and Ogilby. Your additional investment would fall into this category. Jason had indicated that he felt a $3M pre-money valuation (pre second round, that is, but post summer and debt buyout) would be reasonable, as you and I had discussed a few months back.

I agree wholeheartedly with clawback, advisory board and employment contract. Critical issues going forward and items that you and I must address to your satisfaction before doing a thing.

My goal is to clean up the yard and apply fresh paint and do everything we can to attract valuable outside money without getting fleeced. As I drafted that e-mail it occurred to me that the debt buyout, though tricky, offers just such an opportunity. So now we are working multiple sides of the equation to attract new money without seeming desperate, selling the vision, and simultaneously keeping Kevin at the table though we have no fucking idea if we will be able to complete the proposed buyout.

I could type forever, but I imagine you are reading this on the phone and sipping a nice red. Thank you again.

-Matt

On Wed, May 2, 2012 at 1:29 PM, Larina Hintze <larinahintze@gmail.com> wrote:
> Chris:
>
> We will get you what you need in the format you need it in. This is out of my realm but I understand the
> concepts.
>
> Matt - Tag you are it ~
>
> On Wed, May 2, 2012 at 1:24 PM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:
>> There are a couple of issues with the proposal. First, my equity stake is way too low at 15.8%.
>> Unless you're considering some side deal, that's an implied valuation post money of about $4 million for
>> the enterprise (based on my investment including working capital of 575 K). Given the precarious nature
>> of things right now and no EBITDA, the company is simply not worth $4 million. Thus I am going to

Exhibit 7, page 7

need a greater stake, with possible claw backs. Second, I know the problems with an advisory board are fresh in your mind, but as Matt knows, any early stage investment requires some control rights for the initial investors. I trust you guys but as we just learned, the best laid plans…. You should also consider providing an employment agreement … The problem is that as sweat equity, purchase offers look different to you than for me. Consider for example the following scenario (not say you would but consider). We sign the deal and the next week you sell your equity stake at an implied enterprise value of 3 million and use the proceeds to pay off the deb leaving say $2.7 million to be divided among the shareholders. You walk away with over $1.5 million and I would receive $426K for an investment of $575K.

I am sure Matt understands the issues with this structure.

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Wednesday, May 02, 2012 9:52 AM

**To:** James,Christopher
**Subject:** Fwd: Touching Base

Chris - for consideration -

---------- Forwarded message ----------
From: **Matt Hintze**
Date: Wednesday, May 2, 2012
Subject: Touching Base
To: Larina Hintze <larinahintze@gmail.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Matthew Hintze <matthewhintze@gmail.com>
> **Date:** May 1, 2012 1:54:02 PM EDT
> **To:** Larina Hintze <larinahintze@gmail.com>, David Laiderman <david@collegeadvertisingsolutions.com>, jason <jason@hannix.com>
> **Subject:** Re: Touching Base

> Hey guys –

> Thank you very much for your insight and suggestions this morning.  Apparently I wasn't the only one staring at the ceiling last night.

> I think your points are critical insofar as bringing leverage to the negotiations.  Obviously the

fewer lawyers involved and the cleaner the break the better, but it's always helpful to understand everyone's standing.

For me, since my mind tends to err on the side of optimism, I am focused on 'solving' the gun pointed at our head but I can't help but smile when thinking about the tremendous gift that this turn of events provides - I am blown away by the opportunity to clean up a ton of wreckage in one fell swoop.  We absolutely will get the debt buyout and summer working capital done.  Period.  This will be an absolute blessing in terms of reducing our debt and cleaning up our balance sheet.  Further, we consolidate persons involved to people that are extreme TutoringZone advocates.

As you both observed, the most realistic candidates for the additional funding required right now are Chris, Creed and my parents.  Once secured, this gives us a window of 10 – 12 months to enhance existing operations and plan for success.

So that boils the items for consideration to the 'big picture' as we discussed last night.

1.  TutoringZone would have a cap table as follows:

Equity:

| | |
|---|---|
| Matt and Larina Hintze | 58.5% |
| Employees | 10% |
| Chris James | 15.8% |
| Bruce and Patricia Hintze | 2.2% |
| Working Capital and Debt Buyout | 13.5% |

Notes:  Chris (who brings a ton of contacts and connections as an Eminent Scholar in Finance at UF and founding partner of Cornerstone Research) and Bruce and Patricia Hintze as only 'outside investors'.

Debt:

$295,000 in bank and trade credit.

Notes:  Creed Greer entirely off the books as a 'Real Estate Investor' in Hintze Management.

Exhibit 7.page 9

I feel like the vision is robust and this capital structure would allow us to create a compelling

story for investors.

So then the question for consideration is whether the opportunity is attractive for you both.  I am an intuitive decision maker; as such, I can clearly see the value that each of us would bring to the entity and allow for the greatest likelihood for success.

-        Dave, your marketing expertise and experience building a network of campus reps is essential to executing a national rollout.

-        Jason, your wealth of experience and passion for education would clearly help us position TZ as a leader in online supplemental learning of all sorts.

-        My expertise in hiring and training instructors and innovation in online delivery would assure that we always have a high quality and affordable product that is at the forefront of technology and compelling for students.

So for me it boils down to a strong desire to bring our complementary skills together with this strong and proven concept that has a 12-year track record.  Of course, you've both heard the 'how did Matt and Larina meet' story, right?  Obviously I move quite quickly.  The track record is unbelievably solid, but the variance (i.e. Ethan!) has caused some angina.

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 10

---------- Forwarded message ----------
From: **James,Christopher** <christopher.james@warrington.ufl.edu>
Date: Thu, May 3, 2012 at 12:56 PM
Subject: RE: Disclosure of New Investor Prospect
To: Larina Hintze <larinahintze@gmail.com>


Call me on the phone you texted me on. 352-284 0019

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Thursday, May 03, 2012 12:45 PM
**To:** Kevin Ogilby
**Cc:** David Whitney; Rick Staab; Randy Scott; James,Christopher; John Spence; Sheila Spence;
sally scott; Greer,Creed C,III; Bphintze@bellsouth.net; James,Christopher
**Subject:** Re: Disclosure of New Investor Prospect

agreed.  I have a call into them.
On Thu, May 3, 2012 at 12:43 PM, Kevin Ogilby <kgogilby@gmail.com> wrote:
I feel like we should be able to know who these prospective investors are and we should get a call set up
with them Immediately.  They should want to speak with us sooner rather than later if they are serious
about getting a deal done.

Kevin G. Ogilby
352-226-6040
Kevin.Ogilby@duncanwilliams.com

On May 3, 2012, at 12:36 PM, Larina Hintze <larinahintze@gmail.com> wrote:
Hello Group:

This is an extremely frustrating process for all.  As much as our time line is now, the new group has no
incentive to act quickly.  I understand from Kevin that if we do not accept the StudyEdge offer today then
some of you will be filing judgments against us.  My response is that I understand but would be sad as I
think that puts a nail in the coffin and extinguishes any chance of a bail out.

I expressed to Kevin that I can not speak for the group and my impression of many group members is they
would not sell a non-compete to SE as the contract is riddled with outs for Ethan that at best MAY yield .10
cents on the dollar.

Kevin indicated he spoke with Chris and Chris would take this deal and felt only Creed and matt's parents
were the 'hold outs'.  We agreed it would be best to poll everyone so everyone knows directly where each
person stands.

It was also expressed that Matt and Larina could make this deal happen and we did not need all the
creditors to agree.

However, we spoke with legal about 'preferential treatment' to creditors, signing a deal without the
creditors consent and that is fraud and we would be tied up in litigation for years.

TZ is out of funds, Matt and Larina are out of funds and we are at the mercy of existing creditors as well as
new potential creditors.

Exhibit 7.page 11

SpenceReq001122

Here are some questions and thoughts based on my conversation with Kevin for everyone to consider:

Is it possible for you all to wait and at least see if this group or internal creditors will come through with a buy out?  Everyone knows that no matter what 5/13 is a drop dead deadline as TZ will not be able to make payroll without funding.

Kevin stated the concern is that we would file bankruptcy and extinguish all chances of a sale to SE.  I asked Kevin is there a creative way to draft a document that we will not file bankruptcy during this 'waiting time' or further that we promise to pay x cents on the dollar no matter what even if we file bankruptcy.  He indicated no.

Do we have any creative solutions that are not as finite and litigious is my question?  Something that makes everyone feel comfortable with waiting?

Is it possible Kevin to ask Ethan to put the upfront cash in escrow of $350k.  Also can you keep a dialogue going with him so that we have time to get all offers in?

Maybe tell him we have an offer to purchase TZ and we are working that deal so he may want to bring his best foot forward as they come with a war chest.  If Ethan was wise he would have offered a **MINIMUM of $835k** now with a willingness to go up to $1.6 (a pay back of the $835k he was paid and a pay out of same but with a NON-COMPETE which we all realize **now** is extremely valuable).

**OR OFFER TO REVERSE THE OFFER.  We take over his lease, we buy him out under the same terms and he gives us a non-compete.  With 10 years financials and an overnight profit of $600k annualized with a non-compete we could definitely raise the capital.**

His creditors are not happy with him either because he had an unlimited marketing budget, gave everything away for free, paid huge signing bonuses, slashed prices to 50% of ours, has a location right across from campus and only got 50% of the market for exam reviews and 25% for weekly reviews.

He told his creditors we would be closed shortly after the buy out and he would lock down all our tutors.  We all know the summer is dry and so for him to be willing to buy TZ means he is worried.  If he was so confident we were done then why even bother to make an offer right before summer.  Why not just wait for the ship to sink?

We know why because his revenues are less than ours:

Exam reviews are $25 per month x 2850 = 71,250 x Jan-April = $285,000
SE gets 50% of this market as represented by $285k

Weekly reviews are $50 per month x 274 = 13,700 x Jan-April = $54,800
SE gets only 25% of this market as represented by $54,800

Total is $339,800.  Our revenues were $479k year to date.

We also have about 30% less in expenses back of the envelope.  So his burn rate is staggering.  His expenses based on staff and payroll are at least $150k per month - that's $600,000 jan - april.

So he's loosing conservatively $65k per month.  This does not take into account ALL HIS DISCOUNTS AND FREE MEMBERSHIPS but DOES take into account ours as our numbers are actual.

We know these are the numbers and the market split because we have 10 years of semester over semester data and last year we got x and this year we got x and it's easy math.

Let's assume he started with $1.6 million (our pay out plus the funds pledged if we won bid)
$250k in taxes (marc calculated if we had lost the bid and got the $800k)

Exhibit 7.page 12

SpenceReq001123

$250k in build out
150k startup (chairs, tables, computers, tshirts, pens, copiers etc)
$50k summer advertising
$200k loss over summer 6/15 - 8/15 with zero revenue and all the starting staff payroll and signing bonuses
$200k fall loss at burn rate
$260k spring loss at burn rate
_____
1,360,000

So that leaves only $310k which is interesting since his Term Sheet gives him until 2013 to raise the balance.

Paying $835k means he got TMS for free, GIN for Free, and TZ for FREE with a **non-compete.** He made such a complex and absurd term sheet which made it that much harder to bring folks together.

The possible new investor group was prepared to fly down Tuesday which I put calls out to all the creditors to see if they were interested in that.  Randy also followed up with an email to chat and it seemed at that time everyone was focused on working a deal with Ethan and did not want to meet.

Now their schedules are full.  I have a call into them but it's a brand new relationship and if we start asking them if they want to make a baby after just a few dates....  It's a delicate balance and pushing them would only make them want to pay less not more.  We have to patiently negotiate the best deal possible and giving them a deadline of today would not accomplish that - do you agree?

On Thu, May 3, 2012 at 10:10 AM, Kevin Ogilby <kgogilby@gmail.com> wrote:
All:

I have asked Larina to disclose the new investor prospects that they are dealing with.  I feel in order for us to make any reasonable decision on whether to wait on their investment decision we must have a thorough understanding of who they are and their capabilities.

Larina said she would contact them to see if they would disclose their identity.  I will leave it there for now.  I think it would productive for other folks to chime in on this as I am getting to the point of utter frustration with this process.

Exhibit 7.page 13

SpenceReq001124



Larina Hintze <larinahintze@gmail.com>

---

# Re: Spence Meeting
1 message

---

Larina Hintze <larinahintze@gmail.com>                                    Mon, May 7, 2012 at 3:57 PM
To: "James,Christopher" <christopher.james@warrington.ufl.edu>

Chris:

Thinks seemed to have peaked in escalation and are settling back down - very interested in Jeff's input.

Thank you,
Larina

On Monday, May 7, 2012, James,Christopher wrote:

> Sorry I was travelling over the weekend and did not have cell service. I am speaking with Jeff today to get a
> sense of the legal issues in restructuring. I will call you later and fill you in.
>
>
> **From:** Larina Hintze [mailto:larinahintze@gmail.com]
> **Sent:** Sunday, May 06, 2012 2:20 PM
> **To:** James,Christopher
> **Subject:** Spence Meeting
>
>
> Sheila asked me to lunch.
>
> She said Kevin told the creditor group they did not know about the GIN take down or the non-compete.  I was
> personally in the Duncan Williams meeting where with all the DW staff Matt outlined all this in front of Kevin
> and Whit.
>
> They are probably embarrassed and looking to cover their tracks. That is the nexus of everyone's distrust.
>
> I have a call into Scott Walker and Rus Hintze as I'm fairly confident they both had pre-closing talks with Kevin
> and if they did then I will authorize Walker to talk with the Spence's.
>
> Sheila said they think things have spiraled out of control with Whit's and Kevin's 'toxicity' and they want to try
> to 'fix' things.  She proceeded to ask questions about how much we need for 5/13 payroll and soft suggestions
> they may want to at least keep us going for this payroll.
>
> She also said they wanted to get all creditors in the same room "even if Whit and Kevin" are not there.  I told
> her to let me know and we could call a meeting and be there.
>
> I expected her to tell me hey heads up we are filing suit so I did not expect this meeting.
>
> I reaffirmed that we wanted to make everyone whole and pay everyone back but that would take time.
>
> i also said the potential investor group was anxious to meet everyone based on subordination and when they
> saw that creditors were negotiating with Ethan and looking for a pay out they thought the situation was insane
> and I think that ship may have sold.
>
> So I left things open ended....  Thought you should have this update.

Exhibit 7 page 14

Also did you want us in on the call with the attorney?

Thank you for everything....

Exhibit 7.page 15



Larina Hintze <larinahintze@gmail.com>

---

# Re: Spence Meeting
1 message

---

**Larina Hintze** <larinahintze@gmail.com>                                  Mon, May 7, 2012 at 3:57 PM
To: "James,Christopher" <christopher.james@warrington.ufl.edu>

Chris:

Thinks seemed to have peaked in escalation and are settling back down - very interested in Jeff's input.

Thank you,
Larina

On Monday, May 7, 2012, James,Christopher wrote:

> Sorry I was travelling over the weekend and did not have cell service. I am speaking with Jeff today to get a
> sense of the legal issues in restructuring. I will call you later and fill you in.
>
>
>
> **From:** Larina Hintze [mailto:larinahintze@gmail.com]
> **Sent:** Sunday, May 06, 2012 2:20 PM
> **To:** James,Christopher
> **Subject:** Spence Meeting
>
>
>
> Sheila asked me to lunch.
>
> She said Kevin told the creditor group they did not know about the GIN take down or the non-compete.  I was
> personally in the Duncan Williams meeting where with all the DW staff Matt outlined all this in front of Kevin
> and Whit.
>
> They are probably embarrassed and looking to cover their tracks. That is the nexus of everyone's distrust.
>
> I have a call into Scott Walker and Rus Hintze as I'm fairly confident they both had pre-closing talks with Kevin
> and if they did then I will authorize Walker to talk with the Spence's.
>
> Sheila said they think things have spiraled out of control with Whit's and Kevin's 'toxicity' and they want to try
> to 'fix' things.  She proceeded to ask questions about how much we need for 5/13 payroll and soft suggestions
> they may want to at least keep us going for this payroll.
>
> She also said they wanted to get all creditors in the same room "even if Whit and Kevin" are not there.  I told
> her to let me know and we could call a meeting and be there.
>
> I expected her to tell me hey heads up we are filing suit so I did not expect this meeting.
>
> I reaffirmed that we wanted to make everyone whole and pay everyone back but that would take time.
>
> i also said the potential investor group was anxious to meet everyone based on subordination and when they
> saw that creditors were negotiating with Ethan and looking for a pay out they thought the situation was insane
> and I think that ship may have sold.
>
> So I left things open ended....  Thought you should have this update.

Also did you want us in on the call with the attorney?

Thank you for everything....

Exhibit 7.page 17

---------- Forwarded message ----------
From: **James,Christopher** <christopher.james@warrington.ufl.edu>
Date: Tue, May 8, 2012 at 1:45 AM
Subject: RE: Spence emailed tutors
To: Larina Hintze <larinahintze@gmail.com>


I spoke with Jeff yesterday and I am planning another call with him today. As I indicated last week the problem that we have is that we do not have the 350K to put a down payment on creditors buyout and get you through the summer. If Matt's parents put in say 100K and I put in 125k we are still 125K short. I don't see any way around the fact that to stay open you need to raise another 125K. Jeff suggested one avenue that would be less expensive is to file for bankruptcy and then arrange the sale of the TZ name to an LLC that I set up and then I hire Matt and the tutors and we find a small space to rent. The other creditors will obviously not be happy.
Jeff did indicate that, except for Matt, non competes are largely unenforceable which is why Ethan's offer is contingent.
Let me know what a good time to talk is.

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Monday, May 07, 2012 8:57 PM
**To:** James,Christopher
**Subject:** Spence emailed tutors

The positive is that he asked for feedback on how everyone is doing - which I sense means he's reinvesting and considering coming back in.

The negative is the tutors called and Jon a who was further in the email thread indicated spence said we have a big decision to make as next week do you know tz would be out of funds.

I asked Matt to call spence - which he left word to rein this line of discussion in - if that is really want spence is telling tutors - obviously we didn't tell them and presumed everyone would understand that is not how to handle this.  If this comes from creditors while Matt's veneer reassuring everyone - it once again undermines Matt.

We were caught off guard that after 4 months of no involvement with our team - spence took it upon himself to do this without our consent.

However we don't want to thwart spence - if this is what he needs to feel comfortable moving forward.

Another delicate balance - but I keep encouraging Matt to keep in close contact with creditors -

Kevin also left me a message and seemed calmer and Sheila said she thought even Kevin could be salvaged.  Matt has a call into Kevin as well - taking your advice that matt should start to reach out more to everyone.

Wish you were here - when are you coming back?

Exhibit 7.page 18

SpenceReq001722



Matthew Hintze <matthewhintze@gmail.com>

# Thank You - Payroll - Future

1 message

**Larina Hintze** <larinahintze@gmail.com>                    Wed, May 9, 2012 at 9:06 PM
To: Christopher James <christopher.james@cba.ufl.edu>, Matthew Hintze <matthewhintze@gmail.com>

Chris and Matt (my thoughts after digesting all this):

**First thank you**.

I know this has eaten up a great deal of time and resources and I'm very sorry - WE WILL MAKE YOU PROUD :- )

We are both humbly thankful for all that you've done.  We had a lot to digest and we are right back to it getting everything ready.  Jeff is meeting with us at 9:00 a.m.

One thought that keeps rattling around is that I think we should all think about how to keep our key tutors that are expecting to get paid 5/14/12.  We earn about $40k a month in revenue and if we only have payroll it's about $50k for our key team.

That significantly narrows the shortfall to $10k.  Further, **if you and only you** (and NO wacky creditor) addresses the tutors we may even keep them and get them to agree to a different pay model.

If we did a variable pay that made sense they may buy into that if we emphasize that expansion means more revenues and if it goes well = pay raises.  If they agree to less now we all would be wise to agree to give them more later (equity, profit share, etc).

If we keep going over the summer and don't loose the key members then as we re-organize we don't loose all that revenue and all those customers.

Matt's parents are already on board for 2-1/2 months of this shortfall $25k.  We need more now until revenues come in so Matt's parents or whomever is willing would once again be granting Payroll Advances - first paid back out of revenues.

Kevin had a very good call with Matt and he seemed to be on board FINALLY with the reality of where we are at.

He encouraged Matt to call a creditor meeting when you are back on Monday.  He also indicated that Staab and maybe even himself would invest in TZ if we default on all the non-personal debt and present a profitable plan moving forward.  He was talking about a 5 year repayment.  Listen we are down with paying everyone back every cent as long as everyone is rational!  This drama is just to much and I'm sure you are just as tired of it as we are.

I think just Whit and NOW Spence(s) are the only really upset members and unstable - My sense is that Sheila misinterpreted our meeting - rattled John - now he's pissed about things I'm sure I didn't say!  Thank you for sparing me reading the email she circulated ~

Randy, Rick, Creed, you, parents and now Kevin seem pretty square on things - do you have same impression?

I have the civil suit document (100 pages complete with exhibits, proof, dates, time etc) - a copy is attached.  I feel very strongly that we can get him!  Especially now that he's jerked around UGA employees and maybe they will jump on board with a suit and be witnesses as they saw a lot of what happened.

I think that keeping ALL THE PRIVATE MONEY happy keeps us from nasty litigation etc.  We just need IRON CLAD docs for them to sign:
They will not contact any TZ employee

They will agree to monthly reports and have one POC at TZ or from the new governing board.
We have a stable governing board.

Re-Organization seems like the best course to stay all the claims?  In that process we can work out settlements
with all the non personal creditors.



**TZ vs SE GPD.doc**
6370K

Exhibit 7.page 20



Larina Hintze <larinahintze@gmail.com>

## RE: Disclosure of New Investor Prospect
1 message

**James,Christopher** <christopher.james@warrington.ufl.edu>                    Thu, May 3, 2012 at 12:56 PM
To: Larina Hintze <larinahintze@gmail.com>

Call me on the phone you texted me on. 352-284 0019

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Thursday, May 03, 2012 12:45 PM
**To:** Kevin Ogilby
**Cc:** David Whitney; Rick Staab; Randy Scott; James,Christopher; John Spence; Sheila Spence; sally scott; Greer,Creed C,III; Bphintze@bellsouth.net; James,Christopher
**Subject:** Re: Disclosure of New Investor Prospect

agreed.  I have a call into them.

On Thu, May 3, 2012 at 12:43 PM, Kevin Ogilby <kgogilby@gmail.com> wrote:

I feel like we should be able to know who these prospective investors are and we should get a call set up with them Immediately.  They should want to speak with us sooner rather than later if they are serious about getting a deal done.

Kevin G. Ogilby

352-226-6040

Kevin.Ogilby@duncanwilliams.com

On May 3, 2012, at 12:36 PM, Larina Hintze <larinahintze@gmail.com> wrote:

Hello Group:

This is an extremely frustrating process for all.  As much as our time line is now, the new group has no incentive to act quickly.  I understand from Kevin that if we do not accept the StudyEdge offer today then some of you will be filing judgments against us.  My response is that I understand but would be sad as I think that puts a nail in the coffin and extinguishes any chance of a bail out.

I expressed to Kevin that I can not speak for the group and my impression of many group members is they would not sell a non-compete to SE as the contract is riddled with outs for Ethan that at best MAY yield .10 cents on the dollar.

Kevin indicated he spoke with Chris and Chris would take this deal and felt only Creed and matt's parents were the 'hold outs'.  We agreed it would be best to poll everyone so everyone knows directly where each person stands.

It was also expressed that Matt and Larina could make this deal happen and we did not need all the creditors to agree.

Exhibit 7.page 21

However, we spoke with legal about 'preferential treatment' to creditors, signing a deal without the creditors consent and that is fraud and we would be tied up in litigation for years.

TZ is out of funds, Matt and Larina are out of funds and we are at the mercy of existing creditors as well as new potential creditors.

Here are some questions and thoughts based on my conversation with Kevin for everyone to consider:

Is it possible for you all to wait and at least see if this group or internal creditors will come through with a buy out?  Everyone knows that no matter what 5/13 is a drop dead deadline as TZ will not be able to make payroll without funding.

Kevin stated the concern is that we would file bankruptcy and extinguish all chances of a sale to SE.  I asked Kevin is there a creative way to draft a document that we will not file bankruptcy during this 'waiting time' or further that we promise to pay x cents on the dollar no matter what even if we file bankruptcy.  He indicated no.

Do we have any creative solutions that are not as finite and litigious is my question?  Something that makes everyone feel comfortable with waiting?

Is it possible Kevin to ask Ethan to put the upfront cash in escrow of $350k.  Also can you keep a dialogue going with him so that we have time to get all offers in?

Maybe tell him we have an offer to purchase TZ and we are working that deal so he may want to bring his best foot forward as they come with a war chest.  If Ethan was wise he would have offered a **MINIMUM of $835k** now with a willingness to go up to $1.6 (a pay back of the $835k he was paid and a pay out of same but with a NON-COMPETE which we all realize **now** is extremely valuable).

**OR OFFER TO REVERSE THE OFFER.  We take over his lease, we buy him out under the same terms and he gives us a non-compete.  With 10 years financials and an overnight profit of $600k annualized with a non-compete we could definitely raise the capital.**

His creditors are not happy with him either because he had an unlimited marketing budget, gave everything away for free, paid huge signing bonuses, slashed prices to 50% of ours, has a location right across from campus and only got 50% of the market for exam reviews and 25% for weekly reviews.

He told his creditors we would be closed shortly after the buy out and he would lock down all our tutors.  We all know the summer is dry and so for him to be willing to buy TZ means he is worried. If he was so confident we were done then why even bother to make an offer right before summer. Why not just wait for the ship to sink?

We know why because his revenues are less than ours:

Exam reviews are $25 per month x 2850 = 71,250 x Jan-April = $285,000
SE gets 50% of this market as represented by $285k

Weekly reviews are $50 per month x 274 = 13,700 x Jan-April = $54,800
SE gets only 25% of this market as represented by $54,800

Total is $339,800.  Our revenues were $479k year to date.

We also have about 30% less in expenses back of the envelope.  So his burn rate is staggering. His expenses based on staff and payroll are at least $150k per month - that's $600,000 jan - april.

So he's loosing conservatively $65k per month.  This does not take into account ALL HIS DISCOUNTS AND FREE MEMBERSHIPS but DOES take into account ours as our numbers are actual.

Exhibit 7.page 22

We know these are the numbers and the market split because we have 10 years of semester over semester data and last year we got x and this year we got x and it's easy math.

Let's assume he started with $1.6 million (our pay out plus the funds pledged if we won bid)
$250k in taxes (marc calculated if we had lost the bid and got the $800k)
$250k in build out
150k startup (chairs, tables, computers, tshirts, pens, copiers etc)
$50k summer advertising
$200k loss over summer 6/15 - 8/15 with zero revenue and all the starting staff payroll and signing bonuses
$200k fall loss at burn rate
$260k spring loss at burn rate
_____
1,360,000

So that leaves only $310k which is interesting since his Term Sheet gives him until 2013 to raise the balance.

Paying $835k means he got TMS for free, GIN for Free, and TZ for FREE with a **non-compete.**
He made such a complex and absurd term sheet which made it that much harder to bring folks together.

The possible new investor group was prepared to fly down Tuesday which I put calls out to all the creditors to see if they were interested in that.  Randy also followed up with an email to chat and it seemed at that time everyone was focused on working a deal with Ethan and did not want to meet.

Now their schedules are full.  I have a call into them but it's a brand new relationship and if we start asking them if they want to make a baby after just a few dates....  It's a delicate balance and pushing them would only make them want to pay less not more.  We have to patiently negotiate the best deal possible and giving them a deadline of today would not accomplish that - do you agree?


On Thu, May 3, 2012 at 10:10 AM, Kevin Ogilby <kgogilby@gmail.com> wrote:

All:

I have asked Larina to disclose the new investor prospects that they are dealing with.  I feel in order for us to make any reasonable decision on whether to wait on their investment decision we must have a thorough understanding of who they are and their capabilities.

Larina said she would contact them to see if they would disclose their identity.  I will leave it there for now.  I think it would productive for other folks to chime in on this as I am getting to the point of utter frustration with this process.

Exhibit 7.page 23



## Re: Handout for Meeting tonight

1 message

**James,Christopher** <christopher.james@warrington.ufl.edu>                Wed, May 16, 2012 at 9:08 AM
To: Matthew Hintze <matthewhintze@gmail.com>
Cc: Larina Hintze <larinahintze@gmail.com>

Let's meet first thing Thursday Am. Please bring with you the past business plan, financials for this year and outline of the structure that you are going to go with in the restructuring. I am going to meet with Jeff following are meeting to get some idea of my exposure under the plan as well as having him work on the documentation for the transaction. I am still on European time so we can meet as early as you would like. Have you looked into what documentation that is needed to get a release from the other creditors? My understanding is that some of the notes have restrictions on asset sales. Do you have copies of the other notes. If so bring those with you as well as any other docs you think are helpful to understand the position I will have going forward. Thanks

Sent from my iPad

On May 15, 2012, at 15:03, "Matthew Hintze" <matthewhintze@gmail.com> wrote:

> Thanks Chris.  Let me know what time works for you and I will plan on coming by campus.
>
> -Matt
>
>
>
> On Tue, May 15, 2012 at 6:05 AM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:
>> That was my takeaway as well. Back in Gainesville on Wednesday and will touch base with you then.
>>
>> Sent from my iPad
>>
>> On May 14, 2012, at 21:08, "Matthew Hintze" <matthewhintze@gmail.com> wrote:
>>
>>> My understanding of what just happened is
>>>
>>> A.  People have written off their money, just wanted our word that when successful we will pay them back based on moral obligation.
>>> B.  Not too interested in equity in new company.  Just want our word in exchange for not contesting and making a hard time.
>>> C.  Kevin pitched that it would be smart for each of them to invest a few dollars ('get your retainer back and give to TZ') for the DIP financing.  More on that asap.
>>> D.  They would like an e-mail from Larina to confirm that I relayed A and B very clearly to you.  Simply note that we have the inner moral intention of paying them all back eventually, whether it takes a lifetime or not, when we are wildly successful.
>>>
>>>
>>>
>>> On Mon, May 14, 2012 at 7:09 PM, Larina Hintze <larinahintze@gmail.com> wrote:
>>>> Matt:

Exhibit 7.page 24

This guaranty is confusing to me - it seems to survive Chapter 7 but I'm not sure when both personal and business since?

I do not see where it's listed in the lease that is 'secured'.

I would want a legal opinion - this is a complex lease.

On Mon, May 14, 2012 at 5:44 PM, Matthew Hintze <matthewhintze@gmail.com> wrote:
> Based on that, what do you think of the outlined recommendation?

>> On Mon, May 14, 2012 at 5:36 PM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:
>> Good.
>>
>> Sent from my iPad
>>
>> On May 14, 2012, at 17:34, "Matthew Hintze" <matthewhintze@gmail.com> wrote:
>>
>>> Both bank lines are unsecured (I checked out note with them).  Solar loan is secured ONLY by solar panels.
>>>
>>>
>>> On Mon, May 14, 2012 at 5:31 PM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:
>>> Not sure I really follow this. Doesn't the bank have a secured position so won't you need them to approve before you can give a secured interest in the intellectual property of tutoring zone?
>>>
>>> Sent from my iPad
>>>
>>> On May 14, 2012, at 17:16, "Matthew Hintze" <matthewhintze@gmail.com> wrote:
>>>
>>>> Chris -
>>>>
>>>> Welcome back.  Thanks for working so patiently through the past few weeks.
>>>>
>>>> I would like to hand out the attached doc at our meeting tonight.  Based on conversation with Lisa today, I think the 'recommendation' on the first page is superior to the pump and dump.  Any comments?
>>>>
>>>> I have not entered the equity percentages for existing creditors, new working capital, etc.  I think they will be looking for suggestions but I did not want to do to much on this front before speaking to you.

Exhibit 7.page 25

Randy, John, Whit, Kevin and Rick total $518,000. I think that chunk deserves 15% - 20% at best. I mean, the only reason for them to get anything is as an olive branch.

Do we assign a valuation and assign equity to you, Creed and my parents, as well as employees, based on that? Rationally, I guess we have to treat ALL existing notes equally. We can build clawbacks into this framework, of course.

Newco should be an LLC so we can have multiple classes of stock, correct? If so, then new capital can be preferred with 5% dividend and conversion at valuation of $x. Existing indebtedness is granted common.

-Matt

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

<5.14.docx>

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 26

Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 27

**TutoringZone Resolution**

Each option involves Matt and Larina Hintze filing personal bankruptcy.


**Option 1**

Sell Assets to New Company

Mechanics

BK Hintze, Wind Down TZ
Equity to New Capital
- Consideration for existing Noteholders
- Clawback
One Opinion:  Opens equity in NEWCO to fraud
Second Opinion:  Liabilities go with assets.

**Option 2**

Reorganization

**Option 3**

Chapter 7, open new company


**Recommendation:**

1. TZ Grant secured interest in intangible property, remaining physical assets of TZ.  Use this money to fund bills over summer.
2. Begin the bankruptcy process.
3. Negotiate with other creditors to extend winding down process
   - Can we stay at TZ while they look for new tenant if we pay CAM's?
   - How long before Zeno comes to get copy machines?
4. By fall – obtain business valuation, sell TZ assets through receiver.
   - If Auction Value < Lien for New Capital, all assets go to Lienholder(s)
   - If Value > Lien, then additional funds distributed pro-rata

Exhibit 7.page 28

**<u>Debt</u>**

| | |
|---|---|
| AMEX | $18,386.27 |
| Compass - Line of Credit | $100,000.00 |
| Capital City - Line of Credit | $50,000.00 |
| Capital City - Solar Loan | $72,167.72 |
| Ryan Dix | $40,000 |
| Dex | $6,875.26 |
| Gotcha | $6,000.00 |
| Chris James | $475,000 |
| Creed Greer | $150,000 |
| Rick Staab | $150,000 |
| Kevin Ogilby and Family | $143,000 |
| David Whitney | $125,000 |
| John and Sheila Spence | $75,000 |
| Bruce and Patricia Hintze | $67,000 |
| Randy and Sally Scott | $25,000 |
| | $1,503,429.25 |

**Contracts / Bank Loans**

| | Contract Start - End Dates | | |
|---|---|---|---|
| RMC Lease | 7/1/10 - 6/30/16 | $9,569.18 | $478,189.00 |
| Capital City Solar | 7/12/10 - 11/1/18 | $718.33 | $72,167.72 |
| Capital City Line of Credit | 7/19/10 - 7/19/14 | $1,534.92 | $41,439.24 |
| Compass Bank Line of Credit | 6/21/10 - 6/21/12 | $455.52 | $99,999.10 |
| U.S. Bankcorp Equip Finance | 8/11/10 - 7/30/15 | $3,706.69 | $185,334.50 |
| | | | **$877,129.56** |

Exhibit 7.page 29

## Current Position
Bank Balance                 $10,000

| Payroll - Tuesday | | Payroll - Mail/Hold | |
|---|---|---|---|
| Alek Hartzog | $1,491.67 | Matt Hintze | $5,000.00 |
| Jake Rosenzweig | $1,300.00 | Jon Aleman | $5,000.00 |
| Kyle Hannabass | $581.30 | Lauren Figler | $2,153.33 |
| Jon Samuelson | $528.00 | Aaron Figler | $575.50 |
| Lan Hoang Minh | $210.00 | Michael Underwood | $2,083.33 |
| Rob Bailey | $516.00 | John Kavekos | $2,991.67 |
| Katie Murphy | $437.50 | Zayda Lima | $103.50 |
| Jackie Grill | $48.20 | Anna Hartzog | $134.70 |
| TJ O'Toole | $36.98 | Siobhan Waldron | $31.30 |
| Veronica Veitia | $168.93 | Charlie Turner | $550.00 |
| Mariel Rector | $76.50 | Jens Engelmann | $350.00 |
| Paul Hintze | $2,741.67 | Erin Heim | $1,000.00 |
| Estimated Payroll taxes | $1,900.00 | Total | $19,973.33 |
| Total | $10,036.75 | | |

### Bills - Pay ASAP
| | |
|---|---|
| BCBS | $184.25 |
| 352 Media | $44.00 |
| Gainesville Paper Co | $109.82 |
| Zeno | $220.60 |
| Smokin Notes | $11,214.94 |
| Refunds | $180.00 |
| HOSA (donation) | $30.00 |
| 5% back for an A | $73.88 |
| Total | $12,057.49 |

### Bills - Depends, Default, Renegotiate?
| | | |
|---|---|---|
| Sexton & Schnoll | $2,773.75 | Negotiate |
| TCC | $7,202.50 | Negotiate |
| Gainesville SC Co | $9,591.74 | Stay in building? |
| GRU-internet | $1,080.00 | Stay in building? |
| GRU-Util | $2,461.14 | Stay in building? |
| Waste Pro | $426.65 | Stay in building? |
| Scarborough Insurance | $2,006.00 | Stay in building? |
| Retail 1st | $232.44 | Stay in building? |
| Capital City Bank | $718.33 | Default |
| US  Bank Equip Finance | $4,039.54 | Default |
| Gator Shop | $1,355.69 | Default |
| Compass | $440.83 | Default |
| Amex | $3,350.00 | Default |
| Capital City Bank | $1,534.92 | Default |
| Total | $37,213.53 | |
| | | |
| Negotiate | $9,976.25 | |
| Depends | $15,797.97 | |
| Default | $11,439.31 | |
| | | |
| Deficit (Balance - ALL Payroll and ASAP) | -$32,068 | |

Exhibit 7.page 30

**Summer Pro Forma**

Projected Revenues for the May – August Period are $140,000.  Monthly Expenses are outlined below (highlighted items are no longer paid in the event of bankruptcy):

| During breaks - Monthly Expenses - UF and FSU | | |
|---|---:|---:|
| Payroll (UF + FSU, including taxes) | $65,000.00 | |
| CC Fees | $1,000.00 | |
| Video Streaming and Hosting | $300.00 | |
| Healthcare | $653.61 | |
| Refunds | $200.00 | |
| Workers Comp Insurance | $450.00 | |
| Sexton & Schnoll | $385.00 | |
| Healthcare | $225.00 | |
| Bank Fees | $100.00 | $68,313.61 |
| Rent (UF and FSU) | $10,600.00 | |
| Copier Lease | $3,895.37 | |
| American Express | $3,350.00 | |
| Utilities | $1,700.00 | |
| Capital City Line of Credit | $1,534.92 | |
| Dex Imaging | $1,500.00 | |
| GOTCHA | $1,000.00 | |
| Internet | $809.00 | |
| Capital City Solar | $718.33 | |
| Telephone/Fax for TZ | $700.00 | |
| 352 Media/Server | $668.00 | |
| Baker Hostetler | $500.00 | |
| Folds and Walker | $500.00 | |
| Paper | $500.00 | |
| Compass Line of Credit | $486.36 | |
| Trash | $408.26 | |
| Copier Supplies | $200.00 | |
| Cleaning Supplies | $150.00 | |
| Pest Control | $53.50 | |
| Alarm | $47.81 | $29,321.55 |
| | **$97,635.16** | |

There will be additional expenses for rent (live reviews) and copies (relatively small in the summer).

Exhibit 7.page 31

**Fall**

UF and FSU appear as follows:

|  | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|
| Revenues - UF | $40,458 | $40,458 | $40,458 | $13,486 | $80,849 | $80,849 | $121,273 | $121,273 |
| Revenues - FSU | $5,497 | $5,497 | $5,497 | $1,832 | $28,995 | $28,995 | $43,492 | $43,492 |
| Expenses | $75,000 | $75,000 | $75,000 | $85,000 | $90,000 | $90,000 | $90,000 | $90,000 |
| Monthly Profit | -$29,044 | -$29,044 | -$29,044 | -$69,681 | $19,844 | $19,844 | $74,766 | $74,766 |
| Cumulative | -$29,044 | -$58,088 | -$87,133 | -$156,814 | -$136,970 | -$117,125 | -$42,359 | $32,406 |

Our strategy would be:

1.  Position the new company much like Udacity, Knewton, Coursera.  Focus on ILO's, Adaptive Technology.  Position the current offering's as Newco's TutoringZone.

2.  Work with new partners to raise capital and execute expansion strategy.

3.  Newco enter into Employment Contracts with all current employees.  Move to Variable Compensation model with tutors earning a graduated percentage of revenues between 25% and 38% of revenue for all classes.

Exhibit 7.page 32



Matthew Hintze <matthewhintze@gmail.com>

---

## Re: Handout for Meeting tonight

1 message

---

**James,Christopher** <christopher.james@warrington.ufl.edu>                    Wed, May 16, 2012 at 9:08 AM
To: Matthew Hintze <matthewhintze@gmail.com>
Cc: Larina Hintze <larinahintze@gmail.com>

Let's meet first thing Thursday Am. Please bring with you the past business plan, financials for this year and outline of the structure that you are going to go with in the restructuring. I am going to meet with Jeff following are meeting to get some idea of my exposure under the plan as well as having him work on the documentation for the transaction. I am still on European time so we can meet as early as you would like. Have you looked into what documentation that is needed to get a release from the other creditors? My understanding is that some of the notes have restrictions on asset sales. Do you have copies of the other notes. If so bring those with you as well as any other docs you think are helpful to understand the position I will have going forward. Thanks

Sent from my iPad

On May 15, 2012, at 15:03, "Matthew Hintze" <matthewhintze@gmail.com> wrote:

> Thanks Chris.  Let me know what time works for you and I will plan on coming by campus.
>
> -Matt
>
>
>
> On Tue, May 15, 2012 at 6:05 AM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:
>> That was my takeaway as well. Back in Gainesville on Wednesday and will touch base with you then.
>>
>> Sent from my iPad
>>
>> On May 14, 2012, at 21:08, "Matthew Hintze" <matthewhintze@gmail.com> wrote:
>>
>>
>>> My understanding of what just happened is
>>>
>>> A.  People have written off their money, just wanted our word that when successful we will pay them back based on moral obligation.
>>> B.  Not too interested in equity in new company.  Just want our word in exchange for not contesting and making a hard time.
>>> C.  Kevin pitched that it would be smart for each of them to invest a few dollars ('get your retainer back and give to TZ') for the DIP financing.  More on that asap.
>>> D.  They would like an e-mail from Larina to confirm that I relayed A and B very clearly to you.  Simply note that we have the inner moral intention of paying them all back eventually, whether it takes a lifetime or not, when we are wildly successful.
>>>
>>>
>>>
>>> On Mon, May 14, 2012 at 7:09 PM, Larina Hintze <larinahintze@gmail.com> wrote:
>>>> Matt:

Exhibit 7.page 33

This guaranty is confusing to me - it seems to survive Chapter 7 but I'm not sure when both personal and business since?

I do not see where it's listed in the lease that is 'secured'.

I would want a legal opinion - this is a complex lease.

On Mon, May 14, 2012 at 5:44 PM, Matthew Hintze <matthewhintze@gmail.com> wrote:
> Based on that, what do you think of the outlined recommendation?

> On Mon, May 14, 2012 at 5:36 PM, James,Christopher
> <christopher.james@warrington.ufl.edu> wrote:
>> Good.
>>
>> Sent from my iPad
>>
>> On May 14, 2012, at 17:34, "Matthew Hintze" <matthewhintze@gmail.com>
>> wrote:
>>
>>> Both bank lines are unsecured (I checked out note with
>>> them).  Solar loan is secured ONLY by solar panels.
>>>
>>> On Mon, May 14, 2012 at 5:31 PM, James,Christopher
>>> <christopher.james@warrington.ufl.edu> wrote:
>>>> Not sure I really follow this. Doesn't the bank have a
>>>> secured position so won't you need them to approve before
>>>> you can give a secured interest in the intellectual property of
>>>> tutoring zone?
>>>>
>>>> Sent from my iPad
>>>>
>>>> On May 14, 2012, at 17:16, "Matthew Hintze"
>>>> <matthewhintze@gmail.com> wrote:
>>>>
>>>>> Chris -
>>>>>
>>>>> Welcome back.  Thanks for working so
>>>>> patiently through the past few weeks.
>>>>>
>>>>> I would like to hand out the attached doc at
>>>>> our meeting tonight.  Based on conversation
>>>>> with Lisa today, I think the 'recommendation'
>>>>> on the first page is superior to the pump and
>>>>> dump.  Any comments?
>>>>>
>>>>> I have not entered the equity percentages for
>>>>> existing creditors, new working capital, etc.  I
>>>>> think they will be looking for suggestions but I
>>>>> did not want to do to much on this front before
>>>>> speaking to you.

Exhibit 7.page 34

Randy, John, Whit, Kevin and Rick total $518,000.  I think that chunk deserves 15% - 20% at best.  I mean, the only reason for them to get anything is as an olive branch.

Do we assign a valuation and assign equity to you, Creed and my parents, as well as employees, based on that?  Rationally, I guess we have to treat ALL existing notes equally.  We can build clawbacks into this framework, of course.

Newco should be an LLC so we can have multiple classes of stock, correct?  If so, then new capital can be preferred with 5% dividend and conversion at valuation of $x.  Existing indebtedness is granted common.

-Matt


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)


<5.14.docx>


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 35

Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 36



**Matthew Hintze <matthewhintze@gmail.com>**

## Fwd: LLC Operating Agreement, IP Lease

**James,Christopher** <christopher.james@warrington.ufl.edu>                    Wed, May 23, 2012 at 6:09 PM
To: Matthew Hintze <matthewhintze@gmail.com>

Comments?

Sent from my iPad

Begin forwarded message:

> **From:** "Frenchman,Cynthia L" <cynthia.frenchman@warrington.ufl.edu>
> **Date:** May 23, 2012 15:10:20 EDT
> **To:** "James,Christopher" <christopher.james@warrington.ufl.edu>
> **Subject: FW: LLC Operating Agreement, IP Lease**
>
>
> FYI
>
>
>
> **Cynthia Frenchman**
>
> **Assistant to Professor Christopher James**
>
> **University of Florida**
>
> **Warrington College of Business**
>
> **Department of Finance**
>
> **(352) 392-8041-Office**
>
> **(352) 213-2858-Cell**
>
> _____
>
> **From:** Jeffery Childers [mailto:jchilders@smartbizlaw.com]
> **Sent:** Wednesday, May 23, 2012 12:08 PM
> **To:** Frenchman,Cynthia L
> **Cc:** larina@tutoringzone.com
> **Subject:** LLC Operating Agreement, IP Lease
>
>
> Cynthia et al,
>
>
> Attached please find my first draft of the LLC Operating Agreement for Tutoring Zone II, LLC, and the Intellectual Property Lease. Note that I have Chris and Cynthia leasing the IP directly, and then assigning the lease to TZII as consideration for the initial membership units (i.e. capital contribution).

Please review these drafts carefully and return comments or concerns. If you would like to edit directly in the document, please use Word's revision tracking feature so that I can easily see what changes have been made.

Once you approve the Operating Agreement then I will set up the LLC with the State of Florida and get and FEIN. Note though that the Operating agreement ratifies the actions of the Organizer, so that Chris can begin doing things on behalf of TZII in advance of incorporation. Also, because the Lease is between TZ and the individuals, the Lease can be executed immediately and the Lease Payment made as soon as necessary.

I look forward to receiving your feedback.

Thanks,

Jeff

# NOTICE: OUR ADDRESS HAS CHANGED:

**Contact Information** |

| | **Seldon Jeff Childers** |
| | jchilders@smartbizlaw.com |
| T 866.996.6104 | |
| 352-335-0400 | |
| F 407.209.3870 | Childers*Law, LLC |
| | 2135 NW 40th Terrace, Suite B |
| www.smartbizlaw.com | Gainesville, FL 32605 |

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

---

**4 attachments**

 **Lease for Intellectual Property of Tutoring Zone.docx**
100K

 **ATT00001.htm**
1K

**Tutoring Zone II Operating Agreement.doc**

 90K

 **ATT00002.htm**
1K

Exhibit 7.page 39

# INTELLECTUAL PROPERTY LEASE

**between**

## TUTORING ZONE, LLC

**and**

## CHRIS JAMES AND CYNTHIA FRENCHMAN

THIS AGREEMENT (the "Lease" or "Agreement") is made and entered into as of May 22, 2012, between Tutoring Zone, LLC ("Lessor") and Chris James and Cynthia Frenchman ("Lessees").

# R E C I T A L S

A.      Lessor owns the intellectual property rights to certain course materials, videos, instructional materials, workbooks, computer software, electronic documents, training materials, forms, coursework, web materials (the "Intellectual Property").

B.      Lessor owns the right to use the "Tutoring Zone" brand name, which is a common-law trademark of Lessor (the "Mark").

C.      Lessee desires to lease from Lessor the complete and non-exclusive right to use the Intellectual Property and to use the Mark.

D.      Lessor desires to lease the rights to use the Intellectual Property and the Mark to Lessees.

**NOW, THEREFORE,** in consideration of the mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Exhibit 7.page 40 Lease of Intellectual Property – Tutoring Zone
Page 1 of 6

### A G R E E M E N T

1.      The Recitals set forth above are incorporated herein as though fully set forth in this paragraph, and the Parties agree that the Recitals constitute a true and correct statement of fact.

2.      Upon execution of this Lease by both Parties, Lessees shall pay to Lessor a one-time lump-sum payment of seventy-five thousand dollars ($75,000.00) (the "Lease Payment") as consideration for this Lease.

3.      Upon receipt of the Lease Payment, Lessors will deliver the Intellectual Property to Lessees, including electronic source documents and all source materials.

4.      Lessor shall grant to Lessees an unrestricted lease for use of the Intellectual Property for a term of ten (10) years (the "Initial Term"). Lessees may at their option renew the lease for an infinite number of successive ten (10) year terms ("Successive Period") for ten thousand dollars ($10,000.00) per ten-year lease period (the "Successive Period Payment"). The Successive Period Payments shall be paid monthly during each such Successive Period, such that the Lessees will pay $80 per monthly period for 119 periods, and a final payment in the 120th month of $320.00.

5.      Unrestricted use by Lessees includes: copying, modifying, improving, publishing, distributing, reproducing, selling, leasing, and making any other use of the Intellectual Property that might reasonably be required to market, sell, and deliver tutoring services.

6.      Lessees may assign the Lease and/or the rights pursuant to the Lease to any third party without notice to Lessor.  Such assignment may be complete or partial, and may be exclusive or non-exclusive.

Exhibit 7.page 141 Lease of Intellectual Property – Tutoring Zone
Page 2 of 6

7.    Any and all modifications or improvements of the Intellectual Property shall become the sole property of Lessees.

8.    Lessees are specifically and non-exclusively entitled to use the Mark as follows:

a)  Lessees may display the Mark on any of the Intellectual Property, with or without attribution.

b)  Lessees may publish the Mark in any marketing materials, online, or on the building where Lessees provide services to customers.

c)  Lessees may incorporate the Mark into the name of an entity formed to provide services using the Intellectual Property. However, such name shall not be identical to the Mark.  Specifically, but without restriction, Lessees are permitted to use the name "Tutoring Zone II, LLC." The Lessees' right to use the Mark as described in this section shall survive the expiration or termination of the Lease.

d)  Lessees may not explicitly hold themselves out to be Lessor or to be affiliated with Lessor.

9.    **Termination**. Lessees may terminate the Lease by written notice to Lessor.  Lessor may not terminate the Lease.  If Lessees terminate the Lease prior to the expiration of the Initial Period, then Lessor shall pay to Lessees the pro-rata un-used portion of the Lease Payment.

10.    **Expiration**. The Lease shall expire at the end of the Initial Period provided that Lessees do not elect to continue for one or more Successive Periods.  The Lease shall expire at the end of a Successive Period if and when the Lessees do not elect to continue for the next Successive Period.  In order to renew the lease period, Lessees

Exhibit 7.page 142se of Intellectual Property – Tutoring Zone
Page 3 of 6

must give notice to Lessor on or before the thirtieth (30th) day following the expiration of such period.

11. **Discontinuation of Use upon Termination or Expiration**. Upon Termination or Expiration of the Lease, Lessees shall discontinue use of the Intellectual Property, and shall destroy the copies of the Intellectual Property that Lessees hold at that time. Lessees shall be allowed a commercially reasonable time to comply with this provision, including time required to find a replacement or substitute for the Intellectual Property. A commercially reasonable amount of time shall be interpreted in such a manner that Termination or Expiration shall not cause any interruption of Lessees' business.

12. Lessor covenants and guarantees that the Intellectual Property is not subject to any other parties' copyright, trademark, or patent. Lessor covenants and guarantees that the Intellectual Property is unencumbered by any lien or restriction of Lessor's ability to convey the rights in the Lease.

13. **Entire Agreement**. This Agreement supersedes any prior agreements and understandings among the Parties with respect to the subject matter hereof.

14. **Modification**. No change or modification of this Agreement shall be of any force unless the change or modification is in writing and signed by the Parties.

15. **Waiver**. No waiver of any breach of any of the terms of this Agreement shall be effective unless in writing and signed by the Party against whom the waiver is claimed. No waiver of any breach shall be deemed to be a waiver of any other or subsequent breach.

Exhibit 7.page 143 se of Intellectual Property – Tutoring Zone
Page 4 of 6

16.     **Severability**. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

17.     **Governing Law.** This Agreement shall be governed by and be construed in accordance with the laws of the State of Florida, without giving effect to its conflict of laws provisions. Any controversy or claim arising out of or relating to this Agreement or any provision thereof shall be resolved in Alachua County, Florida. The costs of any litigation arising from this Agreement shall be borne by the non-prevailing party, provided that each party shall pay for and bear the cost of his, her or its own experts, evidence and legal counsel unless otherwise agreed in writing.

18.     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument; and any counterpart may be delivered by facsimile transmission.

19.     **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, legal representatives and permitted assigns except where otherwise indicated herein.

20.     All Parties agree that they have had adequate time to consider this Agreement and the have had the opportunity to consult their own independent legal counsel. The Parties enter into this Agreement with complete understanding of their respective rights and duties and consent to the rights, duties, and requirements set forth herein.  This Agreement shall not be construed more strictly against any party.

## SIGNATURE PAGE FOLLOWS

Exhibit 7.page 144se of Intellectual Property – Tutoring Zone
Page 5 of 6

**SIGNATURE PAGE**

**IN WITNESS WHEREOF,** Tutoring Zone, LLC and Chris James and Cynthia

Frenchman have duly executed this Agreement as of the earliest Execution Date written

below.

**TUTORING ZONE, LLC**              **CHRIS JAMES AND CYNTHIA FRENCHMAN**
**By:**

_____              _____
Matthew Hintze, President                     Chris James
and Managing Member


_____              _____
Execution Date                                Cynthia Frenchman

Exhibit 7.page 145se of Intellectual Property – Tutoring Zone
Page 6 of 6



**Matthew Hintze <matthewhintze@gmail.com>**

---

## Re: FW: Introduction: John Spence and Stephanie Travis; The Original E-mail on Stephanie Travis

**Larina Hintze** <larinahintze@gmail.com>                    Mon, May 28, 2012 at 5:48 PM
To: "James,Christopher" <christopher.james@warrington.ufl.edu>, Matthew Hintze <matthewhintze@gmail.com>

Matt since I was not at the meeting I feel this should come from you and maybe just respond to John privately as to not stir up everyone else.

John:

In our last creditor meeting we discussed tz needing to go out of busines as it could not service its debts and creditors did not feel comfortable investing more funds.  So we are allowing tz to go out of business.

The creditors understood based on not being able to service its debts that Larina and I would personally be forced into bankruptcy.

You are right john about our moral obligation and As such we reaffirmed our 'moral obligation' to pay everyone back and creditors therefore stated they would not contest the bankruptcy but did expect us to repay them which we again affirmed we would.

We are working hard to move forward and revive the business in a different way with the goal to pay everyone back.  We offered all creditors the chance to invest in a new company which they were understandably not interested in doing.

Thank you for your continued support.  Let me know if this brings is up to speed.

Thank you,
Matt


On Monday, May 28, 2012, James,Christopher wrote:

> I would respond with 1) a summary of the prior meeting outcome (filing for bankruptcy, restructuring etc), 2) update on restructuring. Remind Spence and everyone that you are working hard to find ways to repay them and that you continue to have, despite bankruptcy, a moral obligation to repay them. Also remind them that restructuring is the only path to follow given the fact that investors were unwilling (justifiably) to put in additional money under the old structure.
>
> ---
>
> **From:** John Spence [mailto:john@johnspence.com]
> **Sent:** Sunday, May 27, 2012 5:30 PM
> **To:** 'Larina Hintze'; 'Sheila Spence'; 'Randy Scott'; 'Sally Scott'; Greer,Creed C,III; James,Christopher; bphintze@bellsouth.net; 'Rick Staab'; kgogilby@gmail.com; 'David Whitney'
> **Subject:** RE: FW: Introduction: John Spence and Stephanie Travis; The Original E-mail on Stephanie Travis
> **Importance:** High
>
> Matt and Larina – I have received NO correspondence from either of you since the last emergency creditors meeting on May, 14th. Considering the very precarious situation at TZ I am surprised and disappointed that

there has been zero communication since you asked all of us for more money.

Please update us all on ALL pertinent information immediately. As creditors who have a significant investment in your company we have the right and obligation to demand robust communication on all relevant developments. It is alarming to me that you have not communicated any information on the financial standing of TZ, how you are making payroll, what the status of the tutors is, other investors, activity on other campuses… we have received weekly reports for the last year, why have you discontinued them? Your obligation to ALL of the investors has not been terminated nor diminished. You have a legal and moral responsibly to keep all of us fully informed of any significant developments that might potentially impact the future of the business. Please respond with a full and detailed report by end of business on Tuesday May 29th and reinstate the weekly status reports.

**Named one of the Top 100 Business Thought Leaders in America**



P: (352) 316-4026 • PO Box 357606, Gainesville, FL 32635

**Website:** www.johnspence.com

**Read my blog**: http://blog.johnspence.com

Exhibit 7.page 47



**Larina Hintze <larinahintze@gmail.com>**

## Re: TZ Update

**Matthew Hintze** <matthewhintze@gmail.com>          Tue, May 29, 2012 at 11:14 AM
To: Matthew Hintze <matthewhintze@gmail.com>
Cc: John Spence <john@johnspence.com>, Sheila Spence <sheila@johnspence.com>, Randy Scott <randyscott14@gmail.com>, Sally Scott <sallycscott@gmail.com>, Cgreer@ufl.edu, Christopher James <christopher.james@warrington.ufl.edu>, bphintze@bellsouth.net, Rick Staab <rstaab@intermed1.com>, Larina Hintze <larinahintze@gmail.com>, kgogilby@gmail.com, David Whitney <whit5470@gmail.com>

John:

In our last creditor meeting we discussed tz needing to go out of busines as it could not service its debts and creditors did not feel comfortable investing more funds.  So we are allowing tz to go out of business.

The creditors understood based on not being able to service its debts that Larina and I would personally be forced into bankruptcy.

You are right John about our moral obligation and as such we reaffirmed our moral obligation to pay everyone back and creditors therefore stated they would not contest the bankruptcy but did expect us to repay them which we again affirmed we would.

We are working hard to move forward and revive the business in a different way with the goal to pay everyone back.  We offered all creditors the chance to invest in a new company which they were understandably not interested in doing.

Thank you for your continued support.  Let me know if this brings everyone up to speed.

Thank you,
Matt


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 48

SpenceReq000540

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 12:28 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: TZ Employment Contracts |
| **Attachments:** | TZ Employment Contract.docx |

5.29.12 e-mail - #1 on privilege log

---------- Forwarded message ----------
From: **Matthew Hintze** <matthewhintze@gmail.com>
Date: Tue, May 29, 2012 at 7:42 PM
Subject: TZ Employment Contracts
To: jchilders@smartbizlaw.com
Cc: Larina Hintze <larinahintze@gmail.com>, Christopher James <christopher.james@warrington.ufl.edu>

Jeff,

Attached is a current copy of the employment contract with TZ instructors.

Going forward, nearly all tutors will be entering the 'Year 2' stage.  This is extremely beneficial in terms of outlining compensation structure.

Two issues that have been raised at various times this semester:

1.  We need to deliver the employee equity pledged in the agreements.

2.  Intellectual property - can TZ use videos (with the instructors face) after the instructor is fired or leaves?

Thanks!

-Matt


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 49

1

\-\-
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 50

2

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "**_Agreement_**") is made effective as of _____, 2011, between TutoringZone, LLC, a Florida limited liability company, and its present and future divisions, affiliates and subsidiaries (collectively, the "**_Company_**"), and _____, individually ("**_Employee_**").

The Company and Employee, intending to be legally bound, agree as follows:

1.    <u>Representations and Warranties</u>.  Employee represents and warrants to the Company that (a) he is not bound by any restrictive covenants and has no prior or other obligations or commitments of any kind (written, oral or otherwise) that would in any way prevent, restrict, hinder or interfere with Employee's acceptance of employment with the Company or the performance of all duties and services hereunder to the fullest extent of Employee's ability and knowledge; and (b) he has full power and capacity to execute and deliver, and to perform all of his obligations under, this Agreement.  Employee agrees to indemnify and hold the Company harmless for any liability the Company may incur as the result of the existence of any such covenants, obligations or commitments.

2.    <u>Employment Term</u>.

2.1.    <u>Term</u>.  Employee's employment pursuant to this Agreement will commence on the date hereof and will be extended thereafter, for a period not less than three (3) years, until terminated in accordance with this Agreement (the period of Employee's employment by the Company under this Agreement will be referred to as the "**_Term_**").

2.2.    <u>Period of Certain Provisions</u>.  Except as provided herein, all compensation and benefits paid by the Company to Employee pursuant to this Agreement will cease upon Employee's last day of employment under this Agreement with the exception of accrued, but unpaid, Base Salary.

3.    <u>Compensation</u>.  In exchange for services rendered by Employee hereunder, the Company shall provide Employee with the following compensation and benefits:

(a)    <u>Base Salary</u>.

<u>Year 1</u>:    Employee will receive the HIGHER of the following three (3) calculations of Base Salary:

(i)    $120,000<u>;</u>

(ii)    <u>TwentyPercent (25%) of Total Revenues for all classes for which the employee is the primary instructor, as designated by the Company's managing member;</u>

(iii)    <u>$50,000 plus 5% of TutoringZone Gross Profit for the twelve-month period representing the employee's first year of employment.  Gross Profit</u>

Exhibit 7.page 51

1

will be calculated by subtracting all costs, excluding compensation paid to tutors, from total revenues.

Years 2 - 3:            Employee will receive the HIGHER of the following two (2) calculations of Base Salary:

(i)      Twenty-Five Percent (25%) of Total Revenues for all classes where employee is the primary instructor;

(ii)     $50,000 plus 5% of TutoringZone Gross Profit for the twelve-month period representing the employee's first year of employment.  Gross Profit will be calculated by subtracting all costs, excluding compensation paid to tutors, from total revenues.

All Base Salary payments shall be paid in the same manner and at the same time as salary payments are made to other senior employees of the Company.  Employee's Base Salary and other compensation paid to him from the Company shall be subject to such withholding as may be required by law.  Employee will be eligible for annual merit-based salary increases following Employee's annual performance review, subject to the sole discretion of the Company's managing member (or other governing body, the "***Board***").

(b)      <u>Benefits</u>.  Employee will be offered the opportunity to participate in such medical and other employee benefit plans for which he is eligible as may be established from time to time by the Board for other Company employees.  The Company will provide fifty percent (50%) of the health insurance premium for the Employee as an individual (and, for the avoidance of doubt, not for any of his dependents or otherwise), in accordance with the Company's policies, which policies may be changed by the Company in the future.

(c)      Provided employee complies with the conditions above and has received a rating of 'satisfactory' or better upon the most recent employee review, employee may, at his sole discretion, determine the manner in which all work is completed.   Specifically, the employee may determine his or her policy with regard to holidays, vacations, days to work, times to work and location to perform work.

(d)      <u>Expense Reimbursement</u>.  While Employee is employed by the Company hereunder, the Company will reimburse Employee for all reasonable and necessary out-of-pocket business, travel and entertainment expenses incurred by Employee in the performance of the duties and responsibilities hereunder, subject to written policies and procedures for expense verification and documentation that the Company may adopt from time to time.  Employee must provide advance notice to the Company's President of any business trips in which Employee reasonably anticipates incurring more than $500 in business, travel and entertainment expenses.

(e)      <u>Phantom Stock</u>.  Employee will be issued $50,000 of Phantom Stock in TutoringZone, LLC pursuant to the terms and conditions of that certain Subscription and Equity

Exhibit 7.page 52

2

Restriction Agreement delivered to the employee no later than 90 days after the effective date of this contract.

4.  <u>Duties</u>.  Employee will be employed by the Company and hold the office of _____.  Employee will have such duties and responsibilities as are commensurate with his title, and as may be assigned, from time to time, by and subject to the direction and supervision of the Company's managing member and the Board.  Employee shall perform all duties necessary to deliver tutoring services to any and all classes which the Company may designate, regardless of whether the Employee has been designated as primary instructor thereof, including not limited to developing study materials, delivering primary instruction (via both "live," in-person instruction and remotely, via video), delivering support services to customers (including but not limited to answering e-mails, facebook posts, and the like), participating in professional development with fellow Company employees, and training new tutors.  In addition, employee shall attend all mandatory company meetings, retreats, or other strategic gatherings. During the Term, excluding any periods of vacation or personal leave to which Employee is entitled, (i) Employee will render his services on an exclusive basis to the Company, (ii) Employee will apply on a full-time basis all of his skills and experience to the performance of his duties, and (iii) Employee may have no other employment and, without the prior written consent of the Company, no outside business activities (provided that the management of Employee's personal assets and affairs will not be deemed outside activities).  Employee may, upon approval by the Board, engage in certain limited non-competitive activities and charitable and civic activities in support of the Company.  Employee will perform his duties under this Agreement with fidelity and loyalty, to the best of his ability, experience and talent and in a manner consistent with his duties and responsibilities and in accord with best practices within the Company's industry.

5.  <u>Termination</u>.  Employee and the Company acknowledge that Employee's employment with the Company is at-will, which may be terminated by the Company or Employee at any time for any reason or no reason.  The provisions of <u>Section 5.1</u> through and including <u>Section 5.3</u> govern the amount of compensation, if any, to be provided to Employee upon termination of employment and do not alter this at-will status.  In the event of any termination, whether by the Company or Employee, and whether with or without Cause, Employee will not be entitled to any severance or other compensation not specifically set forth in this Agreement.

5.1  <u>Termination for Cause</u>.

(a)  The Company shall have the right to terminate Employee's employment with the Company at any time for "***Cause***," which shall include, but is not limited to, the following:

(i)  Employee commits any felony or any crime or offense (whether or not involving the Company or any of its affiliates) either (A) causing substantial harm to the Company (whether or not for personal gain), (B) constituting a crime of moral turpitude that is punishable by imprisonment in a state or federal correction facility, or (C) involving acts of theft, fraud or embezzlement;

Exhibit 7.page 53

3

(ii)    Employee's misconduct that causes harm to the Company or its business reputation, or commission of an act of dishonesty involving the Company;

(iii)    a material breach by Employee of his obligations under this Agreement or any other agreement with the Company, which Employee fails to cure within 10 days after receipt of notice of such breach (if it is of the type that can be cured; provided, that the Company will not be required to deliver Employee more than one such notice and opportunity to cure in any 12-month period);

(iv)    breach of the Company's policies or procedures which causes, or could reasonably be expected to cause, material harm to the Company or its affiliates;

(v)    any material misrepresentation at any time by Employee to the Company; or

(vi)    Employee's willful failure or refusal to comply with the Company's reasonable and lawful instruction(s).

(b)    If the Company terminates Employee's employment for Cause at any time, then: (i) Employee will not be entitled to pay in lieu of notice or any other such compensation, and all compensation and benefits payable to Employee under this Agreement terminate on Employee's date of termination, (ii) the Company agrees to pay Employee the Base Salary and benefits under Section 3(a) that have accrued as of the date of such termination, and (iii) Employee will remain subject to Section 6 through and including Section 9 below.

5.2    Termination Without Cause or Voluntary Termination.

(a)    The employee may not be terminated by the Employer without cause. Employee's employment hereunder may be terminated by the Employee, in which event Employee will be entitled to receive his Base Salary for each day following notice of such termination that Employee reports and is available for work until the termination date. As a professional courtesy, the Company requests that Employee provide it with ninety (90) days' written notice of his intent to terminate employment pursuant to this Section 5.2(a). During any such notice period, Employee agrees to supply any such transition services as the Board or its authorized agents may direct. The Board or its authorized agents, at their sole discretion, may direct Employee to not report to his office and/or to not perform any services for the Company during such 90-day period.

5.3    Death or Disability.

(a)    This Agreement will terminate immediately upon Employee's death, and the Company will not have any further liability or obligation to Employee, Employee's executors, heirs, assigns or any other person claiming under or through Employee's estate, except that Employee's estate will receive any accrued but unpaid Base Salary and benefits through the date of death.

Exhibit 7.page 54

4

(b)     The Company will have the right to terminate this Agreement if Employee becomes disabled.   The term "disabled" means any disability that qualifies as a disability under any long-term disability plan of the Company then in effect or, absent such a plan, Employee's inability, due to physical or mental ill health, to perform substantially all of the duties prescribed to him in the context of Employee's employment, on a full time basis and in a professional, competent and consistent manner, for thirty (30) days during any one hundred eighty (180) day period irrespective of whether or not such days are consecutive.

6.     <u>Non-Disclosure of Confidential Information</u>.  Employee acknowledges and agrees that, during the Term, he may have access to and become familiar with various trade secrets and other confidential or proprietary information of the Company including, but not limited to, the Company's existing and contemplated services and products, documentation, technical data, contracts, business and financial methods, practices and plans, costs and pricing, lists of the Company's customers, prospective customers and contacts, suppliers, vendors, consultants and employees, methods of obtaining customers, suppliers, vendors, consultants and employees, financial and operational data of the Company's present and prospective customers, suppliers, vendors, consultants and employees and the particular business requirements of the Company's present and prospective customers, suppliers, vendors, consultants and employees, marketing and sales literature, records, software, diagrams, source code, object code, product development, trade secrets; and the Company's techniques of doing business, business strategies and standards (including all non-public information of the Company, collectively, the "***Confidential Information***").   Employee expressly agrees not to disclose any Confidential Information, directly or indirectly, nor use Confidential Information in any way, either during the Term or at any time thereafter, except as required in the course of his employment with the Company. Specifically, during the Term or engagement of Employee by the Company and thereafter, Employee (i) shall maintain the Confidential Information in strict confidence; (ii) shall not disclose any Confidential Information to any person or other entity; (iii) shall not use any Confidential Information to the detriment of the Company and for the benefit of Employee or any other person or entity; (iv) shall not authorize or permit such use or disclosure; and (v) shall comply with the policies and procedures of the Company regarding use and disclosure of Confidential Information.   All files, papers, records, documents, drawings, specifications, equipment and similar items relating to the business of the Company and Confidential Information, whether prepared by Employee or otherwise coming into his possession, shall at all times remain the exclusive property of the Company and such items and all copies thereof shall be returned to the Company at the Company's request or upon the expiration or termination of Employee's employment.   In connection with his termination of employment with the Company, Employee will cooperate with the Company in completing and signing a termination statement or affidavit in the form proscribed by the Company, which will contain Employee's certification that he has no tangible Confidential Information in his possession.

7.     <u>Ownership of Intellectual Property</u>.  To the extent that Employee, alone or with others, develops, makes, conceives, contributes to or reduces to practice any intellectual property related to the duties of Employee hereunder or which results in any way from Employee using the resources of the Company, during the period of Employee's employment with the Company, whether or not during working hours, such intellectual property is and shall be the sole and exclusive property of the Company.

Exhibit 7.page 55

5

To the extent any such intellectual property can be protected by copyright, and is deemed in any way to fall within the definition of "work made for hire" as such term is defined in 17 U.S.C. §101, such intellectual property shall be considered to have been produced under contract for the Company as a work made for hire.  In any event, and regardless of whether such intellectual property is deemed to be a "work made for hire," Employee shall disclose any and all such intellectual property to the Company and does hereby assign to the Company any and all right, title and interest which Employee may have in and to such intellectual property.  Upon the Company's request at any time, including any time after termination of Employee's employment, Employee shall execute and deliver to the Company such other documents as the Company deems necessary to vest in the Company the sole ownership of and exclusive worldwide rights in and to all of such intellectual property.

8.      Restrictive Covenants.  The parties hereto recognize that Employee's knowledge and skill are a material factor in inducing the Company to enter into this Agreement.  Further, in the course of the employment of Employee hereunder, and because of the nature of Employee's responsibilities, Employee will acquire valuable and confidential information and trade secrets with regard to the Company's business operations, including, but not limited to, the Company's Confidential Information.  In addition, Employee may develop or continue on behalf of the Company, a personal acquaintance with some of the Company's customers and prospective customers, suppliers, vendors, consultants and employees.  As a consequence, Employee will occupy a position of trust and confidence with respect to the Company's affairs and its services.  In view of the foregoing, and in consideration of the remuneration paid and to be paid to Employee (under this Agreement), Employee agrees that it is reasonable and necessary for the protection of the goodwill and business of the Company that Employee make the restrictive covenants contained in this Agreement regarding the conduct of Employee during and after the employment relationship with the Company, and that the Company will suffer irreparable injury if Employee engages in conduct prohibited thereby.

(a)      Non-Competition.  In consideration of his employment hereunder, and other good and valuable consideration, the receipt of which is hereby acknowledged, Employee agrees that during his employment with the Company and for an additional period of one (1) year immediately following the termination of Employee's employment with the Company for any reason (the "*Restricted Period*"), he will not, either on his own behalf in competition with the Company or on behalf of any third party (except the Company) offering products or services competitive with those offered by the Company (a "*Competitor*"), in the markets in the United States in which the Company is doing business, or where Employee knows that the Company plans to do business, as of such termination date, perform the same or similar services as he performs for the Company during the Term (the "*Territory*"); provided, however, that Employee is not prevented from being a stockholder in any publicly-traded corporation in which Employee does not own more than five percent (5%) of any class of stock.  Notwithstanding the foregoing, upon the mutual agreement of Employee and the Company, whose agreement will not be unreasonably withheld, the parties may amend this Section 8(a) to permit Employee's employment with a Competitor in a capacity where he would not damage the Company.

(b)      Non-Solicitation.  In consideration of his employment hereunder, and other good and valuable consideration, the receipt of which is hereby acknowledged, Employee

Exhibit 7.page 56

6

agrees that during the Restricted Period, he shall not, either on his own behalf or on behalf of any third party, except on behalf of the Company, directly or indirectly:

> (i)    hire, solicit or encourage to leave the employment or service of the Company, any officer or employee of, or any consultant to, the Company, or hire or participate (with another third party) in the process of hiring any person or entity who is then, or who within the preceding twelve (12) months was an employee or consultant of the Company, or provide names or other information about the Company's employees or consultants to any person or entity under circumstances which could lead to the use of that information for purposes of recruiting or hiring; or

> (ii)    otherwise interfere with, disrupt, or attempt to interfere with or disrupt, the relationship between the Company and any of its Clients/Customers, suppliers, consultants or employees.

(c)    <u>Non-Disparagement</u>.  During the Restricted Period, Employee shall not engage in any conduct that involves the making or publishing of written or oral statements or remarks (including, without limitation, the repetition or distribution of derogatory rumors, allegations, negative reports or comments) which are disparaging, deleterious or damaging to the integrity, reputation or goodwill of the Company or its management, employees, independent contractors or consultants.

(d)    <u>Acknowledgment</u>.  Employee acknowledges and agrees that: (a) the services to be performed by him under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) Company's business is national in scope and its products are marketed throughout the Territory; (c) Company competes with other businesses that are or could be located in any part of the Territory; (d) the relevant public policy aspects of restrictive covenants, covenants not to compete, and non-solicitation provisions have been discussed, and that every effort has been made to limit the restrictions placed upon Employee to those that are reasonable and necessary to protect the Company's legitimate interests; (e) based upon the advice of legal counsel and his own education, experience and training, these provisions will not prevent him from earning a livelihood and supporting himself and his family during the Restricted Period; (f) the restrictions contained in this Agreement are reasonable and necessary for the protection of the business and goodwill of the Company, and are fair and reasonable in type of prohibited activity, geographic area covered, scope and duration; (g) the consideration provided by the Company under this Agreement is not illusory; and (h) such provisions do not impose a greater restraint than is necessary to protect the goodwill or other business interests of the Company.  In consideration of the foregoing, and in light of Employee's education, skills, and abilities, Employee agrees that he will not assert that, and it should not be considered that, any provisions of <u>Section 8</u>, <u>Section 8(a)</u>, <u>Section 8(b)</u> or <u>Section 8(c)</u> are otherwise void, voidable, or unenforceable or should be voided or held unenforceable.

(e)    <u>Additional Time</u>.  Employee agrees that the period during which the covenants contained in this <u>Section 8</u> will be effective will be computed by excluding from such computation any time during which Employee is in violation of any provision of this <u>Section 8</u>.

Exhibit 7.page 57

(f) <u>Independent Agreement</u>.  The covenants on the part of Employee in this Agreement will be construed as an agreement independent of any other agreement and independent of any other provision of this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated upon this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of such covenants.  Each of the covenants of this Agreement are given by Employee as part of the consideration for this Agreement and as an inducement to the Company to enter into this Agreement.

(g) <u>Subsequent Employment</u>.  Employee agrees that the Company may notify any person or entity employing Employee or evidencing an intention of employing Employee of the existence and provisions of this Agreement.  Employee hereby covenants and agrees to notify the Company of any employment or consulting arrangement that Employee undertakes on behalf of persons or entities other than the Company at any time during the Restricted Period, including the identity, address and telephone number of such person or entity.

(h) <u>No "Moonlighting."</u>  Employee hereby covenants and agrees that, during Employee's employment with the Company, Employee will not be employed by, or perform consulting or other services for, any other business entity without the express written consent of the Board.

9. <u>Reformation</u>.  In furtherance and not in limitation of the foregoing, should any duration, scope or geographical restriction on business activities covered under any provision of this Agreement be found by any court of competent jurisdiction to be less than fully enforceable due to its breadth of restrictiveness or otherwise, Employee and the Company intend that such court will enforce this Agreement to the full extent the court may find permissible by construing such provisions to cover only that duration, extent or activity which may be enforceable.  Employee shall, at the Company's request, join the Company in requesting that such court take such action.  Employee and the Company acknowledge the uncertainty of the law in this respect and intend that this Agreement will be given the construction that renders its provisions valid and enforceable to the maximum extent permitted by law.

10. <u>Conflicts of Interests</u>.  Without the prior written approval of the Company, Employee shall not engage in any activity which is in conflict with the Company's interests.  In furtherance of this covenant, Employee agrees during the Term, as follows:

(a) Employee will not engage in any other employment or business activity during working hours or at Employee's work location; provided however that Employee may, during working hours, engage in reasonable time managing his personal investments to the extent that such investments and time do not conflict with the Company's interests;

(b) Employee will not engage in any outside employment or activity which would conflict with or compete with Company's business;

(c) Employee will notify the Company of any conflicts of interest or excessive gifts or offers of gifts or remuneration from clients, suppliers or others doing or seeking to do business with the Company;

Exhibit 7.page 58

8

(d)     Employee will not receive remuneration from any party doing business with or competing with the Company unless the prior written consent of the Company is first obtained;

(e)     Employee will promptly inform the Company of any business opportunities that come to the attention of Employee that relate to the existing or prospective business of the Company and will not participate in any such opportunities;

(f)     Employee agrees to comply with all rules and policies of the Company, including those relating to conflicts of interest; and

(g)     Employee will promptly notify the Board in writing of any transaction of which Employee is aware involving the Company in which the other party is related in any way to Employee.  Employee will not cause or permit the Company to participate in any such transaction without the advance written consent of a director or manager of the Company.

11.     <u>Remedies</u>.

(a)     <u>Unique Nature of Agreement</u>.  Employee and the Company recognize that the services to be rendered by Employee are of a special and unique nature involving a high degree of skill and having a peculiar value, the loss of which will cause the Company immediate and irreparable harm, which cannot be adequately compensated in damages.  In the event of a breach or threatened breach by Employee of this Agreement, Employee consents that the Company shall be entitled to injunctive relief, both preliminary and permanent, without bond or proof of specific damages, and Employee will not raise the defense that the Company has an adequate remedy at law.  In addition, the Company shall be entitled to any other legal or equitable remedies as may be available under law.

(b)     <u>Costs and Attorneys' Fees</u>.  In the event of any action or suit involving a breach or threatened breach of this Agreement, then in addition to other remedies available to the prevailing party, the prevailing party in such action or suit will be entitled to recover reasonable attorneys' fees and costs incurred.

(c)     <u>Cumulative Remedies</u>.  All remedies expressly provided for herein are cumulative of any and all other remedies now existing at law or in equity.  Each party shall, in addition to the remedies herein provided, be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the covenants contained herein.  Resort to any remedy provided for hereunder or provided by law will not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude the recovery by such party of monetary damages.

12.     <u>Miscellaneous</u>.

(a)     <u>Notices</u>.  All notices under this Agreement shall be sent and deemed duly given when posted in the United States first-class mail, postage prepaid to the addresses set forth below such party's signature on the signature page of this Agreement.  These addresses may be changed from time to time by written notice to the appropriate party.

Exhibit 7.page 59

9

(b)  <u>Assignment</u>.  This Agreement is binding upon the Company and Employee and their respective heirs, personal representatives, successors and assigns; provided that, the services to be rendered by Employee to the Company under this Agreement are personal in nature and, therefore, Employee may not assign or delegate Employee's rights, duties or obligations under this Agreement, and any attempt to do so shall be null and void.  The Company may assign its rights under this Agreement or delegate its duties and obligations under this Agreement to any affiliate or subsidiary of the Company or to any entity acquiring all or substantially all of the assets of the Company or to any other entity into which the Company may be liquidated, merged or consolidated.  In furtherance of such right of assignment, Employee agrees to acknowledge such assignment in writing or, subject to comparable terms and conditions, terminate this Agreement and execute a new employment agreement or a consulting agreement with such successor to the business of the Company, including without limitation reasonable non-competition and non-solicitation provisions.

(c)  <u>No Waiver</u>.  The failure of either the Company or Employee to object to any conduct or violation of any of the covenants made by the other under this Agreement will not be deemed a waiver of any rights or remedies.  No waiver of any right or remedy arising under this Agreement will be valid unless set forth in an appropriate writing signed by both the Company and Employee.

(d)  <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding between the Company and Employee with respect to employment of Employee, and supersedes all prior oral or written communications, proposals, representations, warranties, covenants, understandings or agreements between the Company and Employee relating to the subject matter of this Agreement.  By entering into this Agreement, Employee certifies and acknowledges that Employee has carefully read all of the provisions of this Agreement, and that Employee voluntarily and knowingly enters into said Agreement.

(e)  <u>Disputes or Controversies</u>.  Employee recognizes that should a dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel, or other third party, the preservation of the secrecy of Confidential Information may be jeopardized.  All pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by the Company, Employee and their respective attorneys, experts and other agents, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as may be limited by them in writing.

(f)  <u>No Oral Modifications</u>.  No alterations, amendments, changes or additions to this Agreement will be binding upon either the Company or Employee unless reduced to writing and signed by both the Company (by an officer of the Company other than Employee specifically assigned by the Board with such authority) and Employee.

(g)  <u>Severability</u>.  The covenants, provisions and sections of this Agreement are severable, and if any portion of this Agreement is held to be unlawful or unenforceable, the same will not affect any other portion of this Agreement, and the remaining terms and conditions or portions thereof will remain in full force and effect.  This Agreement will be construed in such

Exhibit 7.page 60

case as if such unlawful or unenforceable portion had never been contained in this Agreement, in order to effectuate the intentions of the Company and Employee in executing this Agreement.

(h)     Survival.  Provisions of this Agreement which by their nature are intended to survive termination of Employee's employment with the Company or expiration of this Agreement will survive any such termination or expiration of this Agreement, including but not limited to Sections 1, 5.1(b)(iii), 5.2(b)(ii), 6 through and including 9, 11 and 12.

(i)     Governing Law.  This Agreement will be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to the choice of laws principles thereof.

(j)     Jurisdiction; Venue.  Each of the parties hereto by its execution hereof:

(i)     irrevocably submits to the jurisdiction of any state court located in the State of Florida, Alachua County and to the jurisdiction of the United States District Court for the Northern District of Florida, Gainesville Division, or any successor thereto, for the purpose of any suit, action or other proceeding arising out of or based on this Agreement or the subject matter hereof; and

(ii)     waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such proceeding brought in any of the above-named courts, any claim that it is not subject personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that any such proceeding is brought in an inconvenient forum, that the venue of such proceeding is improper, or that this Agreement, or the subject matter hereof, may not be enforced in or by such court.

The parties hereto hereby consent to service of process in any such proceeding in any manner permitted by the laws of the State of Florida, and agree that service of process by registered or certified mail, return receipt requested, at its address specified in or pursuant to this Agreement is reasonably calculated to give actual notice.

(k)     Headings.  The section headings of this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any of the provisions hereof.

(l)     NO JURY TRIAL.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES' ACCEPTANCE OF THIS AGREEMENT.

(m)     Advice of Counsel and Construction.  The parties acknowledge that all parties to this Agreement have been represented by counsel or had the opportunity to be represented by counsel of their choice.  Accordingly, the rule of construction of contract language against the drafting party is hereby waived by all parties.

Exhibit 7.page 61

11

(n)    <u>Counterparts; Electronic Signature</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Further, this Agreement may be executed by transfer of an originally signed document by facsimile, e-mail or other electronic means, any of which will be as fully binding as an original document.

(o)    <u>Section 409A</u>.  Each payment under this Agreement, including each payment in a series of installment payments, is intended to be a separate payment for purposes of Treas. Reg. §1.409A-2(b), and is intended to be: (i) exempt from Section 409A of the Code, the regulations and other binding guidance promulgated thereunder ("***Section 409A***"), including, but not limited to, by compliance with the short-term deferral exemption as specified in Treas. Reg. § 1.409A-1(b)(4) and the involuntary separation pay exception within the meaning of Treas. Reg. §1.409A-1(b)(9)(iii), or (ii) in compliance with Section 409A, including, but not limited to, being paid pursuant to a fixed schedule or specified date pursuant to Treas. Reg. § 1.409A-3(a) and the provisions of this Agreement will be administered, interpreted and construed accordingly.  If, nonetheless, this Agreement either fails to satisfy the requirements of Section 409A or is not exempt from the application of Section 409A, then the parties hereby agree to amend or to clarify this Agreement in a timely manner so that this Agreement either satisfies the requirements of Section 409A or is exempt from the application of Section 409A.

*(Signatures on following page.)*

Exhibit 7.page 62

12

**EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, HAS HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF HIS CHOOSING TO THE EXTENT EMPLOYEE DESIRES LEGAL ADVICE REGARDING THIS AGREEMENT, AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THE AGREEMENT.**

IN WITNESS WHEREOF, the parties hereto have each executed this Employment Agreement effective as of the date first above written.

**COMPANY:**

**TutoringZone, LLC,** a Florida limited liability company

By:_____
      Matthew B. Hintze,
      Managing Member

Address:     1010 North Main Street
              Gainesville, Florida 32601

With a copy to:

     Folds & Walker, LLC
     527 East University Avenue
     Gainesville, Florida 32602
     Attention: S. Scott Walker, Esq.

**EMPLOYEE:**

_____
_____, Individually
Social Security #:

Address:     _____

               _____

Exhibit 7.page 63

*Signature Page to Employment Agreement*



## Re: FW: TZ
1 message

**Larina Hintze** <larinahintze@gmail.com>                                Wed, Jun 6, 2012 at 7:37 PM
To: Norman Bledsoe <norm@foldsandwalker.com>
Cc: Jeffery Childers <jchilders@smartbizlaw.com>, Scott Walker <scott@foldsandwalker.com>, Christopher James
<christopher.james@cba.ufl.edu>, Matthew Hintze <matthewhintze@gmail.com>, "Bphintze@bellsouth.net"
<Bphintze@bellsouth.net>

Norm:

If you think that fieldman's strategy is to

"My guess is that McCarty desires to sue to enforce the note and then subsequently levy on Matt's
ownership interest in TZ."

Then our strategy could be to make it seem like this is the worst thing in the world for us and to make every
effort to attempt to negotiate a way to avoid this so they keep their eye on that ball and keep them focused
on that strategy.

That may be the best way to move us forward.

Thanks for the detailed response.

Larina


On Wednesday, June 6, 2012, Norman Bledsoe   A counterclaim for tortious interference against Steve Fieldman
could be tough to win.  To wit:

1)    No cause of action for TI exists where one does an act which is legal in itself.  Malice or bad motive is of
no import in this instance.  Ethyl Corporation v. Balter, 386 So.2d 1220 (Fla. 3d DCA 1980), *rev. denied*,
392 So.2d 1371 (Fla. 1981), *cert. denied*, 101 S.Ct. 3099 (1981).  Accordingly, Steve's malicious act of
acquiring and enforcing Randy Scott's note is not actionable.

2)    McCarty will argue that Steve is not *interfering* with any relationship—he has merely purchased a note
and is *enforcing* it.  He is not interfering with the payments under the note, *etc.*

3)    A claim against Steve falls outside the typical fact-pattern seen in TI claims.  Ordinarily, the facts involve
an outsider inducing (perhaps via bribes to employees) a business to breach a contract with a vendor, *e.g.*,
one alcohol distributor inducing a restaurant to cease ordering from its contractually-exclusive provider of
liquor.  This is very different from purchasing a note which has fallen into default.

4)    Steve may not be tied closely enough to StudyEdge to maintain an action for tortious interference.  We
would have to bring Ethan Fieldman into the litigation under a conspiracy theory to really get somewhere.
It is my belief that Mac McCarty probably structured the purchase of the Randy Scott note with a view to
avoiding a counterclaim for tortious interference.  Mac is too smart to let Ethan purchase the note on his

Exhibit 7.page 64

own.  Mac told me via phone that "a trustee" owns "a note."

Based on what I know now, I would not advise a TI counterclaim.  My opinion may change if I learn new facts.

My guess is that McCarty desires to sue to enforce the note and then subsequently levy on Matt's ownership interest in TZ.

Norm

---

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Wednesday, June 06, 2012 3:08 PM
**To:** Jeffery Childers; Scott Walker; Norman Bledsoe
**Subject:** Fwd: FW: TZ

Thoughts?

---------- Forwarded message ----------
From: **James,Christopher** <christopher.james@warrington.ufl.edu>
Date: Wed, Jun 6, 2012 at 2:12 PM
Subject: RE: FW: TZ
To: Larina Hintze <larinahintze@gmail.com>

You would should have a very good claim against Ethan for interference in the business if his father files suit. Ask your Attorney what he/she recommends in terms of a response.

---

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Wednesday, June 06, 2012 6:59 AM
**To:** Jeffery Childers; James,Christopher
**Subject:** Fwd: FW: TZ

---------- Forwarded message ----------
From: **Norman Bledsoe** <norm@foldsandwalker.com>
Date: Wed, Jun 6, 2012 at 9:36 AM
Subject: FW: TZ
To: Matthew Hintze <matthewhintze@gmail.com>, Larina Hintze <larinahintze@gmail.com>
Cc: Scott Walker <scott@foldsandwalker.com>

Exhibit 7 page 65
Guys,

Please see below.  Per my e-mail and telephone calls of last week and Monday, I need direction on whether I should negotiate with McCarty.

Thanks,

Norm

---

**From:** Mac McCarty [mailto:mmccarty@lawgators.com]
**Sent:** Tuesday, June 05, 2012 10:00 PM
**To:** Scott Walker; Norman Bledsoe
**Subject:** TZ

Scott and Norm,

Since I haven't heard anything from you following my earlier conversations with each of you, I need to go ahead and begin collection procee

Exhibit 7.page 66



Larina Hintze <larinahintze@gmail.com>

## Re: TZ Update
1 message

**Larina Hintze** <larinahintze@gmail.com>                                   Mon, Jul 2, 2012 at 11:22 AM
To: "James,Christopher" <christopher.james@warrington.ufl.edu>

Chris:

Yes sir boss :-)

Larina

On Sun, Jul 1, 2012 at 9:09 PM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:

> I would not send anything to the investors until we speak with Jeff. My view is that we tell investors that TZ is closing and that you and matt as well as a "number of Tutors" have been hired as employees of CMJ that will begin in the fall offering tutoring services under using the name TZ[2]. Tell them that you and Matt will try very hard to repay investors if and when funds become available. Next Matt discusses all this with the Alligator and we move forward. This is the new and improved, well capitalized and economical tutoring service.

> **From:** Larina Hintze [mailto:larinahintze@gmail.com]
> **Sent:** Sunday, July 01, 2012 8:52 PM
> **To:** Matthew Hintze; James,Christopher; Jeffery Childers; Bphintze@bellsouth.net
> **Subject:** Re: TZ Update

> Matt and Chris conferenced and Matt is meeting with Kevin at noon to get a feel for where this is coming from (isolated) or spurred on by group as well as having a follow up call with Jeff.

> My thoughts are this:

> Would it be wise to send the following response to ALL (removing Randy and Sally Scott from the thread).

> John et all:

> When Scott sold his promissory note to Fieldman we were advised that ANY and ALL information we share would have to be shared with all creditors and as such we should stop all communication.

> The quandry we are in is tenious and for our protection as well as EVERYONE, we must not treat any creditors

Exhibit 7.page 67

differenlty as we can only imagine that any information Fieldman should have gotten but did not would put us ALL at risk.

Scott Walker is going to call you John direclty to expalin the exposure as an advisory board member (or as acting CEO and leave out advisory board so he does not rebel rouse Whit and Ogilby) you have so that you can discuss this with your counsel and why we must follow a strict course of action.

Strategy:

Is it possible to have Scott Walker call John and say listen as acting CEO you have exposure and liablity in that you were privy to all information before, during and after regarding TZ and as such we must weigh our need for communication against our exposure and liability as Fieldman could pursue a suit against Matt and Larina but also individually against you as the CEO and/or possibly the advisory board.

This is an aggressive action which I'm never a fan of.  However, if there is a way to nip this is in the bud that is to our advantage and sometimes fear based people respond best to fear.

I'm wondering if this is classic miscommunication in that Sheila attended the last meeting and did not understand what was discussed so only John is out of the loop?

Or he's just working himself into a resentment to alieve his guilt over wanting to file suit becuase despite his claims he didn't care about the money and planned to write it off that he in fact is very pissed as time goes by and wants to bear pain in hopes to get paid back.

Larina

On Sun, Jul 1, 2012 at 2:35 PM, John Spence <john@johnspence.com> wrote:

Matt:

I have grown tired of your constant excuses. You have a fiduciary responsibility to the entire investor / creditor group to keep us fully informed of ALL pertinent and substantive financial and strategic developments. For months we received weekly financial and corporate updates from you -- which have now halted since early May. You have NOT been relieved of this obligation. I have asked repeatedly for detailed and accurate updates on the financials, other potential investors, the staff/tutor situation, the Dix lawsuit, developments with Fintcher, FSU, UCF… ANY and ALL key issues… and have received nothing from you. I do not want this update over the phone or in a personal meeting – I want it in writing to ALL the investors. Period. No more games.

Exhibit 7.page 68

I am no longer requesting this information – I am demanding it. If I do not receive a FULL, ACCURATE and COMPREHENSIVE report from you by end of business on Thursday July 5th I will contact my attorney and pursue all legal means to recoup my investment immediately. If you have enough money to pay your staff and take a salary – you have enough money to begin payments to me immediately.

Matt, the investor/creditor group has been more than lenient with you, and you have made repeated promises that you would keep us informed and would make every effort to pay us all back. Unfortunately, to this point your actions have not matched your words. If I do not receive all of the information I have requested I will be relentless in my efforts to obtain the funds and interest you owe me and will file suit immediately.

John Spence

**Named one of the Top 100 Business Thought Leaders in America**



P: (352) 316-4026 • PO Box 357606, Gainesville, FL 32635

**Website:** www.johnspence.com

**Read my blog:** http://blog.johnspence.com

**Social Media platforms:** http://about.me/johnspence

**From:** Matthew Hintze [mailto:matthewhintze@gmail.com]
**Sent:** Tuesday, May 29, 2012 11:14 AM
**To:** Matthew Hintze
**Cc:** John Spence; Sheila Spence; Randy Scott; Sally Scott; Cgreer@ufl.edu; Christopher James; bphintze@bellsouth.net; Rick Staab; Larina Hintze; kgogilby@gmail.com; David Whitney
**Subject:** Re: TZ Update

John:

Exhibit 7.page 69

In our last creditor meeting we discussed tz needing to go out of busines as it could not service its debts and

creditors did not feel comfortable investing more funds.  So we are allowing tz to go out of business.

The creditors understood based on not being able to service its debts that Larina and I would personally be forced into bankruptcy.

You are right John about our moral obligation and as such we reaffirmed our moral obligation to pay everyone back and creditors therefore stated they would not contest the bankruptcy but did expect us to repay them which we again affirmed we would.

We are working hard to move forward and revive the business in a different way with the goal to pay everyone back.  We offered all creditors the chance to invest in a new company which they were understandably not interested in doing.

Thank you for your continued support.  Let me know if this brings everyone up to speed.

Thank you,

Matt

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 70



Larina Hintze <larinahintze@gmail.com>

## RE: TZ Update

**James,Christopher** <christopher.james@warrington.ufl.edu>                Sun, Jul 1, 2012 at 9:11 PM
To: Larina Hintze <larinahintze@gmail.com>

> Also, I would not worry about Spence. While I understand he is pissed at losing his money, I think he is trying
> to convince himself that he is still the best turnaround artist and that TZ went under because you and Matt
> deceived him in some way. Let it be.

**From:** Larina Hintze [mailto:larinahintze@gmail.com]
**Sent:** Sunday, July 01, 2012 8:52 PM
**To:** Matthew Hintze; James,Christopher; Jeffery Childers; Bphintze@bellsouth.net
**Subject:** Re: TZ Update

Matt and Chris conferenced and Matt is meeting with Kevin at noon to get a feel for where this is coming from
(isolated) or spurred on by group as well as having a follow up call with Jeff.

My thoughts are this:

Would it be wise to send the following response to ALL (removing Randy and Sally Scott from the thread).

John et all:

When Scott sold his promissory note to Fieldman we were advised that ANY and ALL information we share would
have to be shared with all creditors and as such we should stop all communication.

The quandry we are in is tenious and for our protection as well as EVERYONE, we must not treat any creditors
differenlty as we can only imagine that any information Fieldman should have gotten but did not would put us ALL
at risk.

Scott Walker is going to call you John direclty to expalin the exposure as an advisory board member (or as acting
CEO and leave out advisory board so he does not rebel rouse Whit and Ogilby) you have so that you can discuss
this with your counsel and why we must follow a strict course of action.

Strategy:

Exhibit 7.page 71

Is it possible to have Scott Walker call John and say listen as acting CEO you have exposure and liablity in that you were privy to all information before, during and after regarding TZ and as such we must weigh our need for communication against our exposure and liability as Fieldman could pursue a suit against Matt and Larina but also individually against you as the CEO and/or possibly the advisory board.

This is an aggressive action which I'm never a fan of.  However, if there is a way to nip this is in the bud that is to our advantage and sometimes fear based people respond best to fear.

I'm wondering if this is classic miscommunication in that Sheila attended the last meeting and did not understand what was discussed so only John is out of the loop?

Or he's just working himself into a resentment to alieve his guilt over wanting to file suit becuase despite his claims he didn't care about the money and planned to write it off that he in fact is very pissed as time goes by and wants to bear pain in hopes to get paid back.

Larina

On Sun, Jul 1, 2012 at 2:35 PM, John Spence <john@johnspence.com> wrote:

Matt:

I have grown tired of your constant excuses. You have a fiduciary responsibility to the entire investor / creditor group to keep us fully informed of ALL pertinent and substantive financial and strategic developments. For months we received weekly financial and corporate updates from you -- which have now halted since early May. You have NOT been relieved of this obligation. I have asked repeatedly for detailed and accurate updates on the financials, other potential investors, the staff/tutor situation, the Dix lawsuit, developments with Fintcher, FSU, UCF…  ANY and ALL key issues… and have received nothing from you. I do not want this update over the phone or in a personal meeting – I want it in writing to ALL the investors. Period. No more games.

I am no longer requesting this information – I am demanding it. If I do not receive a FULL, ACCURATE and COMPREHENSIVE report from you by end of business on Thursday July 5th I will contact my attorney and pursue all legal means to recoup my investment immediately. If you have enough money to pay your staff and take a salary – you have enough money to begin payments to me immediately.

Matt, the investor/creditor group has been more than lenient with you, and you have made repeated promises that you would keep us informed and would make every effort to pay us all back. Unfortunately, to this point your actions have not matched your words. If I do not receive all of the information I have requested I will be relentless in my efforts to obtain the funds and interest you owe me and will file suit immediately.

Exhibit 7.page 72

John Spence

**Named one of the Top 100 Business Thought Leaders in America**



P: (352) 316-4026 • PO Box 357606, Gainesville, FL 32635

↘ **Website:** www.johnspence.com

↘ **Read my blog**: http://blog.johnspence.com

↘ **Social Media platforms**: http://about.me/johnspence

**From:** Matthew Hintze [mailto:matthewhintze@gmail.com]
**Sent:** Tuesday, May 29, 2012 11:14 AM
**To:** Matthew Hintze
**Cc:** John Spence; Sheila Spence; Randy Scott; Sally Scott; Cgreer@ufl.edu; Christopher James; bphintze@bellsouth.net; Rick Staab; Larina Hintze; kgogilby@gmail.com; David Whitney
**Subject:** Re: TZ Update

John:

In our last creditor meeting we discussed tz needing to go out of busines as it could not service its debts and creditors did not feel comfortable investing more funds. So we are allowing tz to go out of business.

The creditors understood based on not being able to service its debts that Larina and I would personally be forced into bankruptcy.

You are right John about our moral obligation and as such we reaffirmed our moral obligation to pay everyone back and creditors therefore stated they would not contest the bankruptcy but did expect us to repay them which we again affirmed we would.

We are working hard to move forward and revive the business in a different way with the goal to pay everyone back. We offered all creditors the chance to invest in a new company which they were understandably not interested in doing.

Thank you for your continued support.  Let me know if this brings everyone up to speed.


Thank you,

Matt



--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 74



Larina Hintze <larinahintze@gmail.com>

---

**Re: TZ Update**
1 message

---

**Larina Hintze** <larinahintze@gmail.com>                                    Mon, Jul 2, 2012 at 11:22 AM
To: "James,Christopher" <christopher.james@warrington.ufl.edu>

Chris:

Yes sir boss :-)

Larina

On Sun, Jul 1, 2012 at 9:09 PM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:

> I would not send anything to the investors until we speak with Jeff. My view is that we tell investors that TZ
> is closing and that you and matt as well as a "number of Tutors" have been hired as employees of CMJ that
> will begin in the fall offering tutoring services under using the name TZ². Tell them that you and Matt will try
> very hard to repay investors if and when funds become available. Next Matt discusses all this with the
> Alligator and we move forward. This is the new and improved, well capitalized and economical tutoring
> service.

> **From:** Larina Hintze [mailto:larinahintze@gmail.com]
> **Sent:** Sunday, July 01, 2012 8:52 PM
> **To:** Matthew Hintze; James,Christopher; Jeffery Childers; Bphintze@bellsouth.net
> **Subject:** Re: TZ Update

> Matt and Chris conferenced and Matt is meeting with Kevin at noon to get a feel for where this is coming from
> (isolated) or spurred on by group as well as having a follow up call with Jeff.

> My thoughts are this:

> Would it be wise to send the following response to ALL (removing Randy and Sally Scott from the thread).

> John et all:

> When Scott sold his promissory note to Fieldman we were advised that ANY and ALL information we share
> would have to be shared with all creditors and as such we should stop all communication.

> The quandry we are in is tenious and for our protection as well as EVERYONE, we must not treat any creditors

Exhibit 7.page 75

differenlty as we can only imagine that any information Fieldman should have gotten but did not would put us ALL at risk.

Scott Walker is going to call you John direclty to expalin the exposure as an advisory board member (or as acting CEO and leave out advisory board so he does not rebel rouse Whit and Ogilby) you have so that you can discuss this with your counsel and why we must follow a strict course of action.

Strategy:

Is it possible to have Scott Walker call John and say listen as acting CEO you have exposure and liablity in that you were privy to all information before, during and after regarding TZ and as such we must weigh our need for communication against our exposure and liability as Fieldman could pursue a suit against Matt and Larina but also individually against you as the CEO and/or possibly the advisory board.

This is an aggressive action which I'm never a fan of.  However, if there is a way to nip this is in the bud that is to our advantage and sometimes fear based people respond best to fear.

I'm wondering if this is classic miscommunication in that Sheila attended the last meeting and did not understand what was discussed so only John is out of the loop?

Or he's just working himself into a resentment to alieve his guilt over wanting to file suit becuase despite his claims he didn't care about the money and planned to write it off that he in fact is very pissed as time goes by and wants to bear pain in hopes to get paid back.

Larina

On Sun, Jul 1, 2012 at 2:35 PM, John Spence <john@johnspence.com> wrote:

Matt:

I have grown tired of your constant excuses. You have a fiduciary responsibility to the entire investor / creditor group to keep us fully informed of ALL pertinent and substantive financial and strategic developments. For months we received weekly financial and corporate updates from you -- which have now halted since early May. You have NOT been relieved of this obligation. I have asked repeatedly for detailed and accurate updates on the financials, other potential investors, the staff/tutor situation, the Dix lawsuit, developments with Fintcher, FSU, UCF... ANY and ALL key issues... and have received nothing from you. I do not want this update over the phone or in a personal meeting – I want it in writing to ALL the investors. Period. No more games.

Exhibit 7.page 76

I am no longer requesting this information – I am demanding it. If I do not receive a FULL, ACCURATE and COMPREHENSIVE report from you by end of business on Thursday July 5th I will contact my attorney and pursue all legal means to recoup my investment immediately. If you have enough money to pay your staff and take a salary – you have enough money to begin payments to me immediately.

Matt, the investor/creditor group has been more than lenient with you, and you have made repeated promises that you would keep us informed and would make every effort to pay us all back. Unfortunately, to this point your actions have not matched your words. If I do not receive all of the information I have requested I will be relentless in my efforts to obtain the funds and interest you owe me and will file suit immediately.

John Spence

**Named one of the Top 100 Business Thought Leaders in America**



P: (352) 316-4026 • PO Box 357606, Gainesville, FL 32635

**Website:** www.johnspence.com

**Read my blog:** http://blog.johnspence.com

**Social Media platforms:** http://about.me/johnspence

**From:** Matthew Hintze [mailto:matthewhintze@gmail.com]
**Sent:** Tuesday, May 29, 2012 11:14 AM
**To:** Matthew Hintze
**Cc:** John Spence; Sheila Spence; Randy Scott; Sally Scott; Cgreer@ufl.edu; Christopher James; bphintze@bellsouth.net; Rick Staab; Larina Hintze; kgogilby@gmail.com; David Whitney
**Subject:** Re: TZ Update

John:

Exhibit 7.page 77

In our last creditor meeting we discussed tz needing to go out of busines as it could not service its debts and

creditors did not feel comfortable investing more funds.  So we are allowing tz to go out of business.

The creditors understood based on not being able to service its debts that Larina and I would personally be forced into bankruptcy.

You are right John about our moral obligation and as such we reaffirmed our moral obligation to pay everyone back and creditors therefore stated they would not contest the bankruptcy but did expect us to repay them which we again affirmed we would.

We are working hard to move forward and revive the business in a different way with the goal to pay everyone back.  We offered all creditors the chance to invest in a new company which they were understandably not interested in doing.

Thank you for your continued support.  Let me know if this brings everyone up to speed.

Thank you,

Matt

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 78



**Larina Hintze <larinahintze@gmail.com>**

## Re: TZ Update

**John Spence** <john@johnspence.com>                                    Sun, Jul 1, 2012 at 2:35 PM
To: Matthew Hintze <matthewhintze@gmail.com>
Cc: Sheila Spence <sheila@johnspence.com>, Randy Scott <randyscott14@gmail.com>, Sally Scott
<sallycscott@gmail.com>, Cgreer@ufl.edu, Christopher James <christopher.james@warrington.ufl.edu>,
bphintze@bellsouth.net, Rick Staab <rstaab@intermed1.com>, Larina Hintze <larinahintze@gmail.com>,
kgogilby@gmail.com, David Whitney <whit5470@gmail.com>, John Spence <john@johnspence.com>

Matt:


I have grown tired of your constant excuses. You have a fiduciary responsibility to the entire investor /
creditor group to keep us fully informed of ALL pertinent and substantive financial and strategic
developments. For months we received weekly financial and corporate updates from you -- which have now
halted since early May. You have NOT been relieved of this obligation. I have asked repeatedly for detailed
and accurate updates on the financials, other potential investors, the staff/tutor situation, the Dix lawsuit,
developments with Fintcher, FSU, UCF... ANY and ALL key issues... and have received nothing from you. I do
not want this update over the phone or in a personal meeting – I want it in writing to ALL the investors.
Period. No more games.


I am no longer requesting this information – I am demanding it. If I do not receive a FULL, ACCURATE and
COMPREHENSIVE report from you by end of business on Thursday July 5th I will contact my attorney and
pursue all legal means to recoup my investment immediately. If you have enough money to pay your staff
and take a salary – you have enough money to begin payments to me immediately.


Matt, the investor/creditor group has been more than lenient with you, and you have made repeated
promises that you would keep us informed and would make every effort to pay us all back. Unfortunately, to
this point your actions have not matched your words. If I do not receive all of the information I have
requested I will be relentless in my efforts to obtain the funds and interest you owe me and will file suit
immediately.


John Spence


**Named one of the Top 100 Business Thought Leaders in America**

Exhibit 7.page 79

SpenceReq002195



P: (352) 316-4026 • PO Box 357606, Gainesville, FL 32635

**Website:** www.johnspence.com

**Read my blog:** http://blog.johnspence.com

**Social Media platforms:** http://about.me/johnspence

**From:** Matthew Hintze [mailto:matthewhintze@gmail.com]
**Sent:** Tuesday, May 29, 2012 11:14 AM
**To:** Matthew Hintze
**Cc:** John Spence; Sheila Spence; Randy Scott; Sally Scott; Cgreer@ufl.edu; Christopher James; bphintze@bellsouth.net; Rick Staab; Larina Hintze; kgogilby@gmail.com; David Whitney
**Subject:** Re: TZ Update

[Quoted text hidden]

Exhibit 7.page 80

SpenceReq002196

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 1:33 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: DRAFT RESPONSE FOR SPENCE |

#24 - 7/5/2012

---------- Forwarded message ----------
From: **James,Christopher** <christopher.james@warrington.ufl.edu>
Date: Thu, Jul 5, 2012 at 3:57 PM
Subject: Re: DRAFT RESPONSE FOR SPENCE
To: Matthew Hintze <matthewhintze@gmail.com>

I would as that "in time I may have the opportunity to earn an equity position but at this time that opportunity is not available to me. If and when that occurs   ...."

Sent from my iPhone

On Jul 5, 2012, at 12:05, "Matthew Hintze" <matthewhintze@gmail.com> wrote:

> Please provide comments as you see fit.  My understanding is that without some type of response he will seek to file suit - hence this reply.  Thanks.

> John,

> TutoringZone is in the process of going out of business.  As highlighted in May, since we were unable to secure the $250,000 needed to continue operations through the summer, we are following the Florida unwinding statutes and closing the business.  We have left the building and we are working with a bankruptcy attorney who will be notifying all creditors throughout the process.  The attorney representing TZ in the process is Jeff Childers.  He has been carbon-copied on this e-mail should you wish to speak to him directly.

> Larina and I have completed all paperwork necessary to file for personal bankruptcy.  We will be filing some time in the next few weeks.

> The tutors and I have taken jobs with TutoringZone 2, a Florida LLC with membership interest owned by Christopher James.  As an employee (but not owner) of that firm, I am not at liberty to disclose details regarding funding, business strategy, etc.  Given your existing relationship with Dr. James, PLEASE feel free to e-mail him if you would like to discuss matters.  My belief is that he would be open to receiving capital contributions from any of the individuals who invested in TutoringZone.

> My goal, as always, is to work very very hard to make this business successful.  In so doing, it is my understanding that I will have the opportunity to earn an equity position in the new company.  With this position I will seek to immediately commence repaying you and all of the

Exhibit 7.page 81

1

other creditors who invested in TutoringZone and Matt Hintze.

On a last note, I continue to be open to meeting with you and Sheila at any time to discuss matters further.

Thank you.

-Matt


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)




--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 82



**Matthew Hintze <matthewhintze@gmail.com>**

---

## Fwd: TZ Update

**Matthew Hintze** <matthewhintze@gmail.com>          Fri, Jul 6, 2012 at 10:01 AM
To: Christopher James <christopher.james@warrington.ufl.edu>, Cynthia L Frenchman
<cynthia.frenchman@warrington.ufl.edu>, Jeffery Childers <jchilders@smartbizlaw.com>, Larina Hintze
<larinahintze@gmail.com>

---------- Forwarded message ----------
From: **Matthew Hintze** <matthewhintze@gmail.com>
Date: Fri, Jul 6, 2012 at 10:01 AM
Subject: TZ Update
To: John Spence <john@johnspence.com>, Sheila Spence <sheila@johnspence.com>


John:

We have continued to be committed and focused on the plan in the last creditor meeting where a vote and unanimous decision was made about how to move forward and everyone was in agreement.

Since Kevin and Chris were sort of spearheading how to move us forward both have stated they are available to discuss this further as they would like us all to stay on our current course. It is totally understandable that you want updates, but since Scott sold his note to Fieldman he would have access to any emails or could request them or could claim foul play for being excluded so we have simply been instructed to shut down communication on that front. Does this resonate for you?

This is asking a great deal of you as you've already spent so much time and effort supporting us, being a strong advocate for the unethical and shady behavior that you found unacceptable SE was engaging in going as far as pulling a favor with Avery and Smith to get a civil suit going against SE, the documents you provided to our legal team at Folds and Walker, and all the emails to get criminal charges filed with the GPD and we really, really appreciate all that you have done to support TZ.

On a side note Fieldman had UGA managers sign a lease in their personal name to violate the settlement agreement. He then decided to close UGA so he told the managers up there either lose the $50k in equity you've put into SE and SE will take over the lease OR get back your $50k in equity and take over the lease. They of course were crushed, but it seems that everyone who had a part in engaging in highly unethical behavior is now getting turnabout.

I may look like the loser on paper but frankly I am just not willing to harm others in order to succeed. Despite my imperfections I have a big heart for people and I would not and could not support anyone that prides themselves in hurting others. I know you have a similar desire to help others and I always felt that common bond with you. A desire to do no harm. Larina and I enjoyed very much the master mind meetings and your generosity and hospitality. Please let me know if there is every anything that I can do for you and reciprocate.

I sincerely appreciate all you have done and continue to do for TZ and our community. Please let me reaffirm my desire both stated in our last meeting and continually throughout this process to get everyone paid back. Everyone in the meeting understood this was a long term plan.

Thank you,
Matt

Exhibit 7.page 83
Matthew Hintze

MatthewHintze@gmail.com
(352) 219-1618 (mobile)



--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 84



Matthew Hintze <matthewhintze@gmail.com>

## Fwd: TZ Update
1 message

---

**Larina Hintze** <larinahintze@gmail.com>                          Tue, Jul 10, 2012 at 6:30 AM
To: Christopher James <christopher.james@cba.ufl.edu>, Matthew Hintze <matthewhintze@gmail.com>,
Bphintze@bellsouth.net, Jeffery Childers <jchilders@smartbizlaw.com>

Sent this to John only without ccing everyone.....

---------- Forwarded message ----------
From: **Larina Hintze** <larinahintze@gmail.com>
Date: Tue, Jul 10, 2012 at 6:26 AM
Subject: Re: TZ Update
To: John Spence <john@johnspence.com>


John:

I noticed Rick was left off this email thread.  I am assuming his phone call asking about a rental property is what
initiated this?

We have two rentals for sale that were publicly listed in the MLS.  424 and 502 in order to pay the IRS (who is
first no matter what).

424 has active termites and needs several repairs so the buyer cancelled the contract.

As far as the rest of the email why the need to do this over email and to specifically cc Matt's parents and
myself or anyone else for that matter other than to cause pain?  You have made your decision about Matt and
have repeatedly shared it in unkind ways.

I saw your facebook post yesterday and took your advise and read it many many times.  Please sit down with
Matt he wants to meet, wants to pay you back, wants to move forward despite perceived disappointments.  If
you are not willing to do that then please don't include me on these hurtful emails anymore.

Live the Light, Be the Light, Share the Light,
Larina

Exhibit 7.page 85



On Mon, Jul 9, 2012 at 2:04 PM, John Spence <john@johnspence.com> wrote:

It sucks being lied to, but what is even worse is knowing that you are not worth the truth.

Exhibit 7.page 86

You have not answered any of my questions or repeated requests for accurate and complete information/updates.

You have taken advantage of several key people in our community and I am at a loss as to how you expect to continue to do business here when you have hurt and lied to so many people.

You have lied to your wife about finances, cashing out your IRA, signing contracts without her knowledge… and you have run your family into bankruptcy.

You have lied to your investors, staff and vendors… and you have run your company into bankruptcy.

You are currently liquidating assets to invest in a new business so that there is no collateral for your creditors to pursue.

**Your actions speak volumes about your true intentions.**

You can blame and misdirect and complain all day long (as in the note below) – but at the end of the day when you want to face the truth of why all of these terribly bad things are happening – simply look in the mirror.

*Named one of the Top 100 Business Thought Leaders in America*



P: (352) 316-4026 • PO Box 357606, Gainesville, FL 32635

↘ **Website:** www.johnspence.com

↘ **Read my blog**: http://blog.johnspence.com

↘ **Social Media platforms**: http://about.me/johnspence

Exhibit 7.page 87

**From:** Matthew Hintze [mailto:matthewhintze@gmail.com]
**Sent:** Friday, July 06, 2012 10:01 AM
**To:** John Spence; Sheila Spence
**Subject:** TZ Update

John:

We have continued to be committed and focused on the plan in the last creditor meeting where a vote and unanimous decision was made about how to move forward and everyone was in agreement.

Since Kevin and Chris were sort of spearheading how to move us forward both have stated they are available to discuss this further as they would like us all to stay on our current course.   It is totally understandable that you want updates, but since Scott sold his note to Fieldman he would have access to any emails or could request them or could claim foul play for being excluded so we have simply been instructed to shut down communication on that front.  Does this resonate for you?

This is asking a great deal of you as you've already spent so much time and effort supporting us, being a strong advocate for the unethical and shady behavior that you found unacceptable SE was engaging in going as far as pulling a favor with Avery and Smith to get a civil suit going against SE, the documents you provided to our legal team at Folds and Walker,  and all the emails to get criminal charges filed with the GPD and we really, really appreciate all that you have done to support TZ.

On a side note Fieldman had UGA managers sign a lease in their personal name to violate the settlement agreement.  He then decided to close UGA so he told the managers up there either lose the $50k in equity you've put into SE and SE will take over the lease OR get back your $50k in equity and take over the lease. They of course were crushed, but it seems that everyone who had a part in engaging in highly unethical behavior is now getting turnabout.

I may look like the loser on paper but frankly I am just not willing to harm others in order to succeed.  Despite my imperfections I have a big heart for people and I would not and could not support anyone that prides themselves in hurting others.   I know you have a similar desire to help others and I always felt that common bond with you.  A desire to do no harm.  Larina and I enjoyed very much the master mind meetings and your generosity and hospitality.  Please let me know if there is every anything that I can do for you and reciprocate.

I sincerely appreciate all you have done and continue to do for TZ and our community.  Please let me reaffirm my desire both stated in our last meeting and continually throughout this process to get everyone paid back. Everyone in the meeting understood this was a long term plan.

Thank you,
Matt


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 88



Matthew Hintze <matthewhintze@gmail.com>

## RE: Mid-July Payroll
1 message

**Frenchman,Cynthia L** <cynthia.frenchman@warrington.ufl.edu>    Fri, Jul 13, 2012 at 1:20 PM
To: Matthew Hintze <matthewhintze@gmail.com>

Oh great I thought she gave it to you already. I told her to take care of it this morning. Let me get right back to you.

**Cynthia Frenchman**

**Assistant to Professor Christopher James**

**University of Florida**

**Warrington College of Business**

**Department of Finance**

**(352) 392-8041-Office**

**(352) 213-2858-Cell**

**From:** Matthew Hintze [mailto:matthewhintze@gmail.com]
**Sent:** Friday, July 13, 2012 10:08 AM
**To:** Frenchman,Cynthia L
**Subject:** Re: Mid-July Payroll

Madam Frenchman - Can I call Ariel and ask her to cut check?  Would that be easiest?

Gracias.

-Matt

On Thu, Jul 12, 2012 at 2:18 PM, James,Christopher <christopher.james@warrington.ufl.edu> wrote:

Ok

Sent from my iPhone

Exhibit 7 page 89

On Jul 12, 2012, at 11:17, "Matthew Hintze" <matthewhintze@gmail.com> wrote:

Hey everyone,

We will be writing checks for payroll over the next few days - payday is Sunday the 15th.

We have total expenses of approximately $30,000 and cash on hand of approximately $10,000.  To keep things simple and consistent, would you agree to a payment from CMJ in the amount of $25,000?  This will be the third draw, for a total of $75,000, which conveniently finishes up the consideration in the TZ lease agreement with CMJ - which will certainly make Jeff happy!

Thank you!

-Matt


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)


--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 90

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 2:04 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: TZ2 Employment Agreements |

#4 - 7/13/2012


---------- Forwarded message ----------
From: **Larina Hintze** <larinahintze@gmail.com>
Date: Fri, Jul 13, 2012 at 3:24 PM
Subject: Re: TZ2 Employment Agreements
To: "James,Christopher" <christopher.james@warrington.ufl.edu>, Matthew Hintze
<matthewhintze@gmail.com>


Understand

employment agreements, business plan, draw schedules and quick book reports on the agenda.

ASAP means - will next Friday work - is that doable?

I think if we deliver a careful message - we may be able to accomplish both goals.

a we do it in person
b we avoid prying type questions and Matt can honestly say for legal reasons all I can say is we have financial
backing and your checks are coming from that new source - sound strategy

Should we cc Childers on any draft announcements?  Do we even need a release? Studens don't care -
employees just need to know checks will clear and agreements for their protection are backed by cmj due to
legal matters tz is winding up.



On Friday, July 13, 2012, James,Christopher wrote:

> While the 90 day clock does not end until September, I think that for strategic reasons we should let the Tutors know
> what's going to happen in the fall. We do not need to go into the details of the transactions or the implications for the
> creditors of TZ just that they are going to be working for me and all is well. We can't wait to inform them since I need
> employment agreements from the ASAP.


From: Larina Hintze [mailto:larinahintze@gmail.com]
Sent: Friday, July 13, 2012 11:13 AM
To: Jeffery Childers
Cc: Matthew Hintze; James,Christopher
Subject: RE: TZ2 Employment Agreements

Exhibit 7 page 91

Jeff:

Thank you.  What is the Start Date of the 90 day clock?


On Fri, Jul 13, 2012 at 2:04 PM, Jeffery Childers <jchilders@smartbizlaw.com> wrote:

Matt and Larina,


TZ2 is now a formally constituted corporate entity.  Reminder that the employees need to execute the new employment agreements, which you already should have drafts of.


The publicly visible portions of the logistics can be scheduled as you see fit depending on extrinsic needs. However, as I have stated, TZ2 desires that at least 90 days pass from the asset sale before a public announcement is made if at all possible.


Let me know if you have any questions.


Regards,


Jeff


**Contact Information**

T 866.996.6104
  352-335-0400
F 407.209.3870

www.smartbizlaw.com

**Seldon Jeff Childers**
jchilders@smartbizlaw.com

Childers*Law, LLC
2135 NW 40th Terrace,
Suite B
Gainesville, FL 32605

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

Exhibit 7.page 92

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 93

3

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 1:29 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: Yo |

#21 - 7/13/2012

---------- Forwarded message ----------
From: **Matthew Hintze** <matthewhintze@gmail.com>
Date: Fri, Jul 13, 2012 at 1:27 PM
Subject: Fwd: Yo
To: Jeffery Childers <jchilders@smartbizlaw.com>, Larina Hintze <larinahintze@gmail.com>, Christopher James <christopher.james@warrington.ufl.edu>

Not sure if I forwarded this to you as yet.

Rich receives his paychecks as an independent contractor to Study Edge - he has an LLC called RDM Tutoring.  He also has He offered Jon a job contract with RDM Tutoring for roughly $100,000 with 3 months vacation, contingent (written as such in the contract) on him leaving TZ.  Does this rise to the level of tortious interference?

Thanks.

-Matt

---------- Forwarded message ----------
From: **Jonathan Aleman** <jonaleman0923@gmail.com>
Date: Sun, Jul 8, 2012 at 9:25 AM
Subject: Fwd: Yo
To: Matthew Hintze <matthewhintze@gmail.com>

FYI - I guess not answering the last time prompted another Ethan-driven email.

Jon Aleman
Head of Mathematics and Statistics Instruction
(352) 275-6496 (Cell)
www.TutoringZone.com

Thank you for choosing TutoringZone. It is our pleasure having served you. If you loved

Exhibit 7.page 94

1

our services, please tell your friends.

Begin forwarded message:

> **From:** Richard Melgarejo <richarddmelgarejo@gmail.com>
> **Date:** July 7, 2012 6:03:38 PM EDT
> **To:** Jonathan Aleman <jonaleman0923@gmail.com>
> **Subject: Yo**
>
> Yo dude,
> What is going on with Matt/TZ? Is this what you are talking about when you said you might go another direction? I mean the eviction notice, lawsuits from Randy Scott and Ryan Dix. Is Matt alright? I saw all of the cabinets coming down from the building. Also, the Alligator comes out and Matt denies all of it? I'm just curious, what's going on over there. If you don't mind letting me know.
>
> Are you still working with TZ or do you have another job lined up? I know we spoke about a little about a future plan but if you are still interested in doing online tutoring we might be able to find a way for you to do some off-site tutoring for us. You know we think you are a great tutor and not many people do what we do so let me know your thoughts man. Hope all is well with you and Kelly in Orlando. If you ever make it back up to the Ville, let's grab a beer.
>
> Love,
> The Nigga, Rich
>
>
> "You NEED it; You GOT it!"
> -Rich
> www.facebook.com/RDMCHEMTutor

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 95

2

Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 96

3

**Elizabeth R Bowen**

---

| | |
|---|---|
| **From:** | Matthew Hintze <matt@tutoringzone.com> |
| **Sent:** | Friday, July 17, 2015 11:15 AM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: TZ2 Employment Agreements |

July 17 e-mail

Begin forwarded message:

> **From:** Matthew Hintze <Matt@tutoringzone.com>
> **Subject: Re: TZ2 Employment Agreements**
> **Date:** July 17, 2012 at 2:27:50 PM EDT
> **To:** "James,Christopher" <christopher.james@warrington.ufl.edu>

| Employee | Stock Grant |
|---|---|
| Paul Hintze | 1.67% |
| Jon Aleman | 1.67% |
| John Kavekos | 0.83% |
| Michael Underwood | 0.83% |
| Lauren Figler | 0.83% |
| Alek Hartzog | 0.83% |
| Katie Murphy | 0.33% |
| Rob Bailey | 0.33% |
| | 7.33% |

MATTHEW HINTZE
(352) 219-1618 (Mobile)
1010 NORTH MAIN STREET
GAINESVILLE, FL  32601
WWW.TUTORINGZONE.COM

**TUTORING ZONE**

THANK YOU FOR CHOOSING TUTORINGZONE. WE'RE PROUD TO SERVE YOU. IF YOU LOVE OUR
SERVICES, PLEASE TELL YOUR FRIENDS.

On Jul 17, 2012, at 1:59 PM, James,Christopher wrote:

Exhibit 7.page 97

Who is covered by the 8%? Does that include any Hintze. The simplest way to do this is a side agreement. Given that the equity value is currently worth zero in TZ I suggest that we identify a revenue target for 2012 and 2013. If the revenue target is met then the tutors will be awarded shares equity. That way we do not get into a situation where for every dollar I put into the business I get back $92. I do not remember what the business plan target revenue is,,,

From: Matthew Hintze [mailto:Matt@tutoringzone.com]
Sent: Tuesday, July 17, 2012 9:56 AM
To: Jeffery Childers
Cc: Larina Hintze; James,Christopher; James,Christopher
Subject: Re: TZ2 Employment Agreements

Question on the employment agreements - what do we need to prepare in order to allocate shares to the employees as provided for in the contracts?  I am not sure if there is membership paperwork, etc. that needs to be in place.  Is there a standard ESOP (membership interest) contract with provisions for vesting, exit, etc.?  In total, contracts call for approximately 8% ownership by current team.

Thanks!

-Matt

MATTHEW HINTZE
(352) 219-1618 (MOBILE)
1010 NORTH MAIN STREET
GAINESVILLE, FL  32601
WWW.TUTORINGZONE.COM

**\<image001.jpg\>**

THANK YOU FOR CHOOSING TUTORINGZONE. WE'RE PROUD TO SERVE YOU. IF YOU LOVE OUR SERVICES, PLEASE TELL YOUR FRIENDS.

Exhibit 7.page 98

On Jul 13, 2012, at 2:34 PM, Jeffery Childers wrote:

Larina,

The 90-day period began to run on June 4, 2012, the date of the execution of the Intellectual Property Transfer Agreement.  The 90th day will be Tuesday, September 4, 2012 (it cannot end on a Sunday or holiday).

Regards,

Jeff

| Contact Information | |
|---|---|
| T 866.996.6104<br>352-335-0400<br>F 407.209.3870<br><br>www.smartbizlaw.com | **Seldon Jeff Childers**<br>jchilders@smartbizlaw.com<br><br>Childers*Law, LLC<br>2135 NW 40th Terrace, Suite B<br>Gainesville, FL 32605 |

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

On Jul 13, 2012, at 2:13 PM, Larina Hintze wrote:

Jeff:

Thank you.  What is the Start Date of the 90 day clock?

On Fri, Jul 13, 2012 at 2:04 PM, Jeffery Childers <jchilders@smartbizlaw.com> wrote:
Matt and Larina,

TZ2 is now a formally constituted corporate entity.  Reminder that the employees need to execute the new employment agreements, which you already should have drafts of.

The publicly visible portions of the logistics can be scheduled as you see fit depending on extrinsic needs. However, as I have stated, TZ2 desires that at least 90 days pass from the asset sale before a public announcement is made if at all possible.

Let me know if you have any questions.

Exhibit 7.page 99

Regards,

Jeff

**Contact Information**

T 866.996.6104
352-335-0400
F 407.209.3870

www.smartbizlaw.com

**Seldon Jeff Childers**
jchilders@smartbizlaw.com

Childers*Law, LLC
2135 NW 40th Terrace, Suite B
Gainesville, FL 32605

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

Exhibit 7.page 100

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matt@tutoringzone.com> |
| **Sent:** | Friday, July 17, 2015 11:15 AM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: TZ2 Employment Agreements |

July 17 e-mail

Begin forwarded message:

> **From:** Matthew Hintze <Matt@tutoringzone.com>
> **Subject: Re: TZ2 Employment Agreements**
> **Date:** July 17, 2012 at 2:27:50 PM EDT
> **To:** "James,Christopher" <christopher.james@warrington.ufl.edu>

| Employee | Stock Grant |
|---|---|
| Paul Hintze | 1.67% |
| Jon Aleman | 1.67% |
| John Kavekos | 0.83% |
| Michael Underwood | 0.83% |
| Lauren Figler | 0.83% |
| Alek Hartzog | 0.83% |
| Katie Murphy | 0.33% |
| Rob Bailey | 0.33% |
| | 7.33% |

MATTHEW HINTZE
(352) 219-1618 (Mobile)
1010 NORTH MAIN STREET
GAINESVILLE, FL  32601
WWW.TUTORINGZONE.COM

TUTORING ZONE

THANK YOU FOR CHOOSING TUTORINGZONE. WE'RE PROUD TO SERVE YOU. IF YOU LOVE OUR SERVICES, PLEASE TELL YOUR FRIENDS.

On Jul 17, 2012, at 1:59 PM, James,Christopher wrote:

Exhibit 7.page 101

1

Who is covered by the 8%? Does that include any Hintze. The simplest way to do this is a side agreement. Given that the equity value is currently worth zero in TZ I suggest that we identify a revenue target for 2012 and 2013. If the revenue target is met then the tutors will be awarded shares equity. That way we do not get into a situation where for every dollar I put into the business I get back $92. I do not remember what the business plan target revenue is,,,

---

From: Matthew Hintze [mailto:Matt@tutoringzone.com]
Sent: Tuesday, July 17, 2012 9:56 AM
To: Jeffery Childers
Cc: Larina Hintze; James,Christopher; James,Christopher
Subject: Re: TZ2 Employment Agreements

Question on the employment agreements - what do we need to prepare in order to allocate shares to the employees as provided for in the contracts?  I am not sure if there is membership paperwork, etc. that needs to be in place.  Is there a standard ESOP (membership interest) contract with provisions for vesting, exit, etc.?  In total, contracts call for approximately 8% ownership by current team.

Thanks!

-Matt

MATTHEW HINTZE
(352) 219-1618 (MOBILE)
1010 NORTH MAIN STREET
GAINESVILLE, FL  32601
WWW.TUTORINGZONE.COM

## <image001.jpg>

**THANK YOU FOR CHOOSING TUTORINGZONE. WE'RE PROUD TO SERVE YOU. IF YOU LOVE OUR SERVICES, PLEASE TELL YOUR FRIENDS.**

Exhibit 7.page 102

On Jul 13, 2012, at 2:34 PM, Jeffery Childers wrote:


Larina,

The 90-day period began to run on June 4, 2012, the date of the execution of the Intellectual Property Transfer Agreement.  The 90th day will be Tuesday, September 4, 2012 (it cannot end on a Sunday or holiday).

Regards,

Jeff

| Contact Information | |
| --- | --- |
| T 866.996.6104<br>352-335-0400<br>F 407.209.3870<br><br>www.smartbizlaw.com | **Seldon Jeff Childers**<br>jchilders@smartbizlaw.com<br><br>Childers*Law, LLC<br>2135 NW 40th Terrace, Suite B<br>Gainesville, FL 32605 |

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

On Jul 13, 2012, at 2:13 PM, Larina Hintze wrote:


Jeff:

Thank you.  What is the Start Date of the 90 day clock?

On Fri, Jul 13, 2012 at 2:04 PM, Jeffery Childers <jchilders@smartbizlaw.com> wrote:
Matt and Larina,

TZ2 is now a formally constituted corporate entity.  Reminder that the employees need to execute the new employment agreements, which you already should have drafts of.

The publicly visible portions of the logistics can be scheduled as you see fit depending on extrinsic needs. However, as I have stated, TZ2 desires that at least 90 days pass from the asset sale before a public announcement is made if at all possible.

Let me know if you have any questions.

Exhibit 7.page 103

3

Regards,

Jeff

**Contact Information**

T 866.996.6104
352-335-0400
F 407.209.3870

www.smartbizlaw.com

**Seldon Jeff Childers**
jchilders@smartbizlaw.com

Childers*Law, LLC
2135 NW 40th Terrace, Suite B
Gainesville, FL 32605

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

Exhibit 7.page 104

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 12:36 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: Agenda Items, Updates and Deadlines |

#5 - 7/26/2012


---------- Forwarded message ----------
From: **Matthew Hintze** <matthewhintze@gmail.com>
Date: Thu, Jul 26, 2012 at 5:52 PM
Subject: Agenda Items, Updates and Deadlines
To: Larina Hintze <larinahintze@gmail.com>, langariel@gmail.com, Christopher James
<christopher.james@warrington.ufl.edu>, Cynthia L Frenchman <cynthia.frenchman@warrington.ufl.edu>,
Paul Hintze <hintzepaul7@gmail.com>


Hello Everyone,

Below is an outline of agenda items, updates and deadlines.  Please let me know if you have
thoughts/comments/concerns about these timelines.

Thank you, and sorry for the delay.

-Matt

1.  Employment Contracts and Salary Adjustments


Present Draft Contracts to Chris by Tuesday 7/31 and identify items for consideration

Present contracts to tutors by 8/3 and request completion by 8/8




2.  Management and Financial Recap


Management recap and summary by 7/31

Present detailed P & L for Summer semester by 7/31

Outline precise cash needs (above and beyond final draw from CMJ) by 7/31

Exhibit 7.page 105

3.  Business Plan

Present Business Plan for Fall 2012/Spring 2013 by 8/3

4.  QuickBooks Budget

Enter Budgets from Business Plan into Quickbooks by 8/8

Draft to Larina for adjustments and approval by 8/10

5.  Meet and Greet with Chris 8/11

Confirmed?

Time and Location?

6.  Finalize details of winding down

Press Release and PR campaign

Any loose ends?

Exhibit 7.page 106

2

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 107

3

## Executive Summary

Financial Performance:

We were extremely cost-conscious, with actual expenses that were approximately $16,000 below budget.  Unfortunately, actual revenues were $15,000 short of budget leading to profit that exceeded budget by just .7% ($973.63).  A complete description is contained below.

Looking ahead to the 8/15 pay period and reconciling for additional items, you will see total cash used for summer of $127,000, as compared to the projected summer shortfall of $156,000 as outlined on May 14 to all creditors.

Management Summary

The management summary is extremely detailed and lengthy, as this has been a time of great change! The sections in the summary include:

1.  Team  - assessment of current morale and focus of team.

2.  Summer Attendance Results – Tutor-by-Tutor analysis with assessment for Fall.

3.  New Website and Platform – Fascinating progress with little to no development costs!  New website, integration of 'live online' platform, development of custom PayPal shopping cart and significant layout enhancements.

4.  Expansion – Quick synopsis, with details to follow in the business plan.

5.  Locations

    Retail Distribution:  Update on Swamp, other UF options, as well as Kaplan presence at various campuses.

    Live Review Locations – FREE rent for our weekly reviews, attractive options for our exam reviews.

    New Horizons – Settling into our new home, expanding our technical capabilities and building a strong partnership.

6.  Marketing – Katie is doing a phenomenal job…lots of opportunities ahead!  A conversation for later – PR once we switch over to TZ2.  I need to be clear on exactly what I can and cannot say.

7.  Other – Always good things happening!

8.  Brief outline of Topics for discussion

Financial Performance

Exhibit 7.page 108

Items that need immediate attention:

Cash on Hand                    $14,000

8/1 Expenses                    $32,000

Below you will find:

1.    Profit and Loss for the period 5/14  (beginning of summer classes) through 8/1.

2.    Description of certain items that warrant explanation.

3.    Forecast and Reconciliation – projections for the 8/15 and 8/31 pay periods as well as reconciliation of cash burn for summer period.

4.    Explanation of 'Other Expenses'

<u>Profit and Loss</u>

|  | **Budget** | **Actual** | **Variance** |
|---|---|---|---|
| **Revenues** | $140,000.00 | $125,000.00 | -$15,000.00 |
|  |  |  |  |
| **Expenses** |  |  |  |
| Labor | $195,000 | $186,613.14 | $8,386.86 |
| Insurance Expense | $3,986 | $1,362.02 | $2,623.81 |
| Credit Card Fees | $3,000 | $3,492.87 | -$492.87 |
| Accounting | $1,155 | $75.00 | $1,080.00 |
| Refunds | $600 | $1,115.00 | -$515.00 |
| Bank Service Charges | $300 | $466.85 | -$166.85 |
| Streaming and Hosting | $900 | $1,423.87 | -$523.87 |
| Other (Below) | $21,000 | $15,418.45 | $5,581.55 |
|  | $225,940.83 | $209,967.20 | $15,973.63 |
|  |  |  |  |
| **Net Profit (Loss)** | -$85,940.83 | -$84,967.20 | $973.63 |

<u>Description:</u>

-    A negative variance indicates worse than forecast, positive indicates better than forecast.

-    Actual Revenues are $16,851.90 for FSU and $99,374.06 for UF.  In addition we forecast additional revenues of $1,000 for FSU and $6,000 for UF for the period through final exams.

-    Interest Expense is for the LOC at Compass Bank – since it is on auto-withdrawal and we did not want to change banks until the new LLC was established we continued to pay this expense.

-    'Office Expenses' includes expenses for U-Haul rental, storage facility rental and labor for moving out of the building.

-    Utilities represent the minimum necessary to keep the power on at TZ.  Given our unanticipated ability to offer reviews there, we essentially paid utilities instead of paying for hotels and such for Summer B.

-    Insurance was substantially below budget because we allowed most insurance on TZ to expire without renewal.  The property insurance on our building, for example, was due to be renewed 5/15 and was due in full – no partial refunds were available.  So we determined that it was best to allow the insurance to expire.

-    Technology was associated with purchasing 6 iPads and accessories.  These are necessary for maintaining mobile POS at Swamp, Hotels where live reviews are offered, etc.

Exhibit 7.page 109

<u>Forecast and Reconciliation</u>

<u>8/15:</u>
Expenses $35,000                (Forecast $42,500.  Includes $5,000 in Marketing Expenses)

<u>8/31</u>
$30,000 in bills...SHOULD have that from Fall revenues.

<u>Bills we have postponed but MUST pay eventually</u>
TCC (Negotiate)                          $7,901.25

<u>Bills we have postponed but SHOULD pay eventually</u>
GOTCHA Group                          $3,000

<u>Cash Burn - Summer</u>

| | |
|---|---|
| Projected Shortfall (Business Plan) 5/15 – 8/1 | ($86,000) |
| Revenue Variance | ($15,000) |
| Expense Variance | $16,000 |
| Smokin' Notes Bill Held Over from Spring | ($11,000) |
| Revenues 8/15 | $6,000 |
| Expenses 8/15 | ($35,000) |
| Cash Deficit | $127,000 |

<u>Explanation of 'Other Expenses'</u>

| **Other** | **Budget** | **Actual** | **Variance** |
|---|---|---|---|
| POS | | $200.00 | |
| Professional Development | | $77.65 | |
| Advertising and Promotion | | $1,365.94 | |
| Copier and Paper | | $2,752.66 | |
| Interest Expense | | $440.83 | |
| Meals and Entertainment | | $171.18 | |
| Office Supplies | | $1,386.67 | |
| Smokin Notes | | $1,426.22 | |
| Distance Mailing | | $165.04 | |
| Review Session Supplies | | $165.61 | |
| Review Snacks | | $224.70 | |
| Taxes - Other | | $765.64 | |
| Telephone and Internet Expense | | $1,155.21 | |
| Travel Expense | | $359.79 | |
| Utilities | | $1,991.80 | |
| Technology | | $2,769.51 | |
| | $21,000 | $15,418.45 | $5,581.55 |

# <u>Checks Held</u>

Exhibit 15 page 190

At this time we have held checks (i.e. NOT paid bills) as follows:

## 5/1/12 Held checks

| | |
|---|---|
| RMC | $9,591.74 |
| TCC | $2,956.25 |
| Capital City | $718.33 |
| Waste Pro | $426.65 |
| Sexton & Schnoll | $138.75 |
| Sexton & Schnoll | $1,560.00 |
| GRU | $590.00 |
| Retail 1st | $116.22 |

## 5/15/12 Held checks

| | |
|---|---|
| US Bank Corp | $4,039.54 |
| Sexton & Sch | $1,075.00 |
| Retail 1st | $116.22 |
| GRU | $590.00 |
| TCC | $4,246.25 |
| Auto Owners | $2,006.00 |
| Capital City | $1,534.92 |

## 6/1/12 Held checks

| | |
|---|---|
| Dex Imaging | $1,145.88 |
| Baker Hostetler | $500.00 |
| Folds Walker | $500.00 |
| Gainesville SC Co | $9,591.74 |
| Capital City | $718.33 |
| The Gotcha Group | $1,000.00 |

## 6/15/12 Held checks

| | |
|---|---|
| Waste Pro | $424.75 |
| GRU | $590.00 |
| US Bank | $3,902.86 |
| TCC | $698.75 |
| Sexton & Schnoll | $385.00 |
| Retail 1st | $708.80 |
| Capital City | $1,534.92 |

## 7/1/12 Held checks

| | |
|---|---|
| The Gotcha Group | $1,000.00 |
| Dex Imaging | $1,145.88 |
| Baker Hostetler | $500.00 |
| Folds & Walker | $500.00 |
| Gainesville SC Co | $9,591.74 |
| Capital City Bank | $718.33 |
| Waste Pro | $432.67 |
| GRU | $855.75 |

## 7/15/12 Held checks

| | |
|---|---|
| Capital City Bank | $1,535 |
| GRU | $590 |

## 8/1/12 Held checks

| | |
|---|---|
| The Gotcha Group | $1,000.00 |
| Dex Imaging | $1,145.88 |
| Baker Hostetler | $500.00 |
| Folds & Walker | $500.00 |
| Gainesville SC Co | $9,591.74 |
| Capital City Bank | $718.33 |
| What's Happening Prod | $4,680.46 |

Included this for informational purposes when we declare bankruptcy.

## Management Summary

Items that need immediate attention:

New Printers –
UF - We will be using Xerographic Copy Centers, located on 13th Street and 10th Ave

FSU – needs on onsite printer.  Rob and Alek are working on price options

Exhibit 7.page 111

The strategy would be to lease the printer immediately (while TZ's credit is acceptable) and then reaffirm the lease after the company unwinds.

With your permission, I would ask Jeff Childers about the wisdom of this strategy and, with consideration of the pricing, discuss our options with you.

Summary of Operational and Strategic Progress and Opportunities

1.    Team
My focus on robust and transparent communication with the team has created a stronger bond through all this adversity and change

As a result the teams Morale and tremendous work ethic over the summer has been humbling.

Paul – Aside from the fact that he is my brother…he has done an amazing job.  EVERY one of his classes is kicking ass, he is doing a great job keeping me informed with regard to finances, and he comes to work every day full of energy and enthusiasm.  He brings tremendous levity and glue to the team.

Alek, Rob and Katie – These guys are amazing.  They have really become leaders – they handle things as they come up, let me know when they need direction, and explore opportunities to add value.  They have worked 6 or 7 days a week every single week this summer and have worked on numerous projects (moving, website, etc.) in their personal time.

Jon – SE's continued courtship has finally pissed him off.  He is 100% committed and is aggressively looking for ways to grow his classes, make our product better, etc.

The move to Orlando settled personal conflicts and created new energy.

He also learned a lot from his friend Kellie, my former UGA manager who worked for (and was summarily screwed over by) Study Edge.

Jon asked for permission to e-mail all TZ tutors and staff and share his experience and perspective when SE was e-mailing everyone at TZ a few weeks back.

Once again, these underhanded tactics from SE have really served to strengthen our resolve and unity.

John – He continues to run things smoothly up in Tallahassee.  He maintains a constant watch for indications that SE will be aggressively expanding at FSU; he has not, as yet, seen any uptick in marketing/promotion there.

Lauren – the bond is strong again, but it was strained with (a) her husband (not) working at TZ,  and (b) the stress of all the changes during the past 12 months.

The move to Virginia and robust transparent communication have created a win/win.

Exhibit 7.page 112

<u>Michael</u> – Michael has had a very tough summer. As you can see below, he is absolutely getting pummeled in his courses. He is an exceptional instructor, but he is nowhere near as charismatic as Zach, whom he competes with at SE.

Nevertheless, his revenues justify his salary,

We've had a couple of coaching sessions, and encourage him toward some therapy/coaching.

The issue is his tendency towards depression and negativity.

We see a strong future for him as Director of Tutor Training. Teaching is not natural for him – he is introverted and NOT a 'showman'; he has learned how to teach in an exceptional fashion by being curious and working hard.

<u>Matt and Larina</u> – Larina continues to work behind the scenes, without adulation, keeping me accountable to deadlines and to the team. I am energized and enthusiastic – I have worked very hard with mentors and it's had a deep impact.

**I am humbled by your faith and support in me for allowing this all to happen. I am honored for this opportunity and have laser focus to continue to push forward. Thank you!**

2.    <u>Summer Attendance Results</u> – The overall revenue performance for Summer masks tremendous variation on a class-by-class basis. Results for Summer thus far are below (along with an indication if additional revenues from a remaining session can be anticipated):

| Revenue Forecast - UF | Budget | Actual | Remaining Session? | Variance | Tutor |
|---|---|---|---|---|---|
| ACG2021 | $3,821.92 | $7,715.00 | Y | $3,893.08 | Matt |
| ACG2071 | $2,114.52 | $3,200.00 | N | $1,085.48 | Paul |
| BCH4024 | $4,800.00 | $7,180.00 | N | $2,380.00 | Lan/Kyle |
| CHM1025 | $342.86 | $160.00 | Y | -$182.86 | Alex |
| CHM2045 | $514.29 | $1,755.00 | Y | $1,240.71 | Erin/Mike |
| CHM2046 | $1,173.23 | $380.00 | N | -$793.23 | Jake (Resigned) |
| CHM2210 | $13,486.57 | $10,512.00 | Y | -$2,974.57 | Lauren/Kyle/Chad |
| CHM2211 | $27,000.00 | $14,423.50 | N | -$12,576.50 | Lauren |
| ECO2013 | $600.00 | $1,666.31 | Y | $1,066.31 | Matt |
| ECO2023 | $1,515.07 | $2,613.75 | Y | $1,098.68 | Matt |
| FIN3403 | $24,000.00 | $33,077.50 | N | $9,077.50 | Paul |
| GEB3373 | $0.00 | $0.00 | N | $0.00 | Paul |
| MAC1140 | $0.00 | $90.00 | N | $90.00 | Jon |
| MAC1147 | $0.00 | $0.00 | N | $0.00 | Jon |
| MAC2233 | $0.00 | $100.00 | Y | $100.00 | Jon |
| MAC2311 | $5,926.53 | $535.00 | Y | -$5,391.53 | Jon |
| MAN4504 | $5,120.80 | $2,610.00 | Y | -$2,510.80 | Jon |
| PHY2048 | $768.96 | $755.00 | Y | -$13.96 | Michael |
| PHY2049 | $743.02 | $1,175.00 | Y | $431.98 | Michael |
| PHY2053 | $12,773.20 | $2,050.00 | Y | -$10,723.20 | Michael |
| PHY2054 | $11,685.71 | $5,933.50 | Y | -$5,752.21 | Michael |
| QMB3250 | $2,112.24 | $0.00 | N | -$2,112.24 | Jon |

Exhibit 7.MB3250

| | | | | | |
|---|---|---|---|---|---|
| STA2023 | $1,648.75 | $1,137.50 | Y | -$511.25 | Jon |
| STA3024 | $1,735.42 | $2,305.00 | Y | $569.58 | Jon |
| | $121,883.08 | $99,374.06 | | -$22,509.02 | |

**Revenue
Forecast - FSU**

| | Budget | Actual |
|---|---|---|
| Total Revenue (100% Market Share) | $18,325.00 | |
| Total Revenue (70% Market Share) | $12,827.50 | $18,000.00 |
| Total Revenue (50% Market Share) | $9,162.50 | |

The business classes continue to be an area of strength for us. The results in ACG 2021, ACG 2071, ECO 2013 and ECO 2023 this summer alleviate some of my concern over freshman penetration. The students are showing remarkable fluidity – they talk to their friends and utilize the tutoring service that their friends utilize for each particular class…

As far as the science classes, there are a number of things going on.

First, many of the science classes were 'Summer A' or 'Summer B' courses – as such, the $25 monthly membership meant that our reviews were 3X or 4X as expensive. This was an especially strong concern for students in CHM 2210 and CHM 2211.

Second, their dominance of the General Chemistry classes (CHM 1025, 2045 and 2046) appears to be having a strong impact on our Organic Chemistry (CHM 2210 and 2211) and Physics (PHY 2048, 2049, 2053 and 2054) results.

The bottom line is this – we need to address the fact that Rich at SE absolutely dominated the General Chemistry classes.

Our tutor, Jake, has resigned for a variety of reasons – his mother passed away, he is responsible for a brother with special needs, he cannot survive on a variable compensation wage, etc.

So, our solution is to bring back our original chemistry tutor, Shai Hermon (working on perecentage of revenue basis). Shai started Gen Chem at TZ back in 2002 and trained Rich (the SE tutor) when he left in 2007. He continued to tutor General Chemistry at Penn State (he lived in NYC with his wife, which is why he moved in 2007). They moved to London in 2011 and he flies to Penn State monthly to give reviews. I am confident that he is one of the best chemistry instructors on the planet. With our online platform, he will be tutoring our UF General Chemistry classes from home in Britain. He is an amazing tutor, he is attractive, and he has a British accent.

With your permission we would like to aggressively target this class until we make progress. It is critical for a number of reasons – especially since Kellie (former SE manager) told us that Rich is scheduled to move to Miami in December (he has strong pressure from his fiancé and has a clause in his contract allowing him to move).

My goal is to penetrate the math classes this year. This has been an area of weakness when Zach unexpectedly switched sides last June - Jon volunteered to take over math. It takes several semesters to become a master at teaching a new subject and build a following. This will take time.

Exhibit 7.page 114

The most encouraging fact, is our team is strong from top to bottom.  Looking forward, all our classes are led by our instructors - the absolute best at what they do.

Our team assessment is that aside from Rich and Zach at SE all their new tutors are subpar.  Patiently and with laser focus we are earning back our customers.

3.   <u>New Website and Platform</u> – As Katie showed you, some insiders hold our platform in high regard!  We continue to make significant progress while spending close to zero dollars on development.  Developments over the summer include:

a.   <u>New website</u> – the website, which will be ready for fall, can be seen here:

dev.tutoringzone.com

In addition to being simpler to navigate and more aesthetically pleasing than our old site, the new website has the same layout as our Learning Management System (LMS).

The mandate to Alek, Rob and Jordan was to make the front end and the back end seamless.  They have done a stellar job!  It's worth noting that Rob and Alek work on this project exclusively in their 'free time'.

b.   <u>Integration of 'Live Online' Platform</u> – This is an exciting innovation for TZ2.  Students will have three consumption options –
Attend Live
Watch Live Online
Watch On Demand at their convenience.

The 'Live Online' option is new and was introduced selectively this summer.  For the classes where we introduced this option, live attendance dropped from an average of 10% of enrolled students to 5% of enrolled students, whereas Live Online immediately jumped to 10% of enrolled students.

For example, for FIN 3403 we have 190 students enrolled.  For Exam 1 (no Live Online option available) we had 10 – 12 students attend live each week – the remainder watched at home On Demand.

Currently, the Live Attendance has dropped to 5 or 6 people each session, and the Live Online has regular attendance of 12 – 15 per session.

Feedback from these students is excellent – they love the combination of convenience and interactivity.  The additional upside is that this creates a superior 'On Demand' product as well – high video quality AND true interaction with fellow students.  It 'feels' more natural than a recording in front of a green screen.

The upshot of 'Live Online' is that it changes the nature of the instructor's job – they get the interaction so many of them need (unlike recording On Demand in a studio), while simultaneously allowing them to live anywhere.  This opens many opportunities (such as our new Gen Chem tutor Shai).

Exhibit 7.page 115

    c.    <u>Development of Custom PayPal Shopping Cart</u> – this will allow us to take payments online while honoring discounts (coupons, group discounts for student organizations, BOGO, etc.).

    d.    <u>Layout</u> – One of the weaknesses of an open-source platform such as Moodle is that often there is little attention given to aesthetics; which definitely matters to students! As such, we have crafted improvements to the video player (variable-bit streaming, mobile compatible, tabbed presentation for file organization), file folders, custom sliders (as noted on Moodle blog post).

4.    <u>Expansion</u> – More details in the business plan, of course.  The bottom line is this:

-    We will pursue thoughtful organic growth at Indiana University this Fall, focusing on product quality and the addition of several new classes (Accounting, Chemistry, Mathematics).

-    We will introduce tutoring for a few pilot classes at UCF this Fall (Accounting, Organic Chemistry).  We will keep each group small and focus on getting feedback from students so we can improve our product and make sure that we have a superior product ready for wide release as quickly as possible.

5.    <u>Locations</u>

    a.    Retail Distribution of Packets

    <u>UF</u> – All packets are available online for students to print on their own.  We have seen a strong move in this direction so far.  This is wonderful since it dramatically lowers our printing expenses.  But many students do not have a printer, so it is essential to have a retail distribution location.

    Our current distribution at the Swamp is a terrific solution.  This location allows for promotion along University Ave. and exposure to countless patrons. We are extremely cognizant of the lengths that you and Ron have gone to to make this happen.  Out of respect for this and because it makes good business sense, we have developed a partnership strategy that really focuses on what TZ can do for Swamp.  We will be presenting an outline to Ron this week (along with a bottle of his favorite liquor) for his consideration:

    -    Free review vouchers so Swamp employees get free reviews.
    -    Set up a regular day where guests that buy a meal get half off TZ exam review.
    -    Swamp promotional insert for TZ packets.
    -    Promote Swamp deal/event once per week on TZ facebook.

    We feel like we need an additional location for students to come pick up packets – one with ample parking that is not a bar.  We are disappointed that Target Copy didn't work out and have yet to resolve the UF Kaplan situation.

Exhibit 7.page 116Eddie Daniel runs the Reitz Union.  We have not been able to get a return phone call or

e-mail from him.  Aggression will not work either.  We to figure out his concern (Kaplan WANTS US, after all) and see if we can address that concern.  Kaplan is an absolute home run for us, especially with the freshmen.  It is imperative that we overcome UF's objections and restore this partnership.  Any thoughts you have on a strategy are appreciated.

Current plan:

Add Xerographic Copy Center as our additional retail location.  They will be able to maintain a just-in-time inventory (printing when the customer comes to pick up a packet) and have a reasonable location and hours.  They are willing to do this for a commission of $1 per packet (exam reviews only).

FSU – We will continue to have packets available at Bill's Bookstore (two great locations, including immediately next to sorority row) and TCC (where we have our office).  In addition, we have received permission from FSU to distribute packets at the Kaplan office in Oglesby Union on campus.

IU – Currently our packets are available online only – students must print the packet themselves.  We are discussing the pros and cons of making packets available at the Kaplan office there.  We have met the manager and he is 100% behind it.  Our consternation is (1) printing and staffing costs, and (2) the fact that the Kaplan at IU is somewhat removed from campus.  They are in the process of applying to locate in the student union – for this and other reasons it probably makes sense for us to begin staffing the Kaplan office and distributing packets there.

UCF – We are in the process of submitting an application (to the UCF administration) to distribute packets at the Kaplan office, which is located in the UCF student union.  We will most likely not make packets available until Spring when we make reviews available on a large scale.

b.    Live Review Locations – the plan for fall is definitely dynamic, to say the least.  All classes will be available on demand on our video app.  Some (but not all) classes will be offered live (in person).  Others will be available live online (specifically classes where the tutor lives elsewhere).  For those classes that will be offered live in person, the menu of locations is as follows:

The Continuum – Graduate Student Housing located between campus and downtown on University Avenue.  This is the new construction across from the Seagle Building.  The Continuum is owned by a large publicly traded housing company but is technically a part of UF Housing.  The Director, Lisa Smith, is an old friend of ours.  In exchange for promotion to students through TZ, she has offered use of her Rec Room on site.  There is ample parking (in the attached parking garage) and the location is much closer than the old TZ.  We will have access to this room every Monday and other days when it is not scheduled to have activities.  We can use this room for free; it has a projector and storage for our chairs, etc.  We plan on holding our weekly reviews for ACG, BCH and FIN here.

Exhibit 7.page 117

Going forward, we will be exploring the possibility of trading advertising for a free retail space at the Continuum. They are completely vacant and, given the fact that we need little to no build out, they will consider a trade out that would allow us to maintain a store on University Avenue to distribute our packets and host our weekly reviews.

The Hilton – We will host Exam Reviews for Upper Level courses (such as FIN or QMB) here. Rental rates are $400 - $500 per session (or lower, depending on attendance).

Emerson Alumni Hall OR Holiday Inn – for freshman classes we must have a location within walking distance of campus. Emerson Alumni Hall gave us a preliminary OK but have yet to confirm. They attribute it to new management and their work on a new strategic plan. The Holiday Inn is our backup in case Emerson falls through.

c.  New Horizons –
The team has access to amazing technology, technical knowledge and a very lively culture.
Tim is excited that we bring excitement, energy and enthusiasm to the workplace.

We have collaborated on a number of ideas and have future opportunities to work together.

Tim was contacted by Spence when we first moved in – who aggressively demanded that Tim kick us out for as a personal vendetta against me.

Tim is fully aware of our position and has lost faith in Spence as a result of his actions.

We have not heard anything from Spence since Larina's last thoughtful reply to him

6.  Marketing

Katie has been doing an amazing job managing our social media presence, handling guerrilla marketing activities (posting flyers on campus, handing out flyers outside of classrooms, etc.).

Under Katie's direction, we have a number of exciting marketing events lined up over the remainder of summer and fall:

-  Freshman Welcome Reception and BEAT Event – Rachel Johnson at the Alumni Association honored our long relationship and turned back the usual aggressive approach by SE to allow us exclusive attendance at the Welcome Reception hosted by UFAA at Emerson Alumni Hall on the first day of Fall classes (attendance approximately 1,500 - 2,000 freshmen). In addition, we will once again be passing out donuts and coffee to students that camp out before a home football game for a free BEAT t-shirt. Great PR.
-  AMSA – THE most influential student organization in the Science courses. The ability to attend their FIRST general assembly meeting is a huge opportunity. Last year SE attended the first session while we were relegated to meeting #2. The first meeting has the largest attendance (700 pre-med students) and is immediately before Exam 1 reviews. Many freshmen first hear about tutoring at this meeting. Last year, the 'decision-maker' was one of

Exhibit 7. page 118

Zach's pet students.  This year, the decision maker is a big-time friend-of-Lauren.  This is how these things go…

- <u>Cicerones</u> – We have been invited to attend their recruitment event in the Plaza of the Americas this week.  The Cicerones are the campus ambassadors and play a huge role in giving campus tours, preview, etc.
- <u>Panhellenic Leadership Seminar</u> – Nelson Logan and I will be delivering a seminar on leadership, service and authenticity to the 800+ new members of panhellenic on 8/21 (in other words 800+ freshmen sorority pledges).
- <u>IRHA</u> – We hosted a very successful tie-dye event during the Summer B 'Weeks of Welcome' and will be hosting similar events in Fall.  The coordinator for IRHA, Elliott, is one of my accounting students and has provided preferential opportunities for TZ thus far.  We will be stuffing the freshman welcome bags with 8,000 TZ 'Beat Everyone' buttons next week (SE has an insert as well – funny story there…
- <u>Tabling with Kaplan</u> – We will be sharing a table with Kaplan at the Reitz Union handing out promotional materials during the first week of school.

Once Fall starts, we will continue to go to meetings for various organizations to be a featured speaker, hand out TZ swag, etc.

A conversation for later – PR once we switch over to TZ2.  Clarify on exactly what we can and cannot say.

7.    <u>Other</u>

- My position on the Governor's Task Force for creation of a virtual university continues to draw attention and hopefully will open doors along the way!

http://www2.tbo.com/news/education-news/2012/jul/29/namaino1-online-u-waits-in-wings-ar-445316/

8.  Topics for discussion
- Financial discussions
- Leasing printer at FSU – Childers take and thoughts
- Strategies on getting back into Kaplan U.F.
- PR releases for TZ2 what and how to deliver message

Exhibit 7.page 119

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 1:07 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: Summer P&L and Recap of Summer |
| **Attachments:** | 7.31 Update.docx |

#14 - 7/30/12

---------- Forwarded message ----------
From: **Larina Hintze** <larinahintze@gmail.com>
Date: Mon, Jul 30, 2012 at 11:01 PM
Subject: Summer P&L and Recap of Summer
To: Christopher James <christopher.james@cba.ufl.edu>, "Frenchman,Cynthia L"
<cynthia.frenchman@warrington.ufl.edu>, langariel@gmail.com
Cc: Matthew Hintze <matthewhintze@gmail.com>


Here's a robust update.  Draft employment contracts to follow tomorrow.

Happy ready :-)

Larina



--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 120

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 1:32 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: RMC |

#23 - 8/2/2012

---------- Forwarded message ----------
From: **Larina Hintze** <larinahintze@gmail.com>
Date: Thu, Aug 2, 2012 at 4:38 PM
Subject: RMC
To: Jeffery Childers <jchilders@smartbizlaw.com>, Christopher James <christopher.james@cba.ufl.edu>, Ariel Lang <langariel@gmail.com>, "Frenchman,Cynthia L" <cynthia.frenchman@warrington.ufl.edu>
Cc: Matthew Hintze <matthewhintze@gmail.com>

We were served a 5 day summons which we can not respond to as the Sheriff came to our house and my 18 year old brother signed for it and can't remember where he put it. They mailed a copy of it to my old address which my tenant eventually brought over and I can't find that copy either.

At any rate we continued to stay in the building rather than pay for hotels and August 4th is officially our last day there. We have not been served with a 24 hour notice so we will email them on 8/4 that we have vacated.

I assume since we did not respond to the 5 day (or will not within the 20 day period) they will file a judgment. Is there anything we need to do?

Also do you have any suggestions/concerns with me calling them to see if they will let us hold reviews there as needed for a flat fee while they attempt to re-rent the premises?

Chris / Matt thoughts???

I'm just thinking that it makes sense for them to get some revenue vs none and for us to pay them vs higher priced hotels.

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 121

1

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 1:02 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: Operations Questions |

#11 - 8/22/2012

---------- Forwarded message ----------
From: **Frenchman,Cynthia L** <cynthia.frenchman@warrington.ufl.edu>
Date: Wed, Aug 22, 2012 at 4:16 PM
Subject: RE: Operations Questions
To: Matthew Hintze <matthewhintze@gmail.com>

See his answers below on the last two questions you had for him. Ill get the fed id number to you soon. We are actually going to open up a new TZ2 account and forget the CMJ2.

Cynthia Frenchman

Assistant to Professor Christopher James

University of Florida

Warrington College of Business

Department of Finance

(352) 392-8041-Office

(352) 213-2858-Cell

From: Matthew Hintze [mailto:matthewhintze@gmail.com]
Sent: Wednesday, August 22, 2012 12:42 PM
To: Frenchman,Cynthia L
Subject: Re: Operations Questions

You rock girl!  Thanks!

Exhibit 7.page 122

First day of school here so I haven't had a moment to call you back.  I suck...


On Wed, Aug 22, 2012 at 3:26 PM, Frenchman,Cynthia L <cynthia.frenchman@warrington.ufl.edu> wrote:

Hey Matt,

I'm in the process of addibg dba TZ2 to CMJ2 account and adding John to be a signer. I'll let you know when this is done.

Sent from my iPhone


Begin forwarded message:

> **From:** "James,Christopher" <christopher.james@warrington.ufl.edu>
> **Date:** August 21, 2012 2:58:41 PM PDT
> **To:** "Frenchman,Cynthia L" <cynthia.frenchman@warrington.ufl.edu>
> **Subject: Fwd: Operations Questions**



> Sent from my iPad


> Begin forwarded message:

> > **From:** Matthew Hintze <matthewhintze@gmail.com>
> > **Date:** August 21, 2012 16:28:36 EDT
> > **To:** Christopher James <christopher.james@warrington.ufl.edu>
> > **Subject: Operations Questions**

> > Hey Chris -

> > A couple of ops/admin questions:

> > 1.  Banking - Paul needs to order checks.  The new bank account is set up as CMJ2, not TZ2.  Should we add a DBA, or do you want checks to say CMJ2?
> > 2.  Also with regard to banking, we have typically had John Kavekos write checks related to FSU out of our account.  If you are OK with him continuing in this fashion then we need to add him as a signer.
> > 3.  Copier lease - We are ordering the copier for FSU that you and I spoke about.  The lease doc requires a signature and federal tax id number for the entity.  Should I use the old one (TZ) or the new one (TZ2)? New
> > 4.  Scion lease - the care that we e-mailed about is abput $250 per month plus insurance.  I was considering leasing it in my personal name while I still have credit and having TZ2 make the payment.  Is that OK by you? Ok

Exhibit 7.page 123

Thanks.

-Matt

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 124

3

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matthewhintze@gmail.com> |
| **Sent:** | Monday, July 13, 2015 2:07 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: public records request |

#20 - 9/8/2012


---------- Forwarded message ----------
From: **James,Christopher** <christopher.james@warrington.ufl.edu>
Date: Sat, Sep 8, 2012 at 5:50 PM
Subject: Fwd: public records request
To: Matthew Hintze <matthewhintze@gmail.com>



Sent from my iPhone

Begin forwarded message:

> **From:** "Kraft,John" <john.kraft@warrington.ufl.edu>
> **Date:** September 8, 2012 17:45:50 EDT
> **To:** "James,Christopher" <christopher.james@warrington.ufl.edu>
> **Subject: RE: public records request**
>
> Ok you should update your form so o can put it im the request
> Jk
>
> *Connected by DROID on Verizon Wireless*
>
>
> -----Original message-----
> **From:** "James,Christopher" <christopher.james@warrington.ufl.edu>
> **To:** "Kraft,John" <john.kraft@warrington.ufl.edu>
> **Sent:** Sat, Sep 8, 2012 18:24:02 GMT+00:00
> **Subject:** RE: public records request
>
> My guess is that it has something to do with my involvement in Tutoring Zone. About a year ago, Matt Heinz a former graduate student bought out his partner in tutoring zone. While there was a non-compete clause, his partner set up a competing firm, Study Edge. Matt borrowed heavily to finance the purchase of the business and was ultimately forced into default (I think he is filing for bankruptcy this month). In order to shelter the business from some creditors , and to help Matt out , a partner and I set up an LLC in August and acquired the intellectual property of Tutoring zone. Matt still runs his business but is now an employee of the LLC. All of this is above board and I retained counsel to ensure that I was not violating any laws and was not involved in a voidable or fraudulent transfer under bankruptcy. My conjecture is that

Exhibit 7.page 125

1

Matt's former partner is trying to stir something up. Since this transaction occurred after my outside activities form was submitted for last year, I should probably update the form.

I have no operational involvement in the business and don't teach undergrads so I don't see any conflict. Please let me know if you see a problem. If there is one, I can easily transfer my interest over to my business my partner (the swamp owner) who has no involvement with the university

---

From: Kraft,John
Sent: Friday, September 07, 2012 7:17 PM
To: James,Christopher
Cc: Ryngaert,Michael David
Subject: Fwd: public records request

Hi,

Any idea about why?

Jk

Sent from my iPad

Begin forwarded message:

> **From:** "Sikes, Janine" <jysikes@UFL.EDU>
> **Date:** September 7, 2012 4:52:37 PM EDT
> **To:** "Farrell,Susan C" <sfarrell@UFL.EDU>, "Kraft,John" <john.kraft@warrington.ufl.edu>
> **Cc:** "Holt,Rebecca J" <bholt@UFL.EDU>, "Fuller,Ryan R" <ryanf@ufl.edu>, "Czaplewski,Kimberly M" <kczap@UFL.EDU>
> **Subject: FW: public records request**
>
> Susan:
>
> Would you provide the personnel file for Christopher James in the Department of Finance per the public records request below?
>
> Dean Kraft:

Exhibit 7.page 126

2

Would please provide me any personnel file, filings of disclosure of conflict of interest and outside financial interest, and any complaints and investigations about the disclosures for Christopher James in the Department of Finance per the public records request below?

Please forward to me electronically if possible.

Thank you for your help, janine

Janine Sikes

Director of Public Affairs

University Relations

University of Florida

101 Tigert Hall

Office: 352-846-3903/06

Cell: 352-214-6807

jysikes@ufl.edu

---

From: Clark, Anthony [mailto:Anthony.Clark@gvillesun.com]
Sent: Friday, September 07, 2012 3:18 PM
To: Sikes, Janine
Subject: public records request

Hi Janine,

I am requesting the personnel file of Christopher James in the Department of Finance including any filings of disclosure of conflict of interest and outside financial interest, and any complaints and investigations about the disclosures.

Exhibit 7.page 127

Anthony Clark

<

--
Matthew Hintze
MatthewHintze@gmail.com
(352) 219-1618 (mobile)

Exhibit 7.page 128

4

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matt@tutoringzone.com> |
| **Sent:** | Monday, July 13, 2015 1:18 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: Gainesville Sun article |

#18 - 9/17/2012

Begin forwarded message:

> **From:** Larina Hintze <larina@tutoringzone.com>
> **Subject: Re: Gainesville Sun article**
> **Date:** September 17, 2012 at 5:26:35 PM EDT
> **To:** Matthew Hintze <Matt@TutoringZone.com>
> **Cc:** Christopher James <christopher.james@warrington.ufl.edu>
>
> First order try to get as much information from them:
>
> What accusations - what investors.
>
> My first thought are quotes like this:
> Which will only inflame things - but can they get any worse? I recorded all meeting minutes and my gmail has everything available when we have to defend ourselves -
>
> Spence as a tz board member voted to default on the lease and as recorded in the meeting minutes he and the board were adamant about defaulting on all loans. (don't use this but ogilby's direct quote was 'fuck the banks I know how to delay them' - I know the attorney who did the short sale for his house and think he filed bk as well - just FYI)
>
> The board was also meeting with our former partner and applying pressure to sell back tz since in their opinion both tutoring companies were loosing money by being in competition with one another.  Further some of our board members elected to sell their promissory notes to our former business partners father, Steve fieldman. This means they have a vested interest in us failing and our competitors succeeding.
>
> Since we paid for tz vs selling tz our cash reserves were smaller and our goal was to downsize and adjust to the smaller market so that we could focus on students like rolling out delivery of our packets to students.
>
> Our goal is and always has been focus on students.  We are just focused on what we are doing and doing it well.
>
>
>  Like many companies in our current economic situation we had to reinvent ourselves and we have.  Our platform - delivery systems - content and product are better than they have ever been.

Exhibit 7.page 129

We think the real story here is how students will be served moving forward and not the complex and complicated legal issues that need to be worked out.

also Scott walker - out attorney - is an ally.  He heard the 3 stooges (whit-ogilby-spence) say they were going to launch a criminal suit against our competition as well as spence using his position to meet with Avery and Avery to try and take the case.  So maybe we should let him speak to some of this....

That way we keep our hands clean....

I hate the tight deadline - maybe we also give them Kelly and Brandon's number?

We Gould really think this through as this is our chance for a huge article and it should be well thought out - we should also run it by Childers - does commenting on tz one while employed by tz2 hurt us anyway by making it publicly appear as thought we are the same.

Maybe we need language that we had to reinvent tz and so we have a new company .....

Chris Matt is teaching tonight but if you want to chat I'm free.

Those are my thoughts -

Spence is a big pussy!

Sent from my iPhone

On Sep 17, 2012, at 3:44 PM, Matthew Hintze <Matt@TutoringZone.com> wrote:

> MATTHEW HINTZE
> (352) 219-1618(Mobile)
> WWW.TUTORINGZONE.COM
>
> **<1310056081.png>**
>
>
>
> **THANK YOU FOR CHOOSING TutoringZone. WE'RE PROUD TO SERVE YOU.
> IF YOU LOVE OUR SERVICES, PLEASE TELL YOUR FRIENDS.**

Begin forwarded message:

**From:** "Clark, Anthony" <Anthony.Clark@gvillesun.com>

Exhibit 7.page 130

2

**Date:** September 17, 2012 3:41:47 PM EDT

**To:** "Matt@TutoringZone.com" <Matt@TutoringZone.com>

**Subject: Gainesville Sun article**

Matt,

I am working on an article that may be due as soon as Tuesday about the lawsuits from investors and the eviction against TutorzingZone. I wanted to give you a chance to tell your side and also answer accusations from investors and former partners.

Anthony Clark
Business editor
The Gainesville Sun
2700 SW 13th St.
Gainesville, FL 32608
352-338-3171
anthony.clark@gvillesun.com

Exhibit 7.page 131

3

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Matthew Hintze <matt@tutoringzone.com> |
| **Sent:** | Monday, July 13, 2015 1:25 PM |
| **To:** | Elizabeth R Bowen |
| **Subject:** | Fwd: Weekly Update |
| **Attachments:** | P&L 8_16 through 9_30_12.xlsx; ATT00001.htm; image.png; ATT00002.htm; The 7 Habits of Highly Effective Mediocre Entrepreneurs  TechCrunch.html; ATT00003.htm; The 7 Habits of Highly Effective Mediocre Entrepreneurs  TechCrunch_files.zip; ATT00004.htm; 1310056081.png; ATT00005.htm |

#19 - 9/28/2012


Begin forwarded message:


**From:** Matthew Hintze <Matt@TutoringZone.com>
**Subject: Weekly Update**
**Date:** September 28, 2012 at 10:38:46 PM EDT
**To:** Matthew Hintze <Matt@TutoringZone.com>
**Mime-Version:** 1.0 (Apple Message framework v1084)
**Content-Type:** multipart/alternative; boundary=Apple-Mail-71--935542777
**X-Universally-Unique-Identifier:** 4b56cd35-559b-4b0f-abd5-6cd3717ac4e

To: Matthew Hintze <Matt@TutoringZone.com>

Bcc: The Wife Hintze, Paul Hintze, Alek Hartzog, Christopher James, Nelson Logan, Katie Murphy, Rob Bailey, Lauren Figler, Jon Aleman, John Kavekos, Ashley Ellis, Michael Underwood, Bruce hintze, Tim Broom, Brittany Bruce, hanagabrielle7@gmail.com, Kyle Tucker, Anna Hartzog, Jaclyn Grill, Siobhan Waldron, Timothy O'Toole, Toni Megna, Veronica Veitia, Emon Abtahi, Alexander Crook, Selph Chad, Erin Heim, Hans Tanzler, Jens Engelmann, Jerry Mathis, Jordan Miller, Kyle Hannabass, Lan TZ, statics@tutoringzone.com, Meric Augat, mike@tutoringzone.com, Garrick Harding

**In-Reply-To:** <C81AFA1B-40BF-4FC2-A315-327B4DAB7EBA@TutoringZone.com>
**Message-Id:** <E7ABE597-13FC-417A-8103-A70031BFF729@TutoringZone.com>
**X-Smtp-Server:** smtpout.secureserver.net:matt@tutoringzone.com
**References:** <C8078DD9-A222-476C-9D21-A75E11BED7AD@tutoringzone.com> <873EF55A-BE9E-474B-B6A8-D09265919311@TutoringZone.com> <696838F5-9FED-49DD-8A3F-07FB1EDDA9EC@TutoringZone.com> <8CA250DF-03DE-41D6-8F77-4699B65E9D29@TutoringZone.com> <C81AFA1B-40BF-4FC2-A315-327B4DAB7EBA@TutoringZone.com>


Hey everyone!

I hope you are all enjoying a lovely Friday evening and have plans to enjoy some time this weekend enjoying the beautiful weather with friends and family, perhaps enjoying a nice football game tomorrow!  On to the update!

Exhibit 7.page 132

1

**Numbers**

Attached is the P&L and attendance numbers for Fall to Date.  Our year-over-year revenues are now more than 10% higher, and expenses continue to be significantly lower that last year as well.  All in all a pretty solid recipe for much greater profitability.

When looking at 2012, a couple of notes:

- Revenue for 2012 is through 9/27 (2011 is through 9/30), so you can bump up the 2012 revenue a touch to truly compare apples-to-apples.

- Revenue for 2012 does not fully include FSU sales since we have yet to invoice Bill's Bookstore, so again, to compare apples-to-apples you can add a couple thousand dollars in revenues to the 2012 total.

|            | 8/16/11 – 9/20/11 | 8/16/12 – 9/20/12 |
|------------|-------------------|-------------------|
| Revenues   | $162,209.18       | $182,414.18       |
| Expenses   | $205,756.32       | $141,788.32       |
| Net Income |                   | $40,625.86        |
|            | -$43,547.14       |                   |

Exhibit 7.page 133

2

## **Exhibit Tag/ Cover Sheet**

**Party submitting: PLAINTIFFS**          **Ex. # 8**

**Admitted: Yes   or     No  (circle one)**

**Debtor:  MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:  12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

**Nature of Hearing/**
**Docket No:  Motion to Compel Re: Privilege**

**Dated _____ , 20\_\_\_.**

**By:_____,   Deputy Clerk**

# EXHIBIT 8

## INTELLECTUAL PROPERTY TRANSFER AGREEMENT

THIS INTELLECTUAL PROPERTY TRANSFER AGREEMENT (the "*Agreement*") is made effective as of **June 4, 2012,** between TutoringZone, LLC, a Florida limited liability company, and its present and future divisions, affiliates and subsidiaries (collectively, the "*Seller*"), and TutoringZone II, LLC, a Florida limited liability company, and its present and future divisions, affiliates and subsidiaries (collectively, the "*Buyer*").

WHEREAS;

Seller has agreed to sell and/or transfer all of its right, title, and interest in the Intellectual Property (as defined below) to the Buyer, and

The Buyer has agreed to purchase and accept the Intellectual Property for the Consideration (as defined below);

NOW, THEREFORE, IT IS AGREED as follows:

1.  Definitions:

    (a)   *Consideration* has the meaning given it in Section 3(b).

    (b)   *Execution Date* shall be defined as the effective date stated above.

    (c)   *Intellectual Property* means all of the video and audio, workbooks, tests, instructional materials, graphics, logos, and other materials developed by Seller for delivery of tutoring services, including the source codes and source documents, whether printed or electronic, and all intellectual property rights therein, as well as the other intellectual property rights described on Schedule A attached to the Agreement.

    (d)   *Parties* means the Seller and the Buyer.

2.  Interpretation:

    (a)   The headings are inserted for convenience only and shall not affect the construction of this Agreement;

    (b)   A reference to *sell* or *purchase* or *transfer* includes a reference to produce the sale of or procure the purchase of or procure the transfer of, as the case may be; and

    (c)   General words introduced by the word *other* shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of act, matter or thing, nor by the fact that they are followed by particular examples intended to be embraced by the general words.

rev 06041203

TZ2 000224

3.  THE TRANSFER

(a)  Effective as of the Execution Date, Seller sells and transfers and the Buyer purchases and receives all of Sellers' right, title and interest in the Intellectual Property (the *Sale*).

(b)  The price for the sale and transfer described in Section 3(a) shall be $200,000.00, and other valuable consideration, which is agreed and accepted by the Parties to be full and adequate consideration for the Sale (the *Consideration*). The payment of the Consideration shall be offset and credited by any amounts owed by Seller to Christopher M. James.

(c)  If any sales tax, value added tax or other transfer tax is properly chargeable in respect of the Sale, the Buyer shall pay to Seller the amount of such tax in addition to and at the same time as the Consideration. Buyer will issue to the Seller a proper tax invoice in respect thereof.

(d)  The Seller hereby acknowledges that the Seller makes no representation or warranty to the Buyer under this Agreement, either express or implied, with respect to the Intellectual Property, and that the Sale is made to the Buyer on an "as-is" basis.

4.  COMPLETION

(a)  The sale and purchase of the Intellectual Property shall be completed, and legal title and ownership in respect of the Intellectual Property shall be deemed to pass to the Buyer, in each case, with effect from the Execution Date.

(b)  The Seller shall:

i.  Cause to be delivered or made available to the Buyer such additional documents as the Buyer may reasonably require to complete the sale and purchase of the Intellectual Property; and

ii.  Do other such things reasonably necessary to give full effect to this Agreement.

(c)  The Buyer shall:

i.  Timely notify the holders of the assumed liabilities of such assumption in the manner as Seller may direct; and

ii.  Cause to be delivered or made available to Seller such additional documents as the Seller may reasonably require to complete the Sale; and

rev 06041203

TZ2 000225

       iii.  Do other such things reasonably necessary to give full effect to this Agreement.

5.  **LICENSES**

Seller grants to the Buyer a perpetual, royalty-free, and exclusive license to use all know-how, techniques, ideas, processes and similar intellectual property that was created, invented, or developed by Seller which is related to the Intellectual Property as defined herein but not otherwise transferred within the Sale.

6.  <u>Entire Agreement</u>.  This Agreement (including the Schedules, which are hereby incorporated in the terms of this Agreement) sets forth the entire understanding and agreement among the Parties as to matters covered herein and therein and supersedes any prior understanding, agreement or statement of intent (written or oral) among the Parties with respect to the subject matter hereof.

7.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

8.  <u>Variation</u>. No waiver shall be deemed to have been made by any party of any of its rights under this Agreement unless the same is in writing and is signed on its behalf by an authorized signatory. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time. To be binding, any amendment of this Agreement must be effected by an instrument in writing signed by the Parties.

9.  <u>Costs</u>. The Seller and the Buyer shall each pay its own costs, charges and expenses incurred in connection with the preparation and implementation of this Agreement and the transactions contemplated by it.

10.  <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. Venue shall be Alachua County, Florida.

11.  <u>Integration</u>. This Agreement is the entire agreement between the Parties. All other previous agreements, whether oral or written, are superceded and replaced by the terms of this Agreement.

12.  <u>Severability</u>.  If any portion of this Agreement is found to be unenforceable or avoidable, then the remainder shall stand.  In particular, this Agreement is not intended to replace, supercede, or extinguish the Intellectual Property Lease previously executed between the Parties. In the event that this Agreement found to be avoidable or unenforceable in whole, or materially in whole, the Intellectual Property Lease is intended by the Parties to remain executory and independent from this Agreement, and protected by the Bankruptcy Provisions as described herein.

TZ2 000226

13.    Bankruptcy Provisions. The Parties acknowledge that this Agreement is an "executory contract" as provided in Section 365(n) of Title 11, United States Code (the "U.S. Bankruptcy Code") and may contain licenses to "intellectual property," as provided in Section 365(n) thereof. Each party acknowledges that if it, as a debtor in possession or a trustee in bankruptcy in a case under the Bankruptcy Code, rejects this Agreement, the other party may elect to retain its rights under this Agreement as provided in Section 365(n) of the U.S. Bankruptcy Code to the fullest extent permitted by law, subject to all of such party's obligations and restrictions hereunder. Upon written request of one party to the other party or to an applicable bankruptcy trustee, the other party or such bankruptcy trustee shall not interfere with the rights of the requesting party as provided in this Agreement, except as otherwise provided by law or equity.

14.    Construction. The Parties agree that they have had adequate opportunity to review this Agreement, and to have the Agreement reviewed by their counsel, and agree that the Agreement shall be construed no more strictly against one party than the other, regardless of which party drafted the Agreement.

**AS WITNESS,** this Agreement has been signed by or on behalf of the Parties upon the Execution Date.

**FOR THE SELLER:**

**TutoringZone, LLC,** a Florida limited liability company

By: _____
        Matthew B. Hintze,
        Managing Member

**FOR THE BUYER:**

**TutoringZone II, LLC,** a Florida limited liability company

By: _____
        Christopher M. James,
        Organizer and Managing Member

Intellectual Property Transfer Agreement
Page 4

rev 06041203

TZ2 000227

<u>SCHEDULE A</u>
Intellectual Property

<u>Video Materials</u>

All video instructional materials including exam reviews, weekly reviews, chapter reviews, practice problem solutions, old exam solutions, mock exam solutions, conceptual reviews, and all other solutions, explanations and tutorials for current and prior semesters for tutoring sessions for the following classes at the Indiana University (IU), The University of Florida (UF) and Florida State University (FSU):

| | | | |
|---|---|---|---|
| ACG 2021 - UF | MAC 1140 – UF | STA 3024 - UF | PHY 2054 - FSU |
| ACG 2071 - UF | MAC 1147 – UF | ACG 2021 – FSU | QMB 3200 – FSU |
| BCH 4024 - UF | MAC 2233 – UF | ACG 2071 – FSU | STA 2023 – FSU |
| CHM 1025 - UF | MAC 2234 - UF | CHM 1045 – FSU | STA 2122 – FSU |
| CHM 2045 – UF | MAC 2311 – UF | CHM 1046 – FSU | BUS A 100 – IU |
| CHM 2046 – UF | MAC 2312 – UF | CHM 2210 – FSU | BUS A201 – IU |
| CHM 2210 – UF | MAC 2313 – UF | CHM 2211 – FSU | BUS A202 – IU |
| CHM 2211 – UF | MGF 1106 – UF | ECO 2013 – FSU | ECON E201 – IU |
| CHM 3120 – UF | MAN 4504 – UF | ECO 2023 – FSU | ECON E202 – IU |
| ECO 2013 – UF | PHY 2048 – UF | FIN 3403 – FSU | ECON E370 – IU |
| ECO 2023 – UF | PHY 2049 – UF | MAC 1105 – FSU | MATH M118 – IU |
| FIN 3403 – UF | PHY 2053 – UF | MAC 1114 – FSU | MATH M119 - IU |
| FIN 4243 – UF | PHY 2054 – UF | MAC 1140 – FSU | |
| GEB 3373 – UF | QMB 3250 – UF | MAC 2233 - FSU | |
| MAC 1105 - UF | STA 2023 - UF | PHY 2053 - FSU | |

<u>Other Materials</u>

All written course materials, including (but not limited to):
- Course Handouts, Review Handouts, Review Packets
- Practice Problem sets and solutions
- Mock Exams and solutions
- Conceptual Reviews
- GMAT, GRE and LSAT Preparatory Materials

<u>Other Intellectual Property</u>

- TutoringZone.com and all associated websites
- Domain names currently owned and registered by TutoringZone including:

    2outof3.com
    2toringzone.com
    asklarina.com
    betterthancheating.com

TZ2 000228

gatorgrow.com
gatorgrow.org
gradeinsurance.com
larinahintze.com
letthegatorlead.com
nottutoringzone.com
notworst.com
notworst.org
resumeheadquarters.com
saveyourgpa.com
seekfirsttounderstand.com
sendtutoringzonefiles.com
sendtzfiles.com
statstutor.com
tutoringozne.com
tutoringzone.biz
tutoringzone.com
tutoringzone.org
tutoringzoneauctions.com
tutoringzonefacebook.com
tutoringzonephilanthropy.com
tutoringzoneshirts.com
tutoringzonestaff.com
tutoringzonesurvey.com
tutoringzonetodo.com
tzordering.com
tzsamples.com
tzstaff.com
tzsurveys.com
uftutors.com

- TutoringZone Service Mark, Registration Number 3,355,699 with the US Patent and Trademark Office
- TutoringZone facebook page (www.facebook.com/TutoringZone)
- TutoringZone's Learning Management System (apps.TutoringZone.com)

## Exhibit Tag/ Cover Sheet

Party submitting: **PLAINTIFFS**          Ex. # **9**

Admitted: Yes   or    No  (circle one)

**Debtor:  MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:  12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

**Nature of Hearing/**
**Docket No:  Motion to Compel Re: Privilege**

Dated _____ , 20___.

By:_____,  **Deputy Clerk**

# EXHIBIT 9

**Elizabeth R Bowen**

| | |
|---|---|
| **From:** | Sheila Spence <sheila@johnspence.com> |
| **Sent:** | Monday, May 14, 2012 8:01 AM |
| **To:** | Stinson John |
| **Cc:** | Spence John |
| **Subject:** | Spence: TZ Update |
| **Attachments:** | PastedGraphic-2.tiff |

Hi John -
I was going to drop off the retainer check last Thursday but just as I was looking for a place to park, the other investors and Matt Hintze started trying to plan this meeting. I will drop off the check on Tuesday and give you an update on tonight's meeting. I can't imagine anything will come about that will dramatically change the situation - but we will see.

I hope your wife can represent Rick Staab. He's in this too and we are of like-mind on the situation.

Best regards -

Sheila Spence
John Spence LLC
PO Box 357606
Gainesville, FL 32635
Cell - 352.339.0142
Fax - 352.505.5831
Skype - sheila.spence9
Email  - Sheila@JohnSpence.com
Web - www.JohnSpence.com

PastedGraphic-2.tiff

Begin forwarded message:


**From:** Matt Hintze <matthewhintze@gmail.com>
**Date:** May 13, 2012 8:30:53 PM EDT
**To:** Matt Hintze <matthewhintze@gmail.com>
**Cc:** Kevin Ogilby <kgogilby@gmail.com>, John Spence
<john@johnspence.com>, Sheila Spence <sheila@johnspence.com>, David
Whitney <whit5470@gmail.com>, Christopher James
<christopher.james@cba.ufl.edu>, Randy Scott <randyscott14@gmail.com>,
sallyscott <sallycscott@gmail.com>, Rick Staab <rstaab@intermed1.com>,
"Greer,Creed C,III" <cgreer@ufl.edu>, "Bphintze@bellsouth.net"
<Bphintze@bellsouth.net>, Larina Hintze <larinahintze@gmail.com>
**Subject: Re: TZ Update**

1

Hi all,

It looks like 7:30 pm Monday evening at TutoringZone works for everyone that I have spoken to.  Thank you and see you then.

-Matt

Sent from my iPhone

## Exhibit Tag/ Cover Sheet

**Party submitting: <u>PLAINTIFFS</u>**          **Ex. #<u>10</u>**

**Admitted: Yes   or    No  (circle one)**

**Debtor:  <u>MATTHEW BRUCE HINTZE, and LARINA K. HINTZE</u>**

**Case No.:  <u>12-10462 (KKS)</u>**

***Adv. No.*:  <u>13-01007 (KKS)</u>**

**Nature of Hearing/
Docket No:  <u>Motion to Compel Re: Privilege</u>**

**Dated          <u>              </u>  , 20___.**

**By:<u>                    </u>,   Deputy Clerk**

EXHIBIT 10

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Cynthia Frenchman / (352) 213-2858

**B. SEND ACKNOWLEDGEMENT TO:**
Name   Cynthia Frenchman
Address   928 Marina Drive
Address
City/State/Zip   Napa, California   94559

**FLORIDA SECURED TRANSACTION REGISTRY**

# FILED
**2012 Jun 11 09:49 AM**
****** 201206911415 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

1.a ORGANIZATION'S NAME

| 1.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Hintze | Matthew | | |

| 1.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 708 NE Boulevard | | | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| This space not available. | Gainesville | FL | 32601 | USA |

| 1.d TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1.e TYPE OF ORGANIZATION | 1.f JURISDICTION OF ORGANIZATION | 1.g ORGANIZATIONAL ID# |
|---|---|---|---|---|
| XXX-XX-4537 | | | | NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

2.a ORGANIZATION'S NAME

| 2.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Hintze | Larina | | |

| 2.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 708 NE Boulevard | | | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| This space not available. | Gainesville | FL | 32601 | USA |

| 2.d TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2.e TYPE OF ORGANIZATION | 2.f JURISDICTION OF ORGANIZATION | 2.g ORGANIZATIONAL ID# |
|---|---|---|---|---|
| XXX-XX-8057 | | | | NONE |

**3. SECURED PARTY'S NAME ( or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)**

3.a ORGANIZATION'S NAME

| 3.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| James | Chris | M. | |

| 3.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 2801 NW 58th Blvd | | | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| This space not available. | Gainesville | FL | 32606 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**
All personal property owned by the Debtors, including cash or cash equivalents, stocks, bonds, mutual funds certificates of deposit, household goods and furnishings, automobiles, water craft, .

**5. ALTERNATE DESIGNATION (if applicable)**
- LESSEE/LESSOR
- AG. LIEN
- CONSIGNEE/CONSIGNOR
- NON-UCC FILING
- BAILEE/BAILOR
- SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**
- [✓] All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
- [ ] Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-1 (REV.01/2009)          Filing Office Copy          Approved by the Secretary of State, State of Florida

## Exhibit Tag/ Cover Sheet

**Party submitting: PLAINTIFFS**          **Ex. # 11**

**Admitted: Yes   or    No  (circle one)**

**Debtor:  MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:  12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

**Nature of Hearing/**
**Docket No:  Motion to Compel Re: Privilege**

**Dated          , 20   .**

**By:          ,   Deputy Clerk**

EXHIBIT 11

02/07/13

## TutoringZone LC
## Transaction Detail by Date
### January 1 through August 1, 2012

| Type | Date | Num | Name | Memo | Account | Class | Clr | Split | Amount | Balance |
|------|------|-----|------|------|---------|-------|-----|-------|--------|---------|
| **Jan 1 - Aug 1, '12** | | | | | | | | | | |
| General Journal | 04/13/12 | | | repayment of loan | loan payable–Chris James | UF | | Compass 6880–TZ Chec... | 36,610.02 | 36,610.02 |
| Check | 05/01/12 | CMJ | | | loan payable–Chris James | | | Compass 6880–TZ Chec... | -36,610.02 | 0.00 |
| General Journal | 05/31/12 | | | for payroll | loan payable–Chris James | UF | | Compass 6880–TZ Chec... | 25,000.00 | 25,000.00 |
| General Journal | 06/22/12 | | | for payroll | loan payable–Chris James | UF | | Compass 6880–TZ Chec... | 25,000.00 | 50,000.00 |
| General Journal | 07/13/12 | | | | loan payable–Chris James | UF | | Compass 6880–TZ Chec... | 25,000.00 | 75,000.00 |
| General Journal | 08/01/12 | | | for payroll | loan payable–Chris James | UF | | Compass 6880–TZ Chec... | 25,000.00 | 100,000.00 |
| | | | | | | | | | 100,000.00 | 100,000.00 |
| **Jan 1 - Aug 1, '12** | | | | | | | | | | |

## Exhibit Tag/ Cover Sheet

**Party submitting: PLAINTIFFS**          **Ex. #12**

**Admitted: Yes   or    No  (circle one)**

**Debtor:  MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:  12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

**Nature of Hearing/**
**Docket No:  Motion to Compel Re: Privilege**

**Dated** _____ **, 20___.**

**By:**_____**,   Deputy Clerk**

# EXHIBIT 12

# INTELLECTUAL PROPERTY LEASE

## between

## TUTORING ZONE, LLC

## and

## CHRIS JAMES AND CYNTHIA FRENCHMAN

THIS AGREEMENT (the "Lease" or "Agreement") is made and entered into as of May 22, 2012, between Tutoring Zone, LLC ("Lessor") and Chris James and Cynthia Frenchman ("Lessees").

## R E C I T A L S

A.      Lessor owns the intellectual property rights to certain course materials, videos, instructional materials, workbooks, computer software, electronic documents, training materials, forms, coursework, web materials (the "Intellectual Property").

B.      Lessor owns the right to use the "Tutoring Zone" brand name, which is a common-law trademark of Lessor (the "Mark").

C.      Lessee desires to lease from Lessor the complete and non-exclusive right to use the Intellectual Property and to use the Mark.

D.      Lessor desires to lease the rights to use the Intellectual Property and the Mark to Lessees.

**NOW, THEREFORE,** in consideration of the mutual agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENT

1.      The Recitals set forth above are incorporated herein as though fully set forth in this paragraph, and the Parties agree that the Recitals constitute a true and correct statement of fact.

2.      Upon execution of this Lease by both Parties, Lessees shall pay to Lessor a one-time lump-sum payment of seventy-five thousand dollars ($75,000.00) (the "Lease Payment") as consideration for this Lease.

3.      Upon receipt of the Lease Payment, Lessors will deliver the Intellectual Property to Lessees, including electronic source documents and all source materials.

4.      Lessor shall grant to Lessees an unrestricted lease for use of the Intellectual Property for a term of ten (10) years (the "Initial Term"). Lessees may at their option renew the lease for an infinite number of successive ten (10) year terms ("Successive Period") for ten thousand dollars ($10,000.00) per ten-year lease period (the "Successive Period Payment"). The Successive Period Payments shall be paid monthly during each such Successive Period, such that the Lessees will pay $80 per monthly period for 119 periods, and a final payment in the 120th month of $320.00.

5.      Unrestricted use by Lessees includes: copying, modifying, improving, publishing, distributing, reproducing, selling, leasing, and making any other use of the Intellectual Property that might reasonably be required to market, sell, and deliver tutoring services.

6.      Lessees may assign the Lease and/or the rights pursuant to the Lease to any third party without notice to Lessor. Such assignment may be complete or partial, and may be exclusive or non-exclusive.

7.    Any and all modifications or improvements of the Intellectual Property shall become the sole property of Lessees.

8.    Lessees are specifically and non-exclusively entitled to use the Mark as follows:

a) Lessees may display the Mark on any of the Intellectual Property, with or without attribution.

b) Lessees may publish the Mark in any marketing materials, online, or on the building where Lessees provide services to customers.

c) Lessees may incorporate the Mark into the name of an entity formed to provide services using the Intellectual Property. However, such name shall not be identical to the Mark. Specifically, but without restriction, Lessees are permitted to use the name "Tutoring Zone II, LLC." The Lessees' right to use the Mark as described in this section shall survive the expiration or termination of the Lease.

d) Lessees may not explicitly hold themselves out to be Lessor or to be affiliated with Lessor.

9.    **Termination.** Lessees may terminate the Lease by written notice to Lessor. Lessor may not terminate the Lease. If Lessees terminate the Lease prior to the expiration of the Initial Period, then Lessor shall pay to Lessees the pro-rata un-used portion of the Lease Payment.

10.    **Expiration.** The Lease shall expire at the end of the Initial Period provided that Lessees do not elect to continue for one or more Successive Periods. The Lease shall expire at the end of a Successive Period if and when the Lessees do not elect to continue for the next Successive Period. In order to renew the lease period, Lessees

must give notice to Lessor on or before the thirtieth (30th) day following the expiration of such period.

11.    **Discontinuation of Use upon Termination or Expiration.**    Upon Termination or Expiration of the Lease, Lessees shall discontinue use of the Intellectual Property, and shall destroy the copies of the Intellectual Property that Lessees hold at that time. Lessees shall be allowed a commercially reasonable time to comply with this provision, including time required to find a replacement or substitute for the Intellectual Property. A commercially reasonable amount of time shall be interpreted in such a manner that Termination or Expiration shall not cause any interruption of Lessees' business.

12.    Lessor covenants and guarantees that the Intellectual Property is not subject to any other parties' copyright, trademark, or patent. Lessor covenants and guarantees that the Intellectual Property is unencumbered by any lien or restriction of Lessor's ability to convey the rights in the Lease.

13.    **Entire Agreement.** This Agreement supersedes any prior agreements and understandings among the Parties with respect to the subject matter hereof.

14.    **Modification.** No change or modification of this Agreement shall be of any force unless the change or modification is in writing and signed by the Parties.

15.    **Waiver.** No waiver of any breach of any of the terms of this Agreement shall be effective unless in writing and signed by the Party against whom the waiver is claimed. No waiver of any breach shall be deemed to be a waiver of any other or subsequent breach.

16.     **Severability**. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

17.     **Governing Law.** This Agreement shall be governed by and be construed in accordance with the laws of the State of Florida, without giving effect to its conflict of laws provisions. Any controversy or claim arising out of or relating to this Agreement or any provision thereof shall be resolved in Alachua County, Florida. The costs of any litigation arising from this Agreement shall be borne by the non-prevailing party, provided that each party shall pay for and bear the cost of his, her or its own experts, evidence and legal counsel unless otherwise agreed in writing.

18.     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument; and any counterpart may be delivered by facsimile transmission.

19.     **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, legal representatives and permitted assigns except where otherwise indicated herein.

20.     All Parties agree that they have had adequate time to consider this Agreement and the have had the opportunity to consult their own independent legal counsel. The Parties enter into this Agreement with complete understanding of their respective rights and duties and consent to the rights, duties, and requirements set forth herein. This Agreement shall not be construed more strictly against any party.

SIGNATURE PAGE FOLLOWS

## SIGNATURE PAGE

**IN WITNESS WHEREOF**, Tutoring Zone, LLC and Chris James and Cynthia Frenchman have duly executed this Agreement as of the earliest Execution Date written below.

**TUTORING ZONE, LLC**
By:

Matthew Hintze, President
and Managing Member

**5-22-2012**
Execution Date

**CHRIS JAMES AND CYNTHIA FRENCHMAN**

Chris James

Cynthia Frenchman

Lease of Intellectual Property – Tutoring Zone
Page 6 of 6

TZ2 000223

## Exhibit Tag/ Cover Sheet

Party submitting: **PLAINTIFFS**          Ex. # **13**

Admitted: Yes   or     No  (circle one)

Debtor:  **MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

Case No.:  **12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

Nature of Hearing/
Docket No:  **Motion to Compel Re: Privilege**

Dated _____ , 20____.

By:_____,   Deputy Clerk

# EXHIBIT 13

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

Adversary Proceeding #13-01007-KKS

JOHN SPENCE, SHEILA SPENCE,
INTERMED BIOMEDICAL SERVICES, INC.,
a Florida corporation, DAVID WHITNEY,
and FLH HOLDINGS OF FLORIDA, LLC,
a Florida limited liability company,

      Plaintiffs/Counterclaim-Defendants,

vs.

MATTHEW BRUCE HINTZE and
LARINA K. HINTZE,

      Defendants/Counterclaim-Plaintiffs/
      Third-Party Plaintiffs,

vs.

ETHAN FIELDMAN and STEVEN FIELDMAN,

      Third-Party Defendants.

_____/

| | |
|---|---|
| PROCEEDINGS: | HEARING |
| BEFORE: | HONORABLE KAREN K. SPECIE |
| DATE: | January 7, 2015 |
| TIME: | 1:00 p.m. – 3:20 p.m. |
| PLACE: | U.S. Federal Courthouse<br>401 Southeast First Avenue<br>Gainesville, Florida |
| REPORTED BY: | Jennifer R. Witwer, RPR, CRR<br>Notary Public |

1   APPEARANCES

2        Wilcox Law Firm
         BY:  ROBERT DRAKE WILCOX
3        814 A1A North, Suite 202
         Ponte Vedra Beach, Florida  32082
4        Attorney for Plaintiffs/Counterclaim-Defendants

5        Childers Law, LLC
         BY:  SELDON J. CHILDERS, ESQUIRE
6        2135 Northwest 40th Terrace, Suite B
         Gainesville, Florida  32605
7        Attorney for the Defendants/Counterclaim-Plaintiffs/
         Third-Party Plaintiffs
8
         Winderweedle, Haines, Ward & Woodman, P.A.
9        BY:  RYAN E. DAVIS, ESQUIRE
         329 Park Avenue North, Second Floor
10       Winter Park, Florida  32789
         Attorney for Christopher James and Tutoring Zone 2
11       Appearing via Court Call

12

13

14

15

16                           E-X-H-I-B-I-T-S

17   Plaintiffs' for Identification:              Page

18      Exhibit Number 1 - intellectual property
                           Transfer agreement.........31
19      Exhibit Number 2 - privilege log.............15
        Exhibit Number 3 - amended privilege log......15
20      Exhibit Number 4 - 12/4/14 hearing transcript.30
        Exhibit Number 5 - rebuttal documents.........31
21

22

23

24

25

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  We are here in the case of Spence,

3     et al, versus Hintze, Case Number 13-01007.

4          Before the Court is a continued hearing on the

5     motion for protective order filed by the defendants at

6     Docket Number 266, a hearing on the motion to compel

7     also filed by the defendants at Docket Number 271, a

8     status hearing regarding the motion for protective order

9     at Docket Number 249, and the motion by the plaintiffs

10    for authority or authorization to take more than ten

11    depositions at Docket Number 309.

12         We'll take appearances, please.

13         MR. CHILDERS:  Good afternoon, Your Honor.  Jeff

14    Childers for the debtors/defendants.

15         THE COURT:  Mr. Childers.

16         MR. WILCOX:  Good afternoon, Your Honor.  Robert

17    Wilcox on behalf of the various plaintiffs.

18         THE COURT:  Mr. Wilcox.  Thank you.

19         MR. WILCOX:  Thank you.

20         THE COURT:  All right.  Gentlemen, we have first

21    the motion for protective order and the continued

22    hearing on that at Docket Number 266.

23         Mr. Childers.

24         MR. CHILDERS:  Thank you, Your Honor.

25         I'm happy to report that we made a lot of progress

1    on these issues since our last hearing, so I'll give

2    you first, by way of status, a summary of those

3    accomplishments.

4         Late last week or very early this week we provided

5    an amended privilege log to the plaintiffs which

6    withdrew our assertion of the two contested privileges.

7    The Court will probably remember that was the joint or

8    common interest privilege and the commercial sensitivity

9    or confidential information.

10        THE COURT:  Let me stop you for just a moment,

11   Mr. Childers.

12        Can you hear back there, Mr. Wilcox, or do we need

13   to turn the mic up a little bit?

14        MR. WILCOX:  If you could turn it up just a tiny

15   bit.  Thank you very much.

16        MR. CHILDERS:  And I'll try to be a little closer

17   to the mic as well.

18        MR. DAVIS:  Your Honor, I'm sorry, this is Ryan

19   Davis appearing by phone.  I have a bad connection, but

20   I wanted to enter an appearance as well on behalf of --

21        THE COURT:  I'm sorry, Mr. Davis, I did have a

22   Court Call docket for you and I neglected to call your

23   name.  So it's Ryan E. Davis for interested party

24   Christopher James; is that correct?

25        MR. DAVIS:  Correct, and on behalf of Tutoring

1          Zone 2, Your Honor.  Thank you.

2               THE COURT:  All right.  And, Mr. Davis, if you are

3          on a speakerphone, which it doesn't sound like you are,

4          but if you're on a speakerphone, please pick up, and if

5          you're not, sometimes it helps if you turn up the volume

6          on your hand set.

7               MR. DAVIS:  Okay.  Thank you, Your Honor.

8               THE COURT:  All right.  Thank you.

9               Excuse me, Mr. Childers.  Please processed.  You

10         were saying that the common interest doctrine has been

11         withdrawn as far as the privilege log is concerned?

12              MR. CHILDERS:  That's correct.  We're not conceding

13         that there wasn't a common interest, but for the purpose

14         of the items that were on the privilege log, we've

15         decided to just produce them, and I believe they have

16         already been produced.

17              The second group was the group of e-mails, and this

18         is the largest portion of the privilege log that we had

19         identified as commercially confidential.  And after

20         analyzing the issue, we decided that because they are

21         Tutoring Zone 2's commercially sensitive information,

22         that there might be a question as to whether I even have

23         standing to assert that privilege.

24              So we contacted Mr. Davis, who is not noticed in

25         this case because Mr. James is not a party here, and we

1        identified the problem to him and we put him in contact

2        with Mr. Wilcox.  So we are not going to be asserting

3        commercial sensitivity.  That's between Mr. Davis and

4        Mr. Wilcox.

5                THE COURT:  Thank you.

6                MR. CHILDERS:  I believe that the amended privilege

7        log that I provided still shows those items, but we

8        subsequently gave a letter to Mr. Wilcox indicating that

9        we would not be asserting that privilege.

10               So that leaves just about half a dozen items that

11       were either plain work product or attorney/client

12       privilege identified.

13               I conferred with Mr. Wilcox on Monday, and at that

14       time and since that time I'm not aware of any objections

15       or concerns that the plaintiffs have with the new set of

16       privileged items, so pursuant to that, we notified the

17       Court that we thought the matter was moot and copied

18       Mr. Wilcox, who did not object, and the Court yesterday

19       noticed this as a nonevidentiary hearing.  And hopefully

20       all those issues are now resolved or moot.

21               THE COURT:  Shall we take these motions one at a

22       time?  That was the motion for protective order.  Why

23       don't I give Mr. Wilcox a chance to chime in at this

24       point and see if there are any disagreements, and we can

25       move on.

1          MR. CHILDERS:  Sounds good.

2          THE COURT:  Thank you.

3          Mr. Wilcox.

4          MR. WILCOX:  Thank you, Your Honor.

5          What I was told by counsel, what I was told by

6     counsel was that the joint defense privilege was being

7     withdrawn as to these documents.  The problem with that

8     is that the defendants did not comply with the Court's

9     direction.  And we'd ask the Court to make a finding

10    that there is no common interest privilege among these

11    parties, and I'll explain why in a moment.

12         It's up to Mr. Childers to decide what he wants to

13    proceed with today, but we have been preparing for this

14    as an evidentiary hearing.  I have exhibits that I've

15    prepared for the Court.  I'm not aware of a notice that

16    changed this from a nonevidentiary to an evidentiary

17    hearing.  And I didn't object to any communication

18    Mr. Childers had with the Court.

19         It's not really my place to object to -- I don't

20    think he specifically requested this as a nonevidentiary

21    hearing, but I would like to go through these issues as

22    I perceive them.

23         THE COURT:  Let me help clarify that point,

24    Mr. Wilcox, because I'm afraid that the error in the

25    noticing as an evidentiary hearing was the Court's and

1    it was not yours and it was not Mr. Childers'.  And the

2    amended notice of hearing noticing it as a

3    nonevidentiary hearing was at my request, having

4    reviewed the entire transcript at Docket Number 288, at

5    the conclusion of which I announced that today's hearing

6    would be continued as a nonevidentiary hearing and that

7    if we needed to present evidence, that we would schedule

8    a further hearing.

9         I sincerely apologize on behalf of the Court if

10   that caused either one of you additional work, which it

11   undoubtedly did if you've come prepared with exhibits.

12        I also note for the record that today's hearing was

13   supposed to have been preceded by the privilege log, and

14   I guess I used an inartful term in my announcement, but

15   at the transcript I announced that the privilege log was

16   to be prepared as opposed to filed, and then we were

17   going to go through the claims of privilege I believe

18   one at a time and make argument as to those.

19        And I also was expecting -- Mr. Childers had

20   indicated that he wanted to file a memorandum of law or

21   further brief the issue of whether or what privilege

22   applied to commercially sensitive information.

23        Now, it appears that that issue is moot because

24   Mr. Childers, on behalf of the defendants, has waived

25   that argument.  Is that correct, Mr. Childers?

1     MR. CHILDERS:  As to our motion for protective

2     order, we have withdrawn the portion of protective order

3     that relates to commercially sensitive information and

4     that relates to joint or common interest defense.

5     THE COURT:  All right.  So as to this motion at

6     Docket Number 266, you have essentially withdrawn the

7     portion of that motion that argues that certain

8     documents should not have to be produced because of

9     either the joint defense or common interest doctrine or

10    the commercially sensitive information doctrine that you

11    had set forth; is that correct?

12    MR. CHILDERS:  That is correct, Your Honor.

13    THE COURT:  All right.  I'm sorry to interrupt you,

14    Mr. Wilcox, but I thought it was fair to all parties to

15    make the record abundantly clear.

16    MR. WILCOX:  Well, Your Honor, I have prepared a

17    book with exhibits that does contain the privilege log,

18    so maybe we can go through those.

19    THE COURT:  Hopefully we can, yes, sir.

20    MR. WILCOX:  And that book is right on that table.

21    THE COURT:  All right.  Mr. Childers, have you

22    seen the items in this book that Mr. Wilcox is referring

23    to?

24    MR. CHILDERS:  Mr. Wilcox handed me a copy just

25    before the hearing.  I haven't had a chance to review it

1    yet.

2        MR. WILCOX:  It's his privilege log.  It's what he

3    gave me.  He gave me a privilege log on the 21st and

4    then he gave me a corrected privilege log on Monday.

5    That's not in --

6        THE COURT:  That's all that's in the exhibits that

7    you're handing me?

8        MR. WILCOX:  Well, I can read -- there are -- those

9    are Exhibits 2 and 3.

10        Exhibit 1, because we had prepared for this as an

11    evidentiary hearing based upon the Court's comments

12    basically at -- as I read the transcript, it says:  It

13    may be that we will set this the afternoon before that,

14    January the 7th, because we've already scheduled a

15    two-hour evidentiary hearing for the afternoon of the

16    8th.

17        There is no evidentiary hearing set in this

18    proceeding.

19        THE COURT:  No, it was in a different case,

20    Mr. Wilcox.

21        MR. WILCOX:  In a different proceeding in that.

22        THE COURT:  A different -- in other words, we had

23    until yesterday a two-hour evidentiary final hearing in

24    a Chapter 13 scheduled for tomorrow afternoon, so I

25    couldn't schedule this matter for that date.

1        MR. WILCOX:  And I contacted your chambers this

2    morning and they said that this was a two-hour hearing.

3        THE COURT:  Yes, sir, it is.

4        MR. WILCOX:  All right.  Well, Your Honor, I think

5    it would be useful to go through Exhibits 2 and 3, which

6    are the original privilege log and then the corrected

7    privilege log.

8        It seems to me, though, that the Court's direction

9    from the transcript on December 4th was very clear.  The

10   Court directed the defense to produce a privilege log

11   within 15 days.  They did that.  We received that on the

12   19th.  The Court also directed that within 20 days of

13   the hearing the defendants were to produce affidavits

14   that would support the claims of privilege.

15       The Court, at the December 4th hearing, in my view

16   expressed some skepticism about the privileges that were

17   being asserted and asked for specifics as to the dates

18   and the factual basis, whether it's common interest or

19   sensitive business information, and that direction by

20   the Court applied to all the privileges, not just the

21   common interest privilege.  And I can point to the

22   transcript to that specific part.

23       They were to provide affidavits regarding any

24   assertion of privilege in advance of this hearing today.

25   They didn't file any affidavits in support of that.

1    Now, this morning Mr. Childers -- I received it in an

2    e-mail and I assume it was filed, a declaration by

3    Mr. Childers regarding -- I don't know whether that was

4    filed or not, Your Honor.  I believe it was.

5         THE COURT:  That's all right.  Please proceed.

6    I'll look while you're talking.

7         MR. CHILDERS:  It was not filed, Your Honor.

8         THE COURT:  Was not filed?

9         MR. CHILDERS:  No.

10        MR. WILCOX:  Okay.  Apparently it was not filed.

11   So they've never produced any affidavits, and the

12   Court's directed them to produce something to allow the

13   Court to evaluate the privileges.

14        The Court also strongly suggested, if not directed

15   Mr. Childers to file a brief in support of the asserted

16   privileges.  That was not forthcoming.  We were not in a

17   position to file a brief because we had not seen the

18   affidavits that we would have needed to make that brief

19   at all meaningful.

20        The Court also directed in the notice of hearing

21   that the parties were to provide a joint statement of

22   undisputed facts by last Friday.  We heard nothing about

23   that.  In Document Number 304, which we unfortunately

24   mistitled, we provided our view of what the undisputed

25   facts were, which was zero.  Now, I went in yesterday

1        and filed an amended one to change the title.

2            But the Court was specific as to what it was

3        requiring, and the defendants came forward with nothing.

4        This was their chance to assert joint defense privilege.

5        You can't come in and file a motion for protective order

6        and lead everybody down the primrose path and say I'm

7        asserting joint defense privilege and then two days

8        before the hearing come in and say, well, I'm pulling it

9        as to these documents but I reserve the right to assert

10       it in another context.

11           The Court should make a finding that there is no

12       joint defense privilege in this case.  They completely

13       failed to comply and provide any evidentiary basis for

14       that assertion of privilege.  And the Court specifically

15       made reference to the Pensacola Firefighters case, the

16       extensive affidavits, the affidavits of five attorneys

17       in that instance.  And the Court directed specifically

18       the parties to file affidavits to support the claim of

19       privilege.

20           So Monday I had a call with Mr. Childers, generally

21       very congenial call, and he said he wasn't going to be

22       proceeding with the joint defense privilege.  I made no

23       representations about what our position would be.

24           MR. CHILDERS:  Your Honor, I would object to the

25       extent that the Court has previously ruled about counsel

1     relaying the content of telephone calls that we have

2     with each other.

3          MR. WILCOX:  That's fine.

4          THE COURT:  Sustained.

5          MR. WILCOX:  That's fine.  And I apologize.

6          But at any rate, I was directed to Mr. Davis.  And

7     there was a representation made that Mr. Davis might, on

8     behalf of Tutoring Zone 2, which did nothing to object

9     to the production of any of these documents, would be

10    contacting me to discuss its objections to the

11    production by the defendants of certain allegedly

12    sensitive information.  Again, no evidentiary basis for

13    anything.

14         We were not able to resolve that issue, Your Honor.

15    And it seems to me -- I don't know whether Mr. Davis

16    intends to argue that those documents should not be

17    disclosed, but they haven't provided any research or

18    evidentiary basis that there is such a thing as

19    sensitive business information privilege.

20         THE COURT:  Well, Mr. Davis is not going to have an

21    opportunity to argue anything today because he isn't

22    representing a party to this adversary proceeding.

23         MR. WILCOX:  If I may turn to what I had marked as

24    Exhibit 3, which is the revised privilege log.

25         THE COURT:  Mr. Childers, I would like to see that.

1    Do you have any objection?

2       MR. CHILDERS:  No, Your Honor.  It appears to be

3    our amended privilege log, as Mr. Wilcox represented.

4       THE COURT:  All right.  The courtroom deputy will

5    hand me and we will consider part of the record for

6    today exhibits marked 2 and 3 being submitted on behalf

7    of the plaintiffs.

8       (Plaintiffs' Exhibits Number 2 and 3 were marked

9    and received in evidence.)

10       THE COURT:  Please proceed, Mr. Wilcox.

11       MR. WILCOX:  Thank you, Your Honor.

12       And I guess I would request the Court's guidance on

13    whether the original privilege log is still an issue,

14    because they provided a revised one and I'm not sure

15    whether it's even worth discussing the first one.

16       THE COURT:  It seems to me that if the revised

17    one -- if Mr. Childers agrees that the revised one was

18    meant to take the place of the original one, then we'll

19    just look at Exhibit Number 3, which is apparently the

20    revised one.  Is that correct?  Mr. Childers, is that

21    right?

22       MR. CHILDERS:  That's correct, Your Honor.

23       THE COURT:  All right.

24       MR. WILCOX:  The problem, Your Honor, is that

25    additional documents were added in the revised one that

1      were not in the original one, which I find troubling.

2           THE COURT:  You're certainly welcome to argue

3      that to me, Mr. Wilcox.  I've accepted both of these

4      documents.

5           You know, again, I agree with Mr. Wilcox to the

6      extent that today was supposed to be for an opportunity

7      for us to go through the privilege log one item at a

8      time to determine, A, whether any privilege applied, and

9      that was going to be a matter of legal argument based on

10     affidavits and the privilege log, and then, B, if a

11     privilege of any kind exists -- and I use the term

12     privilege loosely.

13          I want to back up again and clarify that in my

14     view, under the applicable case law, the joint defense

15     doctrine or the common interest doctrine is not a

16     privilege.  It is a doctrine or doctrines that are

17     founded upon the attorney/client privilege.  And the

18     affidavits that the Court reviewed in the Firemen's Fund

19     case were affidavits that apparently proved to the

20     Court's satisfaction that the communications at issue

21     there were communications by counsel for the parties or

22     originated with counsel and were not communications

23     between the parties themselves.  But having said that,

24     again, I'm using the privilege loosely here.

25          I will allow you, Mr. Wilcox, to argue anything you

1    wish with respect to these logs.

2        Mr. Childers?

3        MR. CHILDERS:  Yes, Your Honor.  I think just to

4    fast forward us a little bit, I believe that the issue

5    that we're arguing about here is not so much the common

6    interest privilege or the joint defense privilege, but I

7    believe that Mr. Wilcox expected that we would be

8    proving our basis for the attorney/client and work

9    product privileges that we asserted, just the basic

10   black-and-white ones.  And that was not my understanding

11   of the Court's ruling from the previous hearing.

12       So I think that's the direction Mr. Wilcox is

13   going in, and it would be helpful if the Court would

14   clarify if that was what we were supposed to do.  And if

15   it was, then I'm going to have to apologize --

16       THE COURT:  Mr. Childers, I read the transcript

17   very clearly.  The issue before the Court at the last

18   hearing was in the motion for protective order the

19   defendants were arguing two premises; number one, that

20   the communications between the Hintzes and Mr. James and

21   the Hintzes and -- I can't remember the name of the

22   woman who works for Mr. James.

23       MR. CHILDERS:  Ms. Frenchman.

24       THE COURT:  -- Ms. Frenchman were somehow

25   privileged under the joint defense doctrine.  And stop

1      me if I'm putting words in anyone's mouth.  I reviewed

2      the file very carefully in preparation for today's

3      hearing.

4           The responses to that essentially amounted to,

5      number one, how can there have been a joint defense

6      agreement before this litigation was filed in 2014, and,

7      number two, is there a privilege -- or I should say,

8      number two, was there a joint defense agreement at all,

9      and if so, when did it arise, and, number three, my

10     question to the parties was, was the communication that

11     the defendants seek to have protected attorney/client

12     privileged to begin with or covered under some other

13     privilege under the Federal Rules of Evidence, because

14     without -- my understanding of case law is that without

15     it being founded on such a privilege, there is no joint

16     defense doctrine that would protect communications

17     between parties, especially, as the plaintiff pointed

18     out, where the parties consist of -- the parties that

19     are trying to assert the doctrine of common interest or

20     joint defense constitute the debtors and a creditor of

21     the debtors to whom the debtors transferred the assets

22     that are the foundation of this entire case.

23          And those were the issues that I expected to see

24     some sort of affidavits of proof and/or briefing on, and

25     there's nothing.

1    MR. CHILDERS:  Well, Your Honor, as I said, we

2    released those documents to Mr. Wilcox already.  They're

3    in his custody now.  So it didn't seem like a good use

4    of my client's money, the Court's time, Mr. Wilcox's

5    time, so forth for us to brief it, present affidavits,

6    et cetera, on a privilege we weren't going to be

7    asserting.

8    THE COURT:  Okay.  So that's why I wanted to

9    clarify this, because if the defendants are no longer

10   asserting that any of these communications are covered

11   by an alleged joint defense doctrine or common interest

12   doctrine, then we should be done with that with respect

13   to this adversary proceeding.  They're done.  They have

14   no more joint defense or common interest.

15   But if you're trying to say, as Mr. Wilcox seems

16   to think, that that is waived for purposes of this

17   discovery but not for purposes of the adversary

18   proceeding, then we need facts and we need briefing.

19   Mr. Wilcox, am I taking any words out of your mouth

20   improperly?

21   MR. WILCOX:  No, Your Honor.

22   MR. CHILDERS:  I'm being careful, Your Honor,

23   because there's other litigation pending in this

24   bankruptcy case.  I don't want to step on any privileges

25   that anybody might want to assert.

1        So I'm not waiving the privilege on behalf of my

2    clients, but we're not -- we've released the documents

3    that were on the privilege log that were subject to my

4    motion for protective order.  I'm not sure if there's

5    anything else in the motion for protective order that I

6    even need.

7        It may be that I just should withdraw the motion

8    for protective order and stop arguing about this because

9    he's got the documents that he's looking for.

10       THE COURT:  Mr. Wilcox.

11       MR. WILCOX:  If that's the case, we should be

12   awarded our fees for having to come down here twice on

13   that motion and spend all this time going through it.

14       THE COURT:  File a motion for it.

15       MR. WILCOX:  Okay.  As my understanding at this

16   point, that there is no assertion of privilege -- I

17   don't see how that comment squares with the privilege

18   log that I received on Monday that includes an

19   allegation that a communication on 7/13/2012 involving

20   Jeff Childers, Larina Hintze and Matt Hintze and Chris

21   James asserts sensitive business information and

22   attorney/client privilege.  That's the fourth one down

23   on the first page.

24       I need some -- I'm just asking for clarification.

25       THE COURT:  I hear what you're saying.  I think

1        we're taking these things, at least I was, one at a

2        time.  And the one we just finished discussing was the

3        joint defense doctrine.  But you're right.

4            Mr. Childers, if you're withdrawing the motion for

5        protective order, then the privilege log goes away,

6        correct?

7            MR. CHILDERS:  That's right, at least to any of the

8        items that were referred to in the motion.  And if the

9        motion's withdrawn, there's nothing to hear today.  And

10       Mr. Wilcox is free to file a motion to compel as to any

11       other items that we have provided to him on the

12       privilege log.

13           And I'll just point out that we've been asking for

14       a privilege log from them since the beginning of

15       discovery and have not seen anything.

16           THE COURT:  Well, we'll get to your motion against

17       them in just a few minutes.  Let's deal with this one

18       first and finish this one.

19           So is Docket Number 266 withdrawn at this point?

20           MR. CHILDERS:  Yes, I'll withdraw that Docket 266.

21           THE COURT:  All right.  Docket 266, which is the

22       defendant's motion for protective order on which this

23       hearing was to be based, has been withdrawn.

24           Mr. Wilcox, you are requesting fees and costs for

25       having to deal with this motion through today.  You may

1    file a motion for fees and costs and we will schedule it

2    for hearing.

3        MR. WILCOX:  Thank you, Your Honor.  I would ask,

4    though, that the Court make a determination, because we

5    have it before the Court, that there is no joint common

6    interest privilege among Chris James and the Hintzes.

7    That was the whole point of this.

8        The Court gave specific direction as to

9    how -- we're going to have to deal with that issue.  It

10   seems to me what Mr. Childers is doing is punting that

11   issue down the road.  It's going to come up in

12   depositions or wherever.  This was the time, this was

13   the opportunity to make that argument.

14       And so it seems to me, by withdrawing that motion,

15   he is waiving that argument.  I'm not saying he's

16   waiving a privilege.  He's waiving the argument that

17   there is a common interest privilege among those

18   parties, and we ask the Court to rule to that effect.

19       MR. CHILDERS:  Your Honor, Mr. Wilcox may raise

20   this argument in the future if I do reassert the common

21   interest privilege and he can at that time complain that

22   it was previously litigated if that's what he feels is

23   appropriate at that time, because I think what he's

24   asking is a ruling in the future on something that may

25   or may not occur with facts and circumstances that

1  aren't before the Court.

2       MR. WILCOX:  I guess what I'm really asking for,

3  Your Honor, I'm asking that you not allow him to

4  withdraw the motion and then reassert the same grounds

5  next week, next month, at trial, ever in this

6  proceeding.

7       And for the record, I do not know whether we have

8  all these documents.  There are a lot of documents that

9  we've received.  But since I received this privilege log

10  on Monday, I would be surprised if the documents had

11  been produced prior to Monday to our offices, but that's

12  something we will check.

13       THE COURT:  All right.  I'm going to take a brief

14  recess.  We'll reconvene in approximately ten minutes.

15       (A brief recess was held.)

16       THE COURT:  Be seated, please.

17       There's no question that the primary reason that we

18  scheduled this hearing today was to consider the issues

19  raised in the motion for protective order and the

20  objection to that motion, and notwithstanding the fact

21  that at Page 37 of the transcript I clearly said there

22  was not going to be an evidentiary hearing, it certainly

23  was noticed as one.

24       So I think the appropriate thing to do is that,

25  even though Mr. Childers has moved to withdraw that

1        motion -- I candidly am stymied by whether at this

2        juncture it's appropriate not to allow or whether a

3        Court cannot allow a person to withdraw a motion, but I

4        certainly understand Mr. Wilcox's frustration with

5        having prepared for an evidentiary hearing today and now

6        having the motion withdrawn.

7            I'm going to mention a few points and then I'll

8        tell the parties what we're going to do today.  First of

9        all, I'm going to allow Mr. Wilcox to at least put on

10       what he would like to put on today so that I can

11       consider that even if it just goes into the record for

12       future reference on these issues, Mr. Wilcox, if that's

13       what you would like to do.

14           But I would like to point out that we are here,

15       according to the transcript beginning at Page 23,

16       strictly on the motion for protective order.  And at

17       Page 23 of the transcript -- give me just a moment -- I

18       said with respect to the claims -- well, first of all,

19       talking about the joint defense agreement, et cetera, I

20       said:  We need a specific itemized log of any

21       communications and/or documents that have been requested

22       to which the defendants are objecting and we need

23       evidence that any such communications were, in fact,

24       privileged communications under the attorney/client

25       privilege to begin with.  And then we would need further

1    evidence to determine if any kind of joint defense

2    agreement existed and, if it did, when it occurred,

3    whether there is any common interest doctrine that could

4    possibly come into play here.

5         I go on then to start talking about the claims of

6    the commercially sensitive information.

7         At Page 25 of the transcript Mr. Childers says that

8    he would be happy to specifically brief the issue of

9    commercially sensitive information and reports that he

10   believes there's a lot of case law in that area.  And

11   then at Page 27 I said:  Go ahead and brief those

12   issues.

13        At Page 37 is where I said we were not going to

14   schedule an evidentiary hearing.  And I'm quoting at

15   Line 5:  I'm not going to schedule an evidentiary

16   hearing at this time, but I'm going to continue the

17   hearing on this motion to the Court's docket on January

18   the 8th.  It may be that we will set this the afternoon

19   before that, January the 7th, because we've already

20   scheduled a two-hour evidentiary hearing for the

21   afternoon of the 8th.

22        So we'll either be back on the afternoon of January

23   the 7th at approximately 1:30 or sometime on January the

24   8th.  I'm going to set aside two hours for this hearing

25   for additional argument, and I want us to be prepared

1     and counsel to be prepared to address the claims on the

2     log one at a time or have dealt with them already by the

3     time the hearing begins.

4          If we cannot resolve the issues on the affidavits

5     and the privilege log, then we will look at the calendar

6     and set as soon as I can a full-blown evidentiary

7     hearing on whether there is any attorney/client

8     privilege and, if so, what it may apply to and to whom.

9          Because the motion has been withdrawn, I think it

10    would be premature for me to try to prohibit or grant

11    what in my view amounts to an ore tenus motion to bar

12    these defendants from ever raising these issues again.

13         I think that a motion -- I've already said that I

14    will certainly entertain a motion for attorney's fees

15    and costs for the plaintiffs having dealt with this

16    issue through today, and it may be that other remedies

17    are available under that umbrella.  I'm not going to

18    prejudge any of that.

19         But I think that, as one of my learned law clerks

20    pointed out, for me to go ahead and rule on this issue

21    for the entire case when the issues came up before me

22    strictly on a motion for protective order that addressed

23    communications that have been requested by the plaintiff

24    and that that motion has now been withdrawn I think

25    would be inappropriate for me to go forward today and

1      issue a blanket ruling that the defendants can or cannot

2      in future try to assert these defenses.

3           Having said that, in the event that the defendants

4      attempt to assert these positions on their own behalf,

5      it doesn't change what would be required in order to

6      support any such assertion.

7           I can't rule on whether the nonparty, Mr. James,

8      can assert that he supposedly had a joint defense

9      agreement of some kind and that some communications that

10     he may have made might have been covered by that

11     agreement or privileged because that issue has not been

12     brought before me on any of the pleadings.

13          I can, however, rule definitively in this case,

14     based on Page 40 of this transcript, that if any joint

15     defense agreement ever existed, it started no sooner

16     than May 1, 2012, because at Page 40 I said, starting at

17     Line 18:  Mr. Childers, do you -- can you agree, based

18     on what I just read from the motion, that the assertion

19     of joint defense doctrine, attorney/client privilege,

20     common interest doctrine relates to communications on

21     and after May 1, 2012?

22          Answer by Mr. Childers:  I may live to regret this,

23     but I think we're willing to put the flag on May 1st of

24     2012.

25          So for purposes of this case, including Mr. James,

1      there was no joint defense agreement between the

2      defendants and Mr. James or anybody else, if one existed

3      at all, prior to May 1, 2012.

4           Mr. Wilcox, do you have any questions on the

5      Court's ruling?

6           MR. WILCOX:  Yes, I do, Your Honor.  I think one of

7      the first things the Court said was that you would allow

8      me to proceed.

9           THE COURT:  I absolutely will.  Make your record,

10     Mr. Wilcox.

11          MR. WILCOX:  An evidentiary record?

12          THE COURT:  If you would like, yes, sir.

13          MR. WILCOX:  Thank you.

14          Your Honor, I'd like to at this time move

15     exhibits -- Jeff, have I given you Number 5?  1 through

16     5 into evidence.

17          THE COURT:  Mr. Childers, any objection?

18          MR. CHILDERS:  May I have a moment, Your Honor?

19          THE COURT:  Yes, you may.

20          Have you filed a list of those exhibits already,

21     Mr. Wilcox?

22          MR. WILCOX:  Yes, Your Honor.  I filed an amended

23     witness list on Docket 315.

24          THE COURT:  Thank you.

25          MR. WILCOX:  And that's what's in the book.

1          (Pause in the proceedings.)

2          MR. CHILDERS:  Your Honor, we take exception to

3     Exhibit Number 2, which is the privilege log that I

4     think we agreed is not operative, and --

5          THE COURT:  I think you agreed that it was

6     superseded in your view by Number 3.

7          MR. CHILDERS:  That's correct.

8          THE COURT:  All right.  Thank you.

9          MR. CHILDERS:  But, I mean, if it's necessary for

10    the case or relevant somehow.

11         And then the transcript is in the docket, so I

12    would prefer to have the better evidence of the docket

13    taking judicial notice rather than this exhibit, which I

14    don't have time to review standing here today.

15         THE COURT:  All right.  Thank you.

16         I'm going to overrule the objection to the

17    admissibility of Document Number 2, which is defendant's

18    privilege log dated December 21, 2014, on the basis

19    that, if nothing else, it's admissible under the Federal

20    Rules of Evidence as an admission against interest.

21         And so Documents Number 1 through -- now, 5 is

22    categorized rebuttal documents.  Is there anything under

23    5 at this point, Mr. Wilcox, or are you just

24    offering --

25         MR. WILCOX:  Yes, I am.  I'm proceeding under

1    Number 5 as well.  I've given the Court a copy of those

2    documents, as well as Mr. Childers.  Those are documents

3    that were produced to us in discovery, I would represent

4    to the Court.

5         THE COURT:  All right.  The transcript of the

6    hearing is being admitted for the purpose of the Court

7    being able to have a paper transcript as opposed to

8    having to read it online, but the Court -- if there's

9    any discrepancy between Document Number 4 and the

10   official transcript that's already filed with the Court

11   at Docket Number 288, then the Docket 288 will govern.

12        With that, Number 4 is also admitted into evidence.

13        (Plaintiffs' Exhibit Number 4 was marked and

14   received in evidence.)

15        THE COURT:  And then we're waiting for Mr. Childers

16   I think to look at Document Number 5; is that correct?

17        MR. CHILDERS:  I just received it just now.

18        THE COURT:  All right.  You may have just a few

19   moments.

20        (Pause in the proceedings.)

21        MR. CHILDERS:  Your Honor, these documents appear

22   to be the additional supplemental production that I

23   indicated earlier we had given Mr. Wilcox as a result of

24   withdrawing the privilege that I believe he said he

25   hadn't received yet, so to that extent I have no

1     objection to his use of them.

2          THE COURT:  Very well.

3          MR. WILCOX:  Your Honor, I object to that

4     representation that these documents were produced to us

5     as a result of the withdrawal of the privilege.

6          THE COURT:  Which didn't happen until this

7     afternoon.  I get it, Mr. Wilcox.

8          MR. WILCOX:  Yeah, I just don't see how that

9     argument can be made with a straight face.  We asked

10    for -- we asked for -- excuse me.  I'll calm down.

11         We asked for communications.  We got e-mails.  We

12    asked for attachments.  We had to come in here and fight

13    over whether we were going to get the attachments.

14         THE COURT:  Mr. Childers, you'll get your chance.

15    Just a moment.

16         MR. WILCOX:  We talked about the attachments which

17    we originally requested in native format.  We got those

18    documents sometime in the last week or so, last two

19    weeks perhaps.  It's not clear to me how that relates to

20    the privilege issues.  And so as -- so that's my

21    position on that.

22         THE COURT:  All right.  With that, Exhibits 1

23    through 5 as listed on Docket Number 315 are received in

24    evidence.

25         (Plaintiffs' Exhibits Number 2, 3 and 4 having been

1    previously received by the Court, Plaintiffs' Exhibits

2    Number 1 and 5 were marked and received in evidence.)

3         THE COURT:  Mr. Childers.

4         MR. CHILDERS:  Yes.  I would just point out for

5    the record that the issue of e-mail attachments was

6    not -- we were not moved to compel them.  The first that

7    we heard that there was an issue with those attachments

8    was here in open court.  And we voluntarily produced

9    them, not under a Court order, but in order to

10   facilitate discovery.

11        We have asked the plaintiffs for attachments in

12   native format documents for over six months and haven't

13   received any.

14        THE COURT:  We're going to get to that motion in a

15   few moments.

16        Mr. Wilcox.

17        MR. WILCOX:  Thank you, Your Honor.  I'm prepared

18   to go through the exhibits and discuss their importance.

19        Exhibit Number 1 is the intellectual property

20   transfer agreement between -- purportedly dated

21   June 4th, 2012, between Tutoring Zone, LLC, and Tutoring

22   Zone 2, LLC.  And this is one of the two basic

23   documents.  I think the e-mails will show that they

24   wanted both an intellectual property lease and an

25   intellectual property transfer agreement because of

1    concerns that in a subsequent bankruptcy of Mr. and Mrs.

2    Hintze, the Court would not approve at least one of

3    those agreements.

4         But as we go to the second page of that, there is a

5    definition of consideration, Paragraph 1-A on the first

6    page.

7         MR. CHILDERS:  Your Honor, I object.  If Mr. Wilcox

8    is going to testify about this information he should be

9    sworn first.

10        THE COURT:  He's pointing out a provision in a

11   paragraph in a document that's been admitted into

12   evidence, Mr. Childers.

13        MR. CHILDERS:  He's interpreting or characterizing

14   the significance or use of these documents by other

15   persons who are not in the court.  He's testifying as to

16   what their intentions were, which is a fact issue.  It's

17   not -- there's nothing in here about somebody's

18   intention.  He's not reading from the document when he's

19   explaining to you what the intention of the parties who

20   drafted it was.  He's testifying.

21        If he's testifying, please swear him under oath and

22   then I can make appropriate objections about hearsay or

23   whatever the correct objection would be.

24        THE COURT:  Mr. Wilcox.

25        MR. WILCOX:  I think I'm arguing.

1          THE COURT:  Well, I think that Mr. Childers'

2     objection is legitimate and is sustained to the extent

3     that there's no problem with you pointing out provisions

4     of the document, but any commentary as to what the

5     parties intended with the document must be left to

6     testimony.

7          MR. WILCOX:  I will wait until we reach the e-mail

8     that expresses that concern, Your Honor.

9          At any rate, on Page 2 I would point the Court's

10    attention to Section 3, the transfer, and then B:  The

11    price for the sale and transfer described in Section 3-A

12    shall be 200,000 and other valuable consideration which

13    is agreed and accepted by the parties to be full and

14    adequate consideration for the sale.  The payment of the

15    consideration shall be offset and credited by any

16    amounts owed by seller to Christopher M. James.

17         Now, we know that this was a cashless transaction.

18    So the issue will become whether Tutoring Zone --

19         MR. CHILDERS:  Your Honor, same objection.

20         THE COURT:  To?

21         MR. CHILDERS:  So we know this is a cashless

22    transaction, first of all.

23         THE COURT:  I thought that was a stipulated fact,

24    Mr. Childers.  I thought that was admitted in the

25    pleading.

1        MR. CHILDERS:  There were no joint undisputed

2    facts.

3        THE COURT:  Well, not for today, but in the actual

4    pleadings, the complaint and the answer and affirmative

5    defenses, et cetera, I was unaware of any -- if there is

6    a dispute as to whether any cash changed hands, then say

7    so, but it was my understanding from reading the

8    pleadings that that was not a disputed fact in this

9    adversary.

10        MR. CHILDERS:  I'm just wanting to be careful that

11    we're not establishing facts here based on evidence that

12    is a contract.  Also, Your Honor, I would object to the

13    relevance of this as to the common interest privilege,

14    which is what we're here for.  Mr. Wilcox seems to be

15    arguing the case in chief.

16        THE COURT:  Mr. Wilcox, I will sustain

17    Mr. Childers' objection to the extent that anything

18    you've said purports to introduce into evidence or

19    attempts to introduce into evidence a fact that is

20    not -- that is disputed.  So please stick to the

21    paragraphs of the provision or the contract or go ahead

22    and call a witness, or point me to something else in the

23    record that will assist.

24        MR. WILCOX:  If I may, Your Honor, I'd like to take

25    a quick look at the answer and affirmative defenses

1        because I believe that fact is admitted.

2            That will take a while, Your Honor.  I'll move on.

3        We'll leave that for another day.

4            So with regard to Exhibit 2, you see -- I mean, I

5        don't know whether I can say anything about what's in

6        the document or comment about it at this point.

7            THE COURT:  Well, if it's in evidence you can

8        certainly comment on it, but if it isn't, the motion for

9        protective order has been withdrawn, so I don't -- I

10       won't have anything to refer to.

11           MR. WILCOX:  Right.  Okay.

12           Well, I guess my point with regard to Exhibit 2 is

13       that as of December 19th the defendants continued to

14       assert sensitive business information as a basis for

15       objection, and with regard to a communication on

16       9/17/2012, parties of correspondence, Matt Hintze,

17       Larina Hintze, Chris James, no attorney, that it's work

18       product of TZ 2.

19           Now, if I may, Your Honor, I'd like to identify the

20       differences between the two privilege logs.

21           And I guess I'm confused, Your Honor, at this

22       point.  Are they withdrawing the privilege log or just

23       the motion associated with the privilege log?

24           THE COURT:  My understanding, both are withdrawn.

25       Is that correct, Mr. Childers?

1      MR. CHILDERS:  The privilege log is not withdrawn

2    as to any of the privileges asserted that were not

3    subject to the motion for protective order.  The motion

4    for protective order made arguments about items that

5    were on the privilege log.  Those items are not

6    privileged, as I understand it, by operation of my

7    having withdrawn the motion.

8      THE COURT:  Okay.  So let's take this one item at a

9    time.  I'm going to ask the parties to look at -- is it

10   Number 3 that replaces Number 2?

11     MR. WILCOX:  Yes.  Yes, Your Honor.

12     THE COURT:  Okay.  I'm looking at Exhibit Number 3

13   that's been admitted into evidence.  Based on what

14   Mr. Childers just said, it appears to me that the first,

15   second, and third entries on the first page are no

16   longer applicable.  Is that correct, Mr. Childers?

17     MR. CHILDERS:  The defendants are not asserting any

18   privilege as to those items.

19     THE COURT:  But what you told us at the beginning

20   of the hearing is that maybe TZ 2 is going to be, and

21   that's why Mr. Davis is here; is that right?

22     MR. CHILDERS:  I believe that information is the

23   property of TZ 2.

24     THE COURT:  All right.  But you've produced it,

25   correct?

1        MR. CHILDERS:  I have not yet produced it.  I don't
2    actually have --
3        THE COURT:  So are you asserting privilege or not?
4    If you're waiving the privilege, you have to produce it.
5        MR. CHILDERS:  I'm not asserting the privilege.  I
6    don't have those items.  Mr. Davis has them.  And
7    Mr. Davis I believe -- and by the way, Your Honor,
8    there's a fact you're not aware of, which is Mr. Davis
9    told me --
10       THE COURT:  No, it'd better be of record,
11    Mr. Childers, because you just objected to Mr. Wilcox
12    talking about conversations between counsel that took
13    place outside the courtroom, and so I don't want to hear
14    anything between you and Mr. Davis.
15       MR. CHILDERS:  My belief is that those are going to
16    be produced.
17       THE COURT:  I am ordering those to be produced.  So
18    on Exhibit Number 3, the document date of communication
19    5/29/2012 described as e-mail concerning sensitive
20    business information including tutor payroll and equity
21    incentives, I am ordering those to be produced within
22    ten days.  Mr. Wilcox, you're going to have to prepare
23    this order.
24       Mr. Childers, are you disagreeing with me?
25       MR. CHILDERS:  Your Honor --

1      THE COURT:  If you didn't have them, why object to

2   them?

3      MR. CHILDERS:  If the Court orders the production

4   of those documents, then I'm sure that they will be

5   produced.

6      THE COURT:  The second entry -- Mr. Wilcox?

7      MR. WILCOX:  Is it the defendants' position that

8   they do not have operational control over these

9   documents, custody or control?

10      MR. CHILDERS:  Matt Hintze is an employee of

11   Tutoring Zone 2, and as such, he signed an employment

12   agreement, part of which requires him to keep

13   confidential information of Tutoring Zone 2

14   confidential.  These particular e-mails that we

15   identified were e-mails that Matt Hintze has in his

16   business capacity as an employee of Tutoring Zone 2.

17   And we got a list from him of the e-mails that he had so

18   that we could prepare to produce.  We identified ones

19   that appeared to be commercially sensitive.  We asked

20   him to verify that in his capacity as an employee, which

21   he did, and we put them on the privilege log.

22      As I informed the Court earlier, I, in preparing

23   for the briefing and the hearing, concluded that it's

24   not my fight.  If there is a fight, it's Tutoring

25   Zone 2's fight.  If Matt Hintze gives me those e-mails,

1    I will produce them to Mr. Wilcox.  If not, he will

2    produce them on behalf of Tutoring Zone 2 if the Court

3    so orders.

4         If Mr. -- I would ask that the Court defer entry of

5    the order for two days so that if Mr. Davis wants to

6    make an appearance in the case and assert some motion on

7    behalf of Tutoring Zone 2, he has an opportunity to do

8    so.

9         THE COURT:  I'm not going to defer anything for

10   Mr. James to do anything.  If he wants to enter an

11   appearance, he should have done so long before today.

12        MR. CHILDERS:  In fairness to Mr. James, Your

13   Honor, he's not a party to the case and doesn't get

14   notice of what's happening here.

15        THE COURT:  I understand, Mr. Childers.

16        MR. WILCOX:  Your Honor --

17        THE COURT:  Give me just a moment, please,

18   Mr. Wilcox.

19        (Pause in the proceedings.)

20        THE COURT:  The defendants are ordered to produce

21   the documents dated 5/29/2012, 6/5/2012 and 7/17/2012

22   within ten days, having waived any claim on their own

23   behalf that those documents contain sensitive business

24   information.

25        With respect to the documents at 7/13/2012, the

1    parties to correspondence, Jeff Childers, Larina Hintze,

2    Matt Hintze and Christopher James, nature of document,

3    e-mail direction to employees of TZ 2 as attorney for

4    TZ 2, sensitive business information has been withdrawn,

5    attorney/client privilege.

6        Mr. Childers, please explain to me what standing

7    your clients have to assert attorney/client privilege to

8    this communication.

9        MR. CHILDERS:  Your Honor, as set forth in previous

10   pleadings that I've signed, I've represented Chris

11   James, Tutoring Zone 2, CMJ Consulting, and Matt and

12   Larina Hintze at various periods during this time.

13       At this period, and this is all within the dates

14   that I've previously disclosed, I represented Tutoring

15   Zone 2 -- this is prior to the filing of the bankruptcy

16   case -- and advised Mr. James, as the owner of Tutoring

17   Zone, and his employees as to a matter concerning

18   employees of the company.

19       THE COURT:  His employees meaning Larina and Matt

20   Hintze?

21       MR. CHILDERS:  The tutors.  There were I think -- I

22   don't know how to explain it to you too specifically

23   without disclosing the content of the communication, but

24   they were forming a company and hiring employees and had

25   legal issues about that or questions about legal issues

1        related to that.  And as the Court I'm sure is aware,

2        there's a lot of discussion about noncompetition

3        agreements and confidentiality and so forth related to

4        tutors and I think it's --

5            THE COURT:  So this communication was between you

6        as attorney for TZ 2 and the other parties; is that

7        correct?

8            MR. CHILDERS:  That's correct.

9            THE COURT:  Then what standing do these defendants

10       have to raise that privilege?  It doesn't appear there

11       was any privilege that existed between you and these

12       defendants under this communication.  If any privilege

13       existed, it was between you and TZ 2.

14           MR. CHILDERS:  Chris James is the principal of

15       TZ 2, so an e-mail that went to TZ 2 would naturally go

16       to Mr. James.  Matt and Larina Hintze were organizing

17       the firm as employees of TZ 2, my client.

18           THE COURT:  I just asked if they were employees and

19       you said no.

20           MR. CHILDERS:  I'm sorry, I misunderstood.  I

21       thought you were asking me if the employees that were

22       referenced in the e-mail were Matthew and Larina Hintze.

23           THE COURT:  That's exactly what I asked.  And I

24       think your answer was no.

25           MR. CHILDERS:  The content was not about those

1       particular employees but different employees, but Matt

2       and Larina Hintze --

3              THE COURT:  Right.  What evidence do I have today

4       as noticed on the docket for today that would support

5       any claim of privilege as to this communication?

6              MR. CHILDERS:  My motion for protective order which

7       is signed by me that sets forth those dates of

8       representation.

9              THE COURT:  Thank you.

10             Mr. Wilcox?

11             MR. WILCOX:  Your Honor --

12             THE COURT:  I'm sorry?

13             MR. WILCOX:  I don't how you rely on a motion that

14      you've withdrawn.

15             THE COURT:  You don't.

16             MR. WILCOX:  And I will also -- I can prove, I will

17      proffer the testimony of Mr. Fieldman that TZ 2 did not

18      begin operations until the end of August and had no

19      employees as of June -- July 15th.

20             THE COURT:  The defendants are ordered to produce

21      the documents listed as dated June 13, 2012, within ten

22      days.

23             MR. CHILDERS:  Your Honor --

24             THE COURT:  Mr. Childers, I have ruled.

25             MR. CHILDERS:  Your Honor, I would ask you to

1    reconsider.

2         THE COURT:  I know you will.  You can file a

3    motion.  That is my ruling.

4         The next document is dated 7/26/2012.  It's

5    described as privilege asserted, sensitive business

6    information of TZ 2.  That's been withdrawn by these

7    defendants.  They're ordered to produce that information

8    within ten days.

9         The same is true with respect to every

10   communication on the second page of Exhibit Number 3

11   and every communication on the third page of Exhibit

12   Number 3 other than the very last one which we will ask

13   about at this time, which is that dated 9/17/2012 where

14   it asserts work product of TZ 2 and sensitive business

15   information.

16        To the extent that it reflects a defense of

17   sensitive business information or an alleged privilege,

18   then that's been withdrawn by these defendants.  I need

19   some evidence that it is work product of TZ 2 or that,

20   even if it is, that shouldn't be produced.

21        Mr. Childers?

22        MR. CHILDERS:  Your Honor, I relied on the Court's

23   notice yesterday that this would not be an evidentiary

24   hearing and I did not bring my witnesses or evidence.  I

25   understood that Mr. Wilcox was going to be allowed to

1    put in evidence to preserve it for some future time when

2    the Court would hear these issues.  It now appears that

3    the Court is hearing them now, and I'm not prepared to

4    put on evidence right now.

5         THE COURT:  Mr. Wilcox?

6         MR. WILCOX:  Your Honor, there's no work product.

7    There's not even -- it's not even --

8         THE COURT:  Well, what theory could we be traveling

9    under that a document is work product of a company?

10   This says work product of TZ 2.  Number one, what

11   standing would Mr. and Ms. Hintze have to raise that?

12   Even without evidence.

13        MR. CHILDERS:  Your Honor, suppose the plaintiffs

14   subpoenaed my paralegal and asked for all of the e-mails

15   of my law firm.  My law firm would raise an objection

16   to that.  Ms. Hunt would object that she doesn't have

17   authority to turn over confidential information relating

18   to all of my clients and my law firm's finances and our

19   internal management and everything else because she's an

20   employee of my firm.

21        THE COURT:  All right.  Let's break this down.

22   First of all, a law firm is completely different than

23   TZ 2, so to that extent, that analogy isn't going to

24   fly.

25        First of all, this says e-mail regarding marketing

1    TZ 2, semicolon, public announcements.  How in the world

2    can public announcements amount to anyone's work

3    product?

4         MR. CHILDERS:  Your Honor, TZ 2 was under attack at

5    the time.

6         THE COURT:  This is evidence.

7         MR. CHILDERS:  It wasn't an evidentiary hearing.  I

8    didn't bring the evidence with me.  But you've asked me

9    to give you an explanation.

10        THE COURT:  Is there any dispute, Mr. Wilcox, that

11   TZ 2 was under attack at the time?

12        MR. WILCOX:  Yes, Your Honor, there is.

13        THE COURT:  There is a dispute.  All right.  I'm

14   going to reserve ruling on this item and I'm going to

15   have the parties brief whether or not this item should

16   be produced.  I'm going to give you ten days.

17        MR. WILCOX:  That's the 9/17?

18        THE COURT:  9/17/2012 at the bottom of the,

19   excluding the tabs, third page of Exhibit Number 3.

20        MR. WILCOX:  Your Honor, should we also brief

21   whether these defendants have standing to --

22        THE COURT:  Absolutely.  Brief any issue that

23   might pertain to whether the Court should compel the

24   production of this document in light of the waivers

25   by -- or the withdrawal of the motion at Docket

1       Number 266.

2             Mr. Childers.

3             MR. CHILDERS:  Yes, Your Honor.  Is there a pending

4       motion to compel?

5             THE COURT:  There is not, but I'm proceeding on it

6       anyway.

7             MR. CHILDERS:  Sua sponte?

8             THE COURT:  Yes, sir.  We came here to go over a

9       privilege log.  It was my understanding when you

10      withdrew the motion for protective order that we were

11      here on today, that that negated any issue we might

12      have to deal with with the privilege log.  It hasn't.

13      And so, therefore, the issue today is whether, even

14      though the motion for protective order has been

15      withdrawn, your clients are still refusing to produce

16      these items.  And that's what we came here to try to

17      decide today.  The transcript from the last hearing is

18      abundantly clear.

19            So any legal issue pertaining to this particular

20      set of documents or this particular e-mail needs to be

21      briefed, and if there are facts that are germane,

22      affidavits containing material facts have to be

23      submitted on this issue within ten days.

24            Are there any questions on that ruling?  Thank you.

25            The first entry at the top of the last page of

1    Exhibit Number 3 which is dated 9/28/2012, sensitive

2    business information, the motion has been withdrawn, so

3    that's to be produced within ten days.

4         The next two items which are dated 9/8/2012 and

5    7/13/2012, next to both of which it says work product of

6    TZ 2, those are to be briefed along with the other one.

7    All legal issues are to be briefed, and any evidentiary

8    matters that need to be brought before the Court with

9    respect to those two items have to be filed within ten

10   days or the defendants will be ordered to produce those.

11        With respect to the item dated 7/13/2012, next to

12   which says sensitive business information, that

13   particular objection or defense has been withdrawn and

14   so we are not dealing with that objection.

15        Now, the last three items dated 6/27/2014, 8/2/2012

16   and 7/5/2012, with respect to work product, whose work

17   product are these items, Mr. Childers?

18        MR. CHILDERS:  The work product of Tutoring Zone 2.

19        THE COURT:  And what standing do the Hintzes have

20   to raise an objection to production of those items?

21        MR. CHILDERS:  The Hintzes are agents of Tutoring

22   Zone 2 with managerial authority.

23        THE COURT:  And with respect to attorney/client

24   privilege, whose privilege is being asserted here?

25        MR. CHILDERS:  Tutoring Zone 2.

1        THE COURT:  And what standing do the Hintzes have

2    to assert privilege on behalf of TZ 2 here?

3        MR. CHILDERS:  The Hintzes are agents of Tutoring

4    Zone 2 with authority to raise that objection.

5        THE COURT:  Mr. Wilcox?

6        MR. WILCOX:  I just don't see it, Your Honor, but

7    if we have to brief it, we have to brief it.

8        THE COURT:  Those three items will also be briefed

9    and evidence presented within ten days, after which the

10   Court will either rule on the papers or schedule a

11   further hearing.

12       And once again, so the record is abundantly clear,

13   those are the last three items on the last page

14   of -- I'm sorry, on the last -- fourth page of Exhibit

15   Number 3, and they are dated 6/27/2014, 8/2/2012 and

16   7/5/2012.

17       Are there any questions on those items or anything

18   that we've discussed so far on this exhibit?

19   Mr. Childers?

20       MR. CHILDERS:  No, Your Honor.  I think I

21   understand.

22       THE COURT:  Mr. Wilcox?

23       MR. WILCOX:  No, Your Honor.

24       THE COURT:  Now, there is another attachment to

25   Exhibit Number 3.  Is that simply a cover letter for the

1   amended privilege log?  Is there any reason to have to

2   look at that today?

3        MR. WILCOX:  Only to the extent that there were

4   representations made earlier in the hearing that the

5   documents that we're talking about have actually been

6   produced prior to this hearing.  It says at the last

7   sentence -- the second paragraph reads:  First, we have

8   withdrawn the claim of privilege under the common

9   interest doctrine without prejudice to asserting that

10  basis later for different documents, if needed.  We will

11  produce the documents that were previously identified as

12  privileged in that category.

13       I don't see how that's consistent with the

14  representations made to the Court today.

15       THE COURT:  All right.  Aside from that, is there

16  any other evidentiary effect of this letter?

17       MR. WILCOX:  No, Your Honor.

18       THE COURT:  Anything on that letter, Mr. Childers?

19       MR. CHILDERS:  No, Your Honor.

20       THE COURT:  Thank you.

21       You may proceed, Mr. Wilcox.

22       MR. WILCOX:  Thank you, Your Honor.  And obviously

23  the transcript speaks for itself.  We've already gone

24  through that.

25       I'd like to turn now to Exhibit 5 and talk about

1    these.  These are documents that were produced.  And you

2    can see the first document, these are a series of e-mail

3    strings produced by the defendants in this case.  And

4    the first document is May 2nd.  And I'm not going to

5    comment on it, but it refers to -- contains the phrase

6    in the first line, interesting times.

7        I would then -- I'd ask that if the Court can

8    review these at some point, they make interesting

9    reading.

10       Can I comment, these were -- when these e-mails,

11   how these e-mails relate to the larger case?

12       THE COURT:  Well, we're here today on -- were here

13   today on the motion for protective order.  If I were to

14   take evidence today, it would be strictly dealing with

15   that motion for protective order.

16       Because of the unfortunate chain of events where

17   this was noticed as evidentiary when it shouldn't have,

18   I'm allowing you to present your evidence, but it should

19   be limited to the motion for protective order and the

20   issues that were raised in that.

21       MR. WILCOX:  Thank you, Your Honor.  And I guess we

22   think that this would lay the foundation for a fraud

23   exception to any common interest doctrine that was

24   alleged.

25       I turn now to the 12th, I believe it's the 12th

1    page in, it's an e-mail, Monday, May 7th, 2012, at

2    3:57 p.m., Larina Hintze to Chris James.  And I'll give

3    the Court a minute to get there.  These could not be

4    Bates stamped, Your Honor, because of the format.

5         THE COURT:  May 7th, 2012, at 3:57 p.m.?

6         MR. WILCOX:  That's correct.

7         THE COURT:  I'm there.  Thank you.

8         MR. WILCOX:  Chris, thinks (sic) seem to have

9    peaked in escalation or are settling back down, very

10   interested in Jeff's input.

11        Monday, May 7th, and the earlier string, James,

12   Christopher -- James, comma, Christopher wrote:  Sorry,

13   I was traveling over the weekend and did not have cell

14   service.  I am speaking with Jeff today to get a sense

15   of the legal issues in restructuring.  I will call you

16   later and fill you in.

17        The next e-mail is two pages further, Friday, May

18   11th, Christopher James to Matt Hintze, and I guess it's

19   actually the second e-mail:  Hello, we have spoken with

20   many of you over the past few days, would like to

21   arrange a meeting of creditors to discuss our proposal

22   for moving forward.

23        The next one is Wednesday, May 16th.  And if we

24   start sort of at the end of that, it's a three-page

25   string.  It's a Matthew Hintze to Christopher James:

1      Welcome back.  I would like to hand out the attached

2      document at our meeting today.  I have not entered the

3      equity percentages for existing creditors -- and this is

4      an e-mail, May 14th at 17:16, 5:16 in the afternoon:  I

5      have not entered the equity percentages for existing

6      creditors, new working capital, et cetera.  I think they

7      will be looking for suggestions but I did not want to do

8      much on this front before speaking to you.

9          Then the e-mail at the end of that string,

10     Wednesday, May 16th at 9:08 a.m.:  Let's meet first

11     thing Thursday a.m.  Please bring with you the past

12     business plan, financials for this year, an outline of

13     the structure that you are going to go with in the

14     restructuring.  I am going to meet with Jeff following

15     our -- and it's spelled A-R-E -- I am going to meet with

16     Jeff following our meeting to get some idea of my

17     exposure under the plan as well as having him work on

18     the documentation for the transaction.

19         THE COURT:  All right.  Let me stop you there

20     because you've lost me.  What was the date on that

21     again?

22         MR. WILCOX:  That's Wednesday, May 16th at

23     9:08 a.m.

24         THE COURT:  And it's -- okay.

25         MR. WILCOX:  It's a Gmail e-mail that says, re,

1        handout for meeting tonight.  And I can count the pages.

2            THE COURT:  All right.  I have it.  Thank you.

3            MR. WILCOX:  I can go through it again.

4            THE COURT:  No, I see it.  Thank you.

5            MR. WILCOX:  And the remainder, it says:  My

6        understanding is that some of the notes have

7        restrictions on asset sales.  If so, bring those with

8        you as well as any other docs you think are helpful to

9        understand the position I will have going forward.

10           The next e-mail is Wednesday, May 23rd at

11       6:09 p.m., Christopher James to Matthew Hintze with a

12       one-word e-mail, Comments.  And that is in response to

13       an earlier e-mail, May 23rd, 2012, at 10:20 -- I'm

14       sorry, at 15 hours, 10 minutes, 20 seconds Eastern

15       Daylight Time, FYI, covering an e-mail Wednesday, May

16       23rd at 12:08 p.m., Jeffrey Childers to Cynthia

17       Frenchman, Larina at TutoringZone.com, subject, LLC

18       operating agreement IP lease:  Cynthia, et al, attached

19       please find my first draft of the LLC operating

20       agreement for Tutoring Zone 2, LLC, and the intellectual

21       property lease.  Note that I have Chris and Cynthia

22       leasing the IP directly and then assigning the lease to

23       TZ 2 as consideration for the initial membership units,

24       i.e. capital contribution.

25           Skipping a paragraph:  Once you approve the

1     operating agreement, then I will set up the LLC with the

2     State of Florida and get and (sic) F-E-I-N.

3           The next document two pages following that is the

4     attachment, what's title Intellectual Property Lease.

5           The next e-mail is Monday, May 28th, 5:48 p.m.,

6     Larina Hintze to Chris James.  Looks like that's a draft

7     of an e-mail.

8           The next is Wednesday, June 6th at 7:30 p.m., an

9     e-mail from Larina Hintze to Norman Bledsoe, Jeffrey

10    Childers, Scott Walker, Christopher James, Matthew

11    Hintze, BPHintze@Bellsouth, and that's in response to

12    Norman Bledsoe's memo, which is the e-mail below:  No

13    cause of action for TI exists where one doesn't act,

14    which is legal in itself.

15          Reading from the e-mail at the top, beginning of

16    the third paragraph:  Then our strategy could be to make

17    it seem like this is the worst thing in the world for us

18    and to make every attempt to negotiate a way to avoid

19    this so they keep their eye on that ball and keep them

20    focused on that strategy.  That may be the best way to

21    move us forward.

22          Friday, June 29th, only significance here is that

23    it's an e-mail that was delivered from Matthew Hintze to

24    Jeffrey Childers and Christopher James covering an

25    e-mail, an earlier e-mail.

1        Then we reach what I think is the last e-mail here.

2     Starting at the end of that, it's a four-page string, an

3     e-mail from Matt Hintze to John Spence and some other

4     people:  John, in our last creditor meeting we discussed

5     TZ needing to go out of business as it could not service

6     its debts, and the creditors understood based on not

7     being able to service its debts that Larina and I would

8     personally be forced into bankruptcy.  You are right,

9     John, about our moral obligation, and as such, we

10    reaffirmed our moral obligation to pay everyone back,

11    and creditors therefore stated they would not contest

12    the bankruptcy but did expect us to repay them, which we

13    again affirmed we would.

14        Moving up in the chain, it's an e-mail from John

15    Spence.  I won't go through that.  It's demanding

16    information:  Matt, I've grown tired of your constant

17    excuses.  You have a fiduciary responsibility to the

18    entire investor creditor group to keep us informed of

19    all pertinent and substantive financial and strategic

20    developments.

21        Then above that, Larina Hintze, Sunday, July 11th,

22    2012, to Matthew Hintze, Christopher James, Jeffrey

23    Childers and BP Hintze:  Matt and Chris conferenced and

24    Matt is meeting with Kevin at noon to get a feel for

25    where this is coming from, isolated or spurred on by

1      group, as well as having a follow-up call with Jeff.  My

2      thoughts are -- and then she talks about what her

3      thoughts are and the possible strategy, which is on the

4      next page:  Strategy; is it possible to have Scott

5      Walker, an attorney, call John and say, listen, as

6      acting CEO you have exposure and liability in that you

7      are privy to all information before, during, and after

8      TZ, and as such, we must weigh our need for

9      communication against our exposure and liability as

10     Fieldman could pursue a suit against Matt and Larina but

11     also individually against you as the CEO and/or possibly

12     the advisory board.

13          Then I go to the top e-mail or the next to top

14     e-mail, Sunday, July 1st at 9:09 p.m., Christopher James

15     to Larina:  I would not send anything to the investors

16     until we speak to Jeff.  My view is that we tell

17     investors that TZ is closing and that you and Matt as

18     well as a number of tutors have been hired as employees

19     of CMJ that will begin in the fall offering tutoring

20     services under the name TZ 2.  Tell them that you and

21     Matt will try very hard to repay investors if and when

22     funds become available.  Next, Matt discusses all this

23     with the Alligator and we move forward.  This is the new

24     and improved well-capitalized and economical tutoring

25     service.

1          Now, I will comment that the transfer agreement was

2     dated June the 4th.  This e-mail is July 1st.  Response

3     by Larina:  Yes, sir, boss, with a smiley face.

4          May I comment briefly on the evidence?

5          THE COURT:  Mr. Wilcox, I'm not going to coach

6     you ahead of time as to what you can and cannot say.

7     That's up to you.  You're presenting your case.  If

8     Mr. Childers feels he should object, then he is free to

9     do so.

10          MR. WILCOX:  Your Honor, I think what these e-mails

11     show and that the e-mails will show is that my clients

12     were being told one thing when there was a transaction

13     in place that did something completely different, that

14     the bankruptcy of these individuals was contemplated,

15     that this transfer was contemplated, that this transfer

16     was coordinated by counsel.  I'm not saying it's

17     initiated by counsel, I'm saying it was coordinated by

18     counsel, who I think has a conflict of interest problem

19     here.

20          Let's also remember that Mr. James loaned money in

21     2010.  He came before this Court and argued --

22          MR. CHILDERS:  Your Honor, I'd object again as to

23     relevance to the pending issue before the Court.

24          THE COURT:  What's the relevance to the issue of

25     what documents should be discovered today?

1          MR. WILCOX:  The relevance is it was part of the

2     continuing fraud, this issue of joint representation of

3     creditor and debtor at the same time, action by the

4     creditor to attempt to perfect a security interest using

5     debtor's counsel as his counsel.

6          THE COURT:  I think that that can be taken up by

7     the Court upon filing appropriate pleadings.

8          MR. WILCOX:  That's fine, Your Honor.

9          THE COURT:  Mr. Childers.

10         MR. CHILDERS:  Thank you, Your Honor.

11         THE COURT:  First of all, let me ask the court

12    staff, does anyone need us to take a brief recess?

13    Madam court reporter?  All right.

14         MR. CHILDERS:  I'll just make a brief argument in

15    rebuttal.  I'm not going to address the bigger issues in

16    the case.  Obviously my clients completely disagree with

17    the characterization as Mr. Wilcox enunciated it, and

18    we'll look forward to our day in court.

19         However, I think that what just happened here is

20    that we now have evidence before the Court of the

21    representation that has been alleged of Tutoring Zone 2,

22    Chris James, CMJ Consulting and the Hintzes, as evident

23    in the documents that Mr. Wilcox just introduced into

24    evidence, the employment of the Hintzes by TZ 2 in the

25    formation period and after.

1          Also evident in the e-mails that Mr. Wilcox just

2     read to the Court is the conflict from the Fieldmans

3     that the Hintzes and Mr. James were concerned about from

4     the very beginning.  He read relevant portions and there

5     are longer portions in the parts that he didn't read

6     where it's clear that they are responding to hostile

7     actions by the Fieldmans and making legal plans relating

8     to those.

9          THE COURT:  Mr. Wilcox?

10         MR. WILCOX:  I object to that characterization.  If

11    he can point to it in the document, point to it.

12         MR. CHILDERS:  Your Honor --

13         MR. WILCOX:  But he can't argue it if you don't

14    point to it.

15          THE COURT:  Well, my question here is how is

16    that point relevant to the discovery that we're here on

17    today?

18         MR. CHILDERS:  Well, we're here on a

19    quasi-evidentiary hearing to establish whether or not

20    there was a common or joint interest, and so --

21          THE COURT:  No, no.  Well, we were.

22         MR. CHILDERS:  We were.  And that's what the

23    evidence Mr. Wilcox was presenting is in support of.

24    And he made an argument at the end of his evidence, and

25    I'm making a rebuttal to that argument.  And I assume,

1       Your Honor, that this would be relevant if in the future

2       we reassert the common interest privilege, and then we

3       would back into the proceedings today.

4            So we see in the e-mails that were just introduced

5       into evidence the concern and activity by my clients at

6       that time.  In particular I would draw the Court's

7       attention to the e-mail dated Wednesday, June 6th, and

8       July the 1st of 2012 where the clients not only were

9       discussing between themselves but had a memo prepared

10      for them by the law firm of Folds and Walker.  There's

11      an e-mail copied from Norm Bledsoe and also carbon

12      copied to Scott Walker, who were assisting them at that

13      time with the problems that they were having with the

14      Fieldmans.

15           So I believe that the evidence firmly supports the

16      existence of a joint interest or common defense

17      privilege.

18           MR. WILCOX:  If you look at -- if I may, Your

19      Honor.

20           THE COURT:  Yes, sir.

21           MR. WILCOX:  If you look at the Bledsoe memo, it

22      says that the purchase of that note and the enforcement

23      of that note by FLH is not illegal.  There's nothing

24      wrong with it.  And what we lack for common interest

25      privilege -- first of all, we really lack any sense of

1    representation.

2         There's no evidence of anybody representing

3    anybody.  All there is is an attorney that's at the

4    center of a number of transactions with apparently

5    multiple clients and no identification of any common

6    interest between the transferor and the transferee and

7    no identification of common interest between the debtor

8    and the creditor.  That's the key point to this.  And

9    I'll sit down.

10        THE COURT:  Mr. Childers.

11        MR. CHILDERS:  Thank you, Your Honor.

12        Just to clarify, on Wednesday, June the 6th, 2012,

13   and I'm reading from that --

14        THE COURT:  Give me a moment to get to that one,

15   please, Mr. Childers.

16        Is that the one that at the top of the page it says

17   Gmail and it's re FW:TZ?

18        MR. CHILDERS:  Correct.

19        THE COURT:  Thank you.

20        MR. CHILDERS:  And this is an e-mail, as you can

21   see, from Larina Hintze to Norm Bledsoe, who is an

22   attorney with the law firm of Folds and Walker, copying

23   me, Scott Walker, Chris James, Matt Hintze, and I'm

24   guessing that that's Bruce Hintze's e-mail.

25        And Larina has addressed it to Norm, her attorney

1          at Folds and Walker, and states:  If you think that

2          Fieldman's strategy is to -- and then she quotes:  My

3          guess is that McCarty desires to sue to enforce the note

4          and then subsequently levy on Matt's ownership interest

5          in TZ.

6               So what they're talking about here is the purchase

7          of one of the investors' notes by Mr. Fieldman and what

8          he intended to do with it.

9               MR. WILCOX:  Your Honor, there's no evidence that

10         Mr. Fieldman ever purchased any note.

11              MR. CHILDERS:  Continuing on, this is the portion

12         that Mr. Wilcox read, I would assert, out of context to

13         make it sound like he was referring to the investor

14         plaintiffs, but then:  Our strategy could be to make it

15         seem like this is the worst thing in the world for us,

16         and so forth, which was previously read.  They're

17         referring to the Fieldmans' purchase of the note.

18              THE COURT:  And where is that shown here,

19         Mr. Childers, in response to Mr. Wilcox's comment?

20              MR. CHILDERS:  Well, take a look at the e-mail that

21         Larina is responding to that Norm sent to her:  A

22         counterclaim for tortious interference against Steven

23         Fieldman could be tough to win.

24              THE COURT:  I'm sorry, where are you reading?

25              MR. CHILDERS:  About halfway down the page on the

1      first page.  So it says on Wednesday, June the 6th,

2      right about here, Norm Bledsoe --

3          THE COURT:  Oh, I see, next to it.  Okay.

4          MR. CHILDERS:  A counterclaim for tortious

5      interference against Steven Fieldman could be tough to

6      win.  So there you have a cause of action that they're

7      concerned about, to wit; one, no cause of action for TI,

8      meaning tortious interference exists where one doesn't

9      act, which is legal in itself, malice or bad motive is

10     of no import in this instance.  Accordingly, Steve's

11     malicious act of acquiring and enforcing Randy Scott's

12     note is not factual.  McCarty will argue that Steve is

13     not interfering with any relationship, he's merely

14     purchased the note and is enforcing it.

15         Three; a claim against Steve falls outside the

16     typical fact pattern.  Four; Steve may not be tied

17     closely enough to Study Edge to maintain an action for

18     tortious interference.  We would have to bring in the

19     Fieldmans into the litigation under a conspiracy theory

20     to really get somewhere.

21         It is my belief that Mac McCarty probably

22     structured the purchase of the Randy Scott note with a

23     view to avoiding a counterclaim for tortious

24     interference.  Mac is too smart to let Ethan purchase

25     the note on his own.  Mac told me via phone that, quote,

1    a trustee, end quote, owns, quote, a note, end quote.

2         Based on what I know now, I would not advise a TI

3    counterclaim.  My opinion may change if I learn new

4    facts.  My guess is that McCarty desires to sue to

5    enforce the note and then subsequently levy on Matt's

6    ownership interest in TZ.

7         So my argument is that this is the evidence the

8    Court has been looking for for what the common interest

9    would be between these parties.  These are all the same

10   parties that are parties to this e-mail.  They're

11   sharing work between different law firms that are

12   working on the same issue, which is, as we've said from

13   day one in this case, the aggressive action of Steven

14   Fieldman in trying to destroy the company Tutoring Zone

15   to the detriment of Mr. Wilcox's other clients, the

16   investors.

17        Fortunately, it's now record evidence that such a

18   relationship of a common interest existed.  Because

19   Bruce Hintze is included in this, this particular one

20   would not be privileged under a joint or common interest

21   privilege, so this is -- this one's fine, fair game.

22   Okay.

23        But to the extent that there might be testimony or

24   future documents, I would like to reserve the ability to

25   come back to the evidence that's been presented to the

1    Court today and make the argument that that relationship

2    and exception to the privilege, as the Court has pointed

3    out more than once, and I apologize for continuing to

4    call it a privilege, does exist.

5         THE COURT:  All right.  Thank you.  And your rights

6    are preserved to the extent that they're not ruled on at

7    some later date.

8         Mr. Wilcox.

9         MR. WILCOX:  Very briefly, Your Honor.

10        This just strains credulity.  We have a memo from

11   the lawyer saying that there is no cause of action at

12   this time.  He does reserve, as all lawyers do, if I

13   learn additional facts.  But to suggest that the

14   purchase of the note by Steve Fieldman and his intent to

15   destroy Tutoring Zone when Tutoring Zone, Tutoring

16   Zone's assets had already been sold in an insider deal

17   in a cashless transaction to a creditor of the debtors

18   is just incredible.

19        And this is after the Hintzes were telling

20   everybody that Tutoring Zone was going out of business

21   when, in fact, there was a transfer going on that would

22   allow them to benefit from the sale of the corporate

23   assets and continue to maintain their income.

24        Thank you.

25        THE COURT:   Thank you.

1        Is there anything further to be brought before the

2   Court today with respect to the document production that

3   was covered under the umbrella of motion for protective

4   order, Docket Number 266?

5        No, Mr. Childers?

6        MR. CHILDERS:  Not from the defendants, Your Honor.

7        THE COURT:  And I understand, Mr. Wilcox, nothing

8   further today?

9        MR. WILCOX:  That's correct.

10       THE COURT:  And there are no questions about what

11  the parties have been ordered to brief and submit

12  evidence on; is that correct?

13       MR. CHILDERS:  Your Honor, I understand you went

14  through item by item and gave us direction on each item

15  as to briefing, and I think we've got a good record of

16  that here.

17       THE COURT:  And I want to have Mr. Wilcox prepare

18  an order that so orders.  I had asked at the end of the

19  last hearing for someone to submit an interim order.  We

20  didn't get one, and I think that's part of the reason

21  that we've had an interesting afternoon.

22       Mr. Wilcox, questions?

23       MR. WILCOX:  No, I think I understand it.  I may

24  have to defer to other people's notes, but I will go

25  ahead and prepare that order.

1    THE COURT:  If there are any questions about the

2    terms of the order, then let my chambers know and I'll

3    do my best to schedule an emergency telephonic hearing

4    between the two of you to deal with the terms of the

5    order.  I think it's been pretty clear.  The order

6    should be plan vanilla, I would think, but to the extent

7    that there may be issues, I am willing to undertake to

8    hear them as quickly as possible.

9        And I'm not extending the ten days from the date of

10   the order.  It is ten days from today regardless of when

11   the order is signed.  If you can't resolve your disputes

12   over the order, I'll take your two competing orders and

13   prepare one of my own.

14       But it is ten days from today to brief the issues

15   and submit affidavit-type evidence in support of or

16   against the debtor's remaining claims that those limited

17   number of documents should not have to be produced.

18       MR. WILCOX:  May I ask for somewhat supplementary

19   but related relief that to the extent the defendants

20   assert a common interest privilege in the future, that

21   along with the assertion of that common interest

22   privilege they provide affidavits demonstrating the

23   basis of the privilege, a privilege log, and an

24   affidavit expressing what common interest it is that is

25   being described?

1          My concern, Your Honor, is that we're going to be

2     back here on the same situation where -- I think the

3     parties both want the Court to set this matter for

4     trial.  We've finally agreed on some deposition dates in

5     January and February.  We have a motion coming up on

6     that in a few minutes.  But I think both sides feel the

7     need -- you know, we're trying to schedule depositions

8     when -- both sides, both sides are trying to schedule

9     depositions at a time when they think they do not have

10    all the documents, and that's a difficult thing to do.

11         It seems to me that that procedure, as a case

12    management procedure, would expedite and would also

13    perhaps force people to be very careful in their

14    assertion of these -- privilege is not the right word,

15    but exception to production.  Thank you.

16         THE COURT:  Mr. Childers.

17         MR. CHILDERS:  I was only going to say, Your Honor,

18    that we have no current knowledge of an occasion to

19    assert that particular privilege, but if we do, I would

20    assume that the Court would give us some guidelines at

21    that time.  And again, because we don't know what the

22    future will bring, I think it's premature to start

23    making directives about that.

24         THE COURT:  Just a moment.  Let me look at

25    something.

Electronically signed by Jennifer Witwer (301-375-152-2952)

1          (Pause in the proceedings.)

2          THE COURT:  How much time, first of all, going to

3     the other motions, do you think that we're going to need

4     for a hearing on the motion to compel, we're out of time

5     for today, at 271?  That was your motion, Mr. Childers.

6          MR. CHILDERS:  Yes, Your Honor.  I'll need at least

7     an hour.

8          THE COURT:  Do you disagree, Mr. Wilcox?

9          MR. WILCOX:  Your Honor, it's his motion, so --

10         THE COURT:  All right.  An hour on that one.

11         What about the motion for authority to take more

12    than ten depositions?

13         MR. WILCOX:  That one, Your Honor, I think we can

14    deal with pretty quickly.  I think that's a 15-minute

15    motion.  And I would like to get that done because we're

16    trying to schedule depositions.  In fact, we've been

17    ordered to exchange deposition schedules.  I can't do

18    that until I know how many depositions we can take.

19         THE COURT:  Mr. Childers, 15 minutes for that one

20    do you think or not?

21         MR. CHILDERS:  Your Honor, it could be 30 minutes,

22    but I would suggest that we could perhaps handle that

23    with a telephone hearing.

24         THE COURT:  I have a question for you, Mr. Wilcox,

25    on that motion.  Have you completed your ten depositions

1     already or not?

2          MR. WILCOX:  No, Your Honor, we have not.  I mean,

3     we're having a very difficult time getting them

4     scheduled.  We're trying to be courteous to third

5     parties.  It's just difficult.  We do have --

6          THE COURT:  The reason I ask, to be fair to both of

7     you, is that in preparation for today's hearing we

8     researched this motion specifically, even though it was

9     just filed two days ago.  And the case law that I'm

10    aware of thus far, particularly out of the Southern

11    District of Florida -- let me see if I can locate the

12    case citations for both of you -- seems to indicate that

13    the motion is premature until after the first ten

14    depositions have been fully completed.

15         Now, I recognize that that might present scheduling

16    problems in this case.  That's another matter for

17    another day, because I don't want to short-circuit

18    anybody's right to discovery because of scheduling

19    deadlines, but at the same time I wouldn't want it to go

20    on ad infinitum.

21         The primary case that we looked at is that of

22    Mazur, M-A-Z-U-R, versus Lampert.  It's at 2007 West Law

23    676096 at Page 2.  That is a District Court opinion from

24    the Southern District of Florida in 2007.  We also

25    looked at a 2013 case, 2013 West Law 6383973, and that

1    is Gordilis, G-O-R-D-I-L-I-S, versus Ocean Drive

2    Limousines, Inc.  And in both of those cases the courts

3    ruled that on these types of motions it was premature to

4    entertain the motion until the first ten deposition had

5    been completed.

6          I'm going to continue the hearing on that motion.

7    We'll handle it by telephone.  We'll try to schedule it

8    in the next week or so.  I don't have a schedule right

9    now.

10         With respect to the motion to compel filed by the

11   defendants at 271, Mr. Childers, are you suggesting that

12   we cannot deal with that one by telephone?  Are you

13   requesting an in-person hearing?

14         MR. CHILDERS:  Well, Your Honor, I sure would like

15   to have it heard sooner rather than later.

16         THE COURT:  Mr. Wilcox and Mr. Childers, are either

17   of you available tomorrow afternoon for a one-hour

18   hearing beginning at one?

19         MR. CHILDERS:  I am, Your Honor.

20         MR. WILCOX:  I am not, Your Honor.

21         THE COURT:  You are not?

22         MR. WILCOX:  And I --

23         THE COURT:  I understand.  It was not scheduled.

24   But we're out of time for today.

25         Mr. Childers, do you have any objection to arguing

1      that one by videoconference?

2           MR. CHILDERS:  No, I don't, Your Honor.

3           THE COURT:  Mr. Wilcox?

4           MR. WILCOX:  No, Your Honor.

5           THE COURT:  Very well.  Then we're going to

6      continue the hearing on the motion to compel at Docket

7      Number 271 and the motion for authority to take more

8      than ten depositions at Docket Number 309.  We will

9      schedule those most likely back to back but separately

10     as soon as we can to be held by videoconference.

11          Because they were both docketed for today, we will

12     do our best to contact both of you to give you two or

13     three alternative dates before we actually schedule

14     those for hearing so that we can try to avoid any

15     conflicts because we'll be doing this on relatively

16     short notice.

17          Looking at my schedule -- give me just one moment.

18     Do you both have your calendars with you today or not?

19          MR. WILCOX:  I don't.  They took my phone.

20          THE COURT:  That's fine.  I understand.

21          MR. WILCOX:  I think I'm available next week all

22     week.

23          THE COURT:  All right.  Give me just one moment,

24     please.

25          (A brief discussion was held off the record.)

1        THE COURT:  All right.  It appears that the most

2    likely date that my calendar would be available would be

3    sometime Wednesday, January 14th, which is next

4    Wednesday.  Just a moment.

5        It's possible that the alternative date would be

6    January the 16th, which is Friday.  Both of those dates

7    depend on whether we can get this courtroom to be able

8    to use the video equipment.  But we will have someone

9    contact you.

10        But if both of you would, at a minimum, contact

11    chambers, my JA is Lisa Murrill, let her know whether

12    you're available on those two dates.  Mr. Childers, you

13    may already know.  And then we'll go from there.

14        MR. CHILDERS:  I'll just e-mail my availability to

15    your JA.

16        MR. WILCOX:  Logistically how does that work?  Do I

17    need to go to the court in Jacksonville?

18        THE COURT:  If you want to appear by Court Call,

19    Mr. Wilcox, you can do that.

20        MR. WILCOX:  But that wouldn't be by video.

21        THE COURT:  Correct.  You could be

22    by -- Mr. Childers I think wants to stand and look at

23    me while he argues.  Is that right, Mr. Childers?

24        MR. CHILDERS:  Correct.

25        THE COURT:  The only way to do that right now with

1       my schedule is by videoconference.  So Mr. Childers

2       would be here in the courtroom in Gainesville.  You

3       would be welcome to appear here in the courtroom in

4       Gainesville as well or appear via telephone and we'll be

5       able to hear you, and I will be in Tallahassee.

6            MR. WILCOX:  And I guess I'd like -- I'm not asking

7       the Court for technical advice.  I'm going to see if I

8       can do that through the video hookup at the Jacksonville

9       court.

10           THE COURT:  Absolutely.  Go ahead and ask the

11      Jacksonville clerk's office to have their IT people

12      contact our IT people.  And it may be that we can do

13      that.  I think that's a great idea.

14           MR. WILCOX:  Thank you.

15           THE COURT:  Very well.  So those motions are

16      continued.  Thank you very much.  This hearing is

17      concluded.

18           (The hearing concluded at 3:20 p.m.)

19

20

21

22

23

24

25

Page 76

1                    COURT CERTIFICATE

2

3   STATE OF FLORIDA )
                      :     SS.
4   COUNTY OF ALACHUA)

5

6            I, JENNIFER R. WITWER, RPR, CRR, Court Reporter,

7   certify that I was authorized to and did stenographically

8   report the foregoing proceedings and that the transcript is a

9   true record.

10           Dated this 12th day of January, 2015.

11

12

13                        JENNIFER R. WITWER, RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Exhibit Tag/ Cover Sheet**</u>

**Party submitting: <u>PLAINTIFFS</u>**        **Ex. #<u>14</u>**

**Admitted: Yes   or    No  (circle one)**

**Debtor:  <u>MATTHEW BRUCE HINTZE, and LARINA K. HINTZE</u>**

**Case No.:  <u>12-10462 (KKS)</u>**

***Adv. No.*:  <u>13-01007 (KKS)</u>**

**Nature of Hearing/**
**Docket No:  <u>Motion to Compel Re: Privilege</u>**

**Dated  _____ , 20___.**

**By:_____,   Deputy Clerk**

EXHIBIT 14

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

In re:

MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,

    Debtors.

_____

JOHN SPENCE, et al.
      Plaintiffs/Counterclaim-Defendants,

v.

MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,
      Defendants/Counterclaim-Plaintiffs

v.

THERESA M. BENDER,
  Counterclaim-Plaintiffs/Third-Party Plaintiff,

v.

ETHAN FIELDMAN, and
STEVEN FIELDMAN,
      Third-Party Defendants.

Case No. 12-10462 (KKS)

Adv. No. 13-01007 (KKS)

Chapter 7

## PLAINTIFF JOHN SPENCE'S FIRST REQUEST FOR ADMISSIONS
## TO DEFENDANT MATTHEW B. HINTZE

Pursuant to Rule 1.370, of the Fla. R. Civ. P., Plaintiff John Spence requests that Defendant Matthew Hintze admit or deny the truth of the matters of facts set forth in the Requests below, by separate answers in writing, within thirty (30) days hereof.  Failure to answer the Request for Admissions within the time allowed will results in the Request for Admissions being deemed admitted.  Each answer shall specifically deny the matter or set forth in detail the reasons why You cannot truthfully admit or deny the matter.  A denial must fairly meet the substance of the Request for Admissions, and when good faith requires that You qualify an answer or deny only a part of the matter, You are required to specify and admit so much of it as is true and qualify or deny the remainder.  Lack of information or knowledge may not be given

as a reason for failure to admit or deny unless You have made reasonable inquiry and the information known or readily obtainable by You is insufficient to enable You to admit or deny.

If You fail to admit any of the following requests, Plaintiffs' may take depositions or other discovery tools will be taken, or other witnesses called or evidence used, to prove the truth of the said facts, and application may be made to the Court for an Order requiring You to pay Plaintiffs' fees and expenses incurred in proving the facts as to which admissions are sought herein, as provided by the Florida Rules of Civil Procedure.

## DEFINITIONS

1.      "You" and "Your" shall mean Defendants Matthew B. Hintze and Larina K. Hintze, employees, agents, representatives, attorneys and all persons acting or purporting to act on behalf of Matthew Hintze and/or Larina Hintze, and including TutoringZone.

2.      "TutoringZone" shall mean the business entity TutoringZone, LC.

3.      "TZ2" shall mean the business entity TutoringZone II, LLC.

4.      "IP Lease" shall mean the Intellectual Property Lease between TutoringZone and Christopher James and Cynthia Frenchman dated May 22, 2012.

5.      "IP Transfer" shall mean the "Intellectual Property Transfer Agreement" dated June 4, 2012.

6.      "David Whitney" shall mean David Whitney.

7.      "John and Sheila Spence" shall mean John Spence and Sheila Spence, a married couple, individually or collectively.

8.      "Intermed Biomedical Services" shall mean the business entity Intermed Biomedical Services, Inc.

9.      "Rick Staab" shall mean Rick Staab, the principal of Intermed Biomedical Services.

10.      "Randy Scott" shall mean Randy Scott.

11.      "Plaintiffs" refer to John Spence, Sheila Spence, David Whitney, Intermed Biological Services, and/or Randy Scott either individually or collectively.

12.      "Investor Creditors" refers to John and Sheila Spence Spence, David Whitney, Rick Staab, Intermed Biomedical Services, Inc., Carolyn S. Martin, Creed Greer, Mr. & Mrs. Kevin Ogilby, Frank A. Orlando Revocable Trust and/or Randy Scott either individually or collectively.

2

13.    "Christopher James" shall mean Christopher M. James.

14.    "CMJ" shall mean CMJ Consulting, Inc.

15.    "Cynthia Frenchman" shall mean Cynthia Frenchman, individually or in her capacity as an assistant and/or partner to Christopher James and/or CMJ Consulting, Inc.

16.    "Jeffrey Childers, Esq." shall mean Seldon J. Childers, Esq.

## REQUESTS TO ADMIT TO MATTHEW HINTZE

1.    Admit that You were a partner, officer, manager and owner of TutoringZone and that You dominated and controlled the operations of TutoringZone until October 31, 2012.

**RESPONSE:**

2.    Admit that You were an officer, manager and owner of TutoringZone and that You exerted complete control of the operations of TutoringZone from May 15, 2011 to October 31, 2012.

**RESPONSE:**

3.    Admit that You owned 100% of TutoringZone between June 15, 2011 and October 31, 2012.

**RESPONSE:**

4.    Admit that You transferred ownership of personal property, including claims, owned by TutoringZone after October 31, 2012.

**RESPONSE:**

5.    Admit that in or before April 2012, You entered into discussions with Christopher James to purchase the assets of TutoringZone.

**RESPONSE:**

6.    Admit that in or about April 2012, You engaged in negotiations with Christopher James for a personal debt buy-out in exchange for an equity stake in TutoringZone.

**RESPONSE:**

3

7.      Admit that on or about April 2012, You engaged in negotiations with Christopher James for personal debt buy-out in exchange for an equity stake in TZ2.

**RESPONSE:**


8.      Admit that in the meeting memo of May 14, 2012, provided to Plaintiffs and some or all of the Investor Creditors, You portrayed Your personal debts and liabilities as the debts and liabilities of TutoringZone, and the debts of TutoringZone as Your personal debts and liabilities.

**RESPONSE:**


9.      Admit that in the meeting memo of May 14, 2012, provided to some Plaintiffs, and some or all of the Investor Creditors, You represented that in Option 1, if You were to sell the assets of TutoringZone to a new company, there would be consideration for existing Noteholders.

**RESPONSE:**


10.      Admit that in April 2012, You requested that the Plaintiffs and other Investor Creditors subordinate their claims to the claims of a "new investor" in order to raise capital.

**RESPONSE:**


11.      Admit that You did not disclose to Plaintiffs that Christopher James was the "new investor" mentioned in numerous emails in April and May 2012 until after the assets of TutoringZone were sold to TZ2.

**RESPONSE:**


12.      Admit that You met with Jeffrey Childers on May 10, 2012, and sought counsel regarding Your personal indebtedness and potential bankruptcy.

**RESPONSE:**


13.      Admit that You met with Jeffrey Childers on May 10, 2012, and sought counsel regarding TutoringZone's indebtedness and restructuring.

**RESPONSE:**

14.      Admit that You requested a meeting and met with some or all of the Plaintiffs on Monday, May 14, 2012, and circulated a document indicating the options under consideration and Your recommendation regarding repayment of the amounts due to Plaintiffs and/or Investor Creditors.

**RESPONSE:**

15.      Admit that when You held the meeting with some of the Investor Creditors on Monday, May 14, 2012, You had already meet with Seldon Childers, Esq. and taken steps to lease the Intellectual Property of TutoringZone and sell the assets of TutoringZone to a new entity to be formed by Christopher James.

**RESPONSE:**

16.      Admit that when You requested a meeting with some of the Investor Creditors on Monday, May 14, 2012, You concealed the fact that You intended to lease the Intellectual Property of TutoringZone to Christopher James and sell the assets of TutoringZone to a new entity to be formed.

**RESPONSE:**

17.      Admit that You, Your family or an entity within Your control have repaid Creed Greer all or part of the money owed or given Creed Greer collateral in repayment of the Promissory Note to Creed Greer (dated May 12, 2011) in the amount of $100,000.00.

**RESPONSE:**

18.      Admit that You, and/or Larina Hintze and or another family member caused Susan Hatley to Mortgage assets to repay Creed Greer in whole or in part.

**RESPONSE:**

19.      Admit that You represented to one or more of the Plaintiffs on multiple occasions, including on December 19, 2011, that Larina Hintze's rental properties were the

source of collateral for the debts of TutoringZone, and that the Plaintiffs' notes were considered the debts of TutoringZone.

**RESPONSE:**


20.     Admit that from May, 2012 to on or about September, 2012, You worked for both TutoringZone and TZ2.

**RESPONSE:**


21.     Admit that Your, and other TutoringZone employee email addresses, did not change as a result of the sale of TutoringZone to TZ2.

**RESPONSE:**


22.     Admit that TutoringZone and TZ2 always shared their principal places of business.

**RESPONSE:**


23.     Admit that the capital amounts loaned pursuant to the promissory notes payable to David Whitney (dated May 12, 2011) in the amount $125,000.00, Intermed Biomedical Services (dated May 27, 2011) in the amount of $150,000.00, John and Sheila Spence (dated May 27, 2011) in the amount of $75,000.00, Randy Scott (dated May 27, 2011) in the amount of $25,000.00, Creed Greer (dated May 12, 2011) in the amount of $100,000.00, Creed Greer (dated May 25, 2011) in the amount of $50,000.00, Mr. and Mrs. Kevin Ogilby (dated May 20, 2011) in the amount of $50,000.00, Carolyn S. Martin (dated May 20, 2011) in the amount of $20,000.00, Frank A. Orlando revocable Trust (dated May 20, 2011) in the amount of $25,000.00, Christopher James (dated May 12, 2011) in the amount of $100,000.00 were utilized by You to purchase 100% interest in TutoringZone.

**RESPONSE:**

24.     Admit that the capital amounts loaned pursuant to the promissory notes recited in **Request for Admission No. 23** were utilized by You for personal expenses and or obligations, and/or to purchase assets by You.

**RESPONSE:**

25.     Admit that promissory notes payable to Intermed Biomedical Services (dated May 27, 2011) in the amount of $150,000.00, John and Sheila Spence (dated May 27, 2011) in the amount of $75,000.00, Randy Scott (dated May 27, 2011) in the amount of $25,000.00, Carolyn S. Martin (dated May 5/20/11) in the amount of $20,000.00, Mr. & Mrs. Ogilby (dated May 20, 2011) in the amount of $50,000.00, the Frank A. Orlando Revocable Trust (dated May 20, 2011) in the amount of $25,000.00 required the application of proceeds from the sale of TutoringZone, LC, (if proceeds exceeded $10,000), to be applied to the note holders' debts and accumulated interest.

**RESPONSE:**

26.     Admit that the promissory notes to Christopher James, dated November 10, 2010 and May 12, 2011 *did not* require the application of proceeds from the sale of TutoringZone, LC, (if proceeds exceeded $10,000), to be applied to the Holder's debt and accumulated interest.

**RESPONSE:**

27.     Admit that on May 22, 2012, You executed the IP Lease between TutoringZone and Christopher James and Cynthia Frenchman, which provided for the use of the intellectual property of TutoringZone by and that TutoringZone received $75,000.00 in three payments in June July and August, 2012.

**RESPONSE:**

28.     Admit that the proceeds from the IP Lease were utilized by TutoringZone to operate until TZ2 was created to purchase the assets of TutoringZone.

**RESPONSE:**

29.     Admit that the payments for the IP Lease and the sale of the TutoringZone were concealed from the Plaintiffs to prevent the Plaintiffs from objecting to the sale or attempting to assert their legal rights.

**RESPONSE:**

30.     Admit that You represented that, as of May 17, 2012, that all private creditors had signed onto Your plan to sell the assets of TutoringZone to a new entity, but that you did not disclose to any private creditor, other than insider family members, Christopher James, and Creed Greer that no other creditors were to receive either payment or an equity stake in TZ2.

**RESPONSE:**

## **<u>VERIFICATION</u>**

STATE OF FLORIDA

COUNTY OF _____

BEFORE ME, the undersigned authority, this day personally appeared MATTHEW HINTZE, who being duly sworn, deposed and says that he has read the foregoing requests for Admissions and that the Responses provided are true and correct to the best of his knowledge, information and belief.

_____

MATTHEW HINTZE

Sworn and subscribed before me this _____ day of _____, 2015.  Such person did take an oath and: *(Notary must check applicable box).*

☐   Is/are personally known to me.

☐   Produced a current Florida driver's license as identification.

☐   Produced _____ as identification.

               *(Notary seal must be affixed)*

_____

Signature of Notary

_____

Name of Notary (printed)

Dated July 27, 2015

WILCOX LAW FIRM

**/s/ *Elizabeth Bowen*_____**
Robert D. Wilcox
Florida Bar No.: 755168
Elizabeth R.P. Bowen
Florida Bar No.: 97297
Andrew M. Bonderud
Florida Bar No. 102178
814 North Highway A1A, Suite 202
Ponte Vedra Beach, FL 32082
Telephone: (904) 405-1248
Facsimile: (904) 513-9201
rw@wlflaw.com
eb@wlflaw.com
ab@wlflaw.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2015, I caused the foregoing Requests for Admissions to be served by electronic mail to Matthew B. Hintze and Larina K. Hintze, pro se for Defendants, at matthewhintze@gmail.com and larinahintze@gmail.com and by U.S. Mail, postage pre-paid to 708 N.E. Blvd., Gainesville, FL 32601.

**/s/ *Elizabeth Bowen*_____**
Elizabeth R.P. Bowen, Attorney

## Exhibit Tag/ Cover Sheet

Party submitting: **PLAINTIFFS**          Ex. # **15**

Admitted: Yes   or     No  (circle one)

Debtor:  **MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

Case No.:  **12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

Nature of Hearing/
Docket No:  **Motion to Compel Re: Privilege**

Dated          _____ , 20___.

By:_____,   Deputy Clerk

# EXHIBIT 15

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

In re:

MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,

    Debtors.

Case No. 12-10462 (KKS)

Adv. No. 13-01007 (KKS)

Chapter 7

_____

JOHN SPENCE, et al.
    Plaintiffs/Counterclaim-Defendants,
v.

MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,
    Defendants/Counterclaim-Plaintiffs

v.

THERESA M. BENDER,
  Counterclaim-Plaintiffs/Third-Party Plaintiff,
v.

ETHAN FIELDMAN, and
STEVEN FIELDMAN,
    Third-Party Defendants.

**PLAINTIFF DAVID WHITNEY'S FIRST REQUEST FOR ADMISSIONS**
**TO DEFENDANT MATTHEW B. HINTZE**

    Pursuant to Rule 1.370, of the Fla. R. Civ. P., Plaintiff John Spence requests that

Defendant Matthew Hintze admit or deny the truth of the matters of facts set forth in the

Requests below, by separate answers in writing, within thirty (30) days hereof.  Failure to answer

the Request for Admissions within the time allowed will results in the Request for Admissions

being deemed admitted.  Each answer shall specifically deny the matter or set forth in detail the

reasons why You cannot truthfully admit or deny the matter.  A denial must fairly meet the

substance of the Request for Admissions, and when good faith requires that You qualify an

answer or deny only a part of the matter, You are required to specify and admit so much of it as

is true and qualify or deny the remainder.  Lack of information or knowledge may not be given

as a reason for failure to admit or deny unless You have made reasonable inquiry and the information known or readily obtainable by You is insufficient to enable You to admit or deny.

If You fail to admit any of the foregoing, depositions or other discovery tools will be taken, or other witnesses called or evidence used, to prove the truth of the said facts, and application will be made to the Court for an Order requiring You to pay Plaintiffs' fees and expenses incurred in proving the facts as to which admissions are sought herein, as provided by the Florida Rules of Civil Procedure.

## **DEFINITIONS**

1.     "You" and "Your" shall mean Defendants Matthew B. Hintze and Larina K. Hintze, employees, agents, representatives, attorneys and all persons acting or purporting to act on behalf of Matthew Hintze and/or Larina Hintze, and including TutoringZone.

2.     "TutoringZone" shall mean the business entity TutoringZone, LC.

3.     "TZ2" shall mean the business entity TutoringZone II, LLC.

4.     "IP Lease" shall mean the Intellectual Property Lease between TutoringZone and Christopher James and Cynthia Frenchman dated May 22, 2012.

5.     "IP Transfer" shall mean the "Intellectual Property Transfer Agreement" dated June 4, 2012.

6.     "David Whitney" shall mean David Whitney.

7.     "John and Sheila Spence" shall mean John Spence and Sheila Spence, a married couple, individually or collectively.

8.     "Intermed Biomedical Services" shall mean the business entity Intermed Biomedical Services, Inc.

9.     "Rick Staab" shall mean Rick Staab, the principal of Intermed Biomedical Services.

10.    "Randy Scott" shall mean Randy Scott.

11.    "Plaintiffs" refer to John Spence, Sheila Spence, David Whitney, Intermed Biological Services, and/or Randy Scott either individually or collectively.

12.    "Investor Creditors" refers to John and Sheila Spence Spence, David Whitney, Rick Staab, Intermed Biomedical Services, Inc., Carolyn S. Martin, Creed Greer, Mr. & Mrs. Kevin Ogilby, Frank A. Orlando Revocable Trust and/or Randy Scott either individually or collectively.

2

13.     "Christopher James" shall mean Christopher M. James.

14.     "CMJ" shall mean CMJ Consulting, Inc.

15.     "Cynthia Frenchman" shall mean Cynthia Frenchman, individually or in her capacity as an assistant and/or partner to Christopher James and/or CMJ Consulting, Inc.

16.     "Jeffrey Childers, Esq." shall mean Seldon J. Childers, Esq.

### REQUESTS TO ADMIT TO MATT HINTZE

1.      Admit that part of the consideration for the sale of the TutoringZone was Your personal debt forgiveness by Christopher James.

**RESPONSE:**


2.      Admit that $100,000 of the consideration for the sale of the TutoringZone was the debt-forgiveness associated with the intellectual property lease payment by James and Frenchman of $75,000.00 and the May, 2015 payroll advance to TutoringZone of $25,000.00.

**RESPONSE:**


3.      Admit that the EIN number for TZ2 was not obtained until August 22, 2012, exactly 90 days after the IP Lease was signed in order to time the sale of the assets of TutoringZone to TZ2 to a date after the payment of the IP Lease payments were complete so that those funds would not be available to the Plaintiffs and or other Investor Creditors.

**RESPONSE:**


4.      Admit that You entered into the IP Lease with Christopher James and Cynthia Frenchman and a subsequent agreement to sell the assets of TutoringZone to TZ2, and that You concealed the existence of the IP Lease and IP Transfer, and the fact that TutoringZone had financing, from Plaintiffs until after the sale of TutoringZone to TZ2 was completed.

**RESPONSE:**

3

5.      Admit that You entered into the IP Sale agreement to sell the assets of TutoringZone to TZ2, and that You concealed the existence of the IP Sale from Plaintiffs until after the sale of TutoringZone to TZ2 was consummated.

**RESPONSE:**

6.      Admit that You entered into the IP Sale agreement to sell the assets of TutoringZone to TZ2 on June 4, 2012, and that TZ2 had not been formed as was not incorporated at the time.

**RESPONSE:**

7.      Admit that from June 4, 2012 to on or about August 25, 2012, You stated that You worked for both TutoringZone and TZ2, however You were paid by the TutoringZone payroll until on or about August 25, 2012.

**RESPONSE:**

8.      Admit that You concealed the source of TutoringZone's financing for June 2012 to August 2012 from Plaintiffs.

**RESPONSE:**

9.      Admit that You intentionally misled Plaintiffs from May 2012 to August 2012 regarding the operations of TutoringZone and Your intent to repay the amounts, or some portion thereof, due and owning pursuant to the Plaintiffs' promissory notes.

**RESPONSE:**

10.      Admit that You entered into the IP Lease and IP Sale agreements to transfer and sell the assets of TutoringZone and that, even after the documentation was signed, You were

advised by counsel to wait 90 days before disclosing the sale of TutoringZone to TZ2 to Plaintiffs.

**RESPONSE:**

11.      Admit that You did not disclose to Plaintiffs the IP Lease or IP Sale of TutoringZone to Plaintiffs because You knew that they would proceed with collection efforts, and You sought to delay those efforts until after the sale was final.

**RESPONSE:**

12.      Admit that, after receiving inquiries and communications from the Plaintiffs during the period of May, 2012 to September, 2012, regarding the financial condition of TutoringZone, You sought advice from Christopher James and regarding what to tell the Plaintiffs to delay their taking legal action to protect their rights.

**RESPONSE:**

13.      Admit that, after receiving inquiries and communications from the Plaintiffs Creditors during the period of June, 2012 to September, 2012, regarding Your intent to repay their promissory notes, Your failure to disclose the IP Transfer and sale of TutoringZone hindered the Plaintiffs ability to collect from the sale of TutoringZone.

**RESPONSE:**

14.      Admit that on July 5, 2012, the day after IP Sale, You received an email from Christopher James that suggested that You infer to John Spence that You might have a future equity stake in TZ2 by which You might be able to repay him from, which inference was suggested in an effort to delay John Spence from filing suit.

**RESPONSE:**

15.     Admit that in August 2012, You continued to represent to Plaintiffs that You were pursuing the strategy discussed the meeting and memo of May 14, 2012, which specifically included consideration for noteholders in an equity buy-out, but intentionally omitted the fact that You had already sold TutoringZone and that there would be no consideration for noteholders.

**RESPONSE:**


16.     Admit that as of May, 2012, You valued TutoringZone at $3,000,000.00 in the negotiation of Your equity participation of TZ2.

**RESPONSE:**


17.     Admit that as of November 1, 2012, You valued TutoringZone at $100.00.

**RESPONSE:**


18.     Admit that as of November 1, 2012, You did not own an equity interest in TZ2.

**RESPONSE:**


19.     Admit that as of October 31, 2012, You and Christopher James had an understanding that You would receive an equity interest in TZ2 in the future.

**RESPONSE:**


20.     Admit that after the sale of TutoringZone to TZ2, TZ2 continued to pay selected creditors of TutoringZone.

**RESPONSE:**

21.     Admit that TZ2 was a continuation of TutoringZone, and that the only material change was the elimination of Your ownership interest and the elimination of TutoringZone, which was the collateral for certain Plaintiffs' promissory notes.

**RESPONSE:**


22.     Admit that there is no difference between TutoringZone and TZ2 from the perspective of its clients, and that the transition was seamless, involved transitioning the same tutors, and revising the TutoringZone employment agreements.

**RESPONSE:**


23.     Admit that the TZ2 website refers to both Your personal professional history and the history of TZ2 as including the history of TutoringZone, and that the two companies are indistinguishable on Your social media presence.

**RESPONSE:**


24.     Admit that one or more of the Plaintiffs inquired about the source of the capital for continuing the operations of TutoringZone during the Summer of 2012, and that You did not disclose the intellectual property lease or the existence of TZ2 until long after the Lease Proceeds had been paid.

**RESPONSE:**


25.     Admit that the assets of TutoringZone were utilized to purchase TZ2 and that the sale of TutoringZone to TZ2 was structured to be a sale with no cash proceeds.

**RESPONSE:**

26.      Admit that You represented to investors that TutoringZone and You were "one and the same."

**RESPONSE:**


27.      Admit that in the six months prior to filing bankruptcy on November 1, 2012, You were negotiating an equity stake of 58% in TZ2.

**RESPONSE:**


28.      Admit that You were advised not to receive an equity stake in TZ2 as it would be an asset in Your bankruptcy, and that You and Christopher James and/or TZ2 have a "side deal" that provides for You to receive an equity stake in TZ2 in the future.

**RESPONSE:**


29.      Admit that from the date TZ2 was formed to the present, You have exercised control over the operations of TZ2.

**RESPONSE:**


30.      Admit that between April, 2012 and November, 2012, You continued to control TutoringZone and were responsible for all TutoringZone and TZ2 operations.

**RESPONSE:**

## **<u>VERIFICATION</u>**

STATE OF FLORIDA

COUNTY OF _____


BEFORE ME, the undersigned authority, this day personally appeared MATTHEW HINTZE, who being duly sworn, deposed and says that he has read the foregoing requests for Admissions and that the Responses provided are true and correct to the best of his knowledge, information and belief.


_____

MATTHEW HINTZE

Sworn and subscribed before me this _____ day of _____, 2015.  Such person did take an oath and: *(Notary must check applicable box).*


&#9633;   Is/are personally known to me.

&#9633;   Produced a current Florida driver's license as identification.

&#9633;   Produced _____ as identification.


*(Notary seal must be affixed)*


_____

Signature of Notary


_____

Name of Notary (printed)

Dated July 27, 2015

WILCOX LAW FIRM

*/s/ Elizabeth Bowen*_____
Robert D. Wilcox
Florida Bar No.: 755168
Elizabeth R.P. Bowen
Florida Bar No.: 97297
Andrew M. Bonderud
Florida Bar No. 102178
814 North Highway A1A, Suite 202
Ponte Vedra Beach, FL 32082
Telephone: (904) 405-1248
Facsimile: (904) 513-9201
rw@wlflaw.com
eb@wlflaw.com
ab@wlflaw.com

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2015, I caused the foregoing Requests for Admissions to be served by electronic mail to Matthew B. Hintze and Larina K. Hintze, pro se for Defendants, at matthewhintze@gmail.com and larinahintze@gmail.com and by U.S. Mail, postage pre-paid to 708 N.E. Blvd., Gainesville, FL 32601.


*/s/ Elizabeth Bowen*_____
Elizabeth R.P. Bowen, Attorney

## Exhibit Tag/ Cover Sheet

**Party submitting: PLAINTIFFS**       **Ex. # 16**

**Admitted: Yes   or    No  (circle one)**

**Debtor:  MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

**Case No.:  12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

**Nature of Hearing/**
**Docket No:  Motion to Compel Re: Privilege**

**Dated _____ , 20___.**

**By:_____,  Deputy Clerk**

EXHIBIT 16

## Elizabeth R Bowen

| | |
|---|---|
| **From:** | Jennifer Hunt <jen.hunt@smartbizlaw.com> |
| **Sent:** | Wednesday, December 17, 2014 11:18 AM |
| **To:** | Robert D Wilcox |
| **Cc:** | Jeffery Childers |
| **Subject:** | Spence v. Hintze - Discovery Follow Up |
| **Attachments:** | 1.25.11.docx; 3.29.11.pdf; P&L 2009.xls; P&L 2010.xls; P&L UGA 2009.xls; P&L UGA 2010.xls |

Mr. Wilcox:

After reviewing the hearing transcript from last week, Jeff asked me to try to clear up some of the concerns you voiced regarding discovery.

First, you indicated that you were concerned about an email that looks from first glance like Matt sent to himself, but actually blind copied other friends and family regarding the status of the litigation with Ethan and  bidding process. Please review the email produced under bate label SpenceRequ002936 (saved under request file "#9-10 Emails January 2011 through June 2011" on the CD we initially sent you responsive to John Spence's Request for Production). All responsive emails that were blind copied have been produced.

In regards to the Friends and Family "email" that you sent us after John Spence's deposition- we have finally solved the mystery! An email was sent to Glen Parker (a friend of Ethan) on March 29, 2011, with various attachments, including a word document and various excel files containing financial information. The attachment had a word doc that looks similar to the "Friends and Family email" you provided us (although yours seems to be altered with Matt's business card stapled to it). Mr. Parker was the only person who received this email along with the Friends and Family word doc. I attach the email and all the attachments to this email for quick reference.

Additionally, please allow this email to confirm that all communications and email attachments between Hintze and Chris James have been produced that were dated January 2011 through April 2012, and saved specifically under two files on the Spence CD for you to identify. The only emails that were not produced were those that Defendants assert privilege, dated from May 1, 2012 to present.

We are working on saving all email attachments in their original format to a CD and expect to send it to you in the next day or two along with the privilege log requested for correspondence dated after May 1, 2012.

Meanwhile, please let us know if you have any other concerns regarding production.

Jennifer Hunt

**Contact Information**

direct 352.375.3722
toll free 866.996.6104
main 352.335.0400
fax 407.209.3870

**Jennifer Hunt, F.R.P.**
jen.hunt@smartbizlaw.com

Childers*Law, LLC
2135 NW 40th Terrace,
Suite B
Gainesville, FL 32605

www.smartbizlaw.com

The information contained in this email and/or attachments is intended only for the personal and confidential use of the intended recipient. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient(s) or any agent responsible for delivering it to the intended recipient(s), you are hereby notified that you may have received this document in error. Any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or email and delete the original message. Thank you.

**Exhibit Tag/ Cover Sheet**

Party submitting: **PLAINTIFFS**          Ex. # **17**

Admitted: Yes   or    No  (circle one)

Debtor:  **MATTHEW BRUCE HINTZE, and LARINA K. HINTZE**

Case No.:  **12-10462 (KKS)**

*Adv. No.*:  **13-01007 (KKS)**

Nature of Hearing/
Docket No:  **Motion to Compel Re: Privilege**

Dated _____ , 20___.

By:_____,   Deputy Clerk

# EXHIBIT 17

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

Adversary Proceeding #13-01007-KKS

JOHN SPENCE, SHEILA SPENCE,
INTERMED BIOMEDICAL SERVICES, INC.,
a Florida corporation, DAVID WHITNEY,
and FLH HOLDINGS OF FLORIDA, LLC,
a Florida limited liability company,

      Plaintiffs/Counterclaim-Defendants,

vs.

MATTHEW BRUCE HINTZE and
LARINA K. HINTZE,

      Defendants/Counterclaim-Plaintiffs/
      Third-Party Plaintiffs,

vs.

ETHAN FIELDMAN and STEVEN FIELDMAN,

      Third-Party Defendants.

_____/

| | |
|---|---|
| PROCEEDINGS: | HEARING |
| BEFORE: | HONORABLE KAREN K. SPECIE |
| DATE: | January 7, 2015 |
| TIME: | 1:00 p.m. – 3:20 p.m. |
| PLACE: | U.S. Federal Courthouse<br>401 Southeast First Avenue<br>Gainesville, Florida |
| REPORTED BY: | Jennifer R. Witwer, RPR, CRR<br>Notary Public |

1    APPEARANCES

2         Wilcox Law Firm
          BY:  ROBERT DRAKE WILCOX
3         814 A1A North, Suite 202
          Ponte Vedra Beach, Florida  32082
4         Attorney for Plaintiffs/Counterclaim-Defendants

5         Childers Law, LLC
          BY:  SELDON J. CHILDERS, ESQUIRE
6         2135 Northwest 40th Terrace, Suite B
          Gainesville, Florida  32605
7         Attorney for the Defendants/Counterclaim-Plaintiffs/
          Third-Party Plaintiffs
8
          Winderweedle, Haines, Ward & Woodman, P.A.
9         BY:  RYAN E. DAVIS, ESQUIRE
          329 Park Avenue North, Second Floor
10        Winter Park, Florida  32789
          Attorney for Christopher James and Tutoring Zone 2
11        Appearing via Court Call

12

13

14

15

16                        E-X-H-I-B-I-T-S

17   Plaintiffs' for Identification:            Page

18     Exhibit Number 1 - intellectual property
                          Transfer agreement.........31
19     Exhibit Number 2 - privilege log..............15
       Exhibit Number 3 - amended privilege log......15
20     Exhibit Number 4 - 12/4/14 hearing transcript.30
       Exhibit Number 5 - rebuttal documents.........31
21

22

23

24

25

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  We are here in the case of Spence,

3     et al, versus Hintze, Case Number 13-01007.

4          Before the Court is a continued hearing on the

5     motion for protective order filed by the defendants at

6     Docket Number 266, a hearing on the motion to compel

7     also filed by the defendants at Docket Number 271, a

8     status hearing regarding the motion for protective order

9     at Docket Number 249, and the motion by the plaintiffs

10    for authority or authorization to take more than ten

11    depositions at Docket Number 309.

12         We'll take appearances, please.

13         MR. CHILDERS:  Good afternoon, Your Honor.  Jeff

14    Childers for the debtors/defendants.

15         THE COURT:  Mr. Childers.

16         MR. WILCOX:  Good afternoon, Your Honor.  Robert

17    Wilcox on behalf of the various plaintiffs.

18         THE COURT:  Mr. Wilcox.  Thank you.

19         MR. WILCOX:  Thank you.

20         THE COURT:  All right.  Gentlemen, we have first

21    the motion for protective order and the continued

22    hearing on that at Docket Number 266.

23         Mr. Childers.

24         MR. CHILDERS:  Thank you, Your Honor.

25         I'm happy to report that we made a lot of progress

1    on these issues since our last hearing, so I'll give

2    you first, by way of status, a summary of those

3    accomplishments.

4         Late last week or very early this week we provided

5    an amended privilege log to the plaintiffs which

6    withdrew our assertion of the two contested privileges.

7    The Court will probably remember that was the joint or

8    common interest privilege and the commercial sensitivity

9    or confidential information.

10        THE COURT:  Let me stop you for just a moment,

11   Mr. Childers.

12        Can you hear back there, Mr. Wilcox, or do we need

13   to turn the mic up a little bit?

14        MR. WILCOX:  If you could turn it up just a tiny

15   bit.  Thank you very much.

16        MR. CHILDERS:  And I'll try to be a little closer

17   to the mic as well.

18        MR. DAVIS:  Your Honor, I'm sorry, this is Ryan

19   Davis appearing by phone.  I have a bad connection, but

20   I wanted to enter an appearance as well on behalf of --

21        THE COURT:  I'm sorry, Mr. Davis, I did have a

22   Court Call docket for you and I neglected to call your

23   name.  So it's Ryan E. Davis for interested party

24   Christopher James; is that correct?

25        MR. DAVIS:  Correct, and on behalf of Tutoring

1    Zone 2, Your Honor.  Thank you.

2         THE COURT:  All right.  And, Mr. Davis, if you are

3    on a speakerphone, which it doesn't sound like you are,

4    but if you're on a speakerphone, please pick up, and if

5    you're not, sometimes it helps if you turn up the volume

6    on your hand set.

7         MR. DAVIS:  Okay.  Thank you, Your Honor.

8         THE COURT:  All right.  Thank you.

9         Excuse me, Mr. Childers.  Please processed.  You

10   were saying that the common interest doctrine has been

11   withdrawn as far as the privilege log is concerned?

12        MR. CHILDERS:  That's correct.  We're not conceding

13   that there wasn't a common interest, but for the purpose

14   of the items that were on the privilege log, we've

15   decided to just produce them, and I believe they have

16   already been produced.

17        The second group was the group of e-mails, and this

18   is the largest portion of the privilege log that we had

19   identified as commercially confidential.  And after

20   analyzing the issue, we decided that because they are

21   Tutoring Zone 2's commercially sensitive information,

22   that there might be a question as to whether I even have

23   standing to assert that privilege.

24        So we contacted Mr. Davis, who is not noticed in

25   this case because Mr. James is not a party here, and we

1   identified the problem to him and we put him in contact

2   with Mr. Wilcox.  So we are not going to be asserting

3   commercial sensitivity.  That's between Mr. Davis and

4   Mr. Wilcox.

5       THE COURT:  Thank you.

6       MR. CHILDERS:  I believe that the amended privilege

7   log that I provided still shows those items, but we

8   subsequently gave a letter to Mr. Wilcox indicating that

9   we would not be asserting that privilege.

10      So that leaves just about half a dozen items that

11  were either plain work product or attorney/client

12  privilege identified.

13      I conferred with Mr. Wilcox on Monday, and at that

14  time and since that time I'm not aware of any objections

15  or concerns that the plaintiffs have with the new set of

16  privileged items, so pursuant to that, we notified the

17  Court that we thought the matter was moot and copied

18  Mr. Wilcox, who did not object, and the Court yesterday

19  noticed this as a nonevidentiary hearing.  And hopefully

20  all those issues are now resolved or moot.

21      THE COURT:  Shall we take these motions one at a

22  time?  That was the motion for protective order.  Why

23  don't I give Mr. Wilcox a chance to chime in at this

24  point and see if there are any disagreements, and we can

25  move on.

Electronically signed by Jennifer Witwer (301-375-152-2952)

1          MR. CHILDERS:  Sounds good.

2          THE COURT:  Thank you.

3          Mr. Wilcox.

4          MR. WILCOX:  Thank you, Your Honor.

5          What I was told by counsel, what I was told by

6      counsel was that the joint defense privilege was being

7      withdrawn as to these documents.  The problem with that

8      is that the defendants did not comply with the Court's

9      direction.  And we'd ask the Court to make a finding

10     that there is no common interest privilege among these

11     parties, and I'll explain why in a moment.

12         It's up to Mr. Childers to decide what he wants to

13     proceed with today, but we have been preparing for this

14     as an evidentiary hearing.  I have exhibits that I've

15     prepared for the Court.  I'm not aware of a notice that

16     changed this from a nonevidentiary to an evidentiary

17     hearing.  And I didn't object to any communication

18     Mr. Childers had with the Court.

19         It's not really my place to object to -- I don't

20     think he specifically requested this as a nonevidentiary

21     hearing, but I would like to go through these issues as

22     I perceive them.

23         THE COURT:  Let me help clarify that point,

24     Mr. Wilcox, because I'm afraid that the error in the

25     noticing as an evidentiary hearing was the Court's and

1    it was not yours and it was not Mr. Childers'.  And the

2    amended notice of hearing noticing it as a

3    nonevidentiary hearing was at my request, having

4    reviewed the entire transcript at Docket Number 288, at

5    the conclusion of which I announced that today's hearing

6    would be continued as a nonevidentiary hearing and that

7    if we needed to present evidence, that we would schedule

8    a further hearing.

9        I sincerely apologize on behalf of the Court if

10   that caused either one of you additional work, which it

11   undoubtedly did if you've come prepared with exhibits.

12       I also note for the record that today's hearing was

13   supposed to have been preceded by the privilege log, and

14   I guess I used an inartful term in my announcement, but

15   at the transcript I announced that the privilege log was

16   to be prepared as opposed to filed, and then we were

17   going to go through the claims of privilege I believe

18   one at a time and make argument as to those.

19       And I also was expecting -- Mr. Childers had

20   indicated that he wanted to file a memorandum of law or

21   further brief the issue of whether or what privilege

22   applied to commercially sensitive information.

23       Now, it appears that that issue is moot because

24   Mr. Childers, on behalf of the defendants, has waived

25   that argument.  Is that correct, Mr. Childers?

1        MR. CHILDERS:  As to our motion for protective

2    order, we have withdrawn the portion of protective order

3    that relates to commercially sensitive information and

4    that relates to joint or common interest defense.

5        THE COURT:  All right.  So as to this motion at

6    Docket Number 266, you have essentially withdrawn the

7    portion of that motion that argues that certain

8    documents should not have to be produced because of

9    either the joint defense or common interest doctrine or

10   the commercially sensitive information doctrine that you

11   had set forth; is that correct?

12       MR. CHILDERS:  That is correct, Your Honor.

13       THE COURT:  All right.  I'm sorry to interrupt you,

14   Mr. Wilcox, but I thought it was fair to all parties to

15   make the record abundantly clear.

16       MR. WILCOX:  Well, Your Honor, I have prepared a

17   book with exhibits that does contain the privilege log,

18   so maybe we can go through those.

19       THE COURT:  Hopefully we can, yes, sir.

20       MR. WILCOX:  And that book is right on that table.

21       THE COURT:  All right.  Mr. Childers, have you

22   seen the items in this book that Mr. Wilcox is referring

23   to?

24       MR. CHILDERS:  Mr. Wilcox handed me a copy just

25   before the hearing.  I haven't had a chance to review it

1      yet.

2           MR. WILCOX:  It's his privilege log.  It's what he

3      gave me.  He gave me a privilege log on the 21st and

4      then he gave me a corrected privilege log on Monday.

5      That's not in --

6           THE COURT:  That's all that's in the exhibits that

7      you're handing me?

8           MR. WILCOX:  Well, I can read -- there are -- those

9      are Exhibits 2 and 3.

10          Exhibit 1, because we had prepared for this as an

11     evidentiary hearing based upon the Court's comments

12     basically at -- as I read the transcript, it says:  It

13     may be that we will set this the afternoon before that,

14     January the 7th, because we've already scheduled a

15     two-hour evidentiary hearing for the afternoon of the

16     8th.

17          There is no evidentiary hearing set in this

18     proceeding.

19          THE COURT:  No, it was in a different case,

20     Mr. Wilcox.

21          MR. WILCOX:  In a different proceeding in that.

22          THE COURT:  A different -- in other words, we had

23     until yesterday a two-hour evidentiary final hearing in

24     a Chapter 13 scheduled for tomorrow afternoon, so I

25     couldn't schedule this matter for that date.

1          MR. WILCOX:  And I contacted your chambers this

2     morning and they said that this was a two-hour hearing.

3          THE COURT:  Yes, sir, it is.

4          MR. WILCOX:  All right.  Well, Your Honor, I think

5     it would be useful to go through Exhibits 2 and 3, which

6     are the original privilege log and then the corrected

7     privilege log.

8          It seems to me, though, that the Court's direction

9     from the transcript on December 4th was very clear.  The

10    Court directed the defense to produce a privilege log

11    within 15 days.  They did that.  We received that on the

12    19th.  The Court also directed that within 20 days of

13    the hearing the defendants were to produce affidavits

14    that would support the claims of privilege.

15         The Court, at the December 4th hearing, in my view

16    expressed some skepticism about the privileges that were

17    being asserted and asked for specifics as to the dates

18    and the factual basis, whether it's common interest or

19    sensitive business information, and that direction by

20    the Court applied to all the privileges, not just the

21    common interest privilege.  And I can point to the

22    transcript to that specific part.

23         They were to provide affidavits regarding any

24    assertion of privilege in advance of this hearing today.

25    They didn't file any affidavits in support of that.

1      Now, this morning Mr. Childers -- I received it in an

2      e-mail and I assume it was filed, a declaration by

3      Mr. Childers regarding -- I don't know whether that was

4      filed or not, Your Honor.  I believe it was.

5          THE COURT:  That's all right.  Please proceed.

6      I'll look while you're talking.

7          MR. CHILDERS:  It was not filed, Your Honor.

8          THE COURT:  Was not filed?

9          MR. CHILDERS:  No.

10         MR. WILCOX:  Okay.  Apparently it was not filed.

11     So they've never produced any affidavits, and the

12     Court's directed them to produce something to allow the

13     Court to evaluate the privileges.

14         The Court also strongly suggested, if not directed

15     Mr. Childers to file a brief in support of the asserted

16     privileges.  That was not forthcoming.  We were not in a

17     position to file a brief because we had not seen the

18     affidavits that we would have needed to make that brief

19     at all meaningful.

20         The Court also directed in the notice of hearing

21     that the parties were to provide a joint statement of

22     undisputed facts by last Friday.  We heard nothing about

23     that.  In Document Number 304, which we unfortunately

24     mistitled, we provided our view of what the undisputed

25     facts were, which was zero.  Now, I went in yesterday

1        and filed an amended one to change the title.

2             But the Court was specific as to what it was

3        requiring, and the defendants came forward with nothing.

4        This was their chance to assert joint defense privilege.

5        You can't come in and file a motion for protective order

6        and lead everybody down the primrose path and say I'm

7        asserting joint defense privilege and then two days

8        before the hearing come in and say, well, I'm pulling it

9        as to these documents but I reserve the right to assert

10       it in another context.

11            The Court should make a finding that there is no

12       joint defense privilege in this case.  They completely

13       failed to comply and provide any evidentiary basis for

14       that assertion of privilege.  And the Court specifically

15       made reference to the Pensacola Firefighters case, the

16       extensive affidavits, the affidavits of five attorneys

17       in that instance.  And the Court directed specifically

18       the parties to file affidavits to support the claim of

19       privilege.

20            So Monday I had a call with Mr. Childers, generally

21       very congenial call, and he said he wasn't going to be

22       proceeding with the joint defense privilege.  I made no

23       representations about what our position would be.

24            MR. CHILDERS:  Your Honor, I would object to the

25       extent that the Court has previously ruled about counsel

1    relaying the content of telephone calls that we have

2    with each other.

3         MR. WILCOX:  That's fine.

4         THE COURT:  Sustained.

5         MR. WILCOX:  That's fine.  And I apologize.

6         But at any rate, I was directed to Mr. Davis.  And

7    there was a representation made that Mr. Davis might, on

8    behalf of Tutoring Zone 2, which did nothing to object

9    to the production of any of these documents, would be

10   contacting me to discuss its objections to the

11   production by the defendants of certain allegedly

12   sensitive information.  Again, no evidentiary basis for

13   anything.

14        We were not able to resolve that issue, Your Honor.

15   And it seems to me -- I don't know whether Mr. Davis

16   intends to argue that those documents should not be

17   disclosed, but they haven't provided any research or

18   evidentiary basis that there is such a thing as

19   sensitive business information privilege.

20        THE COURT:  Well, Mr. Davis is not going to have an

21   opportunity to argue anything today because he isn't

22   representing a party to this adversary proceeding.

23        MR. WILCOX:  If I may turn to what I had marked as

24   Exhibit 3, which is the revised privilege log.

25        THE COURT:  Mr. Childers, I would like to see that.

1        Do you have any objection?

2             MR. CHILDERS:  No, Your Honor.  It appears to be

3        our amended privilege log, as Mr. Wilcox represented.

4             THE COURT:  All right.  The courtroom deputy will

5        hand me and we will consider part of the record for

6        today exhibits marked 2 and 3 being submitted on behalf

7        of the plaintiffs.

8             (Plaintiffs' Exhibits Number 2 and 3 were marked

9        and received in evidence.)

10            THE COURT:  Please proceed, Mr. Wilcox.

11            MR. WILCOX:  Thank you, Your Honor.

12            And I guess I would request the Court's guidance on

13       whether the original privilege log is still an issue,

14       because they provided a revised one and I'm not sure

15       whether it's even worth discussing the first one.

16            THE COURT:  It seems to me that if the revised

17       one -- if Mr. Childers agrees that the revised one was

18       meant to take the place of the original one, then we'll

19       just look at Exhibit Number 3, which is apparently the

20       revised one.  Is that correct?  Mr. Childers, is that

21       right?

22            MR. CHILDERS:  That's correct, Your Honor.

23            THE COURT:  All right.

24            MR. WILCOX:  The problem, Your Honor, is that

25       additional documents were added in the revised one that

1    were not in the original one, which I find troubling.

2         THE COURT:  You're certainly welcome to argue

3    that to me, Mr. Wilcox.  I've accepted both of these

4    documents.

5         You know, again, I agree with Mr. Wilcox to the

6    extent that today was supposed to be for an opportunity

7    for us to go through the privilege log one item at a

8    time to determine, A, whether any privilege applied, and

9    that was going to be a matter of legal argument based on

10   affidavits and the privilege log, and then, B, if a

11   privilege of any kind exists -- and I use the term

12   privilege loosely.

13        I want to back up again and clarify that in my

14   view, under the applicable case law, the joint defense

15   doctrine or the common interest doctrine is not a

16   privilege.  It is a doctrine or doctrines that are

17   founded upon the attorney/client privilege.  And the

18   affidavits that the Court reviewed in the Firemen's Fund

19   case were affidavits that apparently proved to the

20   Court's satisfaction that the communications at issue

21   there were communications by counsel for the parties or

22   originated with counsel and were not communications

23   between the parties themselves.  But having said that,

24   again, I'm using the privilege loosely here.

25        I will allow you, Mr. Wilcox, to argue anything you

1     wish with respect to these logs.

2         Mr. Childers?

3         MR. CHILDERS:  Yes, Your Honor.  I think just to

4     fast forward us a little bit, I believe that the issue

5     that we're arguing about here is not so much the common

6     interest privilege or the joint defense privilege, but I

7     believe that Mr. Wilcox expected that we would be

8     proving our basis for the attorney/client and work

9     product privileges that we asserted, just the basic

10    black-and-white ones.  And that was not my understanding

11    of the Court's ruling from the previous hearing.

12        So I think that's the direction Mr. Wilcox is

13    going in, and it would be helpful if the Court would

14    clarify if that was what we were supposed to do.  And if

15    it was, then I'm going to have to apologize --

16        THE COURT:  Mr. Childers, I read the transcript

17    very clearly.  The issue before the Court at the last

18    hearing was in the motion for protective order the

19    defendants were arguing two premises; number one, that

20    the communications between the Hintzes and Mr. James and

21    the Hintzes and -- I can't remember the name of the

22    woman who works for Mr. James.

23        MR. CHILDERS:  Ms. Frenchman.

24        THE COURT:  -- Ms. Frenchman were somehow

25    privileged under the joint defense doctrine.  And stop

1    me if I'm putting words in anyone's mouth.  I reviewed

2    the file very carefully in preparation for today's

3    hearing.

4         The responses to that essentially amounted to,

5    number one, how can there have been a joint defense

6    agreement before this litigation was filed in 2014, and,

7    number two, is there a privilege -- or I should say,

8    number two, was there a joint defense agreement at all,

9    and if so, when did it arise, and, number three, my

10   question to the parties was, was the communication that

11   the defendants seek to have protected attorney/client

12   privileged to begin with or covered under some other

13   privilege under the Federal Rules of Evidence, because

14   without -- my understanding of case law is that without

15   it being founded on such a privilege, there is no joint

16   defense doctrine that would protect communications

17   between parties, especially, as the plaintiff pointed

18   out, where the parties consist of -- the parties that

19   are trying to assert the doctrine of common interest or

20   joint defense constitute the debtors and a creditor of

21   the debtors to whom the debtors transferred the assets

22   that are the foundation of this entire case.

23        And those were the issues that I expected to see

24   some sort of affidavits of proof and/or briefing on, and

25   there's nothing.

1         MR. CHILDERS:  Well, Your Honor, as I said, we

2    released those documents to Mr. Wilcox already.  They're

3    in his custody now.  So it didn't seem like a good use

4    of my client's money, the Court's time, Mr. Wilcox's

5    time, so forth for us to brief it, present affidavits,

6    et cetera, on a privilege we weren't going to be

7    asserting.

8         THE COURT:  Okay.  So that's why I wanted to

9    clarify this, because if the defendants are no longer

10   asserting that any of these communications are covered

11   by an alleged joint defense doctrine or common interest

12   doctrine, then we should be done with that with respect

13   to this adversary proceeding.  They're done.  They have

14   no more joint defense or common interest.

15        But if you're trying to say, as Mr. Wilcox seems

16   to think, that that is waived for purposes of this

17   discovery but not for purposes of the adversary

18   proceeding, then we need facts and we need briefing.

19        Mr. Wilcox, am I taking any words out of your mouth

20   improperly?

21        MR. WILCOX:  No, Your Honor.

22        MR. CHILDERS:  I'm being careful, Your Honor,

23   because there's other litigation pending in this

24   bankruptcy case.  I don't want to step on any privileges

25   that anybody might want to assert.

1    So I'm not waiving the privilege on behalf of my

2    clients, but we're not -- we've released the documents

3    that were on the privilege log that were subject to my

4    motion for protective order.  I'm not sure if there's

5    anything else in the motion for protective order that I

6    even need.

7    It may be that I just should withdraw the motion

8    for protective order and stop arguing about this because

9    he's got the documents that he's looking for.

10   THE COURT:  Mr. Wilcox.

11   MR. WILCOX:  If that's the case, we should be

12   awarded our fees for having to come down here twice on

13   that motion and spend all this time going through it.

14   THE COURT:  File a motion for it.

15   MR. WILCOX:  Okay.  As my understanding at this

16   point, that there is no assertion of privilege -- I

17   don't see how that comment squares with the privilege

18   log that I received on Monday that includes an

19   allegation that a communication on 7/13/2012 involving

20   Jeff Childers, Larina Hintze and Matt Hintze and Chris

21   James asserts sensitive business information and

22   attorney/client privilege.  That's the fourth one down

23   on the first page.

24   I need some -- I'm just asking for clarification.

25   THE COURT:  I hear what you're saying.  I think

1    we're taking these things, at least I was, one at a

2    time.  And the one we just finished discussing was the

3    joint defense doctrine.  But you're right.

4         Mr. Childers, if you're withdrawing the motion for

5    protective order, then the privilege log goes away,

6    correct?

7         MR. CHILDERS:  That's right, at least to any of the

8    items that were referred to in the motion.  And if the

9    motion's withdrawn, there's nothing to hear today.  And

10   Mr. Wilcox is free to file a motion to compel as to any

11   other items that we have provided to him on the

12   privilege log.

13        And I'll just point out that we've been asking for

14   a privilege log from them since the beginning of

15   discovery and have not seen anything.

16        THE COURT:  Well, we'll get to your motion against

17   them in just a few minutes.  Let's deal with this one

18   first and finish this one.

19        So is Docket Number 266 withdrawn at this point?

20        MR. CHILDERS:  Yes, I'll withdraw that Docket 266.

21        THE COURT:  All right.  Docket 266, which is the

22   defendant's motion for protective order on which this

23   hearing was to be based, has been withdrawn.

24        Mr. Wilcox, you are requesting fees and costs for

25   having to deal with this motion through today.  You may

1     file a motion for fees and costs and we will schedule it

2     for hearing.

3          MR. WILCOX:  Thank you, Your Honor.  I would ask,

4     though, that the Court make a determination, because we

5     have it before the Court, that there is no joint common

6     interest privilege among Chris James and the Hintzes.

7     That was the whole point of this.

8          The Court gave specific direction as to

9     how -- we're going to have to deal with that issue.  It

10    seems to me what Mr. Childers is doing is punting that

11    issue down the road.  It's going to come up in

12    depositions or wherever.  This was the time, this was

13    the opportunity to make that argument.

14         And so it seems to me, by withdrawing that motion,

15    he is waiving that argument.  I'm not saying he's

16    waiving a privilege.  He's waiving the argument that

17    there is a common interest privilege among those

18    parties, and we ask the Court to rule to that effect.

19         MR. CHILDERS:  Your Honor, Mr. Wilcox may raise

20    this argument in the future if I do reassert the common

21    interest privilege and he can at that time complain that

22    it was previously litigated if that's what he feels is

23    appropriate at that time, because I think what he's

24    asking is a ruling in the future on something that may

25    or may not occur with facts and circumstances that

1    aren't before the Court.

2         MR. WILCOX:  I guess what I'm really asking for,

3    Your Honor, I'm asking that you not allow him to

4    withdraw the motion and then reassert the same grounds

5    next week, next month, at trial, ever in this

6    proceeding.

7         And for the record, I do not know whether we have

8    all these documents.  There are a lot of documents that

9    we've received.  But since I received this privilege log

10   on Monday, I would be surprised if the documents had

11   been produced prior to Monday to our offices, but that's

12   something we will check.

13        THE COURT:  All right.  I'm going to take a brief

14   recess.  We'll reconvene in approximately ten minutes.

15        (A brief recess was held.)

16        THE COURT:  Be seated, please.

17        There's no question that the primary reason that we

18   scheduled this hearing today was to consider the issues

19   raised in the motion for protective order and the

20   objection to that motion, and notwithstanding the fact

21   that at Page 37 of the transcript I clearly said there

22   was not going to be an evidentiary hearing, it certainly

23   was noticed as one.

24        So I think the appropriate thing to do is that,

25   even though Mr. Childers has moved to withdraw that

1       motion -- I candidly am stymied by whether at this

2       juncture it's appropriate not to allow or whether a

3       Court cannot allow a person to withdraw a motion, but I

4       certainly understand Mr. Wilcox's frustration with

5       having prepared for an evidentiary hearing today and now

6       having the motion withdrawn.

7           I'm going to mention a few points and then I'll

8       tell the parties what we're going to do today.  First of

9       all, I'm going to allow Mr. Wilcox to at least put on

10      what he would like to put on today so that I can

11      consider that even if it just goes into the record for

12      future reference on these issues, Mr. Wilcox, if that's

13      what you would like to do.

14          But I would like to point out that we are here,

15      according to the transcript beginning at Page 23,

16      strictly on the motion for protective order.  And at

17      Page 23 of the transcript -- give me just a moment -- I

18      said with respect to the claims -- well, first of all,

19      talking about the joint defense agreement, et cetera, I

20      said:  We need a specific itemized log of any

21      communications and/or documents that have been requested

22      to which the defendants are objecting and we need

23      evidence that any such communications were, in fact,

24      privileged communications under the attorney/client

25      privilege to begin with.  And then we would need further

1    evidence to determine if any kind of joint defense

2    agreement existed and, if it did, when it occurred,

3    whether there is any common interest doctrine that could

4    possibly come into play here.

5        I go on then to start talking about the claims of

6    the commercially sensitive information.

7        At Page 25 of the transcript Mr. Childers says that

8    he would be happy to specifically brief the issue of

9    commercially sensitive information and reports that he

10   believes there's a lot of case law in that area.  And

11   then at Page 27 I said:  Go ahead and brief those

12   issues.

13       At Page 37 is where I said we were not going to

14   schedule an evidentiary hearing.  And I'm quoting at

15   Line 5:  I'm not going to schedule an evidentiary

16   hearing at this time, but I'm going to continue the

17   hearing on this motion to the Court's docket on January

18   the 8th.  It may be that we will set this the afternoon

19   before that, January the 7th, because we've already

20   scheduled a two-hour evidentiary hearing for the

21   afternoon of the 8th.

22       So we'll either be back on the afternoon of January

23   the 7th at approximately 1:30 or sometime on January the

24   8th.  I'm going to set aside two hours for this hearing

25   for additional argument, and I want us to be prepared

1    and counsel to be prepared to address the claims on the

2    log one at a time or have dealt with them already by the

3    time the hearing begins.

4         If we cannot resolve the issues on the affidavits

5    and the privilege log, then we will look at the calendar

6    and set as soon as I can a full-blown evidentiary

7    hearing on whether there is any attorney/client

8    privilege and, if so, what it may apply to and to whom.

9         Because the motion has been withdrawn, I think it

10   would be premature for me to try to prohibit or grant

11   what in my view amounts to an ore tenus motion to bar

12   these defendants from ever raising these issues again.

13        I think that a motion -- I've already said that I

14   will certainly entertain a motion for attorney's fees

15   and costs for the plaintiffs having dealt with this

16   issue through today, and it may be that other remedies

17   are available under that umbrella.  I'm not going to

18   prejudge any of that.

19        But I think that, as one of my learned law clerks

20   pointed out, for me to go ahead and rule on this issue

21   for the entire case when the issues came up before me

22   strictly on a motion for protective order that addressed

23   communications that have been requested by the plaintiff

24   and that that motion has now been withdrawn I think

25   would be inappropriate for me to go forward today and

```
 1        issue a blanket ruling that the defendants can or cannot

 2        in future try to assert these defenses.

 3             Having said that, in the event that the defendants

 4        attempt to assert these positions on their own behalf,

 5        it doesn't change what would be required in order to

 6        support any such assertion.

 7             I can't rule on whether the nonparty, Mr. James,

 8        can assert that he supposedly had a joint defense

 9        agreement of some kind and that some communications that

10        he may have made might have been covered by that

11        agreement or privileged because that issue has not been

12        brought before me on any of the pleadings.

13             I can, however, rule definitively in this case,

14        based on Page 40 of this transcript, that if any joint

15        defense agreement ever existed, it started no sooner

16        than May 1, 2012, because at Page 40 I said, starting at

17        Line 18:  Mr. Childers, do you -- can you agree, based

18        on what I just read from the motion, that the assertion

19        of joint defense doctrine, attorney/client privilege,

20        common interest doctrine relates to communications on

21        and after May 1, 2012?

22             Answer by Mr. Childers:  I may live to regret this,

23        but I think we're willing to put the flag on May 1st of

24        2012.

25             So for purposes of this case, including Mr. James,
```

Page 28

 1          there was no joint defense agreement between the

 2          defendants and Mr. James or anybody else, if one existed

 3          at all, prior to May 1, 2012.

 4               Mr. Wilcox, do you have any questions on the

 5          Court's ruling?

 6               MR. WILCOX:  Yes, I do, Your Honor.  I think one of

 7          the first things the Court said was that you would allow

 8          me to proceed.

 9               THE COURT:  I absolutely will.  Make your record,

10          Mr. Wilcox.

11               MR. WILCOX:  An evidentiary record?

12               THE COURT:  If you would like, yes, sir.

13               MR. WILCOX:  Thank you.

14               Your Honor, I'd like to at this time move

15          exhibits -- Jeff, have I given you Number 5?  1 through

16          5 into evidence.

17               THE COURT:  Mr. Childers, any objection?

18               MR. CHILDERS:  May I have a moment, Your Honor?

19               THE COURT:  Yes, you may.

20               Have you filed a list of those exhibits already,

21          Mr. Wilcox?

22               MR. WILCOX:  Yes, Your Honor.  I filed an amended

23          witness list on Docket 315.

24               THE COURT:  Thank you.

25               MR. WILCOX:  And that's what's in the book.

```
 1              (Pause in the proceedings.)

 2              MR. CHILDERS:  Your Honor, we take exception to

 3       Exhibit Number 2, which is the privilege log that I

 4       think we agreed is not operative, and --

 5              THE COURT:  I think you agreed that it was

 6       superseded in your view by Number 3.

 7              MR. CHILDERS:  That's correct.

 8              THE COURT:  All right.  Thank you.

 9              MR. CHILDERS:  But, I mean, if it's necessary for

10       the case or relevant somehow.

11              And then the transcript is in the docket, so I

12       would prefer to have the better evidence of the docket

13       taking judicial notice rather than this exhibit, which I

14       don't have time to review standing here today.

15              THE COURT:  All right.  Thank you.

16              I'm going to overrule the objection to the

17       admissibility of Document Number 2, which is defendant's

18       privilege log dated December 21, 2014, on the basis

19       that, if nothing else, it's admissible under the Federal

20       Rules of Evidence as an admission against interest.

21              And so Documents Number 1 through -- now, 5 is

22       categorized rebuttal documents.  Is there anything under

23       5 at this point, Mr. Wilcox, or are you just

24       offering --

25              MR. WILCOX:  Yes, I am.  I'm proceeding under
```

1        Number 5 as well.  I've given the Court a copy of those

2        documents, as well as Mr. Childers.  Those are documents

3        that were produced to us in discovery, I would represent

4        to the Court.

5             THE COURT:  All right.  The transcript of the

6        hearing is being admitted for the purpose of the Court

7        being able to have a paper transcript as opposed to

8        having to read it online, but the Court -- if there's

9        any discrepancy between Document Number 4 and the

10       official transcript that's already filed with the Court

11       at Docket Number 288, then the Docket 288 will govern.

12            With that, Number 4 is also admitted into evidence.

13            (Plaintiffs' Exhibit Number 4 was marked and

14       received in evidence.)

15            THE COURT:  And then we're waiting for Mr. Childers

16       I think to look at Document Number 5; is that correct?

17            MR. CHILDERS:  I just received it just now.

18            THE COURT:  All right.  You may have just a few

19       moments.

20            (Pause in the proceedings.)

21            MR. CHILDERS:  Your Honor, these documents appear

22       to be the additional supplemental production that I

23       indicated earlier we had given Mr. Wilcox as a result of

24       withdrawing the privilege that I believe he said he

25       hadn't received yet, so to that extent I have no

1        objection to his use of them.

2             THE COURT:  Very well.

3             MR. WILCOX:  Your Honor, I object to that

4        representation that these documents were produced to us

5        as a result of the withdrawal of the privilege.

6             THE COURT:  Which didn't happen until this

7        afternoon.  I get it, Mr. Wilcox.

8             MR. WILCOX:  Yeah, I just don't see how that

9        argument can be made with a straight face.  We asked

10       for -- we asked for -- excuse me.  I'll calm down.

11            We asked for communications.  We got e-mails.  We

12       asked for attachments.  We had to come in here and fight

13       over whether we were going to get the attachments.

14            THE COURT:  Mr. Childers, you'll get your chance.

15       Just a moment.

16            MR. WILCOX:  We talked about the attachments which

17       we originally requested in native format.  We got those

18       documents sometime in the last week or so, last two

19       weeks perhaps.  It's not clear to me how that relates to

20       the privilege issues.  And so as -- so that's my

21       position on that.

22            THE COURT:  All right.  With that, Exhibits 1

23       through 5 as listed on Docket Number 315 are received in

24       evidence.

25            (Plaintiffs' Exhibits Number 2, 3 and 4 having been

1    previously received by the Court, Plaintiffs' Exhibits

2    Number 1 and 5 were marked and received in evidence.)

3         THE COURT:  Mr. Childers.

4         MR. CHILDERS:  Yes.  I would just point out for

5    the record that the issue of e-mail attachments was

6    not -- we were not moved to compel them.  The first that

7    we heard that there was an issue with those attachments

8    was here in open court.  And we voluntarily produced

9    them, not under a Court order, but in order to

10   facilitate discovery.

11        We have asked the plaintiffs for attachments in

12   native format documents for over six months and haven't

13   received any.

14        THE COURT:  We're going to get to that motion in a

15   few moments.

16        Mr. Wilcox.

17        MR. WILCOX:  Thank you, Your Honor.  I'm prepared

18   to go through the exhibits and discuss their importance.

19        Exhibit Number 1 is the intellectual property

20   transfer agreement between -- purportedly dated

21   June 4th, 2012, between Tutoring Zone, LLC, and Tutoring

22   Zone 2, LLC.  And this is one of the two basic

23   documents.  I think the e-mails will show that they

24   wanted both an intellectual property lease and an

25   intellectual property transfer agreement because of

1    concerns that in a subsequent bankruptcy of Mr. and Mrs.

2    Hintze, the Court would not approve at least one of

3    those agreements.

4         But as we go to the second page of that, there is a

5    definition of consideration, Paragraph 1-A on the first

6    page.

7         MR. CHILDERS:  Your Honor, I object.  If Mr. Wilcox

8    is going to testify about this information he should be

9    sworn first.

10        THE COURT:  He's pointing out a provision in a

11   paragraph in a document that's been admitted into

12   evidence, Mr. Childers.

13        MR. CHILDERS:  He's interpreting or characterizing

14   the significance or use of these documents by other

15   persons who are not in the court.  He's testifying as to

16   what their intentions were, which is a fact issue.  It's

17   not -- there's nothing in here about somebody's

18   intention.  He's not reading from the document when he's

19   explaining to you what the intention of the parties who

20   drafted it was.  He's testifying.

21        If he's testifying, please swear him under oath and

22   then I can make appropriate objections about hearsay or

23   whatever the correct objection would be.

24        THE COURT:  Mr. Wilcox.

25        MR. WILCOX:  I think I'm arguing.

1          THE COURT:  Well, I think that Mr. Childers'

2     objection is legitimate and is sustained to the extent

3     that there's no problem with you pointing out provisions

4     of the document, but any commentary as to what the

5     parties intended with the document must be left to

6     testimony.

7          MR. WILCOX:  I will wait until we reach the e-mail

8     that expresses that concern, Your Honor.

9          At any rate, on Page 2 I would point the Court's

10     attention to Section 3, the transfer, and then B:  The

11     price for the sale and transfer described in Section 3-A

12     shall be 200,000 and other valuable consideration which

13     is agreed and accepted by the parties to be full and

14     adequate consideration for the sale.  The payment of the

15     consideration shall be offset and credited by any

16     amounts owed by seller to Christopher M. James.

17          Now, we know that this was a cashless transaction.

18     So the issue will become whether Tutoring Zone --

19          MR. CHILDERS:  Your Honor, same objection.

20          THE COURT:  To?

21          MR. CHILDERS:  So we know this is a cashless

22     transaction, first of all.

23          THE COURT:  I thought that was a stipulated fact,

24     Mr. Childers.  I thought that was admitted in the

25     pleading.

1       MR. CHILDERS:  There were no joint undisputed

2       facts.

3       THE COURT:  Well, not for today, but in the actual

4       pleadings, the complaint and the answer and affirmative

5       defenses, et cetera, I was unaware of any -- if there is

6       a dispute as to whether any cash changed hands, then say

7       so, but it was my understanding from reading the

8       pleadings that that was not a disputed fact in this

9       adversary.

10      MR. CHILDERS:  I'm just wanting to be careful that

11      we're not establishing facts here based on evidence that

12      is a contract.  Also, Your Honor, I would object to the

13      relevance of this as to the common interest privilege,

14      which is what we're here for.  Mr. Wilcox seems to be

15      arguing the case in chief.

16      THE COURT:  Mr. Wilcox, I will sustain

17      Mr. Childers' objection to the extent that anything

18      you've said purports to introduce into evidence or

19      attempts to introduce into evidence a fact that is

20      not -- that is disputed.  So please stick to the

21      paragraphs of the provision or the contract or go ahead

22      and call a witness, or point me to something else in the

23      record that will assist.

24      MR. WILCOX:  If I may, Your Honor, I'd like to take

25      a quick look at the answer and affirmative defenses

1        because I believe that fact is admitted.

2               That will take a while, Your Honor.  I'll move on.

3        We'll leave that for another day.

4               So with regard to Exhibit 2, you see -- I mean, I

5        don't know whether I can say anything about what's in

6        the document or comment about it at this point.

7               THE COURT:  Well, if it's in evidence you can

8        certainly comment on it, but if it isn't, the motion for

9        protective order has been withdrawn, so I don't -- I

10       won't have anything to refer to.

11              MR. WILCOX:  Right.  Okay.

12              Well, I guess my point with regard to Exhibit 2 is

13       that as of December 19th the defendants continued to

14       assert sensitive business information as a basis for

15       objection, and with regard to a communication on

16       9/17/2012, parties of correspondence, Matt Hintze,

17       Larina Hintze, Chris James, no attorney, that it's work

18       product of TZ 2.

19              Now, if I may, Your Honor, I'd like to identify the

20       differences between the two privilege logs.

21              And I guess I'm confused, Your Honor, at this

22       point.  Are they withdrawing the privilege log or just

23       the motion associated with the privilege log?

24              THE COURT:  My understanding, both are withdrawn.

25       Is that correct, Mr. Childers?

1      MR. CHILDERS:  The privilege log is not withdrawn
2  as to any of the privileges asserted that were not
3  subject to the motion for protective order.  The motion
4  for protective order made arguments about items that
5  were on the privilege log.  Those items are not
6  privileged, as I understand it, by operation of my
7  having withdrawn the motion.
8      THE COURT:  Okay.  So let's take this one item at a
9  time.  I'm going to ask the parties to look at -- is it
10 Number 3 that replaces Number 2?
11     MR. WILCOX:  Yes.  Yes, Your Honor.
12     THE COURT:  Okay.  I'm looking at Exhibit Number 3
13 that's been admitted into evidence.  Based on what
14 Mr. Childers just said, it appears to me that the first,
15 second, and third entries on the first page are no
16 longer applicable.  Is that correct, Mr. Childers?
17     MR. CHILDERS:  The defendants are not asserting any
18 privilege as to those items.
19     THE COURT:  But what you told us at the beginning
20 of the hearing is that maybe TZ 2 is going to be, and
21 that's why Mr. Davis is here; is that right?
22     MR. CHILDERS:  I believe that information is the
23 property of TZ 2.
24     THE COURT:  All right.  But you've produced it,
25 correct?

1       MR. CHILDERS:  I have not yet produced it.  I don't
2    actually have --
3       THE COURT:  So are you asserting privilege or not?
4    If you're waiving the privilege, you have to produce it.
5       MR. CHILDERS:  I'm not asserting the privilege.  I
6    don't have those items.  Mr. Davis has them.  And
7    Mr. Davis I believe -- and by the way, Your Honor,
8    there's a fact you're not aware of, which is Mr. Davis
9    told me --
10      THE COURT:  No, it'd better be of record,
11   Mr. Childers, because you just objected to Mr. Wilcox
12   talking about conversations between counsel that took
13   place outside the courtroom, and so I don't want to hear
14   anything between you and Mr. Davis.
15      MR. CHILDERS:  My belief is that those are going to
16   be produced.
17      THE COURT:  I am ordering those to be produced.  So
18   on Exhibit Number 3, the document date of communication
19   5/29/2012 described as e-mail concerning sensitive
20   business information including tutor payroll and equity
21   incentives, I am ordering those to be produced within
22   ten days.  Mr. Wilcox, you're going to have to prepare
23   this order.
24      Mr. Childers, are you disagreeing with me?
25      MR. CHILDERS:  Your Honor --

1        THE COURT:  If you didn't have them, why object to

2     them?

3        MR. CHILDERS:  If the Court orders the production

4     of those documents, then I'm sure that they will be

5     produced.

6        THE COURT:  The second entry -- Mr. Wilcox?

7        MR. WILCOX:  Is it the defendants' position that

8     they do not have operational control over these

9     documents, custody or control?

10       MR. CHILDERS:  Matt Hintze is an employee of

11    Tutoring Zone 2, and as such, he signed an employment

12    agreement, part of which requires him to keep

13    confidential information of Tutoring Zone 2

14    confidential.  These particular e-mails that we

15    identified were e-mails that Matt Hintze has in his

16    business capacity as an employee of Tutoring Zone 2.

17    And we got a list from him of the e-mails that he had so

18    that we could prepare to produce.  We identified ones

19    that appeared to be commercially sensitive.  We asked

20    him to verify that in his capacity as an employee, which

21    he did, and we put them on the privilege log.

22       As I informed the Court earlier, I, in preparing

23    for the briefing and the hearing, concluded that it's

24    not my fight.  If there is a fight, it's Tutoring

25    Zone 2's fight.  If Matt Hintze gives me those e-mails,

1     I will produce them to Mr. Wilcox.  If not, he will

2     produce them on behalf of Tutoring Zone 2 if the Court

3     so orders.

4          If Mr. -- I would ask that the Court defer entry of

5     the order for two days so that if Mr. Davis wants to

6     make an appearance in the case and assert some motion on

7     behalf of Tutoring Zone 2, he has an opportunity to do

8     so.

9          THE COURT:  I'm not going to defer anything for

10    Mr. James to do anything.  If he wants to enter an

11    appearance, he should have done so long before today.

12         MR. CHILDERS:  In fairness to Mr. James, Your

13    Honor, he's not a party to the case and doesn't get

14    notice of what's happening here.

15         THE COURT:  I understand, Mr. Childers.

16         MR. WILCOX:  Your Honor --

17         THE COURT:  Give me just a moment, please,

18    Mr. Wilcox.

19         (Pause in the proceedings.)

20         THE COURT:  The defendants are ordered to produce

21    the documents dated 5/29/2012, 6/5/2012 and 7/17/2012

22    within ten days, having waived any claim on their own

23    behalf that those documents contain sensitive business

24    information.

25         With respect to the documents at 7/13/2012, the

1    parties to correspondence, Jeff Childers, Larina Hintze,

2    Matt Hintze and Christopher James, nature of document,

3    e-mail direction to employees of TZ 2 as attorney for

4    TZ 2, sensitive business information has been withdrawn,

5    attorney/client privilege.

6        Mr. Childers, please explain to me what standing

7    your clients have to assert attorney/client privilege to

8    this communication.

9        MR. CHILDERS:  Your Honor, as set forth in previous

10   pleadings that I've signed, I've represented Chris

11   James, Tutoring Zone 2, CMJ Consulting, and Matt and

12   Larina Hintze at various periods during this time.

13       At this period, and this is all within the dates

14   that I've previously disclosed, I represented Tutoring

15   Zone 2 -- this is prior to the filing of the bankruptcy

16   case -- and advised Mr. James, as the owner of Tutoring

17   Zone, and his employees as to a matter concerning

18   employees of the company.

19       THE COURT:  His employees meaning Larina and Matt

20   Hintze?

21       MR. CHILDERS:  The tutors.  There were I think -- I

22   don't know how to explain it to you too specifically

23   without disclosing the content of the communication, but

24   they were forming a company and hiring employees and had

25   legal issues about that or questions about legal issues

1       related to that.  And as the Court I'm sure is aware,

2       there's a lot of discussion about noncompetition

3       agreements and confidentiality and so forth related to

4       tutors and I think it's --

5           THE COURT:  So this communication was between you

6       as attorney for TZ 2 and the other parties; is that

7       correct?

8           MR. CHILDERS:  That's correct.

9           THE COURT:  Then what standing do these defendants

10      have to raise that privilege?  It doesn't appear there

11      was any privilege that existed between you and these

12      defendants under this communication.  If any privilege

13      existed, it was between you and TZ 2.

14          MR. CHILDERS:  Chris James is the principal of

15      TZ 2, so an e-mail that went to TZ 2 would naturally go

16      to Mr. James.  Matt and Larina Hintze were organizing

17      the firm as employees of TZ 2, my client.

18          THE COURT:  I just asked if they were employees and

19      you said no.

20          MR. CHILDERS:  I'm sorry, I misunderstood.  I

21      thought you were asking me if the employees that were

22      referenced in the e-mail were Matthew and Larina Hintze.

23          THE COURT:  That's exactly what I asked.  And I

24      think your answer was no.

25          MR. CHILDERS:  The content was not about those

Electronically signed by Jennifer Witwer (301-375-152-2952)

1    particular employees but different employees, but Matt

2    and Larina Hintze --

3         THE COURT:  Right.  What evidence do I have today

4    as noticed on the docket for today that would support

5    any claim of privilege as to this communication?

6         MR. CHILDERS:  My motion for protective order which

7    is signed by me that sets forth those dates of

8    representation.

9         THE COURT:  Thank you.

10        Mr. Wilcox?

11        MR. WILCOX:  Your Honor --

12        THE COURT:  I'm sorry?

13        MR. WILCOX:  I don't how you rely on a motion that

14   you've withdrawn.

15        THE COURT:  You don't.

16        MR. WILCOX:  And I will also -- I can prove, I will

17   proffer the testimony of Mr. Fieldman that TZ 2 did not

18   begin operations until the end of August and had no

19   employees as of June -- July 15th.

20        THE COURT:  The defendants are ordered to produce

21   the documents listed as dated June 13, 2012, within ten

22   days.

23        MR. CHILDERS:  Your Honor --

24        THE COURT:  Mr. Childers, I have ruled.

25        MR. CHILDERS:  Your Honor, I would ask you to

1      reconsider.

2           THE COURT:  I know you will.  You can file a

3      motion.  That is my ruling.

4           The next document is dated 7/26/2012.  It's

5      described as privilege asserted, sensitive business

6      information of TZ 2.  That's been withdrawn by these

7      defendants.  They're ordered to produce that information

8      within ten days.

9           The same is true with respect to every

10     communication on the second page of Exhibit Number 3

11     and every communication on the third page of Exhibit

12     Number 3 other than the very last one which we will ask

13     about at this time, which is that dated 9/17/2012 where

14     it asserts work product of TZ 2 and sensitive business

15     information.

16          To the extent that it reflects a defense of

17     sensitive business information or an alleged privilege,

18     then that's been withdrawn by these defendants.  I need

19     some evidence that it is work product of TZ 2 or that,

20     even if it is, that shouldn't be produced.

21          Mr. Childers?

22          MR. CHILDERS:  Your Honor, I relied on the Court's

23     notice yesterday that this would not be an evidentiary

24     hearing and I did not bring my witnesses or evidence.  I

25     understood that Mr. Wilcox was going to be allowed to

1    put in evidence to preserve it for some future time when

2    the Court would hear these issues.  It now appears that

3    the Court is hearing them now, and I'm not prepared to

4    put on evidence right now.

5         THE COURT:  Mr. Wilcox?

6         MR. WILCOX:  Your Honor, there's no work product.

7    There's not even -- it's not even --

8         THE COURT:  Well, what theory could we be traveling

9    under that a document is work product of a company?

10   This says work product of TZ 2.  Number one, what

11   standing would Mr. and Ms. Hintze have to raise that?

12   Even without evidence.

13        MR. CHILDERS:  Your Honor, suppose the plaintiffs

14   subpoenaed my paralegal and asked for all of the e-mails

15   of my law firm.  My law firm would raise an objection

16   to that.  Ms. Hunt would object that she doesn't have

17   authority to turn over confidential information relating

18   to all of my clients and my law firm's finances and our

19   internal management and everything else because she's an

20   employee of my firm.

21        THE COURT:  All right.  Let's break this down.

22   First of all, a law firm is completely different than

23   TZ 2, so to that extent, that analogy isn't going to

24   fly.

25        First of all, this says e-mail regarding marketing

1     TZ 2, semicolon, public announcements.  How in the world

2     can public announcements amount to anyone's work

3     product?

4          MR. CHILDERS:  Your Honor, TZ 2 was under attack at

5     the time.

6          THE COURT:  This is evidence.

7          MR. CHILDERS:  It wasn't an evidentiary hearing.  I

8     didn't bring the evidence with me.  But you've asked me

9     to give you an explanation.

10          THE COURT:  Is there any dispute, Mr. Wilcox, that

11     TZ 2 was under attack at the time?

12          MR. WILCOX:  Yes, Your Honor, there is.

13          THE COURT:  There is a dispute.  All right.  I'm

14     going to reserve ruling on this item and I'm going to

15     have the parties brief whether or not this item should

16     be produced.  I'm going to give you ten days.

17          MR. WILCOX:  That's the 9/17?

18          THE COURT:  9/17/2012 at the bottom of the,

19     excluding the tabs, third page of Exhibit Number 3.

20          MR. WILCOX:  Your Honor, should we also brief

21     whether these defendants have standing to --

22          THE COURT:  Absolutely.  Brief any issue that

23     might pertain to whether the Court should compel the

24     production of this document in light of the waivers

25     by -- or the withdrawal of the motion at Docket

1    Number 266.

2        Mr. Childers.

3        MR. CHILDERS:  Yes, Your Honor.  Is there a pending

4    motion to compel?

5        THE COURT:  There is not, but I'm proceeding on it

6    anyway.

7        MR. CHILDERS:  Sua sponte?

8        THE COURT:  Yes, sir.  We came here to go over a

9    privilege log.  It was my understanding when you

10   withdrew the motion for protective order that we were

11   here on today, that that negated any issue we might

12   have to deal with with the privilege log.  It hasn't.

13   And so, therefore, the issue today is whether, even

14   though the motion for protective order has been

15   withdrawn, your clients are still refusing to produce

16   these items.  And that's what we came here to try to

17   decide today.  The transcript from the last hearing is

18   abundantly clear.

19       So any legal issue pertaining to this particular

20   set of documents or this particular e-mail needs to be

21   briefed, and if there are facts that are germane,

22   affidavits containing material facts have to be

23   submitted on this issue within ten days.

24       Are there any questions on that ruling?  Thank you.

25       The first entry at the top of the last page of

Page 48

1     Exhibit Number 3 which is dated 9/28/2012, sensitive

2     business information, the motion has been withdrawn, so

3     that's to be produced within ten days.

4          The next two items which are dated 9/8/2012 and

5     7/13/2012, next to both of which it says work product of

6     TZ 2, those are to be briefed along with the other one.

7     All legal issues are to be briefed, and any evidentiary

8     matters that need to be brought before the Court with

9     respect to those two items have to be filed within ten

10    days or the defendants will be ordered to produce those.

11         With respect to the item dated 7/13/2012, next to

12    which says sensitive business information, that

13    particular objection or defense has been withdrawn and

14    so we are not dealing with that objection.

15         Now, the last three items dated 6/27/2014, 8/2/2012

16    and 7/5/2012, with respect to work product, whose work

17    product are these items, Mr. Childers?

18         MR. CHILDERS:  The work product of Tutoring Zone 2.

19         THE COURT:  And what standing do the Hintzes have

20    to raise an objection to production of those items?

21         MR. CHILDERS:  The Hintzes are agents of Tutoring

22    Zone 2 with managerial authority.

23         THE COURT:  And with respect to attorney/client

24    privilege, whose privilege is being asserted here?

25         MR. CHILDERS:  Tutoring Zone 2.

1        THE COURT:  And what standing do the Hintzes have

2    to assert privilege on behalf of TZ 2 here?

3        MR. CHILDERS:  The Hintzes are agents of Tutoring

4    Zone 2 with authority to raise that objection.

5        THE COURT:  Mr. Wilcox?

6        MR. WILCOX:  I just don't see it, Your Honor, but

7    if we have to brief it, we have to brief it.

8        THE COURT:  Those three items will also be briefed

9    and evidence presented within ten days, after which the

10   Court will either rule on the papers or schedule a

11   further hearing.

12       And once again, so the record is abundantly clear,

13   those are the last three items on the last page

14   of -- I'm sorry, on the last -- fourth page of Exhibit

15   Number 3, and they are dated 6/27/2014, 8/2/2012 and

16   7/5/2012.

17       Are there any questions on those items or anything

18   that we've discussed so far on this exhibit?

19   Mr. Childers?

20       MR. CHILDERS:  No, Your Honor.  I think I

21   understand.

22       THE COURT:  Mr. Wilcox?

23       MR. WILCOX:  No, Your Honor.

24       THE COURT:  Now, there is another attachment to

25   Exhibit Number 3.  Is that simply a cover letter for the

1    amended privilege log?  Is there any reason to have to

2    look at that today?

3        MR. WILCOX:  Only to the extent that there were

4    representations made earlier in the hearing that the

5    documents that we're talking about have actually been

6    produced prior to this hearing.  It says at the last

7    sentence -- the second paragraph reads:  First, we have

8    withdrawn the claim of privilege under the common

9    interest doctrine without prejudice to asserting that

10   basis later for different documents, if needed.  We will

11   produce the documents that were previously identified as

12   privileged in that category.

13       I don't see how that's consistent with the

14   representations made to the Court today.

15       THE COURT:  All right.  Aside from that, is there

16   any other evidentiary effect of this letter?

17       MR. WILCOX:  No, Your Honor.

18       THE COURT:  Anything on that letter, Mr. Childers?

19       MR. CHILDERS:  No, Your Honor.

20       THE COURT:  Thank you.

21       You may proceed, Mr. Wilcox.

22       MR. WILCOX:  Thank you, Your Honor.  And obviously

23   the transcript speaks for itself.  We've already gone

24   through that.

25       I'd like to turn now to Exhibit 5 and talk about

1    these.  These are documents that were produced.  And you

2    can see the first document, these are a series of e-mail

3    strings produced by the defendants in this case.  And

4    the first document is May 2nd.  And I'm not going to

5    comment on it, but it refers to -- contains the phrase

6    in the first line, interesting times.

7         I would then -- I'd ask that if the Court can

8    review these at some point, they make interesting

9    reading.

10        Can I comment, these were -- when these e-mails,

11   how these e-mails relate to the larger case?

12        THE COURT:  Well, we're here today on -- were here

13   today on the motion for protective order.  If I were to

14   take evidence today, it would be strictly dealing with

15   that motion for protective order.

16        Because of the unfortunate chain of events where

17   this was noticed as evidentiary when it shouldn't have,

18   I'm allowing you to present your evidence, but it should

19   be limited to the motion for protective order and the

20   issues that were raised in that.

21        MR. WILCOX:  Thank you, Your Honor.  And I guess we

22   think that this would lay the foundation for a fraud

23   exception to any common interest doctrine that was

24   alleged.

25        I turn now to the 12th, I believe it's the 12th

1       page in, it's an e-mail, Monday, May 7th, 2012, at

2       3:57 p.m., Larina Hintze to Chris James.  And I'll give

3       the Court a minute to get there.  These could not be

4       Bates stamped, Your Honor, because of the format.

5            THE COURT:  May 7th, 2012, at 3:57 p.m.?

6            MR. WILCOX:  That's correct.

7            THE COURT:  I'm there.  Thank you.

8            MR. WILCOX:  Chris, thinks (sic) seem to have

9       peaked in escalation or are settling back down, very

10      interested in Jeff's input.

11           Monday, May 7th, and the earlier string, James,

12      Christopher -- James, comma, Christopher wrote:  Sorry,

13      I was traveling over the weekend and did not have cell

14      service.  I am speaking with Jeff today to get a sense

15      of the legal issues in restructuring.  I will call you

16      later and fill you in.

17           The next e-mail is two pages further, Friday, May

18      11th, Christopher James to Matt Hintze, and I guess it's

19      actually the second e-mail:  Hello, we have spoken with

20      many of you over the past few days, would like to

21      arrange a meeting of creditors to discuss our proposal

22      for moving forward.

23           The next one is Wednesday, May 16th.  And if we

24      start sort of at the end of that, it's a three-page

25      string.  It's a Matthew Hintze to Christopher James:

1    Welcome back.  I would like to hand out the attached

2    document at our meeting today.  I have not entered the

3    equity percentages for existing creditors -- and this is

4    an e-mail, May 14th at 17:16, 5:16 in the afternoon:  I

5    have not entered the equity percentages for existing

6    creditors, new working capital, et cetera.  I think they

7    will be looking for suggestions but I did not want to do

8    much on this front before speaking to you.

9        Then the e-mail at the end of that string,

10   Wednesday, May 16th at 9:08 a.m.:  Let's meet first

11   thing Thursday a.m.  Please bring with you the past

12   business plan, financials for this year, an outline of

13   the structure that you are going to go with in the

14   restructuring.  I am going to meet with Jeff following

15   our -- and it's spelled A-R-E -- I am going to meet with

16   Jeff following our meeting to get some idea of my

17   exposure under the plan as well as having him work on

18   the documentation for the transaction.

19       THE COURT:  All right.  Let me stop you there

20   because you've lost me.  What was the date on that

21   again?

22       MR. WILCOX:  That's Wednesday, May 16th at

23   9:08 a.m.

24       THE COURT:  And it's -- okay.

25       MR. WILCOX:  It's a Gmail e-mail that says, re,

1    handout for meeting tonight.  And I can count the pages.

2         THE COURT:  All right.  I have it.  Thank you.

3         MR. WILCOX:  I can go through it again.

4         THE COURT:  No, I see it.  Thank you.

5         MR. WILCOX:  And the remainder, it says:  My

6    understanding is that some of the notes have

7    restrictions on asset sales.  If so, bring those with

8    you as well as any other docs you think are helpful to

9    understand the position I will have going forward.

10        The next e-mail is Wednesday, May 23rd at

11   6:09 p.m., Christopher James to Matthew Hintze with a

12   one-word e-mail, Comments.  And that is in response to

13   an earlier e-mail, May 23rd, 2012, at 10:20 -- I'm

14   sorry, at 15 hours, 10 minutes, 20 seconds Eastern

15   Daylight Time, FYI, covering an e-mail Wednesday, May

16   23rd at 12:08 p.m., Jeffrey Childers to Cynthia

17   Frenchman, Larina at TutoringZone.com, subject, LLC

18   operating agreement IP lease:  Cynthia, et al, attached

19   please find my first draft of the LLC operating

20   agreement for Tutoring Zone 2, LLC, and the intellectual

21   property lease.  Note that I have Chris and Cynthia

22   leasing the IP directly and then assigning the lease to

23   TZ 2 as consideration for the initial membership units,

24   i.e. capital contribution.

25        Skipping a paragraph:  Once you approve the

Page 55

1       operating agreement, then I will set up the LLC with the

2       State of Florida and get and (sic) F-E-I-N.

3            The next document two pages following that is the

4       attachment, what's title Intellectual Property Lease.

5            The next e-mail is Monday, May 28th, 5:48 p.m.,

6       Larina Hintze to Chris James.  Looks like that's a draft

7       of an e-mail.

8            The next is Wednesday, June 6th at 7:30 p.m., an

9       e-mail from Larina Hintze to Norman Bledsoe, Jeffrey

10      Childers, Scott Walker, Christopher James, Matthew

11      Hintze, BPHintze@Bellsouth, and that's in response to

12      Norman Bledsoe's memo, which is the e-mail below:  No

13      cause of action for TI exists where one doesn't act,

14      which is legal in itself.

15           Reading from the e-mail at the top, beginning of

16      the third paragraph:  Then our strategy could be to make

17      it seem like this is the worst thing in the world for us

18      and to make every attempt to negotiate a way to avoid

19      this so they keep their eye on that ball and keep them

20      focused on that strategy.  That may be the best way to

21      move us forward.

22           Friday, June 29th, only significance here is that

23      it's an e-mail that was delivered from Matthew Hintze to

24      Jeffrey Childers and Christopher James covering an

25      e-mail, an earlier e-mail.

1    Then we reach what I think is the last e-mail here.

2    Starting at the end of that, it's a four-page string, an

3    e-mail from Matt Hintze to John Spence and some other

4    people:  John, in our last creditor meeting we discussed

5    TZ needing to go out of business as it could not service

6    its debts, and the creditors understood based on not

7    being able to service its debts that Larina and I would

8    personally be forced into bankruptcy.  You are right,

9    John, about our moral obligation, and as such, we

10   reaffirmed our moral obligation to pay everyone back,

11   and creditors therefore stated they would not contest

12   the bankruptcy but did expect us to repay them, which we

13   again affirmed we would.

14        Moving up in the chain, it's an e-mail from John

15   Spence.  I won't go through that.  It's demanding

16   information:  Matt, I've grown tired of your constant

17   excuses.  You have a fiduciary responsibility to the

18   entire investor creditor group to keep us informed of

19   all pertinent and substantive financial and strategic

20   developments.

21        Then above that, Larina Hintze, Sunday, July 11th,

22   2012, to Matthew Hintze, Christopher James, Jeffrey

23   Childers and BP Hintze:  Matt and Chris conferenced and

24   Matt is meeting with Kevin at noon to get a feel for

25   where this is coming from, isolated or spurred on by

1    group, as well as having a follow-up call with Jeff.  My

2    thoughts are -- and then she talks about what her

3    thoughts are and the possible strategy, which is on the

4    next page:  Strategy; is it possible to have Scott

5    Walker, an attorney, call John and say, listen, as

6    acting CEO you have exposure and liability in that you

7    are privy to all information before, during, and after

8    TZ, and as such, we must weigh our need for

9    communication against our exposure and liability as

10   Fieldman could pursue a suit against Matt and Larina but

11   also individually against you as the CEO and/or possibly

12   the advisory board.

13        Then I go to the top e-mail or the next to top

14   e-mail, Sunday, July 1st at 9:09 p.m., Christopher James

15   to Larina:  I would not send anything to the investors

16   until we speak to Jeff.  My view is that we tell

17   investors that TZ is closing and that you and Matt as

18   well as a number of tutors have been hired as employees

19   of CMJ that will begin in the fall offering tutoring

20   services under the name TZ 2.  Tell them that you and

21   Matt will try very hard to repay investors if and when

22   funds become available.  Next, Matt discusses all this

23   with the Alligator and we move forward.  This is the new

24   and improved well-capitalized and economical tutoring

25   service.

1       Now, I will comment that the transfer agreement was

2   dated June the 4th.  This e-mail is July 1st.  Response

3   by Larina:  Yes, sir, boss, with a smiley face.

4       May I comment briefly on the evidence?

5       THE COURT:  Mr. Wilcox, I'm not going to coach

6   you ahead of time as to what you can and cannot say.

7   That's up to you.  You're presenting your case.  If

8   Mr. Childers feels he should object, then he is free to

9   do so.

10      MR. WILCOX:  Your Honor, I think what these e-mails

11  show and that the e-mails will show is that my clients

12  were being told one thing when there was a transaction

13  in place that did something completely different, that

14  the bankruptcy of these individuals was contemplated,

15  that this transfer was contemplated, that this transfer

16  was coordinated by counsel.  I'm not saying it's

17  initiated by counsel, I'm saying it was coordinated by

18  counsel, who I think has a conflict of interest problem

19  here.

20      Let's also remember that Mr. James loaned money in

21  2010.  He came before this Court and argued --

22      MR. CHILDERS:  Your Honor, I'd object again as to

23  relevance to the pending issue before the Court.

24      THE COURT:  What's the relevance to the issue of

25  what documents should be discovered today?

Electronically signed by Jennifer Witwer (301-375-152-2952)

1          MR. WILCOX:  The relevance is it was part of the

2     continuing fraud, this issue of joint representation of

3     creditor and debtor at the same time, action by the

4     creditor to attempt to perfect a security interest using

5     debtor's counsel as his counsel.

6          THE COURT:  I think that that can be taken up by

7     the Court upon filing appropriate pleadings.

8          MR. WILCOX:  That's fine, Your Honor.

9          THE COURT:  Mr. Childers.

10         MR. CHILDERS:  Thank you, Your Honor.

11         THE COURT:  First of all, let me ask the court

12    staff, does anyone need us to take a brief recess?

13    Madam court reporter?  All right.

14         MR. CHILDERS:  I'll just make a brief argument in

15    rebuttal.  I'm not going to address the bigger issues in

16    the case.  Obviously my clients completely disagree with

17    the characterization as Mr. Wilcox enunciated it, and

18    we'll look forward to our day in court.

19         However, I think that what just happened here is

20    that we now have evidence before the Court of the

21    representation that has been alleged of Tutoring Zone 2,

22    Chris James, CMJ Consulting and the Hintzes, as evident

23    in the documents that Mr. Wilcox just introduced into

24    evidence, the employment of the Hintzes by TZ 2 in the

25    formation period and after.

Page 60

1          Also evident in the e-mails that Mr. Wilcox just

2    read to the Court is the conflict from the Fieldmans

3    that the Hintzes and Mr. James were concerned about from

4    the very beginning.  He read relevant portions and there

5    are longer portions in the parts that he didn't read

6    where it's clear that they are responding to hostile

7    actions by the Fieldmans and making legal plans relating

8    to those.

9          THE COURT:  Mr. Wilcox?

10         MR. WILCOX:  I object to that characterization.  If

11   he can point to it in the document, point to it.

12         MR. CHILDERS:  Your Honor --

13         MR. WILCOX:  But he can't argue it if you don't

14   point to it.

15          THE COURT:  Well, my question here is how is

16   that point relevant to the discovery that we're here on

17   today?

18         MR. CHILDERS:  Well, we're here on a

19   quasi-evidentiary hearing to establish whether or not

20   there was a common or joint interest, and so --

21         THE COURT:  No, no.  Well, we were.

22         MR. CHILDERS:  We were.  And that's what the

23   evidence Mr. Wilcox was presenting is in support of.

24   And he made an argument at the end of his evidence, and

25   I'm making a rebuttal to that argument.  And I assume,

1     Your Honor, that this would be relevant if in the future

2     we reassert the common interest privilege, and then we

3     would back into the proceedings today.

4          So we see in the e-mails that were just introduced

5     into evidence the concern and activity by my clients at

6     that time.  In particular I would draw the Court's

7     attention to the e-mail dated Wednesday, June 6th, and

8     July the 1st of 2012 where the clients not only were

9     discussing between themselves but had a memo prepared

10    for them by the law firm of Folds and Walker.  There's

11    an e-mail copied from Norm Bledsoe and also carbon

12    copied to Scott Walker, who were assisting them at that

13    time with the problems that they were having with the

14    Fieldmans.

15         So I believe that the evidence firmly supports the

16    existence of a joint interest or common defense

17    privilege.

18         MR. WILCOX:  If you look at -- if I may, Your

19    Honor.

20         THE COURT:  Yes, sir.

21         MR. WILCOX:  If you look at the Bledsoe memo, it

22    says that the purchase of that note and the enforcement

23    of that note by FLH is not illegal.  There's nothing

24    wrong with it.  And what we lack for common interest

25    privilege -- first of all, we really lack any sense of

Page 62

1    representation.

2         There's no evidence of anybody representing

3    anybody.  All there is is an attorney that's at the

4    center of a number of transactions with apparently

5    multiple clients and no identification of any common

6    interest between the transferor and the transferee and

7    no identification of common interest between the debtor

8    and the creditor.  That's the key point to this.  And

9    I'll sit down.

10        THE COURT:  Mr. Childers.

11        MR. CHILDERS:  Thank you, Your Honor.

12        Just to clarify, on Wednesday, June the 6th, 2012,

13   and I'm reading from that --

14        THE COURT:  Give me a moment to get to that one,

15   please, Mr. Childers.

16        Is that the one that at the top of the page it says

17   Gmail and it's re FW:TZ?

18        MR. CHILDERS:  Correct.

19        THE COURT:  Thank you.

20        MR. CHILDERS:  And this is an e-mail, as you can

21   see, from Larina Hintze to Norm Bledsoe, who is an

22   attorney with the law firm of Folds and Walker, copying

23   me, Scott Walker, Chris James, Matt Hintze, and I'm

24   guessing that that's Bruce Hintze's e-mail.

25        And Larina has addressed it to Norm, her attorney

1     at Folds and Walker, and states:  If you think that

2     Fieldman's strategy is to -- and then she quotes:  My

3     guess is that McCarty desires to sue to enforce the note

4     and then subsequently levy on Matt's ownership interest

5     in TZ.

6          So what they're talking about here is the purchase

7     of one of the investors' notes by Mr. Fieldman and what

8     he intended to do with it.

9          MR. WILCOX:  Your Honor, there's no evidence that

10    Mr. Fieldman ever purchased any note.

11         MR. CHILDERS:  Continuing on, this is the portion

12    that Mr. Wilcox read, I would assert, out of context to

13    make it sound like he was referring to the investor

14    plaintiffs, but then:  Our strategy could be to make it

15    seem like this is the worst thing in the world for us,

16    and so forth, which was previously read.  They're

17    referring to the Fieldmans' purchase of the note.

18         THE COURT:  And where is that shown here,

19    Mr. Childers, in response to Mr. Wilcox's comment?

20         MR. CHILDERS:  Well, take a look at the e-mail that

21    Larina is responding to that Norm sent to her:  A

22    counterclaim for tortious interference against Steven

23    Fieldman could be tough to win.

24         THE COURT:  I'm sorry, where are you reading?

25         MR. CHILDERS:  About halfway down the page on the

1        first page.  So it says on Wednesday, June the 6th,

2        right about here, Norm Bledsoe --

3            THE COURT:  Oh, I see, next to it.  Okay.

4            MR. CHILDERS:  A counterclaim for tortious

5        interference against Steven Fieldman could be tough to

6        win.  So there you have a cause of action that they're

7        concerned about, to wit; one, no cause of action for TI,

8        meaning tortious interference exists where one doesn't

9        act, which is legal in itself, malice or bad motive is

10       of no import in this instance.  Accordingly, Steve's

11       malicious act of acquiring and enforcing Randy Scott's

12       note is not factual.  McCarty will argue that Steve is

13       not interfering with any relationship, he's merely

14       purchased the note and is enforcing it.

15           Three; a claim against Steve falls outside the

16       typical fact pattern.  Four; Steve may not be tied

17       closely enough to Study Edge to maintain an action for

18       tortious interference.  We would have to bring in the

19       Fieldmans into the litigation under a conspiracy theory

20       to really get somewhere.

21           It is my belief that Mac McCarty probably

22       structured the purchase of the Randy Scott note with a

23       view to avoiding a counterclaim for tortious

24       interference.  Mac is too smart to let Ethan purchase

25       the note on his own.  Mac told me via phone that, quote,

1    a trustee, end quote, owns, quote, a note, end quote.

2         Based on what I know now, I would not advise a TI

3    counterclaim.  My opinion may change if I learn new

4    facts.  My guess is that McCarty desires to sue to

5    enforce the note and then subsequently levy on Matt's

6    ownership interest in TZ.

7         So my argument is that this is the evidence the

8    Court has been looking for for what the common interest

9    would be between these parties.  These are all the same

10   parties that are parties to this e-mail.  They're

11   sharing work between different law firms that are

12   working on the same issue, which is, as we've said from

13   day one in this case, the aggressive action of Steven

14   Fieldman in trying to destroy the company Tutoring Zone

15   to the detriment of Mr. Wilcox's other clients, the

16   investors.

17        Fortunately, it's now record evidence that such a

18   relationship of a common interest existed.  Because

19   Bruce Hintze is included in this, this particular one

20   would not be privileged under a joint or common interest

21   privilege, so this is -- this one's fine, fair game.

22   Okay.

23        But to the extent that there might be testimony or

24   future documents, I would like to reserve the ability to

25   come back to the evidence that's been presented to the

1    Court today and make the argument that that relationship

2    and exception to the privilege, as the Court has pointed

3    out more than once, and I apologize for continuing to

4    call it a privilege, does exist.

5        THE COURT:  All right.  Thank you.  And your rights

6    are preserved to the extent that they're not ruled on at

7    some later date.

8        Mr. Wilcox.

9        MR. WILCOX:  Very briefly, Your Honor.

10       This just strains credulity.  We have a memo from

11   the lawyer saying that there is no cause of action at

12   this time.  He does reserve, as all lawyers do, if I

13   learn additional facts.  But to suggest that the

14   purchase of the note by Steve Fieldman and his intent to

15   destroy Tutoring Zone when Tutoring Zone, Tutoring

16   Zone's assets had already been sold in an insider deal

17   in a cashless transaction to a creditor of the debtors

18   is just incredible.

19       And this is after the Hintzes were telling

20   everybody that Tutoring Zone was going out of business

21   when, in fact, there was a transfer going on that would

22   allow them to benefit from the sale of the corporate

23   assets and continue to maintain their income.

24       Thank you.

25       THE COURT:  Thank you.

1          Is there anything further to be brought before the

2     Court today with respect to the document production that

3     was covered under the umbrella of motion for protective

4     order, Docket Number 266?

5          No, Mr. Childers?

6          MR. CHILDERS:  Not from the defendants, Your Honor.

7          THE COURT:  And I understand, Mr. Wilcox, nothing

8     further today?

9          MR. WILCOX:  That's correct.

10         THE COURT:  And there are no questions about what

11    the parties have been ordered to brief and submit

12    evidence on; is that correct?

13         MR. CHILDERS:  Your Honor, I understand you went

14    through item by item and gave us direction on each item

15    as to briefing, and I think we've got a good record of

16    that here.

17         THE COURT:  And I want to have Mr. Wilcox prepare

18    an order that so orders.  I had asked at the end of the

19    last hearing for someone to submit an interim order.  We

20    didn't get one, and I think that's part of the reason

21    that we've had an interesting afternoon.

22         Mr. Wilcox, questions?

23         MR. WILCOX:  No, I think I understand it.  I may

24    have to defer to other people's notes, but I will go

25    ahead and prepare that order.

1          THE COURT:  If there are any questions about the

2     terms of the order, then let my chambers know and I'll

3     do my best to schedule an emergency telephonic hearing

4     between the two of you to deal with the terms of the

5     order.  I think it's been pretty clear.  The order

6     should be plan vanilla, I would think, but to the extent

7     that there may be issues, I am willing to undertake to

8     hear them as quickly as possible.

9          And I'm not extending the ten days from the date of

10     the order.  It is ten days from today regardless of when

11     the order is signed.  If you can't resolve your disputes

12     over the order, I'll take your two competing orders and

13     prepare one of my own.

14          But it is ten days from today to brief the issues

15     and submit affidavit-type evidence in support of or

16     against the debtor's remaining claims that those limited

17     number of documents should not have to be produced.

18          MR. WILCOX:  May I ask for somewhat supplementary

19     but related relief that to the extent the defendants

20     assert a common interest privilege in the future, that

21     along with the assertion of that common interest

22     privilege they provide affidavits demonstrating the

23     basis of the privilege, a privilege log, and an

24     affidavit expressing what common interest it is that is

25     being described?

1          My concern, Your Honor, is that we're going to be

2     back here on the same situation where -- I think the

3     parties both want the Court to set this matter for

4     trial.  We've finally agreed on some deposition dates in

5     January and February.  We have a motion coming up on

6     that in a few minutes.  But I think both sides feel the

7     need -- you know, we're trying to schedule depositions

8     when -- both sides, both sides are trying to schedule

9     depositions at a time when they think they do not have

10    all the documents, and that's a difficult thing to do.

11         It seems to me that that procedure, as a case

12    management procedure, would expedite and would also

13    perhaps force people to be very careful in their

14    assertion of these -- privilege is not the right word,

15    but exception to production.  Thank you.

16         THE COURT:  Mr. Childers.

17         MR. CHILDERS:  I was only going to say, Your Honor,

18    that we have no current knowledge of an occasion to

19    assert that particular privilege, but if we do, I would

20    assume that the Court would give us some guidelines at

21    that time.  And again, because we don't know what the

22    future will bring, I think it's premature to start

23    making directives about that.

24         THE COURT:  Just a moment.  Let me look at

25    something.

1            (Pause in the proceedings.)

2        THE COURT:  How much time, first of all, going to

3    the other motions, do you think that we're going to need

4    for a hearing on the motion to compel, we're out of time

5    for today, at 271?  That was your motion, Mr. Childers.

6        MR. CHILDERS:  Yes, Your Honor.  I'll need at least

7    an hour.

8        THE COURT:  Do you disagree, Mr. Wilcox?

9        MR. WILCOX:  Your Honor, it's his motion, so --

10       THE COURT:  All right.  An hour on that one.

11       What about the motion for authority to take more

12   than ten depositions?

13       MR. WILCOX:  That one, Your Honor, I think we can

14   deal with pretty quickly.  I think that's a 15-minute

15   motion.  And I would like to get that done because we're

16   trying to schedule depositions.  In fact, we've been

17   ordered to exchange deposition schedules.  I can't do

18   that until I know how many depositions we can take.

19       THE COURT:  Mr. Childers, 15 minutes for that one

20   do you think or not?

21       MR. CHILDERS:  Your Honor, it could be 30 minutes,

22   but I would suggest that we could perhaps handle that

23   with a telephone hearing.

24       THE COURT:  I have a question for you, Mr. Wilcox,

25   on that motion.  Have you completed your ten depositions

1       already or not?

2              MR. WILCOX:  No, Your Honor, we have not.  I mean,

3       we're having a very difficult time getting them

4       scheduled.  We're trying to be courteous to third

5       parties.  It's just difficult.  We do have --

6              THE COURT:  The reason I ask, to be fair to both of

7       you, is that in preparation for today's hearing we

8       researched this motion specifically, even though it was

9       just filed two days ago.  And the case law that I'm

10      aware of thus far, particularly out of the Southern

11      District of Florida -- let me see if I can locate the

12      case citations for both of you -- seems to indicate that

13      the motion is premature until after the first ten

14      depositions have been fully completed.

15             Now, I recognize that that might present scheduling

16      problems in this case.  That's another matter for

17      another day, because I don't want to short-circuit

18      anybody's right to discovery because of scheduling

19      deadlines, but at the same time I wouldn't want it to go

20      on ad infinitum.

21             The primary case that we looked at is that of

22      Mazur, M-A-Z-U-R, versus Lampert.  It's at 2007 West Law

23      676096 at Page 2.  That is a District Court opinion from

24      the Southern District of Florida in 2007.  We also

25      looked at a 2013 case, 2013 West Law 6383973, and that

1    is Gordilis, G-O-R-D-I-L-I-S, versus Ocean Drive

2    Limousines, Inc.  And in both of those cases the courts

3    ruled that on these types of motions it was premature to

4    entertain the motion until the first ten deposition had

5    been completed.

6         I'm going to continue the hearing on that motion.

7    We'll handle it by telephone.  We'll try to schedule it

8    in the next week or so.  I don't have a schedule right

9    now.

10        With respect to the motion to compel filed by the

11   defendants at 271, Mr. Childers, are you suggesting that

12   we cannot deal with that one by telephone?  Are you

13   requesting an in-person hearing?

14        MR. CHILDERS:  Well, Your Honor, I sure would like

15   to have it heard sooner rather than later.

16        THE COURT:  Mr. Wilcox and Mr. Childers, are either

17   of you available tomorrow afternoon for a one-hour

18   hearing beginning at one?

19        MR. CHILDERS:  I am, Your Honor.

20        MR. WILCOX:  I am not, Your Honor.

21        THE COURT:  You are not?

22        MR. WILCOX:  And I --

23        THE COURT:  I understand.  It was not scheduled.

24   But we're out of time for today.

25        Mr. Childers, do you have any objection to arguing

1    that one by videoconference?

2         MR. CHILDERS:  No, I don't, Your Honor.

3         THE COURT:  Mr. Wilcox?

4         MR. WILCOX:  No, Your Honor.

5         THE COURT:  Very well.  Then we're going to

6    continue the hearing on the motion to compel at Docket

7    Number 271 and the motion for authority to take more

8    than ten depositions at Docket Number 309.  We will

9    schedule those most likely back to back but separately

10   as soon as we can to be held by videoconference.

11        Because they were both docketed for today, we will

12   do our best to contact both of you to give you two or

13   three alternative dates before we actually schedule

14   those for hearing so that we can try to avoid any

15   conflicts because we'll be doing this on relatively

16   short notice.

17        Looking at my schedule -- give me just one moment.

18   Do you both have your calendars with you today or not?

19        MR. WILCOX:  I don't.  They took my phone.

20        THE COURT:  That's fine.  I understand.

21        MR. WILCOX:  I think I'm available next week all

22   week.

23        THE COURT:  All right.  Give me just one moment,

24   please.

25        (A brief discussion was held off the record.)

1          THE COURT:  All right.  It appears that the most

2     likely date that my calendar would be available would be

3     sometime Wednesday, January 14th, which is next

4     Wednesday.  Just a moment.

5          It's possible that the alternative date would be

6     January the 16th, which is Friday.  Both of those dates

7     depend on whether we can get this courtroom to be able

8     to use the video equipment.  But we will have someone

9     contact you.

10          But if both of you would, at a minimum, contact

11     chambers, my JA is Lisa Murrill, let her know whether

12     you're available on those two dates.  Mr. Childers, you

13     may already know.  And then we'll go from there.

14          MR. CHILDERS:  I'll just e-mail my availability to

15     your JA.

16          MR. WILCOX:  Logistically how does that work?  Do I

17     need to go to the court in Jacksonville?

18          THE COURT:  If you want to appear by Court Call,

19     Mr. Wilcox, you can do that.

20          MR. WILCOX:  But that wouldn't be by video.

21          THE COURT:  Correct.  You could be

22     by -- Mr. Childers I think wants to stand and look at

23     me while he argues.  Is that right, Mr. Childers?

24          MR. CHILDERS:  Correct.

25          THE COURT:  The only way to do that right now with

1    my schedule is by videoconference.  So Mr. Childers

2    would be here in the courtroom in Gainesville.  You

3    would be welcome to appear here in the courtroom in

4    Gainesville as well or appear via telephone and we'll be

5    able to hear you, and I will be in Tallahassee.

6         MR. WILCOX:  And I guess I'd like -- I'm not asking

7    the Court for technical advice.  I'm going to see if I

8    can do that through the video hookup at the Jacksonville

9    court.

10         THE COURT:  Absolutely.  Go ahead and ask the

11    Jacksonville clerk's office to have their IT people

12    contact our IT people.  And it may be that we can do

13    that.  I think that's a great idea.

14         MR. WILCOX:  Thank you.

15         THE COURT:  Very well.  So those motions are

16    continued.  Thank you very much.  This hearing is

17    concluded.

18         (The hearing concluded at 3:20 p.m.)

19

20

21

22

23

24

25

Page 76

1                          COURT CERTIFICATE

2

3    STATE OF FLORIDA )
                          :     SS.
4    COUNTY OF ALACHUA)

5

6              I, JENNIFER R. WITWER, RPR, CRR, Court Reporter,

7    certify that I was authorized to and did stenographically

8    report the foregoing proceedings and that the transcript is a

9    true record.

10             Dated this 12th day of January, 2015.

11

12

13                             JENNIFER R. WITWER, RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25