EXHIBIT 7

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

In Re:

    MATTHEW BRUCE HINTZE, and            Case No. 12-10462-KKS
    LARINA K. HINTZE,

             Debtors.              Chapter 7

_____

JOHN SPENCE, SHEILA SPENCE, INTERMED    Adv. No. 13-01007-KKS
BIOMEDICAL SERVICES, INC., a Florida corporation,
DAVID WHITNEY, and FLH HOLDINGS OF
FLORIDA, LLC, a Florida limited liability company,

    Plaintiffs/Counterclaim-Defendants,

v.

MATTHEW BRUCE HINTZE, and
LARINA K. HINTZE,

    Defendants/Counterclaim-Plaintiffs/Third-Party
Plaintiffs,

v.

ETHAN FIELDMAN and STEVEN FIELDMAN,

    Third-Party Defendants.

_____/

## DEFENDANTS' SECOND AMENDED ANSWER,
## AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO COMPLAINT
## OBJECTING TO DISCHARGE & DETERMINING DISCHARGEABILITY

COME NOW MATTHEW BRUCE HINTZE and LARINA K. HINTZE (the

"Defendants"), and file their Amended Answer, Affirmative Defenses, and Counterclaims to

the Plaintiffs' Complaint as follows:

    1.    Admit.

    2.    Admit.

3.      Admit.

4.      Admit.

5.      Admit.

6.      Admit.

7.      Admit.

8.      Admit.

9.      Admit.

10.     Admit.

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit that Defendants represented that Plaintiffs' loans would be paid from cash flow from the business or loans from TutoringZone; Denied as to the remainder.

15.     Denied, and Defendants demand strict proof thereof.

16.     Admit that Fieldman immediately used funds received in the sale of his interest in TutoringZone to start Study Edge and compete with TutoringZone for business, denied as to the remainder.

17.     Admit.

18.     Denied and demand strict proof thereof.

19.     Admit that TutoringZone, while under the authority of a board controlled by some or all of the Plaintiffs, made limited payments on all creditors' loans, including Plaintiffs' loans.

20.     Admit only that under the authority of a board controlled by some or all of the Plaintiffs, TutoringZone became insolvent. After the board abandoned the insolvent

TutoringZone (including rejecting a sale of the assets and an opportunity to purchase the assets individually), the Defendants transferred a non-exclusive license to certain intellectual property in TutoringZone to a creditor-owned entity.

21.     Statement of legal conclusion that requires no response.

22.     Defendants adopt their answers to allegations of paragraphs 1 through 6 and 10 through 20 above.

23.     Admit.

24.     Admit that Defendants represented TutoringZone as a consistently profitable company with good cash flow, denied as to the remainder. John Spence and David Whitney were close advisors of the Defendants prior to the purchase of TutoringZone from Ethan Fieldman and had knowledge that the terms of the Settlement Agreement between the Defendants and Ethan Fieldman (specifically page 4, paragraph i) explicitly precluded either party and all tutors from non-compete agreements. A copy of the Settlement Agreement is attached hereto as **Exhibit A** (the "Settlement Agreement").

25.     Admit; but note that the email dated May 24, 2011 attached to the Plaintiffs' Complaint as Exhibit B specifically discloses all loan participants known to the Defendants at the time, including Christopher James along with "family and friends." In addition, the Defendants clearly state that following closing, TutoringZone will have no money in its accounts, and debt totaling $935,000.00. In addition, the document attached to that email entitled TutoringZone Execution Plan gave specific details concerning current employees of the TutoringZone and issues surrounding new hires, and says nothing of non-compete agreements.

26.     Denied.

27.     Admit that Defendants represented that they expected to sell their interest in an entity named GIN for money, and that he believed that TutoringZone had sufficient cash flow to service its debt; Denied as to the remainder.

28.     Denied. The exhibit is a true and correct copy of the Note between Spence and *TutoringZone*; however, the document does not speak for itself, and should not be taken at face value because the agreement was not an arms-length transaction.

29.     Denied and demand strict proof thereof.

30.     Denied and demand strict proof thereof.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Statement of legal conclusion that does not require a response.

35.     Defendants adopt their answers to allegations of paragraphs 1 through 6 and 10 through 20 above.

36.     Admit.

37.     Denied. Christopher James was identified early on as a creditor of the Defendants. Further, the value of GIN was based on a report regarding its value provided by an independent appraiser.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Statement of legal conclusion that does not require a response.

43.     Defendants adopt their answers to allegations of paragraphs 1 through 5, 7 and 10 through 20 above.

44.     Admit that Debtor approached InterMed for a loan for *TutoringZone* on or about May 19, 2011; Denied as to the remainder.

45.     Denied that there were non-compete agreements in place to prevent Fieldman and the tutors from competing; admit as to the remainder.

46.     Admit.

47.     Denied.

48.     Denied. The exhibit is a true and correct copy of the Note between InterMed and TutoringZone; however, the document does not speak for itself, and should not be taken at face value because the agreement was not an arms-length transaction.

49.     Denied.

50.     Denied. Defendants reallege and incorporate their response to paragraph 37.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Statement of legal conclusion that does not require a response.

55.     Defendants reallege their responses to paragraphs 1, 5, 7, and 10 through 20.

56.     Admit that the Debtor provided certain financial information to Staab; Denied as to the remainder. Defendants reallege and incorporate their response to paragraph 37.

57.     Admit that InterMed loaned money to Debtors; Denied to the remainder.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Statement of legal conclusion that does not require a response.

63.     Defendants reallege their responses to paragraphs 1 through 5, 8, and 10 through 20.

64.     Admit.

65.     Denied.

66.     Admit that Defendants provided certain financial information; Denied as to the remainder.

67.     Denied. The exhibit is a true and correct copy of the Note between InterMed and TutoringZone; however, the document does not speak for itself, and should not be taken at face value because the agreement was not an arms-length transaction.

68.     Denied.

69.     Denied.

70.     Denied. Defendants reallege and incorporate their response to paragraph 37.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Statement of legal conclusion that does not require a response.

75.     Defendants reallege their responses to paragraphs 1 through 5, and 9 through 20.

76.     Without knowledge.

77.     Denied. Whitney acted as an agent of the Scotts, not the Defendants, and Whitney alone is liable for any misrepresentations he may have made.

78.     Without knowledge.

79.     Admit that Defendants provided financial information to potential investors; Denied as to the remainder.

80.     Admit that Defendants provided financial information to potential investors; Denied as to the remainder.

81.     Admit that the exhibit is a true and correct copy of the note between the Scotts and the Defendants; however, the document does not speak for itself, and should not be taken at face value because the agreement was not an arms-length transaction.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Without knowledge as to the transfers between Steven D. Fieldman and the Scotts; however, such transfers were made for an improper purpose and the related documents cannot be taken at face value, as the transaction was not at arms-length.

89.     Statement of legal conclusion that does not require a response.

90.     Defendants reallege their responses to paragraphs 1 through 5, and 9 through 20 above.

91.     Admit that Defendants provided financial information to potential investors; Denied as to the remainder.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Without knowledge. The transfers between Steven D. Fieldman and the Scotts were made for an improper purpose and the related documents cannot be taken at face value, as the transaction was not at arms-length.

