# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

In re:

MATTHEW BRUCE HINTZE &
LARINA K. HINTZE,

Case No. 12-10462-KKS
Chapter: 7

      Debtors.

_____/

JOHN SPENCE, et al.

Adv. No. 13-01007-KKS

      Plaintiffs,

v.

MATTHEW BRUCE HINTZE &
LARINA K. HINTZE,

      Defendants.

_____/

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION IN SUPPORT OF FINAL JUDGMENT FOR PLAINTIFFS ON COUNT VIII OF COMPLAINT (DOC. 915)*

Plaintiffs are creditors of Defendants, who are the Debtors. Plaintiffs' unsecured claims are based on unpaid promissory notes representing loans made to enable Defendants to acquire all membership interests in an entity by the name of TutoringZone, LC ("TZ1"). After Defendants filed Chapter 7, Plaintiffs discovered that Defendants had caused TZ1 to transfer its remaining valuable assets to a new company formed and owned by a friend, business associate and mentor. Plaintiffs

---

\* The changes in this document, contained on pages 7, 8, 9 and 15, are corrections to the Findings of Fact, only, contained in the original *Findings of Fact, Conclusions of Law and Memorandum Opinion* at Doc. 915. The corrections have no effect on the *Final Judgment for Plaintiffs on Count III of Complaint,* at Doc. 916.

filed an eight count Complaint commencing this adversary proceeding seeking judgments against Defendants that their debts to Plaintiffs were non-dischargeable under various subsections of Section 523, and seeking denial of Defendants' discharges under Section 727(a)(2)(A).  Plaintiffs elected to proceed to trial on their objections to discharge, so Count VIII of this Adversary Proceeding was tried before the Court on May 19 and 20, 2016.  Having considered the evidence presented at trial, as well as facts determined in a partial summary judgment prior to trial, and post-trial briefing, on October 6, 2016 the Court announced its ruling that judgment would be entered in favor of Plaintiffs and against Defendants under 11 U.S.C. §727(a)(2)(A).  The Court issues these findings of fact and conclusions of law in support of its ruling, pursuant to Bankruptcy Rule 7052.

## BACKGROUND

When Defendants, Matthew and Larina Hintze, filed Chapter 7 on November 1, 2012 they owned 100% of the membership interests in TZ1, which was in the business of offering tutoring services to university students.[1]  Mr. Hintze worked as a tutor for and was an officer of TZ1 until it went out of business.

From 2006 through May of 2011 TZ1 was owned 50/50 by Matthew Hintze and Ethan Fieldman.   In 2010, Mr. Hintze and Mr. Fieldman had a falling-out.  Mr.

---

[1] TZ1, which began operating in late 2003 or early 2004, offered tutoring services primarily at the University of Florida, in Gainesville, and to a lesser degree two or more other universities in the southeast.

Hintze filed suit in state court to dissolve TZ1. The state court appointed a liquidating agent who scheduled an auction sale of the membership interests in TZ1. Messrs. Fieldman and Hintze submitted sealed bids to purchase each other's membership interests. Mr. Hintze's bid was any amount that Mr. Fieldman bid, plus $35,000, up to a stated maximum. Mr. Hintze's bid was declared the winner. The liquidating agent awarded Mr. Hintze the right to purchase Mr. Fieldman's 50% interest in TZ1 for the sum of $835,000.00, payable within approximately two weeks.

Defendants did not have $835,000. They had obtained commitments from several investors, but according to Mr. Hintze one investor that had pledged a portion of the money was "unable to perform."[2] Mr. Hintze immediately began contacting Plaintiff John Spence and other potential investors in order to raise the balance of the $835,000.[3]

Mr. Hintze ultimately convinced Plaintiffs to loan him and his wife the remainder of the $835,000 needed to purchase Mr. Fieldman's 50% interest in TZ1. In May of 2011, Defendants executed Promissory Notes in favor of Plaintiffs (and their predecessors) in the aggregate principal amount of $443,578.08.[4] In their

---

[2] Email from M. Hintze to John Spence dated May 24, 2011 (Doc. 676-11; Doc. 1-1, p. 2 of 111.)
[3] Id.
[4] Plaintiffs' unsecured claims totaled $443,578.08 as of November 1, 2012, based upon a series of one-year purchase-money loans made to Defendants in May, 2011.

answer to the Complaint, Defendants admitted owing each of the Plaintiffs the following amounts as of the Petition date:

- John and Sheila Spence: $90,634.44.
- InterMed Biomedical Services, Inc.: $168,049.32.
- David Whitney: $154,732.16.
- FLH Holdings of Florida, LLC: $30,162.16.[5]

The purchase and sale of Mr. Fieldman's 50% interest in TZ1 closed on or about June 17, 2011.[6] At all times prior to that date, TZ1 had been a very successful business, with gross revenues during 2010 and 2011, according to financial statements provided by Defendants, in excess of $1.6 million.

Defendants did not request or obtain a non-compete agreement from Ethan Fieldman as part of the purchase of Mr. Fieldman's 50% interest in TZ1.[7] A day or so after selling his 50% interest in TZ1, Mr. Fieldman caused his newly formed tutoring company, "Study Edge," to begin competing against TZ1 in the tutoring business in Gainesville, Florida. Study Edge hired over half of TZ1's full-time tutors. It located its business directly across from the main University of Florida campus, making its tutoring services more accessible to students than TZ1, which

---

[5] *See Complaint Objecting to Discharge and Determining Dischargeability of Debts* (Doc. 1, ¶¶ 6-9.) & *Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to Complaint Objecting to Discharge & Determining Dischargeability* (Doc. 99, ¶¶ 6-9.)

[6] The bid for Mr. Fieldman's 50% interest in TZ1 was awarded to only Mr. Hintze. Between May of 2011 and November of 2012, Mr. Hintze's ownership interest in TZ1 became owned by both Debtors. Case No. 12-10462, Doc. 1. No evidence or testimony of how or why that occurred was offered at trial.

[7] Mr. Hintze explained that he did not feel anyone could successfully compete with TZ1 in the Gainesville market.

was located about a mile away.  TZ1 was forced to find new people to tutor courses previously taught by Mr. Fieldman and others.  Mr. Hintze took over tutoring TZ1's corporate finance and other finance-related courses.[8]

Immediately after Study Edge began competing, TZI suffered a severe downturn in revenues and cash flow.  Defendants began meeting frequently with Plaintiffs to discuss TZ1's economic woes and ideas from primarily Mr. Hintze for turning TZ1's business around.  Defendants tried different ways to bring TZ1's business back.  At one point, they had Ms. Hintze take a more active role with TZ1 that included managing the tutors.  This apparently made the situation worse:  the tutors threatened to leave TZ1 unless Ms. Hintze was let go.  By May of 2012, Defendants reported to Plaintiffs that TZ1 would not have enough money to make payroll during the summer and into the fall.  They asked Plaintiffs to put more money into TZ1, but Plaintiffs declined.  Unable to obtain more money from Plaintiffs, Defendants turned to Christopher James ("James"), Mr. Hintze's friend and mentor, for money and help saving their tutoring business.[9]

---

[8] Mr. Hintze has an MBA from the University of Florida and took additional graduate level courses in, among other things, corporate finance.  Ms. Hintze testified that she has a bachelor's degree from University of Florida but could not remember what year she received her degree.