99.     Statement of legal conclusion that does not require a response.

100.    Defendants reallage their responses to paragraphs 1 through 20 above.

101.    Admit.

102.    Admit that the assets described had some value; without knowledge as to whether the assets are "most valuable" or whether the assets had any quantifiable market value at all.

103.    Admit.

104.    Denied.

105.    Denied.

106.    Admit that the exhibit is a true and correct copy of the Agreement between TutoringZone and Tutoring Zone II, LLC; Denied as to the remainder.

107.    Denied.

108.    Denied.

109.    Denied. At all times relevant to Plaintiffs' Complaint, some or all of the Plaintiffs were members of an advisory board that controlled TutoringZone until it became insolvent. Ultimately the managing Plaintiffs resigned from the advisory board.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied; TutoringZone was unable to do business as a result of insolvency prior to the transfer.

114.    Admit that Debtor Matthew Hintze is an employee of TutoringZone II; Denied as to the remainder.

115.    Admit that while TutoringZone was under the management of the advisory board, consisting of some or all of the Plaintiffs, few to no payments were made to service the debt of TutoringZone.

116.    Denied.

117.    Admit that at the time the transfer was made, the Defendants and TutoringZone were insolvent and unable to continue in business; Denied as to the remainder.

118.    Denied.

119.    Statement of legal conclusion that does not require a response.

120.    Defendants reallege their responses to paragraphs 1 through 20 above.

121.    Denied.

## AFFIRMATIVE DEFENSES AS TO COUNT I - SPENCE

### Good Faith

122.    At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

123.    As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

124.    This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory

Committee Agreement"). The committee formed pursuant to this agreement will hereinafter be referred to as the "Advisory Committee".

125.    Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiffs' investments were made and relied.

126.    The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

127.    The Plaintiffs' involvement in negotiations over the acquisition of the TutoringZone asset, based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

128.    The Plaintiffs' involvement in management and control of TutoringZone, including participation in every key decision leading to the insolvency of that entity, which was based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to post-acquisition events (transfer of assets of TutoringZone to Chris James, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

129.    Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *these* Plaintiffs should not be found to be non-dischargeable because of the Defendants' good faith at every step of the transaction, including prior to the extension of credit.

<u>Bad Faith</u>

130.     The claims of Plaintiffs, John Spence, Sheila Spence, should be equitably barred because they acted in bad faith towards the Defendants. For example, without limitation, the Plaintiffs intentionally helped procure the insolvency of the Defendants most significant asset, their interest in TutoringZone.

131.     Plaintiffs acted in bad faith by: misrepresenting their ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting their ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

132.     Plaintiff served as an advisor to the Defendants in negotiating a buy out of Ethan Fieldman's interest in TutoringZone.

133.     Plaintiff, John Spence, failed to assess the business risk of buying out Ethan Fieldman's interest without receiving a covenant not to compete.

134.     Defendants relied on the advice of their advisor, and as a result of such advice, have incurred significant damages.

135.     Plaintiffs' losses as a result of financing the buyout of TutoringZone are a direct result of Defendants acting and relying on the advice of John Spence as their business advisor prior to the buyout of Ethan Fieldman's interest of TutoringZone, as well as John Spence's mismanagement of TutoringZone following the buyout.

136.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to

*these* Plaintiffs should not be found to be non-dischargeable <u>because of</u> the Plaintiffs' bad faith conduct which occurred <u>prior to</u> the extension of credit.

<u>Lack of Benefit</u>

137.    The money loaned the Defendants from the Plaintiffs, combined with money received from multiple other investors, was used to pay Ethan Fieldman for his interest in TutoringZone.

138.    Plaintiffs paid the money into a third party's escrow account, and then the escrow agent delivered the loan proceeds to Ethan Fieldman.

139.    The Defendants never received the funds directly.

140.    Defendants never received the intended benefit of the loan made to purchase TutoringZone because the <u>Plaintiffs</u> controlled TutoringZone under the Advisory Committee Agreement, and Defendants never received shares in profits, distributions, or any other benefit, and never had effective control until after Plaintiffs had destroyed the economic value of the Defendants membership, and abandoned the enterprise in haste, breaching their duty to the Defendants and to TutoringZone.

141.    The mismanagement of TutoringZone by the Advisory Committee caused the immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

142.    First, the lack of benefit makes the Plaintiffs' obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

143.    Second, the Plaintiffs' improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

<u>Estoppel (Fiduciary Duty)</u>

144.    As manager and director of TutoringZone, John Spence owed a fiduciary duty to the Defendants arising from the Advisory Committee Agreement.

145.    Spence breached his fiduciary duties by, among others: misrepresenting his ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting his ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

146.    By breaching his fiduciary duties to TutoringZone and the Defendants, John Spence caused the insolvency of TutoringZone, and consequently prevented the Plaintiffs, from realizing the benefit of their investment in TutoringZone.

147.    Had it not been for the Plaintiffs' breach of fiduciary duty, the Defendants would not have become insolvent and the obligations underlying the Plaintiffs causes of action would have been repaid as intended by TutoringZone.

148.    John Spence, as a creditor and board member of TutoringZone, failed to uphold his fiduciary duty to prevent the harm that occurred and should now be equitably estopped from asserting claims against the Defendants based on that harm.

<u>Equitable Disallowance</u>

149.    Plaintiffs acted in bad faith by: misrepresenting their ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting their ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then

willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

150.    Plaintiffs had an opportunity to prevent or mitigate their damages and failed to do so.

151.    The Plaintiffs' claims should be barred and equitably disallowed, because it would be inequitable to allow the Plaintiffs to obtain the relief they seek, since their loss is a result of their own misconduct.  *See e.g. Pepper v. Litton*, 308 U.S. 239 (1939); *Adelphia Recovery Trust v. Bank of America*, 390 B.R. 64 (S.D. N.Y. 2008).

152.    Lacking any enforceable claim, Plaintiffs have no standing to bring a § 523 action.

<u>In Pari Delicto - Spence</u>

153.    Creditor, John Spence, as CEO, board member and advisor, improperly damaged TutoringZone, to the detriment of the Defendants, their creditors and the other Plaintiffs that bring this action.

154.    Even if the Defendants' actions are found to have been improper, Plaintiffs should be denied the relief they seek.

155.    It was under the advice and guidance of John Spence that Defendants negotiated buyout of Ethan Fieldman from TutoringZone and solicited loans from other creditors to finance the buyout.

156.    Spence helped to recruit the other investors and provided them with assurances that were not authorized to be provided by the Defendants.

157.    Spence was at all times aware of loans owed to Christopher James and Ryan Dix, and identified as a company debt of TutoringZone. He encouraged the Defendants to use their personal finances, as opposed to TutoringZone financials, to induce additional financial support for the buyout.