[9] James is a tenured professor of Finance at the University of Florida in Gainesville, and works with an economic and financial consulting firm in California named Cornerstone Research.  *Order on Plaintiffs' Motion for Summary Judgment as to Count VIII of the Complaint Objecting to Discharge and Determining Dischargeability of Debts,* Doc. 860, ¶ 12.

On May 14, 2012, Defendants met with some of the Plaintiffs one last time. James attended this meeting via telephone; John Spence was unable to attend. The parties' memories as to exactly what was said at the May 14 meeting are very different. Mr. Hintze claims that at the May 14 meeting he told Plaintiffs of his and his wife's intent to transfer the assets of TZ1 to a new company to be owned by James; Plaintiffs vehemently deny that is what they were told at the meeting. No one recorded or took minutes of the May 14 meeting. After the May 14 meeting, Plaintiffs continuously requested, and then demanded, that Defendants provide them with additional and accurate financial information about TZ1. These requests and demands went largely unanswered.

Just before or just after the May 14 meeting (the exact timing remains unclear), Defendants prevailed upon James to provide them more money to keep their tutoring business afloat. A series of transactions ensued, ultimately resulting in James and a newly formed entity acquiring TZ1's assets. Approximately 150 days before filing bankruptcy, Defendants caused TZ1 to lease, and then transfer, all of its valuable assets to an entity formed by James for that purpose: TutoringZone, II, LLC ("TZ2").[10] The assets transferred comprised TZ1's intellectual property ("IP") and other intangible assets, described as:

---

[10] James owns the majority (90%) of shares in TZ2; the remainder are owned by James's long-time personal assistant, Cynthia Frenchman.

[V]ideo and audio, workbooks, tests, instructional materials, graphics, logos, and other materials developed by [TZ1] for delivery of tutoring services, including the source codes and source documents, whether printed or electronic, and all intellectual property rights therein, as well as the other intellectual property rights described on Schedule A attached to the agreement.[11]

The transfer of assets from TZ1 to TZ2 (the "IP Transfer"), was accomplished through two sets of documents. First, TZ1 executed an Intellectual Property Lease that required James and Frenchman, the "Lessees" of the above-described assets, to pay TZ1 $75,000.[12] Shortly after the IP Lease came the IP Transfer document executed by TZ1 in favor of TZ2, which transferred ownership of the same assets.

The IP Transfer document stated the effective date of the IP Transfer as June 4, 2012. Beginning on the effective date of the IP Transfer, Defendants, purportedly via TZ2, continued operating the same tutoring business as had TZ1, even though TZ2 was not created until July of 2012.[13] From its inception, TZ2 used the same business name ("TutoringZone"), telephone numbers, web address, advertising materials, logo and tutoring materials that TZ1 had developed and used throughout its history. After the IP Transfer, Mr. Hintze and some tutors remained with TZ1 until August of 2012, making it appear to Plaintiffs and the general public that TZ1

---

[11] Plaintiffs' Ex. 8. (Doc. 452, pp. 216-221.) Defendants also caused TZ1 to transfer computers, desks and other tangible personal property to TZ2. Whatever was not transferred to TZ2, including 500-600 chairs, was sold for cash via Craigslist. The cash sales totaled a few thousand dollars.
[12] Plaintiffs' Ex. 12. (Doc. 452, pp. 234-239.) The $75,000 was due in a lump sum, but James paid it in three $25,000 installments (Trial Tr. Vol. 3, Doc. 839, pp. 131-132). In addition, James advanced $25,000 to Defendants with which TZ1 paid Mr. Hintze's salary during the summer of 2012 (Deposition of James, Plaintiffs' Ex. 23. (Doc. 676-9, p. 174.)).
[13] *Joint Statement of Undisputed Facts*, Doc. 808, ¶ 41.

was continuing to operate through the summer.[14]  In August of 2012, Mr. Hintze

became officially employed by and received his first pay check from TZ2, but the

charade that TZ1 remained in business continued until the Defendants filed their

bankruptcy petition.[15]

Before the IP Transfer, James was represented by an attorney whom he

introduced to Defendants.  From approximately May 1 through October 31, 2012 the

same attorney represented James, Defendants and TZ1.  This attorney drafted all of

the documents that effectuated the IP Transfer, prepared and filed the paperwork to

form TZ2 for James, and drafted employment agreements between Mr. Hintze, TZ2

and other tutors.  After filing Defendants' bankruptcy petition, the same attorney

apparently ceased representing TZ1 and James.[16]

TZ1 received no cash or other payment for the transfer of its assets to TZ2.

The only consideration for the IP Transfer went to Defendants, individually:  James

---

[14] Ultimately, all TZ1 tutors went to TZ2, including Mr. Hintze, other than a couple that were named in Mr. and Mr. Hintze's affidavits who may have gone elsewhere.  Specifically, two went to work for Mr. Fieldman's company, Study Edge.  *See Order on Plaintiffs' Motion for Summary Final Judgment as to Count VIII of the Complaint Objecting to Discharge and Determining Dischargeability of Debts* (Doc. 860, p. 3).  In an email sent on July 26, 2012, Mr. Hintze discussed a proposed timeline for presenting TZ2 employment agreements to tutors in August 2012 and the need for winding down of TZ1 thereafter.  Plaintiffs' Ex. 36, part 3, Doc. 821 at 40-42.

[15] Until August of 2012, TZ1 continued to pay Mr. Hintze a salary of $10,000 per month for his tutoring and management of its business affairs.  This money came from the "lease" payments advanced by James.

[16] At about the same time as the IP Transfer was being documented and put into place, Defendants authorized or instructed James to file a UCC-1 Financing Statement purporting to show that James held a perfected security interest in the assets transferred.  The same attorney prepared that UCC-1.

released them from liability for $200,000 of the $475,000.00 they owed him prior to the IP Transfer.[17]

At the time of the IP Transfer Defendants' membership interest in TZ1 was their only asset of value, other than their exempt homestead. The IP Transfer, together with the transfers of TZ1's other assets, rendered TZ1 insolvent and Defendants' membership interests in TZ1 worthless.[18] The evidence at trial showed that Defendants viewed their membership interests in TZ1 as valuable. At various times before the IP Transfer, Defendants sent correspondence and financial information about TZ1 to each other and James in which they valued TZ1 at anywhere between $350,000 to $3 million.[19] At trial, Mr. Hintze testified that TZ1 had no value as of the IP Transfer. He tried to explain away his own and his wife's valuations of $350,000 - $3 million by testifying that in "hindsight" those valuations were incorrect.[20] This testimony came after Defendants were fully aware that the

---

[17] James holds two promissory notes from Defendants: 1) A $375,000 promissory note signed in October or November of 2010, representing money James loaned to Defendants in connection with an unrelated business deal (the "First James Note"); and 2) a one-year $100,000 promissory note signed by Defendants in May or June of 2011 (the "Second James Note"). *See, Joint Statement of Undisputed Facts,* Doc. 808, ¶¶ 36-37. The Second James Note was executed in conjunction with Matthew Hintze's acquisition of Ethan Fieldman's ownership interest in TZ1. *Id.* at ¶ 40.