158.    The Plaintiffs' goal was to defraud future creditors about the obligations of TutoringZone by concealing the new debt on the Defendants' personal balance sheets. In this way, the Plaintiffs orchestrated and participated in a scheme to defraud future investors or creditors by whitewashing the financial statements of TutoringZone, by keeping the debt of TutoringZone off the books (and thereby understating the debt of TutoringZone).    The Defendants did not understand this maneuver by the vastly more sophisticated investor creditor Plaintiffs.

159.    These Plaintiffs' claims for nondischargeability must fail due to their own improper conduct.  *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001) (the doctrine of *in pari delicto* provides that where two parties engage in tortious conduct, the parties cannot recover from each other for damages suffered as a result of such conduct; only injured third parties can recover for damages); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

Unclean Hands

160.    Plaintiffs have unclean hands and should not be provided the requested relief because: they have contributed to or caused the damages they complain about in their Complaint; they participated in the production of financial statements that allegedly defrauded investors; they made allegedly material misstatements to investors without authority from the Defendants; they have committed civil and/or criminal acts against the Defendants and their property; they misrepresented to Defendants their ability to provide competent financial advice and manage TutoringZone; they have been the proximate cause of the Defendants' insolvency and resulting bankruptcy; they have engaged in an improper surreptitious negative public relations campaign against the Defendants in order to force or "shame" them into paying prepetition obligations in violation of the automatic stay; and they have engaged in a civil

conspiracy to harm the Defendants by improperly providing a competitor, StudyEdge, with confidential and proprietary information to further their own self interests.

161.     Due to the Plaintiffs' unclean hands, they should be equitably barred from the relief they seek.

## AFFIRMATIVE DEFENSES AS TO COUNT II - SPENCE

### Good Faith

162.     At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

163.     As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

164.     This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

165.     Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiffs' investments were made and relied.

166.     The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

167.     The Plaintiffs' involvement in negotiations over the acquisition of the TutoringZone asset, based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

168.     The Plaintiffs' involvement in management and control of TutoringZone, including participation in every key decision leading to the insolvency of that entity, which was based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to post-acquisition events (transfer of assets of TutoringZone to Chris James, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

169.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *these* Plaintiffs should not be found to be non-dischargeable because of the Defendants' good faith at every step of the transaction, including prior to the extension of credit.

### Bad Faith

170.     The claims of Plaintiffs, John Spence, Sheila Spence, should be equitably barred because they acted in bad faith towards the Defendants. For example, without limitation, the Plaintiffs intentionally helped procure the insolvency of the Defendants most significant asset, their interest in TutoringZone.

171.     Plaintiffs acted in bad faith by: misrepresenting their ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting their ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

172.     Plaintiffs served as an advisor to the Defendants in negotiating a buy out of Ethan Fieldman's interest in TutoringZone.

173.     Plaintiff, John Spence, failed to assess the business risk of buying out Ethan Fieldman's interest without receiving a covenant not to compete.

174.     Defendants relied on the advice of their advisor, Spence, and as a result of such advice, have incurred significant damages.

175.     Plaintiffs' losses as a result of financing the buyout of TutoringZone are a direct result of Defendants acting and relying on the advice of John Spence as their business advisor prior to the buyout of Ethan Fieldman's interest of TutoringZone, as well as John Spence's mismanagement of TutoringZone following the buyout.

176.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *these* Plaintiffs should not be found to be non-dischargeable <u>because of</u> the Plaintiffs' bad faith conduct which occurred <u>prior to</u> the extension of credit.

<u>Lack of Benefit</u>

177.     The money loaned the Defendants from the Plaintiffs, combined with money received from multiple other investors, was used to pay Ethan Fieldman for his interest in TutoringZone.

178.     Plaintiffs paid the money into a third party's escrow account, and then the escrow agent delivered the loan proceeds to Ethan Fieldman.

179.     The Defendants never received the funds directly.

180.     Defendants never received the intended benefit of the loan made to purchase TutoringZone because the <u>Plaintiffs</u> controlled TutoringZone under the Advisory Committee Agreement, and Defendants never received shares in profits, distributions, or any other benefit, and never had effective control until after Plaintiffs had destroyed the economic value of the

Defendants membership, and abandoned the enterprise in haste, breaching their duty to the Defendants and to TutoringZone.

181.     The mismanagement of TutoringZone by this Advisory Committee caused the immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

182.     First, the lack of benefit makes the Plaintiffs' obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

183.     Second, the Plaintiffs' improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

<u>Estoppel (Fiduciary Duty)</u>

184.     As manager and director, Plaintiff, John Spence owed a fiduciary duty to the Defendants arising from the Advisory Committee Agreement.

185.     Spence breached his fiduciary duties by, among others: misrepresenting his ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting his ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

186.     By breaching his fiduciary duties to TutoringZone and the Defendants, John Spence caused the insolvency of TutoringZone and, consequently, prevented the Plaintiffs from realizing the benefit of their investment in TutoringZone.

187.     Had it not been for the Plaintiff's breach of fiduciary duty, the Defendants would not have become insolvent and the obligations underlying the Plaintiffs causes of action would have been repaid as intended by TutoringZone.

188.     John Spence, as a creditor and board member of TutoringZone, failed to uphold his fiduciary duty to prevent the harm that occurred and should now be equitably estopped from asserting claims against the Defendants based on that harm.

Equitable Disallowance

189.     Plaintiffs acted in bad faith by: misrepresenting their ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting their ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

190.     Plaintiffs had an opportunity to prevent or mitigate their damages and failed to do so.

191.     The Plaintiffs' claims should be barred and equitably disallowed, because it would be inequitable to allow the Plaintiffs to obtain the relief they seek, since their loss is a result of their own misconduct.  *See e.g. Pepper v. Litton*, 308 U.S. 239 (1939); *Adelphia Recovery Trust v. Bank of America*, 390 B.R. 64 (S.D. N.Y. 2008).

192.     Lacking any enforceable claim, Plaintiffs have no standing to bring a § 523 action.

In Pari Delicto - Spence

193.     Creditor, John Spence, as CEO, board member and advisor, improperly damaged TutoringZone, to the detriment of the Defendants, their creditors and the other Plaintiffs that bring this action.

194.    Even if the Defendants' actions are found to have been improper, Plaintiffs should be denied the relief they seek.

195.    It was under the advice and guidance of John Spence that Defendants negotiated buyout of Ethan Fieldman from TutoringZone and solicited loans from other creditors to finance the buyout.

196.    Spence helped to recruit the other investors and provided them with assurances that were not authorized to be provided by the Defendants.

197.    Spence was at all times aware of loans owed to Christopher James and Ryan Dix, and identified as a company debt of TutoringZone. He encouraged the Defendants to use their personal finances, as opposed to TutoringZone financials, to induce additional financial support for the buyout.

198.    The Plaintiffs' goal was to defraud future creditors about the obligations of TutoringZone by concealing the new debt on the Defendants' personal balance sheets. In this way, the Plaintiffs orchestrated and participated in a scheme to defraud future investors or creditors by whitewashing the financial statements of TutoringZone, by keeping the debt of TutoringZone off the books (and thereby understating the debt of TutoringZone). The Defendants did not understand this maneuver by the vastly more sophisticated investor creditor Plaintiffs.