[18] Mr. Hintze testified at trial that TZ1 was insolvent before the IP Transfer. This testimony was not credible.

[19] Plaintiffs' Ex. 36, part 1. (Doc. 819 at 28, 41, 61, 102, and 174.) Just prior to the IP Transfer, Mr. Hintze prepared a balance sheet to present to Plaintiffs that showed TZ1 as insolvent, but that balance sheet contained no IP or other intangible assets. Defendants' Ex. 21.

[20] On direct examination Mr. Hintze's attorney asked Mr. Hintze: "Looking back on it now, do you believe that those [prior] valuations are correct?" Mr. Hintze's answer was: "No. Nobody was interested." Trial Tr. Vol. 3, Doc. 839, p. 149.

value of the assets transferred was relevant to whether or not their discharges would be denied.

Defendants caused the IP Transfer at a time that they owed Plaintiffs significant sums, and despite a provision in certain of Plaintiffs' notes that required them to pay Plaintiffs from the proceeds of any sale of TZ1's assets:

> Maker explicitly agrees that collateral for this loan includes both their personal assets as well as the assets of Tutoringzone, LC. Maker further agrees that any proceeds from the sale of any Tutoringzone, LC assets exceeding individually or collectively $10,000.00 must first be applied to the Holder's debt and accumulated interest thereon.[21]

Plaintiffs did not discover the IP Transfer until after Defendants filed bankruptcy. Email correspondence shows that the attorney representing James, TZ1 and Defendants counseled Defendants and James not to disclose the IP Transfer to Plaintiffs until after Defendants filed their Chapter 7 Petition. That attorney also advised Defendants and James not to disclose the creation of TZ2 until 90 days had run from the IP Transfer.[22]

After the IP Transfer, TZ1 was left a shell with no assets and no income. Through the trial, and presumably continuing through this ruling, TZ2 continues to

---

[21] *See, e.g.,* Claim 4-1, Part 2, P. 1 of 4. This provision was in all of Plaintiffs' notes except that held by David Whitney. The term "Maker" referred to Defendants.
[22] Plaintiffs' Ex. 36, part 1. (Doc. 819, p. 191); Plaintiffs' Ex. 36, part 2. (Doc. 820, p. 18); Plaintiffs' Ex. 36, part 3. (Doc. 821, p. 24).

operate the same tutoring business, called "TutoringZone," under the direction of Mr. Hintze.  TZ2 is still owned by James and Frenchman and remains profitable.

## PROCEDURAL HISTORY

Plaintiffs filed the Complaint commencing this adversary proceeding on May 31, 2013, seeking judgments that 1) their claims are non-dischargeable under Section 523 of the Bankruptcy Code, and 2) that the Defendants' discharges should be denied pursuant to Section 727(a)(2)(A) of the code.[23]  Before trial, the parties engaged in, and the Court held several hearings involving disputes over, rather torturous discovery that, for the most part, consisted of Plaintiffs seeking information and Defendants refusing to provide it.  Discovery problems and related issues significantly delayed the scheduling of a trial.  For example, an evidentiary hearing in October of 2015 resulted in a ruling that Defendants' communications with their counsel were not protected by the attorney-client privilege due to the crime-fraud exception.  That hearing produced an order requiring Defendants and their former attorney to produce all communications between them pertaining to the IP Transfer. By this hearing, Defendants' attorney had withdrawn, leaving Defendants unrepresented. Shortly after this hearing, Defendants hired replacement counsel and filed an emergency motion for reconsideration.  Upon granting that motion the Court

---

[23] The parties agreed to bifurcate this adversary proceeding for trial:  Plaintiffs' cause of action under Section 727(a)(2)(A), contained in Count VIII of the Complaint, was to be tried first.

scheduled a full day evidentiary hearing to give Defendants an opportunity to re-try the crime-fraud exception issue, with counsel.  The day of that hearing, Defendants and James waived attorney-client privilege as to communications with their collective former attorney, thus avoiding a full-blown evidentiary hearing on the merits.  Had the hearing gone forward as scheduled, the evidence would have focused on the IP Transfer and communications surrounding that transfer.  By waiving the attorney-client privilege the day of the hearing, Defendants successfully delayed, yet again, a final resolution of this Adversary Proceeding.

More discovery disputes and other battles ensued, necessitating significant attorney and judicial time and spawning several hearings.  Throughout these skirmishes, none of the fundamental facts have changed.  Rather, as more and more evidence came to light as a result of the tireless efforts of Plaintiffs and their counsel, the picture of how and why the IP Transfer occurred crystalized.

Before trial, the Court granted partial summary judgment to Plaintiffs.[24]  At the conclusion of the trial, the Court directed the parties to file written closing arguments and brief summaries of the evidence on two issues:

1) Whether TZ1 was Defendants' alter ego; and

2) Whether the assets of TZ1 had value at the time the transactions occurred.

---

[24] Doc. 860.

# DISCUSSION

At issue is whether Defendants' bankruptcy discharges should be denied pursuant to 11 U.S.C. § 727(a)(2)(A), which provides:

> The court shall grant the debtor a discharge, unless… (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition.

A bankruptcy discharge is for honest but unfortunate debtors who, despite their best efforts, are unable to meet the demands of their creditors.[25]  Provisions denying discharge are generally construed liberally in favor of debtors and strictly against creditors.[26]  At the same time, bankruptcy laws are intended to give debtors a "fresh start," not a "head start."[27]  Cases involving denial of discharge are fact-intensive.

In *In re Jennings*, the Eleventh Circuit held that "[a] party who objects to a discharge has the burden to prove the objection by a preponderance of the evidence."[28]  To prevail on an objection to a debtor's discharge under Section 727(a)(2)(A), a creditor must establish that the act complained of: 1) was done within one year prior to the date the petition was filed; 2) was done with actual intent to

---

[25] *In re Ryals,* 424 B.R. 539, 543 (Bankr. M.D. Fla. 2009) (citing *In re Fretz,* 244 F.3d 1323, 1326 (11th Cir. 2001)).

[26] *Friendly Finance Discount Corp. v. Jones (In re Jones)*, 490 F.2d 452 (5th Cir. 1974).

[27] *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991). *See also In re Taylor*, 3 F.3d 1512, 1516 (11th Cir. 1993).