199.    These Plaintiffs' claims for nondischargeability must fail due to their own improper conduct. *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001) (the doctrine of *in pari delicto* provides that where two parties engage in tortious conduct, the parties cannot recover from each other for damages suffered as a result of such conduct; only injured third parties can recover for damages); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

## Unclean Hands

200.     Plaintiffs have unclean hands and should not be provided the requested relief because: they have contributed to or caused the damages they complain about in their Complaint; they participated in the production of financial statements that allegedly defrauded investors; they made allegedly material misstatements to investors without authority from the Defendants; they have committed civil and/or criminal acts against the Defendants and their property; they misrepresented to Defendants their ability to provide competent financial advice and manage TutoringZone; they made material representations to other investors on behalf of the Defendants without authority to do so; they have been the proximate cause of the Defendants' insolvency and resulting bankruptcy; they have engaged in an improper surreptitious negative public relations campaign against the Defendants in order to force or "shame" them into paying prepetition obligations in violation of the automatic stay; and they have engaged in a civil conspiracy to harm the Defendants by improperly providing a competitor, StudyEdge, with confidential and proprietary information to further their own self interests.

201.     Due to the Plaintiffs' unclean hands, they should be equitably barred from the relief they seek.

## AFFIRMATIVE DEFENSES AS TO COUNT III - INTERMED

### Good Faith

202.     At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

203.     As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

204.    This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

205.    Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiffs' investments were made and relied.

206.    The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

207.    The Plaintiffs' involvement in negotiations over the acquisition of the TutoringZone asset, based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

208.    Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *this* Plaintiff should not be found to be non-dischargeable because of the Defendants' good faith at every step of the transaction, including prior to the extension of credit.

<u>Lack of Benefit</u>

209.    The money loaned the Defendants from the Plaintiffs, combined with money received from multiple other investors, was used to pay Ethan Fieldman for his interest in TutoringZone.

210.    Plaintiffs paid the money into a third party's escrow account, and then the escrow agent delivered the loan proceeds to Ethan Fieldman.

211.    The Defendants never received the funds directly.

212.    In addition, Defendants did not receive the benefit of an increased share of profits from TutoringZone because the Plaintiffs controlled TutoringZone under the Advisory Committee Agreement, and Defendants did not receive shares in profits, distributions, or any other benefit until Plaintiffs destroyed the economic value of the Defendants' membership.

213.    The mismanagement of TutoringZone by this Advisory Committee caused the immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

214.    First, the lack of benefit makes the Plaintiffs' obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

215.    Second, the Plaintiff's improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

<u>In Pari Delicto - Intermed</u>

216.    Even if the Plaintiff's allegations against the Defendants are true, the Plaintiff should be denied the relief sought due to the Plaintiff's own improper conduct.

217.    The Plaintiff knowingly participated in a scheme to defraud future investors or creditors by whitewashing the financial statements of TutoringZone, by keeping the debt of TutoringZone off the books (and thereby understating the debt of TutoringZone).  I.e., the Plaintiff engaged in the same tortious conduct that Plaintiff alleges Defendants committed.

218.    This Plaintiff's claims for nondischargeability must fail due to Plaintiff's own improper conduct. *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001) (the doctrine of *in pari delicto* provides that where two parties engage in

tortious conduct, the parties cannot recover from each other for damages suffered as a result of such conduct; only injured third parties can recover for damages); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

## AFFIRMATIVE DEFENSES AS TO COUNT IV - INTERMED

### Good Faith

219.    At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

220.    As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

221.    This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

222.    Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiff's investments were made and relied.

223.    The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

224.    The Plaintiff's involvement in negotiations over the acquisition of the TutoringZone asset, <u>based entirely on Defendants' good faith</u>, make its new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

225.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *this* Plaintiff should not be found to be non-dischargeable <u>because of</u> the Defendants' good faith at every step of the transaction, including <u>prior to</u> the extension of credit.

Lack of Benefit

226.     The money loaned the Defendants from the Plaintiffs, combined with money received from multiple other investors, was used to pay Ethan Fieldman for his interest in TutoringZone.

227.     Plaintiffs paid the money into a third party's escrow account, and then the escrow agent delivered the loan proceeds to Ethan Fieldman.

228.     The Defendants never received the funds directly.

229.     The mismanagement of TutoringZone by this Advisory Committee caused the immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

230.     Defendants never received the intended benefit of the loan made to purchase TutoringZone because the <u>Plaintiffs</u> controlled TutoringZone under the Advisory Committee Agreement, and Defendants never received shares in profits, distributions, or any other benefit, and never had effective control until after Plaintiffs had destroyed the economic value of the Defendants membership, and abandoned the enterprise in haste, breaching their duty to the Defendants and to TutoringZone.

231.     First, the lack of benefit makes the Plaintiffs' obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

232.     Second, the Plaintiff's improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

### AFFIRMATIVE DEFENSES AS TO COUNT V - WHITNEY

### Good Faith

233.     At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

234.     As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

235.     This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

236.     Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiff's investments were made and relied.

237.     The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

238.     The Plaintiffs' involvement in negotiations over the acquisition of the TutoringZone asset, <u>based entirely on Defendants' good faith</u>, make their new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

239.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *this* Plaintiff should not be found to be non-dischargeable <u>because of</u> the Defendants' good faith at every step of the transaction, including <u>prior to</u> the extension of credit.

<u>Bad Faith</u>

240.     The claims of Plaintiff, David Whitney, should be equitably barred because he acted in bad faith towards the Defendants. For example, without limitation, the Plaintiff intentionally helped procure the insolvency of the Defendants most significant asset, their interest in TutoringZone.

241.     Plaintiff acted in bad faith by: misrepresenting his ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting his ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

242.     Plaintiff served as an advisor to the Defendants in negotiating a buy out of Ethan Fieldman's interest in TutoringZone.

243.     Plaintiff failed to assess the business risk of buying out Ethan Fieldman's interest without receiving a covenant not to compete.

244.     Defendants relied on the advice of their advisor, Whitney, and as a result of such advice, have incurred significant damages.

245.     Plaintiffs' losses as a result of financing the buyout of TutoringZone are a direct result of Defendants acting and relying on the advice of Whitney as their business advisor prior

to the buyout of Ethan Fieldman's interest of TutoringZone, as well as Whitney's mismanagement of TutoringZone following the buyout.

246.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *this* Plaintiff should not be found to be non-dischargeable <u>because of</u> the Plaintiff's bad faith conduct which occurred <u>prior to</u> the extension of credit.

Lack of Benefit

247.     The money loaned the Defendants from the Plaintiffs, combined with money received from multiple other investors, was used to pay Ethan Fieldman for his interest in TutoringZone.

248.     Plaintiffs paid the money into a third party's escrow account, and then the escrow agent delivered the loan proceeds to Ethan Fieldman.