[28] *Jennings v. Maxfield* (*In re Jennings*), 533 F.3d 1333, 1339 (11th Cir. 2008) (citing *Grogan v. Garner*, 498 U.S. 279, 289-91 (1991)).

hinder, delay, or defraud a creditor; 3) was that of the debtor; and 4) consisted of transferring, removing, destroying, or concealing any of the debtor's property.[29]  If the creditor meets the burden of proving these "*Jennings* factors," "the debtor then must bring forward enough credible evidence to dissuade the court from exercising its jurisdiction to deny the debtor discharge based on the evidence presented by the objecting party."[30]

It is undisputed that the acts complained of occurred within one year before Defendants filed their Chapter 7 petition and that the IP Transfer was orchestrated and effectuated by Defendants, so the first and third *Jennings* factors do not require analysis.   Analysis of the second and fourth *Jennings* factors is critical.

## SECOND "*JENNINGS*" FACTOR—ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD

Because it is rare to have direct proof of intent to hinder, delay or defraud, it is proper to infer intent from circumstantial evidence.  This evidence often emanates from conditions surrounding the transaction, commonly known as the badges of fraud.  The Eleventh Circuit in *Jennings* reiterated specific, but not exclusive, badges of fraud:  1) the lack or inadequacy of consideration for the property received; 2) the nature of the relationship between the transferor and  the transferee; 3) whether the

---

[29] *Id.*
[30] *Id.* (citing *In re Prevatt*, 261 B.R. 54, 58 (Bankr. M.D. Fla. 2000)).

transferor retains possession, control, benefits, or use of the property in question; 4) whether the transfer resulted in insolvency; 5) the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and 6) the general chronology and timing of the transfer in question.[31]  Plaintiffs have proven the existence of several badges of fraud:

The lack or inadequacy of consideration received.  TZ1 received nothing for the IP Transfer.  Instead, Defendants received personal debt forgiveness in the amount of $200,000.

The nature of the relationship between the transferor and transferee.  Because TZ1 was Defendants' alter ego, Defendants constitute the actual transferors, even though the assets transferred belonged to TZ1.[32]  The owners, TZ1 were Defendants; the majority owner of the transferee, TZ2, is James.[33]  James is a longtime friend of and mentor to Matthew Hintze, as well as a creditor to whom Defendants owed $475,000 on account of prior business transactions.

Whether the transferor retains possession, control, benefit, or use of the property in question.  Defendants, the putative transferors, retained complete use of

---

[31] *Id.* (citing *In re Marrama*, 445 F.3d 518, 522 (1st Cir. 2006)).
[32] *See infra.*
[33] Deposition of James, Plaintiffs' Ex. 23. (Doc. 676-9, p. 124.)

the assets transferred via the IP Transfer, the tutoring business, and a job and salary for Mr. Hintze.

Whether the transfer resulted in insolvency.  The IP Transfer rendered TZ1 insolvent; in turn, the insolvency of TZ1 rendered Defendants insolvent.

The cumulative effect of the transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors.  TZ1's financial difficulties began immediately upon Mr. Hintze taking ownership of and Defendants getting control over 100% of TZ1.  After TZ1's financial difficulties began Defendants started planning how to keep TZ1's tutoring business, goodwill, reputation and income while at the same time transferring its assets out of Plaintiffs' reach.    By ultimately transferring TZ1's assets to a friend, James, Defendants eviscerated their contractual obligations to pay some Plaintiffs everything they received upon the sale of TZ1's assets in excess of $10,000.00.  Through the combination of the IP Transfer and filing bankruptcy, Defendants left Plaintiffs with no assets from which to be repaid for their loans, and no effective remedy other than to file the instant suit.

The general chronology and timing of the transfer in question.  The IP Transfer occurred after Defendants realized they could not pay Plaintiffs, after one Plaintiff had sued Defendants, and after the others told Defendants they would not

put any more money into TZ1.[34]   Defendants' correspondence and actions surrounding the IP Transfer are particularly revealing.

Beginning in March of 2012, Defendants began communicating among themselves, and with James and their collective attorney, about options for saving their struggling tutoring business, including selling TZ1 back to Ethan Fieldman and raising more money; all options included Defendants filing bankruptcy.[35] Defendants did not share these communications with Plaintiffs.  In a May 8, 2012 email, James described what he categorized as a less expensive "avenue" suggested by his and Defendants' collective attorney: to have Defendants "file for bankruptcy and then arrange the sale of the TZ name to an LLC" to be set up by James.[36]  James would then have his LLC hire Mr. Hintze and the other TZ1 tutors and find a small space to rent.  With regard to this "avenue," James wrote:  "The other creditors will obviously not be happy."[37]

In a May 10, 2012 email regarding "Update on Meeting with Attorney," Mr. Hintze outlined what Defendants, James, and their collective attorney referred to as the "Pump and Dump" strategy:[38]

---

[34] Randy Scott initiated the lawsuit against Defendants pursuant to the same promissory note that was later purchased by Plaintiff FLH Holdings of Florida, LLC.
[35] Plaintiffs' Ex. 36, part 1. (Doc. 819.)
[36] *Id*. at 94. The way James phrased this "avenue" is not entirely logical.  Once they filed bankruptcy, Defendants could not have guaranteed that the TZ name would be sold to any particular entity controlled by James.  Rather, that decision would have been under the control of an independent Chapter 7 Trustee.
[37] *Id.*
[38] *Id*. at 102.

> [Our attorney] discussed the 'Pump and Dump' Strategy.  Based on the conversations, here are some questions and considerations:
>
> Pump and Dump Strategy
>
> **How it works:**
> TutoringZone IP is sold to an LLC Holding Company (Special Purpose Entity);
> Special Purpose Entity sells to NEWCO;
> Since leases and lines of credit were personally guaranteed, Matt and Larina [Hintze] would most likely have to declare personal bankruptcy;
> - IP is sold at Forced Liquidation Value.
> - Attorney stated "value" is known based on SE [Study Edge] $350,000 valuation although he did not see or analyze term sheet.
> - If so, then back at square 1.  Wouldn't have any problems if we had $350,000
> - NEWCO observes 90-day window **under radar** due to reach back from creditors.
> - Attorney stated we may 'operate' just can't set up new entity.
> - **Need clarification how we can operate now vs 90 day window.**[39]

In that same email, under the heading "Considerations," Mr. Hintze wrote:  "Pump and Dump must happen prior to ANYONE files [sic] lawsuits = must be very careful in communications;" under "Option A," Mr. Hintze suggested:  "Sell IP to new entity on 5/14 (back date contract if necessary)."[40] In a section of the same email entitled "Creditor Retorts," Mr. Hintze voiced concerns with the Pump and Dump strategy:

> 1. Merger Doctrine – More similarities between TZ and NEWCO (name, website, phone numbers, etc.), more likely creditors prevail they

---

[39] *Id.* (emphasis, spacing and fonts in original).
[40] This reference to "5/14" means May 14, 2012, the date Defendants last met with Plaintiffs before actually implementing the IP Transfer.  This email proves that as of May 10, 2012, 4 days before the meeting, Defendants and James were already contemplating back-dating the IP Transfer documents to hide the transfer from plaintiffs.

were duped.  Otherwise this looks like a merger and we are vulnerable;" and "2.  With respect to name 1,000 of recorded videos that have to be redone to remove TZ logo on bottom.  **Need clarification on ramifications of keeping TZ Logo streaming in videos or keeping TZ name.**[41]