249.     The Defendants never received the funds directly.

250.     Defendants never received the intended benefit of the loan made to purchase TutoringZone because the <u>Plaintiffs</u> controlled TutoringZone under the Advisory Committee Agreement, and Defendants never received shares in profits, distributions, or any other benefit, and never had effective control until after Plaintiffs had destroyed the economic value of the Defendants' membership, and abandoned the enterprise in haste, breaching their duty to the Defendants and to TutoringZone.

251.     The mismanagement of TutoringZone by this Advisory Committee caused the immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

252.    First, the lack of benefit makes the Plaintiff's obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

253.    Second, the Plaintiff's improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

## Estoppel (Fiduciary Duty)

254.    As manager and director, Plaintiff David Whitney owed a fiduciary duty to the Defendants arising from the Advisory Committee Agreement.

255.    Whitney breached his fiduciary duties by, among others: misrepresenting his ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting his ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

256.    By breaching his fiduciary duties to TutoringZone and the Defendants, Whitney caused the insolvency of TutoringZone, and consequently prevented the Plaintiffs, from realizing the benefit of their investment in TutoringZone.

257.    Had it not been for the Plaintiff's breach of fiduciary duty, the Defendants would not have become insolvent and the obligations underlying the Plaintiffs causes of action would have been repaid as intended by TutoringZone.

258.    David Whitney, as a creditor and board member of TutoringZone, failed to uphold his fiduciary duty to prevent the harm that occurred and should now be equitably estopped from asserting claims against the Defendants based on that harm.

<u>Equitable Disallowance</u>

259.     Plaintiff acted in bad faith by: misrepresenting his ability and experience to successfully organize the acquisition of TutoringZone, misrepresenting his ability and experience to successfully manage TutoringZone, conspiring with Ethan Fieldman to procure the insolvency of TutoringZone, taking actions that created a hostile board of directors, then willfully failing to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

260.     Plaintiff had an opportunity to prevent or mitigate his damages and failed to do so.

261.     The Plaintiff's claims should be barred and equitably disallowed, because it would be inequitable to allow the Plaintiff to obtain the relief he seeks, since his loss is a result of his own misconduct.  *See e.g. Pepper v. Litton*, 308 U.S. 239 (1939); *Adelphia Recovery Trust v. Bank of America*, 390 B.R. 64 (S.D. N.Y. 2008).

262.     Lacking any enforceable claim, Plaintiff has no standing to bring a § 523 action.

<u>Unclean Hands</u>

263.     Plaintiff has unclean hands and should not be provided the requested relief because: he has contributed to or caused the damages they complain about in their Complaint; he participated in the production of financial statements that allegedly defrauded investors; he made allegedly material misstatements to investors without authority from the Defendants; he has committed civil and/or criminal acts against the Defendants and their property; he has been the proximate cause of the Defendants' insolvency and resulting bankruptcy; he has engaged in an improper surreptitious negative public relations campaign against the Defendants in order to force or "shame" them into paying prepetition obligations in violation of the automatic stay; and he has engaged in a civil conspiracy to harm the Defendants by improperly providing a

competitor, StudyEdge, with confidential and proprietary information to further his own self interests.

264.    Due to the Plaintiff's unclean hands, he should be equitably barred from the relief he seeks.

### In Pari Delicto - Whitney

265.    Creditor, David Whitney, as board member and advisor, improperly damaged TutoringZone, to the detriment of the Defendants, their creditors and the other Plaintiffs that bring this action.

266.    Even if the Defendants' actions are found to have been improper, Plaintiff should be denied the relief he seeks.

267.    It was under the advice and guidance of Plaintiff that Defendants negotiated buyout of Ethan Fieldman from TutoringZone and solicited loans from other creditors to finance the buyout.

268.    Plaintiff helped to recruit the other investor Plaintiffs (apart from Spence) and provided them with assurances that were not authorized to be provided by the Defendants.

269.    Plaintiff was at all times aware of loans owed to Christopher James and Ryan Dix, and identified as a company debt of TutoringZone. He encouraged the Defendants to use their personal finances, as opposed to TutoringZone financials, to induce additional financial support for the buyout.

270.    The Plaintiff's goal was to defraud future creditors about the obligations of TutoringZone by concealing the new debt on the Defendants' personal balance sheets. In this way, the Plaintiff orchestrated and participated in a scheme to defraud future investors or creditors by whitewashing the financial statements of TutoringZone, by keeping the debt of TutoringZone off the books (and thereby understating the debt of TutoringZone).    The

Defendants did not understand this maneuver by the vastly more sophisticated investor creditor Plaintiff.

271.     This Plaintiff's claims for nondischargeability must fail due to his own improper conduct. *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001) (the doctrine of *in pari delicto* provides that where two parties engage in tortious conduct, the parties cannot recover from each other for damages suffered as a result of such conduct; only injured third parties can recover for damages); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

## AFFIRMATIVE DEFENSES AS TO COUNT VI - FLH HOLDINGS

### Good Faith

272.     At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

273.     As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

274.     This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

275.     Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiff's investments were made and relied.

276.     The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

277.     The Plaintiffs' involvement in negotiations over the acquisition of the TutoringZone asset, <u>based entirely on Defendants' good faith</u>, make their new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

278.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to *this* Plaintiff should not be found to be non-dischargeable <u>because of</u> the Defendants' good faith at every step of the transaction, including <u>prior to</u> the extension of credit.

<u>Bad Faith</u>

279.     The claim of Plaintiff, FLH Holdings of Florida, LLC should be barred because it acted in bad faith towards the Defendants. For example, the Plaintiff FLH Holdings of Florida, LLC along with previous owner of the Note, Randy Scott, actively helped to procure the insolvency of the Defendants and their most significant asset, their interest in TutoringZone.

<u>Lack of Benefit</u>

280.     The money loaned the Defendants from the Plaintiffs, combined with money received from multiple other investors, was used to pay Ethan Fieldman for his interest in TutoringZone.

281.     Plaintiffs paid the money into a third party's escrow account, and then the escrow agent delivered the loan proceeds to Ethan Fieldman.

282.     The Defendants never received the funds directly.

283.     The mismanagement of TutoringZone by this Advisory Committee caused the immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was

received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

284.     Defendants never received the intended benefit of the loan made to purchase TutoringZone because the <u>Plaintiffs</u> controlled TutoringZone under the Advisory Committee Agreement, and Defendants never received shares in profits, distributions, or any other benefit, and never had effective control until after Plaintiffs had destroyed the economic value of the Defendants' membership, and abandoned the enterprise in haste, breaching their duty to the Defendants and to TutoringZone.

285.     First, the lack of benefit makes the Plaintiffs' obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

286.     Second, the Plaintiff's improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

Equitable Disallowance

287.     Plaintiff FLH Holdings of Florida, LLC, by and through its managing member Steven Fieldman, actively procured the insolvency and ultimate bankruptcy of the Defendants.

288.     Plaintiff's conduct in orchestrating the bankruptcy and then bringing a non-dischargeability complaint is improper and shocks the conscience.