On May 11, 2012, Defendants met with another bankruptcy attorney for a second opinion.[42]   In an email to James the next day, Ms. Hintze recited that attorney's trepidation about the "Pump and Dump" strategy:

> [The attorney] thought pump and dump would give creditors a pretty strong fraud and misrepresentation case against Matt and Larina [Hintze].  They don't have debtors prison – but 18 months for fraud they do have.  She thought it was a very risky strategy for us personally especially given the current state of some creditors.[43]

After meeting with that attorney, and before their final meeting with Plaintiffs, Defendants consulted with yet another bankruptcy attorney.   Then Mr. Hintze emailed James and Ms. Hintze a document entitled "TutoringZone Resolution" that he stated he intended to hand out at the meeting. That document set forth three options, with "Option 1" described as:

> Sell assets to New Company
>
> Mechanics
>
> BK Hintze; Wind Down TZ
> Equity to New Capital
>     -Consideration for existing Noteholders
>     -Clawback

---

[41] *Id*. at 102-103 (emphasis, spacing and fonts in original).
[42] *Id*. at 106.
[43] *Id.* at 110.

One Opinion:  Opens equity in NEWCO to fraud
Second Opinion:  Liabilities go with assets.[44]

Neither "Option 1" nor anything else in the "TutoringZone Resolution" mentioned that the plan was for TZ1's assets to go to TZ2, for TZ2 to be owned by James, or for there to be no consideration flowing to TZ1 or Plaintiffs as a result of the transfer.

The May 14, 2012 meeting was held in the evening.[45]   Before the meeting, Mr. Hintze reported to Ms. Hintze and James that one attorney's opinion of "Option 1" was that it "[o]pens equity in NEWCO to fraud."[46]   Notwithstanding that attorney's opinion, Defendants distributed the TutoringZone Resolution at the May 14 meeting.[47]   The evidence is not clear that anyone explained the details of the contemplated IP Transfer to Plaintiffs beyond what was set forth in "Option 1" on the TutoringZone Resolution, which is the only option remotely similar to what actually happened.  Mr. Hintze and John Spence testified at trial that James did not speak during the May 14 meeting.  James' testimony at trial was presented via deposition transcript.[48]   In his deposition, James initially testified that he spoke during the May 14 meeting and gave details of what he said:  in response to a question from Plaintiffs' counsel regarding his motivations in setting up TZ2, James

---

[44] The other two options were to reorganize TZ1 or to put TZ1 into Chapter 7 and "open new company." *Id.* at 124.

[45] No representative of FLH Holdings attended the May 14 meeting.  John Spence was unable to attend; the other Plaintiffs and Defendants attended in person; James attended by phone.

[46] *Id.*

[47] *Plaintiffs' Statement of Proposed Findings of Fact* (Doc. 852, ¶ 15.); Testimony of Mr. Hintze, Trial Tr. Vol. 3, Doc. 839, p. 113.

[48] The transcript of James' deposition was received in evidence. Plaintiffs' Ex. 23. (Doc. 676-9.)

answered that he "laid out those motivations to the investor creditors in a May 14th meeting in which I said we've tried to restructure this company."[49]   After that detailed description of what he said at the May 14 meeting, James contradicted himself, testifying that he did not disclose or say anything at the meeting other than agree to the "restructuring."[50]

Defendants claim that they explained to Plaintiffs at the May 14 meeting their plans with respect to the IP Transfer.  Emails they exchanged with each other, James and their collective attorney after the May 14 meeting show otherwise.  They also demonstrate that the goal was keep the IP Transfer "under the radar."[51]  The day after the May 14 meeting, Ms. Hintze emailed James and Mr. Hintze.  Referring to "Option 1" in the "TutoringZone Resolution," Ms. Hintze declared:   "This would keep TZ alive, protect the payroll advanced and discharge all other creditors.  This is a 'cleaner' pump and dump scenario where we keep the name and thus thousands of hours of recorded video as well as the chance to capture all those summer revenues."[52]

On May 27, 2012, John Spence emailed Defendants, James, and others complaining that he had received no correspondence from Defendants since the May

---

[49] *Id*. at 134.
[50] *Id*. at 243-44.
[51] Plaintiffs' Ex. 36, parts 1-3.  (Docs. 819, 820 and 821.)
[52] *Id*. at 119.  James testified that no one used the term "pump and dump" at the May 14 meeting.  This testimony is far from shocking, considering how Plaintiffs would likely have reacted to Defendants' use of such a term in describing what they planned to do with TZ1.

14 meeting.[53]  On May 28, 2012, Defendants and James discussed possible responses to John Spence's May 27 email.[54]  When Mr. Hintze finally replied to John Spence on May 29, 2012, rather than use any of the responses discussed, rather than disclosing the upcoming IP Transfer, he declared that Defendants were "allowing TZ to go out of business," and wrote:  "[w]e are working hard to move forward and revive the business in a different way with the goal to pay everyone back . . . ."[55] Defendants claim that the "plan" they actually put in place was communicated to Plaintiffs in this May 29, 2012 email.  That claim is patently false.  That email made no mention of an entity named TZ2, that TZ2 was to be owned by James, that Defendants intended to have TZ1 transfer its assets to TZ2 for no consideration to TZ1, or that TZ2 would continue TZ1's business with Mr. Hintze at the helm.

A May 30, 2012 email exchange between Ms. Hintze and the attorney representing Defendants, James and TZ1 provides more proof of Defendants' intent to hinder, delay, or defraud their creditors.  In that email, Ms. Hintze asked the attorney whether "time was of the essence."[56] In his reply that same day the attorney confirmed that time was indeed of the essence, explaining that the more time that passed between the execution and assignment of the IP Lease and when Plaintiffs

---

[53] Plaintiffs' Ex. 36, part 1.  (Doc. 819, pp. 163-64.)
[54] *Id*. at 163.
[55] *Id*. at 170.
[56] *Id*. at 190.  In the same email, Ms. Hintze pointed out that only the people on that email knew about the "lease," which had not been discussed outside that "group."  "That group" did not include any of the Plaintiffs.

learned of it, the better.[57]  In an email the following day, the same lawyer instructed

that James was anxious to get the IP Transfer agreement executed so that the "90-

day clock starts running as soon as possible."[58]  No one had yet disclosed the plan

or the IP Transfer to Plaintiffs.

On June 11, 2012, Plaintiff Sheila Spence emailed Ms. Hintze, again voicing

concern about the lack of communication from Defendants.[59]  Rather than reveal the

IP Transfer at that time or give Plaintiffs any other material information about what

was happening, Mr. Hintze simply retorted that he would give an update via phone

or in person.[60]

The cover-up continued.  In a June 30, 2012 email to James and Mr. Hintze,

Ms. Hintze wrote:  "Doesn't telling them about TZ2 alert Ethan [Fieldman] about

TZ2?  I thought that was the quandary we were in – trying to keep them from

knowing for 90 days."[61]

Clearly distressed with the continued lack of communication from

Defendants, on July 1, 2012 John Spence emailed Mr. Hintze again voicing his

displeasure with being kept in the dark.  He reiterated that Defendants had not

provided financial or corporate updates since early May 2012, and threatened to file

---

[57] In this email, the attorney described Plaintiffs as "opponents."  He copied James and Mr. Hintze with his response, in which he also discussed the risk of a possible involuntary bankruptcy.