289.     The Plaintiff's claim should be barred and equitably disallowed, because it would be inequitable to allow the Plaintiff to obtain the relief it seeks, owing to the shocking improper conduct of the Plaintiff. *See e.g. Pepper v. Litton*, 308 U.S. 239 (1939); *Adelphia Recovery Trust v. Bank of America*, 390 B.R. 64 (S.D. N.Y. 2008).

## Unclean Hands

290.     Plaintiff FLH Holdings of Florida, LLC, by and through its managing member Steven Fieldman, actively conspired with Randy Scott, the previous holder of the claim, to force the Defendants into insolvency and bankruptcy through subterfuge. Scott participated wittingly in order to recover the maximum value on his claim given that Plaintiff was destroying the Defendants' financial existence.

291.     Both Plaintiff and Plaintiff's predecessor in interest have engaged in conduct that should shock the conscience of the Bankruptcy Court.

292.     Therefore, Plaintiff should be equitably barred from obtaining nondischargeability of a claim that was purchased in a conspiracy to put the Defendants into bankruptcy.

## In Pari Delicto - FLH

293.     Even if the Plaintiff's allegations against the Defendants are true, the Plaintiff should be denied the relief sought due to the Plaintiff's own improper conduct.

294.     The Plaintiff knowingly participated in a scheme to defraud future investors or creditors by whitewashing the financial statements of TutoringZone, by keeping the debt of TutoringZone off the books (and thereby understating the debt of TutoringZone).  I.e., the Plaintiff engaged in the same tortious conduct that Plaintiff alleges Defendants committed.

295.     This Plaintiff's claims for nondischargeability must fail due to Plaintiff's own improper conduct. *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001) (the doctrine of *in pari delicto* provides that where two parties engage in tortious conduct, the parties cannot recover from each other for damages suffered as a result of such conduct; only injured third parties can recover for damages); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

## AFFIRMATIVE DEFENSES AS TO COUNT VII - FLH HOLDINGS

### Good Faith

296.     At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

297.     As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

298.     This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement")

299.     Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiff's investments were made and relied.

300.     The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

301.     The Plaintiffs' involvement in negotiations over the acquisition of the TutoringZone asset, based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to the acquisition (financial statements, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

302.     Therefore, *even if* as alleged, the financial statements provided by Defendants to anyone included overstated asset values or understated liabilities, or if, as alleged, non-compete agreements did not exist and representations were made about them, Defendants' obligation to

*this* Plaintiff should not be found to be non-dischargeable <u>because of</u> the Defendants' good faith

at every step of the transaction, including <u>prior to</u> the extension of credit.

<u>Bad Faith</u>

303.    The claim of Plaintiff, FLH Holdings of Florida, LLC should be barred because

they acted in bad faith towards the Defendants. For example, the Plaintiff FLH Holdings of

Florida, LLC along with previous owner of the Note, Randy Scott, actively helped to procure

the insolvency of the Defendants and their most significant asset, their interest in TutoringZone.

<u>Lack of Benefit</u>

304.    The money loaned the Defendants from the Plaintiffs, combined with money

received from multiple other investors, was used to pay Ethan Fieldman for his interest in

TutoringZone.

305.    Plaintiffs paid the money into a third party's escrow account, and then the

escrow agent delivered the loan proceeds to Ethan Fieldman.

306.    The Defendants never received the funds directly.

307.    The mismanagement of TutoringZone by this Advisory Committee caused the

immediate loss of value to the Defendants' interest in TutoringZone, so that no gain was

received from Plaintiffs' loan. *See In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996) (citing cases from

the Fifth, Sixth, and Ninth Circuits and adopting the "receipt of benefits" approach).

308.    Defendants never received the intended benefit of the loan made to purchase

TutoringZone because the <u>Plaintiffs</u> controlled TutoringZone under the Advisory Committee

Agreement, and Defendants never received shares in profits, distributions, or any other benefit,

and never had effective control until after Plaintiffs had destroyed the economic value of the

Defendants' membership, and abandoned the enterprise in haste, breaching their duty to the

Defendants and to TutoringZone.

309.     First, the lack of benefit makes the Plaintiffs' obligation unenforceable. An unenforceable obligation cannot support a § 523 action.

310.     Second, the Plaintiff's improper conduct caused the failure of the benefit to Defendants. Therefore, on equitable grounds, Plaintiffs should not now be permitted to assert a § 523 nondischargeability claim.

<u>Equitable Disallowance</u>

311.     Plaintiff FLH Holdings of Florida, LLC, by and through its managing member Steven Fieldman, actively procured the insolvency and ultimate bankruptcy of the Defendants.

312.     Plaintiff's conduct in orchestrating the bankruptcy and then bringing a non-dischargeability complaint is improper and shocks the conscience.

313.     The Plaintiff's claim should be barred and equitably disallowed, because it would be inequitable to allow the Plaintiff to obtain the relief it seeks, owing to the shocking improper conduct of the Plaintiff.  *See e.g. Pepper v. Litton*, 308 U.S. 239 (1939); *Adelphia Recovery Trust v. Bank of America*, 390 B.R. 64 (S.D. N.Y. 2008).

<u>Unclean Hands</u>

314.     Plaintiff FLH Holdings of Florida, LLC, by and through its managing member Steven Fieldman, actively conspired with Randy Scott, the previous holder of the claim, to force the Defendants into insolvency and bankruptcy through subterfuge. Scott participated wittingly in order to recover the maximum value on his claim given that Plaintiff was destroying the Defendants' financial existence.

315.      Both Plaintiff and Plaintiff's predecessor in interest have engaged in conduct that should shock the conscience of the Bankruptcy Court.

316.     Therefore, Plaintiff should be equitably barred from obtaining nondischargeability of a claim that was purchased in a conspiracy to put the Defendants into bankruptcy.

### In Pari Delicto – FLH

317.     Even if the Plaintiff's allegations against the Defendants are true, the Plaintiff should be denied the relief sought due to the Plaintiff's own improper conduct.

318.     The Plaintiff knowingly participated in a scheme to defraud future investors or creditors by whitewashing the financial statements of TutoringZone, by keeping the debt of TutoringZone off the books (and thereby understating the debt of TutoringZone).  I.e., the Plaintiff engaged in the same tortious conduct that Plaintiff alleges Defendants committed.

319.     This Plaintiff's claims for nondischargeability must fail due to Plaintiff's own improper conduct. *See e.g. Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001) (the doctrine of *in pari delicto* provides that where two parties engage in tortious conduct, the parties cannot recover from each other for damages suffered as a result of such conduct; only injured third parties can recover for damages); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003).

### AFFIRMATIVE DEFENSES AS TO COUNT VIII

### Good Faith

320.     At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

321.     As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

322. This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

323. Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiff's investments were made and relied

324. The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

325. The Plaintiffs' involvement in management and control of TutoringZone, including participation in every key decision leading to the insolvency of that entity, which was based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to post-acquisition events (transfer of assets of TutoringZone to Chris James, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

326. Therefore, *even if* as alleged, the transfer by Defendants to anyone of non-debtor assets was for less than reasonably equivalent value, and in the unlikely event that the transfer may have somehow affected the value of the Defendants' membership interest to the bankruptcy estate, or any of the other allegations in the Count were somehow true, the Defendants' obligations should not be found to be non-dischargeable because of the Defendants' good faith at every step of the alleged transaction(s).