[58] Plaintiffs' Ex. 36, part 2.  (Doc. 820, p. 18.)

[59] *Id.* at 80-81.

[60] *Id.* at 80.

[61] *Id.* at 115.

suit unless he received a "full, accurate and comprehensive report" about TZ1's situation by July 5, 2012.[62]   Mr. Hintze drafted, but never sent, a response to John Spence explaining that he and the other TZ1 tutors had taken jobs with TZ2.  Mr. Hintze transmitted this draft response only to Ms. Hintze, James, and their collective attorney;[63] he sent a sanitized response to John Spence that did not disclose the IP Transfer, the current status of TZ1, or the situation with TZ2.[64]

Meanwhile, Defendants' efforts to delay and hinder Plaintiffs continued.  On June 18, 2012, after the paperwork transferring TZ1's assets to TZ2 was complete, Ethan Fieldman enquired of Defendants' state court attorney whether Defendants might be willing to entertain an offer to re-purchase TZ1.[65]  By that time TZ1 was nothing but a shell.  Rather than have Defendants' state court attorney disclose to Fieldman that TZ1 was defunct, Ms. Hintze thanked that attorney for "keeping the ball moving around with **no goal other than to delay.**"[66]

Even James admitted that the purpose of his involvement with TZ1 and TZ2 was to "shelter" TZ1 from creditors and help Mr. Hintze.  In response to an email

---

[62] *Id*. at 117.

[63] *Id*. at 177.

[64] *Id*. at 187.  On July 13, 2012, the attorney for Defendants, James and TZ1 emailed those parties that TZ2 was "now a formally constituted corporate entity," and reiterated that TZ2 "desires that at least 90 days pass from the asset sale before a public announcement is made if at all possible." Doc. 821, p. 24.

[65] This inquiry was from Mr. Fieldman's competing company, Study Edge, and was addressed to the attorneys who represented Defendants when Mr. Hintze purchased Ethan Fieldman's 50% interest in TZ1 in 2011.

[66] Plaintiffs' Ex. 36, part 2.  (Doc. 820, p. 178.)  (Emphasis added.)

24

from the Dean of the UF Finance Department asking why UF had received a public

records request about James' financial disclosures, James replied, in part:

> My guess is that it has something to do with my involvement in
> Tutoring Zone . . . In order to shelter the business from some creditors,
> and to help Matt [Hintze] out, a partner and I set up an LLC in August
> and acquired some of the intellectual property in Tutoring zone.  Matt
> [Hintze] still runs his business but is now an employee of the LLC.[67]

FOURTH "*JENNINGS*" FACTOR:  TRANSFER OR DESTRUCTION OF
PROPERTY OF THE DEBTORS

The Transfer was of property of the Debtors because TZ1 was Defendants'
Alter Ego.

Because the assets transferred belonged to TZ1 and not the Defendants,

individually, a determination that Defendants transferred "property of the debtor"

turns on whether TZ1 was Defendants' alter ego.  A ruling that TZ1 was Defendants'

alter ego amounts, in essence, to piercing the corporate veil.

The Florida Supreme Court has held that the corporate veil will not be pierced

unless it is shown that the corporation was organized *or employed* to mislead

creditors or to work a fraud upon them.[68]  A showing of improper conduct is required

to pierce the corporate veil.[69]  "Florida's high regard for corporate ownership

requires a showing that the corporation was specifically organized *or used* to mislead

---

[67] James also wrote:  "All of this is above board and I retained counsel to ensure that I was not violating
any laws and was not involved in a voidable or fraudulent transfer under bankruptcy."  *Id*. at 79.
[68] *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120 (Fla. 1984) (emphasis added).
[69] *Id*. at 1121.

creditors or to perpetrate fraud before a party can pierce a corporation's veil."[70] Improper conduct exists where a corporation is used "as a mere subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust."[71]

In *Biscayne Realty & Ins. Co. v. Ostend Realty Co.*, the Florida Supreme Court held:

> If the stockholders of a corporation enter into a transaction in their individual and private interests, and utilize the name of the corporation merely as a convenience for the completion of the transaction, where the legal entity as such has no interest in the matter, but the name is used to mislead creditors or perpetrate a fraud upon them, the legal entity in the name of which the transaction was carried will be ignored and the parties held to individual liability.[72]

To pierce the corporate veil under Florida law, the claimant has the heavy burden to prove by a preponderance of the evidence that:  1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholder was in fact the alter ego of the corporation;  2) the corporate form must have been used fraudulently or for an improper purpose; and 3) the fraudulent or improper use of the corporate

---

[70] *In re Pearlman*, 462 B.R. 849, 856 (Bankr. M.D. Fla. 2012) (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d at 1120) (emphasis added).
[71] *Eckhardt v. U.S.*, 463 Fed. Appx. 852, 856 (11th Cir. 2012) (quoting *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000).
[72] 148 So. 560, 564 (Fla. 1933).

form caused injury to the claimant.[73]  Plaintiffs have proven the elements needed to pierce the corporate veil and hold that TZ1 was Defendants' alter ego.

1) <u>Whether Defendants dominated and controlled TZ1 to such an extent that its independent existence was in fact non-existent.</u>

Defendants urge that at all times TZ1 maintained a separate and independent existence.  The evidence shows otherwise.  The sole consideration for the transfer of TZ1's assets to TZ2 was personal debt forgiveness in favor of Defendants.[74]  Both Mr. Hintze and James admitted that it was their intent for Defendants to receive personal debt forgiveness, rather than have any money or consideration flow to TZ1.[75]  This diversion of consideration from TZ1 to Defendants illustrates Defendants' domination and control over TZ1 prior to and at the time of the IP Transfer.

Defendants' domination and control of TZ1 is also revealed in correspondence between Defendants and others.  In an email to James about a meeting with the attorney representing all of them, Ms. Hintze  wrote: "I was unclear and confused by the meeting **as TZ is us and we are TZ** – first he [the attorney]

---

[73] *Pearlman,* 462 B.R. at 855.

[74] The *Joint Statement of Undisputed Facts for Trial* states:  "The consideration provided for the sale of TutoringZone included, *among other items,* personal debt forgiveness of $200,000.00 from Mr. James for the Hintzes."  (Doc. 809, ¶5; emphasis added.)  Nowhere in the Record is there evidence or discussion of what is meant by "among other items."