<u>Bad Faith</u>

327.     The claim of Plaintiff, FLH Holdings of Florida, LLC, by and through its managing member, Steven Fieldman, should be barred because of its bad faith towards the Defendants. For example, the Plaintiff along with previous owner of the Note, Randy Scott, conspired to procure the insolvency of the Defendants and their most significant asset, their interest in TutoringZone.

328.     The claims of Plaintiffs, David Whitney and John Spence, should be barred because they acted in bad faith towards the Defendants. For example, without limitation, the Plaintiffs: misrepresented their ability and experience to successfully organize the acquisition of TutoringZone, misrepresented their ability and experience to successfully manage TutoringZone, conspired with Ethan Fieldman to procure the insolvency of the Defendants and TutoringZone, took actions that created a hostile board of directors, then willfully failed to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

329.     Plaintiffs David Whitney and John Spence served as advisors to the Defendants in negotiating a buy out of Ethan Fieldman. Plaintiffs failed to assess the business risk of buying out Ethan Fieldman's interest without receiving a covenant not to compete. Defendants relied on the advice of their advisors, and as a result of such advice, incurred significant damages. Plaintiffs' losses as a result of financing the buyout of TutoringZone is a direct result of Defendants acting and relying on the advice of David Whitney and John Spence as their business advisors prior to the buyout of Ethan Fieldman's interest of TutoringZone, as well as their mismanagement of TutoringZone following the buyout.

## AFFIRMATIVE DEFENSES AS TO COUNT IX

### Good Faith

330.    At all times material to the claims and allegations in the Plaintiffs' Complaint, the Defendants acted in good faith toward their creditors, including the Plaintiffs.

331.    As but one example, without limitation, the Defendants executed an agreement allowing the investor creditors, including some or all of the Plaintiffs, to directly manage and have full control of and access to the Defendants' most significant asset, TutoringZone.

332.    This agreement, attached hereto as **Exhibit B**, gave a committee of investor creditors, including the Plaintiffs, management control of TutoringZone (the "Advisory Committee Agreement").

333.    Due to the Defendants' good faith, Plaintiffs exercised a complete degree of control over the only significant asset at issue at that time (or now), and upon which the Plaintiff's investments were made and relied.

334.    The Defendants also in good faith surrendered a great deal of control over the negotiation over acquisition of TutoringZone to certain of the Plaintiffs, upon whom the Defendants, and the other Plaintiffs, relied entirely for their acumen and expertise.

335.    The Plaintiffs' involvement in management and control of TutoringZone, including participation in every key decision leading to the insolvency of that entity, which was based entirely on Defendants' good faith, make their new claims of improper conduct of Defendants related to post-acquisition events (transfer of assets of TutoringZone to Chris James, alleged tutor non-competition agreements, etc.) unenforceable on equitable grounds.

336.    Therefore, *even if* as alleged, the transfer by Defendants to anyone of non-debtor assets was for less than reasonably equivalent value, and in the unlikely event that the transfer may have somehow affected the value of the Defendants' membership interest to the

bankruptcy estate, or any of the other allegations in the Count were somehow true, the Defendants' obligations should not be found to be non-dischargeable <u>because of</u> the Defendants' good faith at every step of the alleged transaction(s).

<u>Bad Faith</u>

337.    The claim of Plaintiff, FLH Holdings of Florida, LLC, by and through its managing member, Steven Fieldman, should be barred because of its bad faith towards the Defendants. For example, the Plaintiff along with previous owner of the Note, Randy Scott, conspired to procure the insolvency of the Defendants and their most significant asset, their interest in TutoringZone.

338.    The claims of Plaintiffs David Whitney and John Spence should be barred because they acted in bad faith towards the Defendants. For example, without limitation, the Plaintiffs: misrepresented their ability and experience to successfully organize the acquisition of TutoringZone, misrepresented their ability and experience to successfully manage TutoringZone, conspired with Ethan Fieldman to procure the insolvency of the Defendants and TutoringZone, took actions that created a hostile board of directors, then willfully failed to defend TutoringZone against the criminal attacks of Ethan Fieldman, owner of Study Edge, TutoringZone's main competitor.

339.    Plaintiffs David Whitney and John Spence served as advisors to the Defendants in negotiating a buy out of Ethan Fieldman. Plaintiffs failed to assess the business risk of buying out Ethan Fieldman's interest without receiving a covenant not to compete. Defendants relied on the advice of their advisors, and as a result of such advice, incurred significant damages. Plaintiffs' losses as a result of financing the buyout of TutoringZone is a direct result of Defendants acting and relying on the advice of David Whitney and John Spence as their

business advisors prior to the buyout of Ethan Fieldman's interest of TutoringZone, as well as their mismanagement of TutoringZone following the buyout.

## COUNTERCLAIM

Defendants, Matthew Bruce Hintze and Larina K. Hintze ("Defendants" or "Counterclaim-Plaintiffs"), countersue FLH Holdings of Florida, LLC (together, "Counterclaim-Defendants"), and state in support as follows:

340.     On November 1, 2012 (the "Petition Date"), the Defendants filed a joint petition for relief under Chapter 7 of Title 11 of the United States Code.

341.     This adversary proceeding arises in and relates to the case of In re Matthew Bruce Hintze and Larina K. Hintze, Case No.: 12-10462-KKS, pending in the United States Bankruptcy Court for the Northern District of Florida (the "Bankruptcy Case").

342.     This Court has jurisdiction over this adversary proceeding pursuant to 28 USC §§ 157 and 1334.

343.     Venue of the adversary proceeding in this district is proper pursuant to 28 USC §§ 1408 and 1409.

344.     This is a core proceeding pursuant to 28 USC § 157(b)(2)(I) and (J).

345.     FLH Holdings of Florida, LLC is a limited liability company organized under the laws of the State of Florida, not for a lawful purpose, but for the sole purpose of acting as the alter-ego of Steven Fieldman and Ethan Fieldman, the former business partner of the Defendants, who received the full loan proceeds of John Spence, Sheila Spence, David Whitney, Intermed Biomedical Services, Inc., Randy Scott, and other investor creditors as a result of the Settlement Agreement. Ethan Fieldman's father and attorney, Steven Fieldman, formed the alter-ego company only for the purpose of interfering in this bankruptcy case and advancing the Fieldmans' other improper aims.

346.     In 2011, the Lawsuits were resolved generally through a bidding process whereby the Counterclaim-Plaintiffs and Ethan Fieldman were each to present bids to purchase the other's interest in TutoringZone.

347.     The Counterclaim-Plaintiffs borrowed approximately $835,000.00 in a successful bid to purchase Ethan Fieldman's fifty-percent interest in TutoringZone.