[75] This intent is contrary to the terms of the IP Transfer Agreement.  That document defines "Seller" as TZ1 and "Buyer" as TZ2 and provides that the $200,000 in consideration was to "be offset and credited by any amounts owed by **Seller** to Christopher M. James."  TZ1, the Seller, did not owe any money to James, so there was no such thing as "amounts owed by Seller" that could have been offset against the purchase price.

said he only represents TZ – then he said we are so mingled he would waive conflict and represent us."[76]

As evidence that Defendants and TZ1 maintained a separate and independent existence, Defendants point to what Mr. Hintze described as an "advisory board."[77] According to Mr. Hintze, this "advisory board" functioned like a board of directors for TZ1 and had the ability to take operational and financial control of the company with a three-fourths vote.[78]  In reality, there was no advisory board.  There was a provision for an advisory *committee* entitled to provide "routine oversight" to TZ1's operations and to evaluate and monitor its budgets, operations and financial functions.[79]  The advisory committee, comprised of some Plaintiffs, became active and John Spence took over as temporary CEO of TZ1 for a short period of time to avert an emergency with the tutors; in large part by removing Ms. Hintze from her then role as supervisor of tutors and, by so doing, convincing the remaining tutors not to leave.[80]

---

[76] Plaintiffs' Ex. 36, part 1.  (Doc. 819, p. 109.)
[77] Testimony of Mr. Hintze. Trial Tr. Vol. 3, Doc. 839, pp. 81-82.
[78] *Id.*
[79] Letter agreement signed by Mr. Hintze, David Whitney, John Spence and Kevin Ogilby in June of 2011. (*Defendants' Answer, Affirmative Defenses and Cross-claim*, Doc. 15-2, p. 2 of 4; *Defendants' Amended Answer*, Doc. 99.)
[80] Mr. Luna: Did the advisory board take any action or make any recommendations?
Mr. Hintze: I think at that time [October of 2012], the tutors were all rightfully scared.  It wasn't clear that we were going to make payroll…So, at that point in time, the advisory board recommended that I step down at [sic] CEO, that Larina step down as COO and John Spence take over as [CEO].
(Trial Tr. Vol. 3, Doc. 839, pp. 90-91.)

Defendants introduced no evidence that they relinquished control of TZ1's finances, bank account or overall business affairs while the advisory committee was active. Before, during and after the advisory committee's efforts to help save TZ1's business Defendants were in absolute control and essentially treated TZ1 as an extension of themselves. Among other things, Defendants had TZ1 make an interest payment on their personal obligation to InterMed Biomedical Services, Inc. and pay other personal debts.[81]   Defendants were the only persons authorized to sign on TZ1's bank accounts. They pledged TZ1 assets for their personal loans from Plaintiffs, failed to observe corporate formalities, and comingled their own and TZ1's liabilities on various financial statements.

2)  <u>Whether Defendants used TZ1 fraudulently or for an improper purpose.</u>

Defendants used TZ1 to put their tutoring business into the hands of friend and mentor, James. By so doing, Defendants shielded themselves from having to pay Plaintiffs any proceeds from the transfer, and kept the benefits of TZ1 for themselves. Defendants caused TZ1 to do all this in secret. They retained the attorney that was representing James and TZ1 and stopped communicating with Plaintiffs after meeting with that attorney just prior to the May 14, 2012 meeting. After that meeting, and after they had caused TZ1 to lease and then transfer its assets

---

[81] Plaintiffs' Ex. 26.  (Doc. 676-12, p. 55.)

to James and TZ2, Defendants maintained a charade that TZ1 was conducting business as usual.  Defendants' and their cohorts' repeated references to the "90 day clock" leave no question that Defendants intended to hide the IP Transfer from Plaintiffs until after the 90 day preference period expired.  While TZ1 may have been operated for a legitimate purpose and as an independent entity while it was owned 50/50 by Mr. Hintze and Ethan Fieldman, once Defendants bought out Mr. Fieldman everything changed.  TZ1 became virtually indistinguishable from and an extension of Defendants, who employed it to mislead and hinder, delay and defraud their creditors.[82]

3) <u>Whether the fraudulent or improper use of TZ1 caused injury to Plaintiffs.</u>

The IP Transfer and transfers of TZ1's other assets left TZ1 with no value, income or ability to generate income.  The transfers rendered Plaintiffs' contractual right to receive the proceeds of any sale of the assets of TZ1 in excess of $10,000 a nullity.  Defendants' avowal that Plaintiffs were not injured by the transfer of TZ1's assets because they had no value is negated by the preponderance of the evidence.  All of TZ1's intellectual property, including its website, TutoringZone Service Mark and Registration Number with the US Patent and Trademark office was transferred

---

[82] In *Husky Intl. Electronics v. Ritz,* 136 S.Ct. 1581 (2016), the individual debtor, a director and at least 30% owner of a corporation, had "drained" the corporation of assets it could have used to pay a corporate creditor by funneling those assets to entities largely owned and controlled by him.  The Court wrote that the term "actual fraud" under §523(a)(2)(A) encompasses forms of fraud, "like fraudulent conveyance schemes." *Id*. at 1588-89.  Defendants' actions here, comprised of the IP Transfer and transfers of TZ1's other assets, are virtually identical to those of the debtor in *Husky.*

to TZ2.  TZ2 continued operating the same business under the same name, using the same logo and using many, if not all, of the same materials.[83]  TZ2 tutored the same classes and used the same phone number, URL, email address and business model as TZ1.  If these assets had zero value, it makes no sense that James and Defendants would want to continue doing business under the same TutoringZone name.[84]

### Plaintiffs properly brought the §727(a)(2)(A) action based on an alter ego claim.

Where a trustee, or such other party as may be authorized by the court to do so, is asserting an alter ego claim that is common to all creditors and allowed by state law, such a claim is proper, even in the case of individual, as opposed to corporate, debtors.[85]  Here, Plaintiffs have pursued the alter ego claim in order to deny Defendants' bankruptcy discharge, which will benefit all creditors, not just

---

[83] The testimony showed that even through the date of trial TZ2 was still using some tutoring videos that had been produced by TZ1.

[84] Defendants argue that the "real" value of TZ1 was not in the intellectual property and other assets transferred, but in the tutors themselves.  While the evidence showed that much of the going concern value of TZ1 was due to the tutors, it also showed that TZ1's assets had value aside from the tutors.  In bankruptcy, the value of intangibles can be critical.  *See, generally, "The Role of Intangibles in Bankruptcy," ABI Journal, Oct. 2006.*

[85] *In re Icarus Holding, LLC,* 391 F.3d 1315, 1321 (11th Cir. 2004)(*Icarus I*).  In Defendants' main case this Court stated, in *dicta*:  "[a] trustee cannot stand in the shoes of individual debtors to bring a claim of alter ego against a corporate entity," citing *In re Kodsi,* 2015 WL 222493 at *5 (Bankr. S.D. Fla. 2015).  (*In re Hintze*, Case No. 12-10462 (Doc. 650, p. 6)).  *Kodsi* is no longer good law.  *Angueira v. Trujillo (In re Ortega T.)*, Adv. No. 16-1277-LMI, 2016 WL 6901266 at *6 (Bankr. S.D. Fla. Nov. 29, 2016).  For that reason, to the extent that it is necessary to recede from dicta, I recede from the quoted statement and concur with my sister courts that a trustee or other party may have standing in an individual's bankruptcy case to pursue alter ego claims.  *See:  Brown v. Luboff (In re Sigma-Tech Sales, Inc.),* 2016 WL 4224090 (Bankr. S.D. Fla. August 1, 2016); *Official Committee of Unsecured Creditors v. 1st Choice Breeding, LLC, et. al. (In re Haisfield*), Case No. 3:13-ap-00065-PMG (Bankr. M.D. Fla. Oct. 12, 2016).