348.     Immediately following the execution of the Settlement Agreement with Ethan Fieldman on May 27, 2011, Ethan Fieldman and Steven Fieldman stole proprietary information from TutoringZone and used Ethan Fieldman's knowledge of TutoringZone's website and social media to damage TutoringZone and direct business to his new competing entity StudyEdge. Fieldman also began recruiting TutoringZone's key employees and, if an employee could not be recruited, attempting to coerce or incent the employee to discontinue working for TutoringZone. Furthermore, Ethan Fieldman used his knowledge of and relationship with TutoringZone's webmaster to access TutoringZone's webmail for the purpose of committing corporate espionage against TutoringZone and improperly diverting business to his new competing entity, StudyEdge. Ethan Fieldman even went so far as to offer the Plaintiff creditors incentives for their help to "fold TutoringZone into StudyEdge."

349.     After the Counter-Plaintiffs filed for bankruptcy relief, Ethan Fieldman and Steven Fieldman continued their tactics against Counter-Plaintiffs.

**Sanctions for Violation of the Automatic Stay – FLH Holdings (Fieldman)**

350.     Counterclaim-Plaintiffs reallege paragraphs 342 through 351.

351.     FLH Holdings of Florida, LLC, by and through its agents' actions, has violated the automatic stay of 11 U.S.C. § 362, and should be sanctioned in the full amount of damages, including emotional damages, plus an amount necessary to ensure that the misconduct does not reoccur, plus all attorneys' fees and costs.

352.     Plaintiff FLH Holdings, by and through Steven Fieldman and Ethan Fieldman (together, "Fieldman" or "Fieldmans"), conceived and executed a plan to violate the automatic stay long before the bankruptcy case was filed. On May 29, 2014, Fieldman purchased the claim of Randy Scott. A copy of the purchase and sale agreement is attached hereto as **Exhibit C** (the "Scott Agreement"). The Scott Agreement evidences Fieldmans' motive via the incentive; Randy Scott would receive an additional $10,000.00 if the Debtors and their business were forced to file bankruptcy by the end of that year. This agreement demonstrates the financial motivation of Fieldman: he wanted to prevent TutoringZone from operating at all.

353.     After the case was filed, Fieldman continued to engage in a surreptitious campaign to achieve the same result: put the Debtors out of business through economic pressure. Fieldman did this by offering financial incentives to any ally of TutoringZone so that they would collude in Fieldman's scheme and as well launched public smear campaigns against Hintze and TutoringZone. All these activities were while Fieldman effectively held the Randy Scott claim, which gave Fieldman (via FLH Holdings) a stake in the bankruptcy case. Of course, Fieldman consented to the Bankruptcy Court's jurisdiction by way of the claim. He currently shares an attorney with the Plaintiff creditors in this action, and offers them financial incentives to keep the pressure on so that Matthew Hintze will acquiesce to demands to deliver up TutoringZone and not compete with StudyEdge. A few examples of the improper post-petition conduct follow.

354.     In August of 2013, Fieldman "anonymously" bid on and purchased the Debtors' personal property through the bankruptcy case through his agent Adam Rourk, Esq. for no other reason than to harass, embarrass, burden and force Hintze to pay Fieldman's claim (by way of agreeing never to compete with Fieldman's business). To do this, Fieldman used agent, Adam Rourke, Esq. and pretended that he had nothing to do with the bid.  On October 23, 2013,

Fieldman was advised (through his attorney) that the auctioneer stated flatly that the cost of disassembling the Debtors' childrens' playset would greatly exceed any potential sale price. Instead of accepting $500 cash for the playset to remain in *statu quo*, Fieldman ordered the auctioneer to disassemble the wooden playset over three days and remove it. On November 15, 2013 Ethan Fieldman personally attended the auction of the Debtors' personal property, and before witnesses, bid against the Debtors' family whenever they made a bid to purchase property, thereby improperly driving up the auction prices. Again, this was solely to harass and embarrass the Debtors and force them to satisfy the Fieldmans' claim against them.

355.    Shortly after the bankruptcy case was filed, Fieldman contacted Tom Griffin, a potential business partner with the Debtors in a project to provide the University of Florida and P.K. Yonge school with electronic education software. Fieldman through financial incentives persuaded Griffin to use his position with the University of Florida to publish a "legal report" to the University of Florida attempting to convince the University not to do business with Hintze.  A copy of the "legal report" is attached hereto as **Exhibit D**.  The Fieldmans' sole purpose was to harass and embarrass the Debtors and force them to satisfy the Fieldmans' claim.

356.    The Fieldmans have improperly advertised or caused to be published information about the Debtors' bankruptcy case in an attempt to embarrass and harass them into satisfying the Fieldmans' claim. For example and without limitation, the Fieldmans instigated the publication of advertisements on Facebook stating "RIP TutoringZone." Also, in late 2012, the Fieldmans printed and hung posters on the campus of the University of Florida stating "TutoringZone is Bankrupt!" and providing information about the Debtor's bankruptcy.

357.    The Fieldmans have also attacked the Debtors through their employer, Christopher James and TutoringZone II.

358.    Numerous "anonymous" complaints were filed with the University of Florida against James in 2013 falsely alleging that Dr. James had violated any number of UF policies, causing embarrassment and burden for Dr. James. The investigations were all found to be without merit, and Dr. James was cleared of any wrongdoing. However, the message to Dr. James was clear: fire Debtor Matthew Hintze or the harassment would continue. Fieldman was the instigator and cause of each and every "anonymous" complaint.

359.    Similarly, "anonymous" or "random" complaints were filed by "students" with UF falsely alleging that TutoringZone II (the Debtor's employer) was helping students "cheat" by giving them test or homework answers in advance of other students. The complaints were ultimately dismissed, but they caused additional embarrassment and burden for Dr. James who was required by UF to answer for them and rebut the false allegations. The message to Dr. James was clear: fire Debtor Matthew Hintze or the harassment would continue. Fieldman was the instigator and cause of each and every "anonymous" complaint.

360.    The Fieldmans have improperly interfered with business relationships of TutoringZone II, particularly with TutoringZone II employees. Not only have the Fieldmans paid key employees of TutoringZone II to leave its employment, but the Fieldmans have paid those employees to then return and essentially "picket" TutoringZone II, by standing outside its place of business and discussing the "problems" with the company. The intent of these actions was not ordinary business competition but rather was intended to harass and embarrass the Debtors to force the Debtors to satisfy the Fieldmans' claim.

WHEREFORE, the Counterclaim-Plaintiffs request that this Honorable Court enter judgment against Counterclaim-Defendant FLH Holdings of Florida, LLC, and against its agents, Ethan Fieldman and Steven Fieldman, for Counterclaim-Plaintiffs' damages, equitable relief, attorney's fees and costs, and all other relief that this Court deems necessary.

Dated this 2nd day of July, 2014.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been furnished this day, to all parties who receive notice on this Court's CM\ECF electronic notice system, and by United States mail to the Defendants.



2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel 866.996.6104  fax 407.209.3870
net jchilders@smartbizlaw.com

 /s/ Seldon J. Childers, Esq.    .
Florida Bar No. 61112