Plaintiffs. Plaintiffs' alter ego claim is allowed by state law.[86] Plaintiffs could, and did, properly bring a §727(a)(2)(A) action based on an alter ego claim.

### Defendants destroyed their property, comprised of their membership interests in TZ1.

A debtor's discharge may be denied if the evidence shows that the debtor, with intent to hinder, delay or defraud a creditor, has destroyed property of the debtor within one year before filing bankruptcy.[87] The Bankruptcy Code does not define, and there is little case law interpreting, the word "destroy" as used in Section 727(a)(2). When a word is not defined by statute, courts normally construe it in accord with its ordinary or natural meaning.[88] Merriam-Webster's Dictionary defines the word "destroy" as "to ruin the structure, organic existence, or condition of."[89] It also defines "destroy" as "to ruin as if by tearing to shreds."[90] An example of the latter definition of "destroy" in the Merriam Webster Online Dictionary is: "their reputation was destroyed."[91] If one can "destroy" a reputation, then it stands to reason that one can destroy the value of a membership interest in an LLC.[92]

---

[86] The focus of veil piercing is the injury to creditors, whether those creditors be of the corporate entity or of the individual shareholder or member – the focus is on the abuse of the corporate structure." *Angueira v. Trujillo (In re Ortega T.)*, *infra*, citing *Biscayne Realty & Ins. Co. v. Ostend Realty Co.*, 148 So. 560, 564 (Fla. 1933).

[87] 11 U.S.C. §727(a)(2)(A).

[88] *Smith v. U.S.*, 508 U.S. 223, 228 (1993).

[89] *Destroy*, Merriam-Webster, http://www.merriam-webster.com/dictionary/destroy (last visited October 31, 2016).

[90] *Id.*

[91] *Id.*

[92] In *PAH Co. v. Eliopoulos* (*In re Eliopoulos*), Ch. 7 Case No. 11-19665-EPK, Adv. No. 11-02657 (Bankr. S.D. Fla. June 26, 2015), the bankruptcy court's view was that the word "destroy" in the context of Section 727(a)(2) "connotes physical destruction, as of a tangible object." The facts in *PAH* are distinguishable,

Evidence that Defendants' membership interest in TZ1 had value begins with the fact that the purchase price for Ethan Fieldman's 50% interest in TZ1 was $835,000 a mere year before the IP Transfer.   TZ1's historical cash flow provides additional evidence.  On April 5, 2012, Mr. Hintze placed a $2 million valuation on TZ1 based on its 2012 income.[93] On the same date, Mr. Hintze valued TZ1 at $1.5 million based on its 2011 income.[94]  At least one Florida bankruptcy court has found that the most common measure of the value of a business is the cash flow approach, which is based on how much income the business will produce to provide a return on investment.[95]   That valuation method, applied to TZ1's cash flow, would prove that TZ1, and therefore Defendants' membership interest, clearly had value.

Defendants' own words provide additional evidence of value.  On May 2, 2012, Mr. Hintze, who has a degree and significant experience in finance and business, told James that he wanted "to position a $3 million valuation" for TZ1.[96] That same month, Ethan Fieldman offered to purchase TZ1 back from the Debtors

---

and the case was affirmed with no reference to the meaning of "destroy."  *PAH Co. v. Eliopoulos*, Case No.: 15-80960-CIV-MARRA (S.D. Fla. February 16, 2016).

[93] Using a projected EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) for 2012. Whether Mr. Hintze used the correct multiplier is irrelevant because the Plaintiffs only need to prove that TZ1 had value—the exact valuation is not material.  Plaintiffs' Ex. 36, part 1.  (Doc. 819, p. 28).

[94] *Id*.

[95] *In re Biddiscombe Intern.*, L.L.C., 392 B.R. 909, 918 (Bankr. M.D. Fla. 2008) (the value of a business is determined by multiplying the business's earnings before interest, taxes, depreciation and amortization, or "EBITDA," by a certain number that is determined based on the type of industry. A higher multiplier indicates a riskier and potentially more profitable industry.).

[96] *Id*. at 62.

for $350,000.00.[97]   Only six days before the IP Transfer became effective, in an email to James Ms. Hintze discussed a $2,520,000 valuation of TZ1.[98]

It is unnecessary to assign a specific value to an asset fraudulently transferred because there is no *de minimis* exception in Section 727(a)(2)(A).[99]   The same reasoning should be applied where a debtor, with intent to hinder, delay or defraud a creditor, has destroyed, or permitted to be destroyed, property.   Once Plaintiffs met their burden to prove that Defendants' membership interests in TZ1 had value, it did not matter what the specific value was or if the value was *de minimis*.

## CONCLUSION

Plaintiffs have met their burden to prove the elements of Section 727(a)(2)(A) by a preponderance of the evidence.   The unrefuted facts show that with intent to hinder, delay or defraud creditors, Plaintiffs in particular, Defendants caused their wholly owned entity, TZ1, to transfer its most valuable assets to a friendly creditor within a year prior to filing bankruptcy.   By doing so, Defendants destroyed the value of their membership interest in TZ1.   Defendants purposefully hid the transfer from Plaintiffs.   Defendants employed TZ1 to mislead and work a fraud upon Plaintiffs.

---

[97] On May 10, 2012, Mr. Hintze wrote: "Attorney stated "value" [of TZ1] is known based on Study Edge's $350,000 value…." *Id*. at 102.

[98] This value included a hypothetical non-compete agreement—presumably from Mr. Hintze. *Id*. at 174.

[99] *See Davis v. Davis (In re Davis)*, 911 F.2d 560, 561-62 (11th Cir. 1990); *Feynman v. Rosenthal (In re Feynman)*, 77 F.2d 320, 322 (2d Cir. 1935).

Defendants failed to bring forward enough credible evidence to dissuade the Court from denying their discharge.

Having considered the trial evidence, the credibility of the witnesses, the facts determined on summary judgment, the written closing arguments, proposed findings of fact and summaries of evidence, and having heard argument of counsel, as announced in open Court on October 6, 2016, judgment shall be entered for Plaintiffs. Defendants' discharges will be denied pursuant to 11 U.S.C. § 727(a)(2)(A).

Final Judgment shall be entered in favor of Plaintiffs and against Defendants on Count VIII. A separate order will be entered in Case No. 12-10462 denying Defendants' discharge pursuant to Section 727(a)(2)(A).

DONE AND ORDERED ON ___February 9, 2017_____.

KAREN K. SPECIE
United States Bankruptcy Judge

cc: all parties in interest